# EXHIBIT 3

# FAYETTE COUNTY CODE ENFORCEMENT AGENCY
## FAYETTE COUNTY, WEST VIRGINIA

**IN RE:**

**National Grid NE Holdings 2 LLC,** a Massachusetts Limited Liability Company, [successor in interest to the remedial liabilities of: **Eastern Gas and Fuel Associates (l.k.a. Eastern Associates) incurred as a result of its status, acts or omissions prior to January 1, 1966**], a Massachusetts Business Trust, arising out of its mining operations and mining waste disposal practices conducted within Fayette County, West Virginia;

- Respondent;

**Eastern Associated Coal, LLC,** a defunct West Virginia Limited Liability Company (**f.k.a. Eastern Associated Coal Corporation**), solely to the extent of its undistributed assets, non-exclusively including the available coverage and proceeds from its liability insurance policies, named herein as a Nominal Respondent Only, and not as a Real Party in Interest;

- Nominal Respondent;

**Pardee and Curtin Realty LLC,** a Delaware Limited Liability Company qualified to do business in West Virginia;

- Respondent;

**Quercus West Virginia, LLC,** a Delaware Limited Liability Company authorized to do business in West Virginia,

- Respondent;

**Continental Insurance Company,** a Pennsylvania corporation, solely to the extent of the remaining proceeds available pursuant to liability insurance policies issued by Continental

Fayette Co. Code Enforcement Agency
Matter No. 2019-002

**FINAL & BINDING
TIME-SENSITIVE
ABATEMENT ACTION ORDER
NO. 2021-002-9.5(b)-001**

---

IN RE: Johnson Fork-Loop Creek Pollution Abatement Project
FCCEA Matter No. 2019-002 (Fayette Co., WV Code Enforcement Agency)

**FINAL & BINDING TIME-SENSITIVE ABATEMENT ACTION ORDER NO. 2021-002-9.5(b)-001**

Page 1 of 90 pages

Insurance Company expressly providing coverage to **Eastern Gas and Fuel Associates or any of its subsidiaries, Eastern Consolidated Coal Corporation**, or **Coal Properties Corporation** (the latter two (2) entities now both defunct corporations), during any part of the period of 1963 through 1987, non-exclusively including Continental Insurance Company Policy Numbers RD9972829, RDU9433461, XC102700, EXC102701, EXC102779 and EXC103326;

<div align="right">

- **Respondent**;

</div>

**Lexington Insurance Company,** a Delaware corporation and an AIG company, solely to the extent of remaining proceeds available pursuant to liability insurance policies issued by Lexington Insurance Company expressly providing coverage to **Eastern Gas and Fuel Associates or any of its subsidiaries, Eastern Consolidated Coal Corporation**, or **Coal Properties Corporation** (the latter two (2) entities now both defunct corporations), during any part of the period of 1963 through 1987, non-exclusively including Lexington Insurance Company policy numbers GC403574, CE5503429, and 5570079;

<div align="right">

- **Respondent**;

</div>

**Certain Underwriters of Lloyd's London Subscribing to Liability Insurance Policies Expressly Providing Coverage to Eastern Gas and Fuel Associates or any of its subsidiaries, Eastern Consolidated Coal Corporation,** or **Coal Properties Corporation** (the latter two (2) entities now both defunct corporations), solely to the extent of remaining proceeds available pursuant to liability insurance policies issued by such Underwriters during any part of the period of 1963 ///

---

IN RE:  Johnson Fork-Loop Creek Pollution Abatement Project
FCCEA Matter No. 2019-002 (Fayette Co., WV Code Enforcement Agency)

**FINAL & BINDING TIME-SENSITIVE ABATEMENT ACTION ORDER NO. 2021-002-9.5(b)-001**

Page 2 of 90 pages

through 1987, non-exclusively including Lloyds
policy numbers K26309, 881UHL1124, UJL0726,
881/WK1731,    881/WK1771,    881/WL1271,
881/WL1281, 707FUL083448, 707FUL083447,
707FUL083450, 707FUL083449, 707FUL084426,
707FUL084425, 707FUL084428, 707FUL084427,
707FUL084430,             707FUL084429,
707FUL084556/7,    U51538A/B,    U51539A/B,
U51540A/B, 3KA42790, 3KA42800, 3KA42810,
HA359784,        HA359884,        HA359984,
5KA40460/70,5KA40500,
KA40452/30,6KA30600/1, and 6KA30610/1;

- Respondent;

**The Travelers Casualty and Surety Company,** a
Connecticut corporation (successor in interest to
**Aetna Casualty and Surety Co.**) and a member
company of The Travelers Companies, Inc., a
Minnesota corporation, solely to the extent of
remaining proceeds available pursuant to liability
insurance policies issued by Aetna Casualty and
Surety Company expressly providing coverage to
**Eastern Gas and Fuel Associates or any of its
subsidiaries, Eastern Consolidated Coal
Corporation**, or **Coal Properties Corporation**
(the latter two (2) entities now both defunct
corporations), during any part of the period of 1963
through 1987, non-exclusively including Aetna
Casualty and Surety policy numbers
06AL013817SC,            06AL122094SCY
06AL1220SCY,             06AL125194SCY,
06AL127247SRAY,          06AL128702SRAY,
06AL131419SRAY,          06AL133503SRAY,
06AL133534SRA(Y),        06AL133562SRA(Y),
06AL133588SRA,           06AL230021SRA,
06AL230063SCA,           01XN423WCA,
01XN558WCA,              01XN1047WCA,
01XN1017WCA,    01XN1395WCA,    and
01XN1396WCA;

- Respondent;

**The Insurance Company of the State of**

IN RE: Johnson Fork-Loop Creek Pollution Abatement Project
FCCEA Matter No. 2019-002 (Fayette Co., WV Code Enforcement Agency)

**FINAL & BINDING TIME-SENSITIVE ABATEMENT ACTION ORDER NO. 2021-002-9.5(b)-001**

Page 3 of 90 pages

**Pennsylvania,** an Illinois corporation and subsidiary of AIG Property Casualty U.S., Inc., solely to the extent of remaining proceeds available pursuant to liability insurance policies issued by The Insurance Company of the State of Pennsylvania expressly providing coverage to **Eastern Gas and Fuel Associates or any of its subsidiaries, Eastern Consolidated Coal Corporation,** or **Coal Properties Corporation** (the latter two (2) entities now both defunct corporations), during any part of the period of 1963 through 1987, non-exclusively including policy numbers 41767015 and 41777983;

- **Respondent;**

**Munich Reinsurance America, Inc.,** a New York corporation (successor in interest to American Reinsurance Company) qualified to do business in West Virginia, solely to the extent of remaining proceeds available pursuant to liability insurance policies issued by American Reinsurance Company expressly providing coverage to **Eastern Gas and Fuel Associates or any of its subsidiaries, Eastern Consolidated Coal Corporation,** or **Coal Properties Corporation** (the latter two (2) entities now both defunct corporations), during any part of the period of 1963 through 1987, non-exclusively including policy number M1050254;

- **Respondent;**

**National Union Fire Insurance Company of Pittsburgh, PA,** a Pennsylvania corporation, and an AIG company, solely to the extent of insurance coverage available pursuant to liability insurance policies issued by National Union Fire Insurance Company of Pittsburgh, PA expressly providing coverage to **Eastern Gas and Fuel Associates or any of its subsidiaries, Eastern Consolidated Coal Corporation,** or **Coal Properties Corporation** (the latter two (2) entities now both defunct corporations), during any part of the period of 1963 through 1987, non-exclusively including

IN RE: Johnson Fork-Loop Creek Pollution Abatement Project
FCCEA Matter No. 2019-002 (Fayette Co., WV Code Enforcement Agency)

**FINAL & BINDING TIME-SENSITIVE ABATEMENT ACTION ORDER NO. 2021-002-9.5(b)-001**

Page 4 of 90 pages

policy numbers 1186557, 1229247, 1224427, and 9600303;

<div align="center">- Respondent;</div>

**Columbia Casualty Company;** an Illinois corporation and a subsidiary of Continental Casualty Company and a CNA Financial Corporation company, solely to the extent of remaining proceeds available pursuant to liability insurance policies issued by American Reinsurance Company expressly providing coverage to **Eastern Gas and Fuel Associates or any of its subsidiaries, Eastern Consolidated Coal Corporation,** or **Coal Properties Corporation** (the latter two (2) entities now both defunct corporations), during any part of the period of 1963 through 1987, non-exclusively including policy number RDX3652438;

<div align="center">- Respondent;</div>

**Allianz Global Risks US Insurance Company;** an Illinois Corporation and a member of Allianz Global Corporate & Specialty North America Group, solely to the extent of remaining proceeds available pursuant to liability insurance policies issued by Allianz Insurance Company expressly providing coverage to **Eastern Gas and Fuel Associates or any of its subsidiaries, Eastern Consolidated Coal Corporation,** or **Coal Properties Corporation** (the latter two (2) entities now both defunct corporations), during any part of the period of 1963 through 1987, non-exclusively including policy numbers H0001324, AUX5200531 and AUX5200959;

<div align="center">- Respondent;</div>

**Zurich American Insurance Company;** a New York corporation and a member company of Zurich North America Group, solely to the extent of remaining proceeds available pursuant to liability insurance policies issued by Zurich Insurance Company expressly providing coverage to **Eastern**

IN RE: Johnson Fork-Loop Creek Pollution Abatement Project
FCCEA Matter No. 2019-002 (Fayette Co., WV Code Enforcement Agency)

FINAL & BINDING TIME-SENSITIVE ABATEMENT ACTION ORDER NO. 2021-002-9.5(b)-001

Page 5 of 90 pages

**Gas and Fuel Associates or any of its subsidiaries, Eastern Consolidated Coal Corporation,** or **Coal Properties Corporation** (the latter two (2) entities now both defunct corporations), during any part of the period of 1963 through 1987, non-exclusively including Zurich Insurance Company policy numbers CA8260827, 8811297 and IDRSR4099;

- **Respondent;**

**Interstate Fire & Casualty Company;** an Illinois Corporation and member company of Allianz Global Corporate & Specialty North America Group, solely to the extent of remaining proceeds available pursuant to liability insurance policies issued by Interstate Fire and Casualty Company expressly providing coverage to **Eastern Gas and Fuel Associates or any of its subsidiaries, Eastern Consolidated Coal Corporation,** or **Coal Properties Corporation** (the latter two (2) entities now both defunct corporations), during any part of the period of 1963 through 1987, non-exclusively including policy number 155U27979;

- **Respondent;**

**North Star Mutual Insurance Company;** a Minnesota corporation, solely to the extent of coverage available pursuant to liability insurance policies issued by North Star Mutual Insurance Company expressly providing coverage to **Eastern Gas and Fuel Associates or any of its subsidiaries, Eastern Consolidated Coal Corporation,** or **Coal Properties Corporation** (the latter two (2) entities now both defunct corporations), during any part of the period of 1963 through 1987, non-exclusively including policy number NSX15324;

- **Respondent;**

**Fireman's Fund Insurance Company;** a California corporation and member company of Zurich North America Group, solely to the extent

IN RE: Johnson Fork-Loop Creek Pollution Abatement Project
FCCEA Matter No. 2019-002 (Fayette Co., WV Code Enforcement Agency)

**FINAL & BINDING TIME-SENSITIVE ABATEMENT ACTION ORDER NO. 2021-002-9.5(b)-001**

Page 6 of 90 pages

of coverage available pursuant to liability insurance policies issued by North Star Mutual Insurance Company expressly providing coverage to **Eastern Gas and Fuel Associates or any of its subsidiaries, Eastern Consolidated Coal Corporation**, or **Coal Properties Corporation** (the latter two (2) entities now both defunct corporations), during any part of the period of 1963 through 1987, non-exclusively including policy numbers XLX1299533, D1275 and D1323;

- Respondent;

**Westport Insurance Corporation;** a Missouri corporation, successor in interest to **Puritan Insurance Company**, and a subsidiary of Swiss Reinsurance Company ("Swiss Re"), solely to the extent of coverage available pursuant to liability insurance policies issued by Puritan Insurance Company expressly providing coverage to **Eastern Gas and Fuel Associates or any of its subsidiaries, Eastern Consolidated Coal Corporation**, or **Coal Properties Corporation** (the latter two (2) entities now both defunct corporations), during any part of the period of 1963 through 1987, non-exclusively including policy number ML650418;

- Respondent;

**Insurance Company of North America;** a Pennsylvania corporation and subsidiary of the Chubb Group, solely to the extent of coverage available pursuant to liability insurance policies issued by Insurance Company of North America expressly providing coverage to **Eastern Gas and Fuel Associates or any of its subsidiaries, Eastern Consolidated Coal Corporation**, or **Coal Properties Corporation** (the latter two (2) entities now both defunct corporations), during any part of the period of 1963 through 1987, non-exclusively including policy numbers ISL1176, ISL1330, ISLGO002701, and SL209169;

- Respondent;

IN RE: Johnson Fork-Loop Creek Pollution Abatement Project
FCCEA Matter No. 2019-002 (Fayette Co., WV Code Enforcement Agency)

**FINAL & BINDING TIME-SENSITIVE ABATEMENT ACTION ORDER NO. 2021-002-9.5(b)-001**

Page 7 of 90 pages

**Markel Insurance Company;** an Illinois corporation and successor in interest to the **Insurance Company of Evanston**, solely to the extent of coverage available pursuant to liability insurance policies issued by the Insurance Company of Evanston expressly providing coverage to **Eastern Gas and Fuel Associates or any of its subsidiaries, Eastern Consolidated Coal Corporation,** or **Coal Properties Corporation** (the latter two (2) entities now both defunct corporations), during any part of the period of 1963 through 1987, non-exclusively including policy number UM100292;

- Respondent;

**Pacific Employers Insurance Company;** a Pennsylvania corporation and subsidiary of the Chubb Group, solely to the extent of coverage available pursuant to liability insurance policies issued by Pacific Employers Insurance Company expressly providing coverage to **Eastern Gas and Fuel Associates or any of its subsidiaries, Eastern Consolidated Coal Corporation,** or **Coal Properties Corporation** (the latter two (2) entities now both defunct corporations), during any part of the period of 1963 through 1987, non-exclusively including policy number XCC012815;

- Respondent;

**Falcon Insurance Group, LLC** a Delaware corporation and subsidiary of Fairfax Financial Holdings Limited, solely to the extent of coverage available pursuant to liability insurance policies issued by Falcon Insurance Company expressly providing coverage to **Eastern Gas and Fuel Associates or any of its subsidiaries, Eastern Consolidated Coal Corporation,** or **Coal Properties Corporation** (the latter two (2) entities now both defunct corporations), during any part of the period of 1963 through 1987, non-exclusively including policy number S1600401;

- Respondent;

---

IN RE: Johnson Fork-Loop Creek Pollution Abatement Project
FCCEA Matter No. 2019-002 (Fayette Co., WV Code Enforcement Agency)

FINAL & BINDING TIME-SENSITIVE ABATEMENT ACTION ORDER NO. 2021-002-9.5(b)-001

Page 8 of 90 pages

**Hartford Fire Insurance Company;** a Connecticut corporation and subsidiary of The Hartford Financial Services Group, Inc., solely to the extent of coverage available pursuant to liability insurance policies issued by Hartford Insurance Company expressly providing coverage to **Eastern Gas and Fuel Associates or any of its subsidiaries, Eastern Consolidated Coal Corporation,** or **Coal Properties Corporation** (the latter two (2) entities now both defunct corporations), during any part of the period of 1963 through 1987, non-exclusively including policy numbers 08XS102705 and 08CJ31028;

- **Respondent;**

**Associated Electric & Gas Insurance Services Limited ("AEGIS");** a Bermuda corporation, solely to the extent of coverage available pursuant to liability insurance policies issued by AEGIS expressly providing coverage to **Eastern Gas and Fuel Associates or any of its subsidiaries, Eastern Consolidated Coal Corporation,** or **Coal Properties Corporation** (the latter two (2) entities now both defunct corporations), during any part of the period of 1963 through 1987, non-exclusively including policy numbers 010A; 010NJ, 010CNJ, and XL010A86;

- **Respondent;**

**Illinois Union Insurance Company;** an Illinois corporation and a subsidiary of Pacific Employers Insurance Company, solely to the extent of coverage available pursuant to liability insurance policies issued by Illinois Union Insurance Company expressly providing coverage to **Eastern Gas and Fuel Associates or any of its subsidiaries, Eastern Consolidated Coal Corporation,** or **Coal Properties Corporation** (the latter two (2) entities now both defunct corporations), during any part of the period of 1963 through 1987, non-exclusively including policy

IN RE:  Johnson Fork-Loop Creek Pollution Abatement Project
FCCEA Matter No. 2019-002 (Fayette Co., WV Code Enforcement Agency)

**FINAL & BINDING TIME-SENSITIVE ABATEMENT ACTION ORDER NO. 2021-002-9.5(b)-001**

Page 9 of 90 pages

number ICX020268;

- **Respondent;**

**Chicago Insurance Company;** an Illinois corporation and subsidiary of Allianz Societas Europea, solely to the extent of coverage available pursuant to liability insurance policies issued by Chicago Insurance Company expressly providing coverage to **Eastern Gas and Fuel Associates or any of its subsidiaries, Eastern Consolidated Coal Corporation,** or **Coal Properties Corporation** (the latter two (2) entities now both defunct corporations), during any part of the period of 1963 through 1987, non-exclusively including policy number 255U034933;

- **Respondent;**

**Essentia Insurance Company;** a Missouri corporation and successor in interest to **American Central Insurance Company,** solely to the extent of coverage available pursuant to liability insurance policies issued by American Central Insurance Company expressly providing coverage to **Eastern Gas and Fuel Associates or any of its subsidiaries, Eastern Consolidated Coal Corporation,** or **Coal Properties Corporation** (the latter two (2) entities now both defunct corporations), during one or more years within the period of 1963 through 1987, non-exclusively including policy number CC002540;

- **Respondent;**

**First State Insurance Company; a** Connecticut corporation and a member company of the Hartford Financial Services Group, solely to the extent of coverage available pursuant to liability insurance policies issued by First State Insurance Company expressly providing coverage to **Eastern Gas and Fuel Associates or any of its subsidiaries, Eastern Consolidated Coal Corporation,** or **Coal Properties Corporation** (the latter two (2) entities now both defunct corporations), during any part of

---

**IN RE:  Johnson Fork-Loop Creek Pollution Abatement Project**
**FCCEA Matter No. 2019-002 (Fayette Co., WV Code Enforcement Agency)**

**FINAL & BINDING TIME-SENSITIVE ABATEMENT ACTION ORDER NO. 2021-002-9.5(b)-001**

Page 10 of 90 pages

the period of 1963 through1987, non-exclusively including policy numbers 980061 and 980591;

- Respondent;

**Arrowood Indemnity Company**; a Delaware corporation, a subsidiary of Arrowpoint Capital, and the successor in interest to **Royal Indemnity Company** and **Globe Indemnity Company**, solely to the extent of coverage available pursuant to liability insurance policies issued by either Royal Indemnity Company or Globe Insurance Company expressly providing coverage to **Eastern Gas and Fuel Associates or any of its subsidiaries**, **Eastern Consolidated Coal Corporation**, or **Coal Properties Corporation** (the latter two (2) entities now both defunct corporations), during any part of the period of 1963 through 1987, non-exclusively including Royal Indemnity Company policy numbers EC102072 and EC102073 and Globe Indemnity Company policy number GLCO38232;

- Respondent;

**ACE American Insurance Company**; a Pennsylvania corporation and subsidiary of Chubb Limited, and the successor in interest to the **California Union Insurance Company**, solely to the extent of coverage available pursuant to liability insurance policies issued by California Union Insurance Company expressly providing coverage to **Eastern Gas and Fuel Associates or any of its subsidiaries**, **Eastern Consolidated Coal Corporation**, or **Coal Properties Corporation** (the latter two (2) entities now both defunct corporations), during any part of the period of 1963 through 1987, non-exclusively including policy number ZCX006606;

- Respondent;

**Prosight Specialty Insurance Group, Inc.**; a New York corporation and successor in interest to **Mutual Marine Insurance Company**, solely to

IN RE:  Johnson Fork-Loop Creek Pollution Abatement Project
FCCEA Matter No. 2019-002 (Fayette Co., WV Code Enforcement Agency)

**FINAL & BINDING TIME-SENSITIVE ABATEMENT ACTION ORDER NO. 2021-002-9.5(b)-001**

Page 11 of 90 pages

the extent of coverage available pursuant to liability insurance policies issued by Mutual Marine Insurance Company expressly providing coverage to **Eastern Gas and Fuel Associates or any of its subsidiaries, Eastern Consolidated Coal Corporation,** or **Coal Properties Corporation** (the latter two (2) entities now both defunct corporations), during any part of the period of 1963 through 1987, non-exclusively including policy numbers MMO05211 and MMO06865;

<div align="center">- <strong>Respondent;</strong></div>

**New York Marine and General Insurance Company**; a New York corporation and a subsidiary of Prosight Specialty Insurance Holdings, Inc., solely to the extent of coverage available pursuant to liability insurance policies issued by New York Marine and General Insurance Company expressly providing coverage to **Eastern Gas and Fuel Associates or any of its subsidiaries, Eastern Consolidated Coal Corporation,** or **Coal Properties Corporation** (the latter two (2) entities now both defunct corporations), or **Coal Properties Corporation**, during any part of the period of 1963 through 1987, non-exclusively including policy numbers 84L2373/02 and 84L2373/03;

<div align="center">- <strong>Respondent;</strong></div>

**St. Paul Surplus Lines Insurance Company**; a Delaware corporation and subsidiary of The Travelers Companies, Inc., solely to the extent of coverage available pursuant to liability insurance policies issued by a St. Paul Insurance Company expressly providing coverage to **Eastern Gas and Fuel Associates or any of its subsidiaries, Eastern Consolidated Coal Corporation,** or **Coal Properties Corporation** (the latter two (2) entities now both defunct corporations), or **Coal Properties Corporation**, during any part of the period of 1963 through 1987, non-exclusively including policy numbers 390FA9105 390FA1823,

LC05516718, LC05516719, 390FA1821, 390FA1822, 390FA1844 and 390FA1823;

- **Respondent;**

**Granite State Insurance Company**; an Illinois corporation and an AIG company, solely to the extent of coverage available pursuant to liability insurance policies issued by Granite State Insurance Company expressly providing coverage to **Eastern Gas and Fuel Associates or any of its subsidiaries, Eastern Consolidated Coal Corporation**, or **Coal Properties Corporation** (the latter two (2) entities now both defunct corporations), during any part of the period of 1963 through 1987, non-exclusively including policy numbers 64856384 and 64856472;

- **Respondent;**

**Medmarc Casualty Insurance Company**; a Vermont corporation and successor in interest to **Dependable Insurance Company**, solely to the extent of coverage available pursuant to liability insurance policies issued by Dependable Insurance Company expressly providing coverage to **Eastern Gas and Fuel Associates or any of its subsidiaries, Eastern Consolidated Coal Corporation**, or **Coal Properties Corporation** (the latter two (2) entities now both defunct corporations), during one or more years within the period of 1963 through 1987,non-exclusively including policy number D00179;

- **Respondent;**

**Navigators Insurance Company**; a New York corporation and member of The Hartford Fire and Casualty Group, solely to the extent of coverage available pursuant to liability insurance policies issued by Navigators Insurance Company expressly providing coverage to **Eastern Gas and Fuel Associates or any of its subsidiaries, Eastern Consolidated Coal Corporation**, or **Coal Properties Corporation** (the latter two (2) entities

now both defunct corporations), during one or more years within the period of 1963 through 1987, non-exclusively including policy number 85L1159/01;

Corporation, or **Coal**

- **Respondent**;

**TIG Insurance Company**; a California corporation, subsidiary of Fairfax Financial Holdings Limited, and successor in interest to **Ranger Insurance Company**, solely to the extent of coverage available pursuant to liability insurance policies issued by Ranger Insurance Company expressly providing coverage to **Eastern Gas and Fuel Associates or any of its subsidiaries, Eastern Consolidated Coal Corporation**, or **Coal Properties Corporation** (the latter two (2) entities now both defunct corporations), during one or more years within the period of 1963 through 1987, non-exclusively including policy numbers D1274, D1318, D1320, and 1321;

- **Respondent**;

**Federal Insurance Company**; an Indiana corporation and subsidiary of Chubb Limited, solely to the extent of coverage available pursuant to liability insurance policies issued by Ranger Insurance Company expressly providing coverage to **Eastern Gas and Fuel Associates or any of its subsidiaries, Eastern Consolidated Coal Corporation**, or **Coal Properties Corporation** (the latter two (2) entities now both defunct corporations), during one or more years within the period of 1963 through 1987, non-exclusively including policy number 79290292;

- **Respondent**;

**Hanover Insurance Company;** a New Hampshire corporation, solely to the extent of coverage available pursuant to liability insurance policies issued by it expressly providing coverage to **Eastern Gas and Fuel Associates or any of its subsidiaries, Eastern Consolidated Coal**

IN RE: Johnson Fork-Loop Creek Pollution Abatement Project
FCCEA Matter No. 2019-002 (Fayette Co., WV Code Enforcement Agency)

FINAL & BINDING TIME-SENSITIVE ABATEMENT ACTION ORDER NO. 2021-002-9.5(b)-001

Page 14 of 90 pages

**Properties Corporation** (the latter two (2) entities now both defunct corporations), during one or more years within the period of 1963 through 1987, non-exclusively including policy number CGL 60203;

<div align="center">- Respondent;</div>

---

# FINDINGS OF FACT, CONCLUSIONS OF LAW
# AND
# FINAL & BINDING
# TIME-SENSITIVE ABATEMENT ACTION ORDER
# NUMBER 2021-002-9.5(b)-001

## <u>NOTICES TO RESPONDENTS:</u>

1. This Order is issued pursuant to the legal authority vested in the Fayette County Code Enforcement Agency (hereinafter sometimes referred to as the "FCCEA") by **Fayette County, West Virginia Ordinance # 2018-001** that became effective on August 17, 2018 and is entitled: "Fayette County Comprehensive Public Nuisance Abatement Ordinance" (hereinafter sometimes referred to as "**FCoWV Ordinance 2018-001**"). You may review and download a complete and verified version of **FCoWV Ordinance 2018-001** as enacted by the County Commission of Fayette County, West Virginia from the official website of Fayette County, West Virginia that may be found at the following web address: https://fayettecounty.wv.gov/commission/Pages/Enacted-Ordinances.aspx and you may also obtain a copy of the current version of **FCoWV Ordinance 2018-001** from the Office of the Fayette County Clerk.

2. The failure or refusal **without good cause** of any Respondent named in this **Order** that has been served with a copy of this **Order** in compliance with Section **IX.V(c)** of **FCoWV Ordinance 2018-001** timely to comply with any requirement of this Order may subject such Respondent to: **(i)** a compulsory judicial order issued in a civil enforcement action brought by the Fayette County Prosecuting Attorney in a court of competent jurisdiction pursuant to Sections **IX.V(d), XX(f),** and **XXII(a)(2)**, or any combination of those sections, of **FCoWV Ordinance 2018-002; (ii)** to the **award to the Fayette County Commission of its litigation costs**, including attorneys' fees and expenses, expert witness fees and expenses, and the fees and expenses of no more than one (1) non-testifying technical or scientific expert to assist the Fayette County Prosecuting Attorney in the preparation and prosecution of the action to secure compliance with the requirements of this **Order**; and **(iii)** judicial imposition of civil penalties of not less than Five thousand dollars ($5,000), but not to exceed Ten thousand dollars ($10,000), for **each day of willful violation of any requirement of this Order.**

IN RE: Johnson Fork-Loop Creek Pollution Abatement Project
FCCEA Matter No. 2019-002 (Fayette Co., WV Code Enforcement Agency)

FINAL & BINDING TIME-SENSITIVE ABATEMENT ACTION ORDER NO. 2021-002-9.5(b)-001

Page 15 of 90 pages

3. If, upon being properly served with this Final and Binding Time-Sensitive Abatement Action Order, a Respondent named in this Order that is liable pursuant to Section VI of Fayette County Ordinance 2018-001 fails or refuses <u>without just and sufficient cause</u> properly and timely to provide for or perform any Abatement Action herein ordered shall be liable to Fayette County for punitive damages in an amount equal to, and not more than, three (3) times the amount of any Abatement Action Costs incurred or to be incurred by or on behalf of Fayette County, non-exclusively including any Abatement Action Costs incurred or paid by, in whole or in part, by the Fayette County Environmental and Public Health Protection Special Settlement Fund created by Formal Order# 2018-001 of the Fayette County Commission issued on January 5, 2018, as a result of such failure timely and properly to comply with any requirement of this Order.

4. Pursuant to Section IX.V(g) of FCoWV Ordinance 2018-001, any Respondent to this Order may <u>only</u> seek any legal or equitable relief that would as a practical matter have the effect of invalidating, dismissing, staying, quashing (in whole or in part), or modifying all or any part of this Order in the course of one of the judicial proceedings described in Sections IX.V(g)(1) – (4), inclusive, of FCoWV Ordinance 2018-001.

5. <u>The FCCEA Demands for the Production of *Records* and Information Set Forth Herein Are Exempt from the Requirements of the West Virginia Insurance Consumer Financial Information Privacy Regulations</u>:    The **Demands** for production of *Records* and **Information** set forth in this **Order** are issued by the **FCCEA** pursuant to the authority vested in it by Sections **VII** and **VIII** of **FCoWV Ordinance 2018-001**, which was duly enacted by the County Commission of Fayette County, West Virginia in exercise of the express statutory authority vested in that County Commission by West Virginia Code §§ 7-1-3, 7-1-3ff and 7-1-3kk.  Thus, W. Va. C.S.R. §§ 114-57-14.1(l), (m) and (n) and 114-57-15.2 exempt these **Demands** from the limitations and requirements of the West Virginia Insurance Consumer Financial Information Privacy regulations, W. Va. C.S.R., Title 114, Series 57, as the **Respondents** are required by local law to provide the *Records* and **Information** demanded herein.

6. Pursuant to Section IX.V(c) of FCoWV Ordinance 2018-001 and Section IX of this Order, any Respondent to this Order is entitled to and may in compliance with the requirements of Section IX of this Order request an informal opportunity to confer with authorized FCCEA legal and environmental technical representatives respecting the terms, conditions, and requirements of this Order.

## I.    JURISDICTION AND GENERAL PROVISIONS:

a. This Time-Sensitive Abatement Action Order ("**Order**") is issued under the authority vested in the Fayette County Code Enforcement Agency by **FCoWV Ordinance 2018-001** Sections **VIII(a)(2), VIII(b),** and **IX.V(b).**  The principal provisions of this **Order** require:
  1. each **Respondent** timely to provide to the **FCCEA** and file with the Office of the

IN RE:  Johnson Fork-Loop Creek Pollution Abatement Project
FCCEA Matter No. 2019-002 (Fayette Co., WV Code Enforcement Agency)

FINAL & BINDING TIME-SENSITIVE ABATEMENT ACTION ORDER NO. 2021-002-9.5(b)-001

Page 16 of 90 pages

Fayette County Clerk written notice of its irrevocable intent to comply with the requirements of this **Order** in compliance with **Section VIII** of this **Order**.

2. the **Remedial Respondents**, jointly and severally, timely and competently to prepare and perform in full compliance with the terms and conditions of this **Order** a **Remedial Investigation** and **Feasibility Study** ("RI/FS") of the **Open Dumps** of mining **Wastes** located with the Johnson Fork-Loop Creek watershed in Fayette County, WV;

3. the **Remedial Respondents**, jointly and severally, timely to reimburse Fayette County, WV for: **(A)** the *Abatement Action Costs* incurred in connection with the FCCEA investigation of and response to conditions of *Public Nuisance* in the Johnson Fork-Loop Creek watershed in Fayette County, West Virginia in the amount of the invoice required by **Section XXVI** of this **Order**; and **(B)** all **Future Abatement Action Costs** incurred in connection with the **FCCEA** investigation of and response to conditions of *Public Nuisance* in the Johnson Fork-Loop Creek watershed in Fayette County, WV within the timeframes and in the amounts set forth in or pursuant to **Section XXVI** of this **Order**;

4. the **Remedial Respondents**, jointly and severally, to create and maintain: **(A)** such community involvement and participation information resources and document depository(ies) as the **FCCEA** may determine to be necessary and proper in its formal Community Involvement Plan for the **JF-LC Watershed Pollution Abatement Project**; and **(B)** at their sole cost, participate in such public outreach and public meeting events as the **FCCEA** may direct either in the Community Involvement Plan for this **Site** or by subsequent Order;

5. the **Insurer Respondents** timely to provide to the **FCCEA** complete copies of the **Insurance Policies** issued by each **Insurer Respondent** and related demanded documents and information described in **Section XX** of this **Order** in compliance with the requirement of that **Section**; and

6. Each **Respondent** to comply with the *Record* Retention requirements set forth in **Section XXII** of this **Order**.

b.   Applying the criteria delineated in Section IX.V(h) of **FCoWV Ordinance 2018-001**, the **FCCEA** has made in **Sections IV** and **V** of this **Order** the required determinations necessary for the proper invocation of its authority to issue this Time-Sensitive Abatement Action Order; namely:

(1) that the conditions at and emanating from the **Open Dumps** of coal mining waste within the Johnson Fork-Loop Creek watershed may present an *Imminent* and *Substantial Endangerment* to the Public Health or the *Environment* within the Johnson Fork-Loop Creek watershed and to the hydraulically connected, downgradient surface waters and groundwaters, all of which are *Waters of the State*; and

(2) that the continuing *Release* of **Wastes**, non-exclusively including *Hazardous Substances, Hazardous Wastes, Pollutants and Contaminants*, and **Leachate** into the *Environment* from the **Open Dumps** of mining wastes within the Johnson Fork-Loop Creek watershed requires expeditious abatement to prevent further harm to the *Environment* and to the beneficial uses of the *Waters of the State* within the Johnson Fork-Loop Creek watershed.

IN RE:  Johnson Fork-Loop Creek Pollution Abatement Project
FCCEA Matter No. 2019-002 (Fayette Co., WV Code Enforcement Agency)

**FINAL & BINDING TIME-SENSITIVE ABATEMENT ACTION ORDER NO. 2021-002-9.5(b)-001**

Page 17 of 90 pages

## II. **PARTIES BOUND**:

**a.** This **Order** applies to and is binding upon the **FCCEA** and upon each **Respondent** and their agents, successors, and assigns. Any change in ownership or corporate status of a **Respondent**, non-exclusively including any **Transfer** of assets or real or personal property, shall not alter such **Respondent's** responsibilities under this **Order**.

**b.** The **Remedial Respondents** are each jointly and severally liable for carrying out all activities expressly imposed upon either **Respondents** or the **Remedial Respondents** by any provision of this **Order**. In the event of the insolvency or other failure of any one or more of the **Remedial Respondents** to implement any requirement of this **Order**, the remaining **Remedial Respondent(s)** shall complete all such requirements.

**c.** The **Remedial Respondents** shall ensure that their contractors, sub-contractors, and representatives each receive a copy of this **Order** and comply with it. Each **Remedial Respondent** shall be responsible for any noncompliance with this **Order** by any contractors, sub-contractors, and authorized representatives of that **Remedial Respondent**.

**d.** The **Insurer Respondents** are each liable for compliance with the applicable requirements set forth in **Sections VIII, XX, and XXII** of this **Order**.

**e.** Subject to the provisions of Section **VI(j)** of **FCoWV Ordinance 2018-001** and **Subsection (f)** of this Section, **Respondents Hanover/CGL 60203** and **Continental/RDU 9433461** are liable for compliance with the applicable requirements of **Sections VIII, XX, and XXII** of this **Order**.

**f. Notwithstanding any other provision of this Order, the liability asserted against Hanover/CGL 60203 and Continental/RDU9433461 by this Order is limited to the available proceeds of the respective insurance coverage afforded by Hanover Insurance Company Comprehensive General Liability Insurance Policy Number CGL 60203 and Continental Insurance Company Umbrella Excess Third Party Liability Insurance Policy Number RDU 9433461, issued respectively by each insurer to Eastern Gas and Fuel Associates and Eastern Associated Coal Corporation on account of: (i) the liability imposed upon EACC by the terms of this Order; and (ii) the liability imposed upon Eastern Gas and Fuel Associates by the terms of this Order, which liability was assumed by EACC.**

**g. Notwithstanding any other provision of this Order, the liability asserted against each of the Insurer Respondents by this Order is limited to the available proceeds of the insurance coverage afforded to the Responsible Party insured, non-exclusively including all remaining limits of liability for indemnification and all sums properly due pursuant to each Insurer Respondent's duty to defend its Responsible Party insured, if any, by the valid terms and conditions of each Insurance Policy issued by each Insurer Respondent to any of its insureds that are, or may be, Responsible and Liable Parties pursuant to the terms of this Order.**

## III. **DEFINITIONS**:

Words used in this **Order** are to be taken and understood in their natural and ordinary sense unless this **Order** indicates that a different meaning was intended. Unless otherwise expressly

provided herein, terms used in this **Order** that are defined in **FCoWV Ordinance 2018-001** (indicated herein by both bolding and italics emphasis) shall have the meaning assigned to them in that Ordinance. Whenever terms listed below are used in this **Order** or in any appendices now or later attached to this **Order** and incorporated hereunder, the following definitions shall apply:

a. The term **"Affected Property"** shall mean all real property at the **Site** and any other real property within Fayette County where the **FCCEA** determines, at any time, that access, land, water, or other resource use restrictions are needed to implement the **RI/FS** or adequately to protect the Public Health, Safety, Welfare or the *Environment* with respect to this **site**.

b. The terms **"ARAR"** or **"ARARs"** each means: **(1)** *Applicable Requirements*; and **(2)** all "applicable requirements" or "relevant and appropriate requirements" as each of those terms are defined in the **National Contingency Plan** at 40 C.F.R. § 300.5.

c. The terms **"Area"** and **"Area of the Site"** shall each mean those portions of the **Site** identified herein where all or any part of the **RI/FS** or **Work** required by this **Order** is to be performed.

d. The term **"CERCLA"** shall mean the Comprehensive Environmental Response, Compensation, and Liability Act of 1980, as amended, 42 U.S.C. §§ 9601 - 9675.

e. The term **"Day"** shall mean a calendar day. In computing any period of time under this **Order**, where the last day would fall on a Saturday, Sunday, or Federal or West Virginia holiday, the period shall run until the close of business of the next working day.

f. The term **"Effective Date"** shall be the effective date of this **Order** as provided in **Section VII** of this **Order**.

g. The terms **"EPA,"** **"U.S. EPA,"** or **"USEPA"** shall each mean the United States Environmental Protection Agency and any successor departments or agencies of the United States.

h. The term **"Engineering Controls"** shall mean constructed containment barriers or systems that control one or more of the following: downward migration; lateral migration; infiltration or seepage of surface runoff or rain; or natural leaching migration of contaminants through the subsurface over time. Examples include caps, engineered liners or bottom barriers, immobilization processes, and vertical barriers.

i. Consistent with its definition in the **NCP**, 40 C.F.R. § 300.5, the terms **"Feasibility Study"** and **"FS"** shall each mean a study undertaken by, under order of, or under the oversight and supervision of, the **FCCEA** to develop and evaluate options for an *Abatement Action* or *Remedial Action*, or both. The **FS** emphasizes data analysis and is generally performed concurrently and in an interactive fashion with the **Remedial Investigation**, using data gathered during the **RI**. The **RI** data are used to define the objectives of the *Abatement Action*, *Response Action*, or both, to develop *Abatement Action* or *Remedial Action* alternatives, and to undertake an initial screening and detailed analysis of the alternatives. Each of these terms also refers to a report that describes the results of the study.

j. The term **"Future Abatement Action Costs"** shall mean: **(1)** all *Abatement Action Costs*, non-exclusively including direct and indirect costs, that the **FCCEA**, the Office of the Fayette County Prosecuting Attorney, or Fayette County, West Virginia incur in reviewing, commenting on, responding to, or developing plans, reports, technical memoranda and other items pursuant to this **Order**, conducting community relations and implement the Community

Involvement Plan for this **Site**, providing technical assistance to community groups (if any), monitoring and overseeing the planning and performance of any part of the **Work**, or otherwise implementing, overseeing, or enforcing this **Order**, non-exclusively including payroll costs, contractor costs (including fees), travel costs, laboratory costs; **(2)** ***Response*** costs incurred by the Fayette County Board of Health; and **(3)** Costs of ***Response*** and ***Abatement Action Costs*** incurred by Fayette County pursuant to **Section XVIII** (costs and attorneys' fees and any monies paid to secure access or implement and enforce **Institutional Controls**, including the amount of just compensation), and **Section XXI** (emergency response).

**k.** The term "**Institutional Controls**" shall mean non-engineered instruments, such as legislative, administrative, or judicial legal controls, that help to minimize the potential for human or adverse ecological exposure to contamination or protect the integrity and effectiveness of an ***Abatement Action*** by limiting land or resource use. Examples of **Institutional Controls** include easements and restrictive covenants, zoning restrictions, special building permit requirements, and well drilling restrictions or prohibitions.

**l.** The term "**Interest**" shall mean interest at the rate specified in Section **III.b.6** of **FCoWV Ordinance 2018-001**. The applicable rate of interest shall be the rate in effect at the time the interest accrues.

**m.** The term "**Insurance Policy**" means any policy of insurance, or part thereof, hold harmless agreement, or any contract to indemnify or to provide any guarantee of any kind with respect to the liability of any **Person**, that does or may provide any insurance coverage, including the provision of any legal defense of, or indemnification to, any ***Person***, including but not limited to any and all insurance ***Records***, whether or not **related to** insurance policies that were placed, issued, quoted, canceled, or terminated during one or more years within the period of 1963 through 1987, inclusive, and that has or may have a provision that provides or may provide defense or indemnity coverage for any actual or potential liability of any ***Person*** to any third party arising from any action, omission or condition on, at or under the any real property within or comprising the **Site** which might have or might cause damage or injury to any ***Person*** or the property of any ***Person***, regardless of: **(a)** how such coverage may be limited, excepted or conditioned, **(b)** whether such liability is for property damage, personal injury or otherwise, **(c)** whether such coverage is primary, excess, or umbrella in nature, **(d)** whether the policy follows form, **(e)** who issued the policy, and **(f)** whether or not the policy(ies), contract(s) or agreement(s) is or was terminated, canceled, bound, placed, or not renewed. The term "**Insurance Policy**" also includes all rating agreements, renewal agreements, separately issued endorsements, and other ***Records*** that change, modify, add to, delete or supplement the terms of any **Insurance Policy** or demonstrate the existence or possible existence of any prior or additional **Insurance Policy(ies)**.

**n.** The term "**Insurer Respondents**" shall mean Continental Insurance Company, Lexington Insurance Company, Certain Underwriters of Lloyd's London Subscribing to Liability Insurance Policies Expressly Providing Coverage to **CPC** or **EACC** (as more fully described in the Caption of this **Order**), The Travelers Casualty and Surety Company, The Insurance Company of the State of Pennsylvania, Munich Reinsurance America, Inc., National Union Fire Insurance Company of Pittsburgh, PA, Columbia Casualty Company, Allianz Global Risks US Insurance Company, Zurich American Insurance Company, Interstate Fire & Casualty Company, North Star Mutual Insurance Company, Fireman's Fund Insurance

Company, Westport Insurance Corporation, Insurance Company of North America, Markel Insurance Company, Pacific Employers Insurance Company, Falcon Insurance Group, LLC, Hartford Fire Insurance Company, Associated Electric & Gas Insurance Services Limited ("AEGIS"), Illinois Union Insurance Company, Chicago Insurance Company, Essentia Insurance Company, First State Insurance Company, First State Insurance Company, Arrowood Indemnity Company, ACE American Insurance Company, Prosight Specialty Insurance Group, Inc., New York Marine and General Insurance Company, St. Paul Surplus Lines Insurance Company, Granite State Insurance Company, Medmarc Casualty Insurance Company, Navigators Insurance Company, TIG Insurance Company, Federal Insurance Company and Hanover Insurance Company.

o.  Consistent with its definition in federal **RCRA** Subtitle D regulations, 40 C.F.R. § 257.2, and in the West Virginia Solid Waste Management Rule, W. Va. C.S.R. § 33-1-2.66, the term **"Leachate"** means any liquid that has come into contact with, passed through or emerged from **Solid Waste** and contains soluble, suspended, or miscible materials removed from such waste.

p.  The terms **"National Contingency Plan"** and **"NCP"** or shall each have the meaning set forth in Section **III.z** of **FCoWV Ordinance 2018-001**.

q.  The term **"Open Dump"** shall mean:
    **(1)** consistent with its definition in **RCRA** § 1004(14), 42 U.S.C. § 9603(14) any *Facility* or site where *Solid Waste* is disposed of which is not a sanitary landfill which meets the criteria codified at 40 C.F.R, Part 257, and which is not a facility required to have a permit for disposal of hazardous waste;
    **(2)** consistent with its definition in W. Va. Code § 22-15-2, any *Facility* or site where *Solid Waste* is disposed in a manner that does not protect the *Environment*; or
    **(3)** consistent with its definition in the West Virginia Solid Waste Management Rule, W. Va. C.S.R. §§ 33-1-1 – 33-1-7, promulgated by WVDEP pursuant to its authority under W. Va. Code § 22-15-5, any site or location at which *Solid Waste* is disposed of which is declared to be an **Open Dump** by the following provisions of the West Virginia Solid Waste Management Rule:  W. Va. C.S.R. §§ **33-1-1.6** (solid waste disposed of at other than a permitted site); **33-1-7.2.a.1** (solid waste disposal location at which measure have not been taken to prevent the discharge of pollutants from the accumulated waste into the *Waters of the State*); **33-1-7.2.a** (solid waste disposed of at other than a permitted site); and **33-1-7.2.a.1** (solid waste disposal location at which measure have not been taken to limit public access to the accumulated waste).

r.  Consistent with its definition in the federal **SMCRA** regulations, 30 C.F.R. § 701.5, the term **"Overburden"** shall mean material of any nature, consolidated or unconsolidated, that overlies a coal deposit, excluding topsoil and mining waste containing ore or minerals resulting from the extraction, beneficiation, or processing of coal.

s.  The term **"Paragraph,"** when used in connection with this **Order**, shall mean a portion of this **Order** identified by a small case letter(s).

t.  The term **"Parties"** shall mean the **FCCEA** and each **Respondent** identified in and properly served with this **Order**.

u.  The term **"RCRA"** shall mean the Solid Waste Disposal Act, as amended by the Resource Conservation and Recovery Act of 1976, as further amended, 42 U.S.C. §§ 6901 - 6991m, as

IN RE:  Johnson Fork-Loop Creek Pollution Abatement Project
FCCEA Matter No. 2019-002 (Fayette Co., WV Code Enforcement Agency)

**FINAL & BINDING TIME-SENSITIVE ABATEMENT ACTION ORDER NO. 2021-002-9.5(b)-001**

Page 21 of 90 pages

the same may be amended or re-enacted from time to time.

**v.** The terms "**relates to**" and "**related to**" shall each mean in any way, directly or indirectly, evidencing, demonstrating, describing, explaining, supporting, mentioning, discussing, commenting on, constituting, concerning, comprising, containing, reflecting upon, identifying, stating, depicting, illustrating, recording, or referring to the given subject.

**w.** Consistent with its definition in the **NCP**, 40 C.F.R. § 300.5, the terms "**Remedial Investigation**" or "**RI**" shall each mean the process undertaken by, under order of, or under the oversight and supervision of the **FCCEA** to determine the nature and extent of the problem(s) presented by a *Release*. The **RI** emphasizes data collection and site characterization and is generally performed concurrently and in an interactive fashion with the **Feasibility Study**. The **RI** includes sampling and monitoring, as necessary, and includes the gathering of sufficient information to determine the necessity for *Remedial Action* and to support the evaluation of remedial alternatives.

**x.** The term "**Remedial Respondents**" shall mean: **(1)** National Grid NE Holdings 2 LLC (as successor to the liabilities imposed by **FCoWV Ordinance 2018-001** upon **EGFA** with respect to its acts, omissions alleged herein, and status as **Owner** or **Operator** of mining and mining waste *Disposal* **Facilities** within the **Subject Watershed** that existed or occurred on or before January 1, 1966); **(2)** Pardee and Curtin Realty LLC; **(3)** Quercus West Virginia, LLC; **(4)** Eastern Associated Coal Corporation, as a nominal party and not a real party in interest, solely to the extent of its undistributed assets, non-exclusively including the available proceeds from each of its liability insurance policies; **(5)** Hanover Insurance Company, solely to the extent of the available limits of liability under Hanover Insurance Company Commercial General Liability Insurance Policy Number CGL 60203 with respect to indemnification and other insurance coverage afforded to Eastern Associated Coal Corporation for all sums it shall be obligated to pay by reason of liability imposed upon it by law or assumed by it under contract or agreement for damages and expenses as defined by the term "property" within such policy caused by or arising out of each occurrence on or after January 1, 1966 (hereinafter sometimes referred to as: "**Hanover/ CGL 60203**"); and **(6)** Continental Insurance Company, solely to the extent of the available limits of liability under Continental Insurance Company Umbrella Excess Third Party Liability Insurance Policy Number RDU 9433461 with respect to indemnification and other insurance coverage afforded to Eastern Associated Coal Corporation for all sums it shall be obligated to pay by reason of liability imposed upon it by law or assumed by it under contract or agreement for damages and expenses as defined by the term "ultimate net loss" within such policy on account of property damage caused by or arising out of each occurrence on or after January 1, 1966 (hereinafter sometimes referred to as: "**Continental/ RDU 9433461**").

**y.** The term "**Respondents**" shall mean the **Remedial Respondents** and the **Insurer Respondents**.

**z.** The term "**RI/FS Planning Documents**" shall mean the Workplan, Field Sampling Plan, Quality Assurance Project Plan, Health and Safety Plan, and other documents referenced in this **Order** that relate to the planning or implementation of all or any part of the **Work** required by this **Order**.

**aa.** Consistent with its definition in the West Virginia Solid Waste Management Rule,

**IN RE: Johnson Fork-Loop Creek Pollution Abatement Project**
**FCCEA Matter No. 2019-002 (Fayette Co., WV Code Enforcement Agency)**

**FINAL & BINDING TIME-SENSITIVE ABATEMENT ACTION ORDER NO. 2021-002-9.5(b)-001**

Page 22 of 90 pages

W. Va. C.S.R. § 33-1-2.106, the term "**Runoff**" means any rainwater, **Leachate**, or other liquid that drains over land from any part of a **Solid Waste** *Facility*.

bb.  The term "**Section**," when used in connection with this **Order**, shall mean any portion of this **Order** identified by a Roman numeral.

cc.  The term '"**Site**" shall mean:  **(1)** all geographical areas, sites, facilities and locations, both above ground and underground, that are within the Johnson Fork-Loop Creek watershed where the Public Health, Safety, Welfare or the *Environment* are or maybe adversely impacted by any condition of *Public Nuisance* existing within the Johnson Fork-Loop Creek watershed; and **(2)** any adjacent area within Fayette County where the Public Health, Safety, Welfare or the *Environment* are or maybe adversely impacted by any condition of *Public Nuisance* existing within the Johnson Fork-Loop Creek watershed within Fayette County, West Virginia.

dd.  Consistent with its definition in **RCRA** § 1004(27), 42 U.S.C. § 6903(27), in the applicable provisions of W. Va. Code § 22-15-2(31), and in the applicable provisions of Section **III(ww)** of **FCoWV Ordinance 2018-001**, the term "**Solid Waste**" shall mean any garbage, refuse, sludge from a waste treatment plant, water supply treatment plant or air pollution control facility, and other discarded material including solid, liquid, semisolid or contained gaseous material resulting from industrial, commercial, mining, agricultural operations, or from community activities, but does not include:

(1)  solid or dissolved material in domestic sewage;

(2)  any mixture of domestic sewage and other wastes that passes through a sewer system to a publicly-owned treatment works for treatment;

(3)  industrial discharges which are point sources subject to permits under Section 402 of the federal Water Pollution Control Act, as amended; and

(4)  materials subjected to in-situ mining techniques which are not removed from the ground as part of the extraction process.

ee.  Consistent with relevant parts of its definition in the West Virginia Solid Waste Management Rule, W. Va. C.S.R. § 33-1-2.123, the term "**Solid Waste Facility**" means any system, facility, land, contiguous land, improvements on the land, structures or other appurtenances or methods used for processing, recycling or disposing of solid waste, including landfills, and solid waste disposal surface impoundments, and other facilities not herein specified.

ff.  The term "**State**" shall mean the State of West Virginia.

gg.  The terms "**Surface Mining Control & Reclamation Act**" and "**SMCRA**" shall each mean the federal Surface Mining Control and Reclamation Act, 33 U.S.C. §§ 1201 - 1328, as it may be amended from time to time.

hh.  The term "**Transfer**" shall mean to sell, assign, convey, lease, mortgage, or grant a security or option interest in, or where used as a noun, a sale, assignment, conveyance, or other disposition of any interest by operation of law or otherwise.

ii.  The term "**Waste Materials**" shall mean: **(l)** any *Hazardous Substance*; **(2)** any *Pollutant or Contaminant*; or **(3)** any *Waste*.

jj.  The term "**WVDEQ**" shall mean the West Virginia Department of Environmental Quality and any successor departments or agencies of the **State**.

IN RE:  Johnson Fork-Loop Creek Pollution Abatement Project
FCCEA Matter No. 2019-002 (Fayette Co., WV Code Enforcement Agency)

**FINAL & BINDING TIME-SENSITIVE ABATEMENT ACTION ORDER NO. 2021-002-9.5(b)-001**

Page 23 of 90 pages

**kk.** The term **"Work"** shall mean all activities **Respondents** are required to perform under this **Order**, except those required by **Section XXII** (Retention of Records) and **Section XXVI** (Reimbursement of *Abatement Action Costs*).

The term **"Workplan"** shall mean the **FCCEA**-approved Workplan required to be prepared and submitted to the **FCCEA** pursuant to this **Order**.

## IV.   FINDINGS OF FACT:

Based upon the results of its investigation, all of which are set forth in the "Administrative Record" for Fayette County Code Enforcement Agency Matter No. 2018-002 ("Johnson Fork-Loop Creek Pollution Abatement Project"), and its review of information set forth in that Administrative Record, the **FCCEA** makes the following Findings of Fact:

**a.   The Respondents to this Order:**

1. **National Grid NE Holdings 2 LLC [legal successor to the remedial liabilities imposed by FCoWV Ordinance 2018-001 on Eastern Gas and Fuel Associates (l.k.a. Eastern Associates) as a result of its acts or omissions on or before January 1, 1966]:**

   A. **Eastern Gas and Fuel Associates**, (Secretary of the Commonwealth of Massachusetts, Corporations Division File # T00299956), was a Voluntary Business Trust organized and declared under the law of the Commonwealth of Massachusetts on July 18, 1929 when the Massachusetts Gas Company and some units of Koppers Company of Pittsburgh formed a voluntary association under the name **Eastern Gas and Fuel Associates** (hereinafter sometimes referred to as **"EGFA"**).

   B. **EGFA** applied to the West Virginia Secretary of State for authority to conduct business in the State of West Virginia, which authorization was granted by the West Virginia Secretary of State, effective April 28, 1947, and remained in effect until its application for qualified status in West Virginia was withdrawn effective May 23, 1968.

   C. At and after the time of its formation, **EGFA** consolidated and conducted the coal mining operations of the Massachusetts Gas Co. and the Koppers Company, specifically including coal mining operations in the Johnson Fork-Loop Creek watershed located wholly within Fayette County, West Virginia (hereinafter sometimes referred to as the **"Subject Watershed"**).

   D. Beginning no later than the late 1920's, **EGFA** continuously conducted, until at least the mid-1950s, extensive underground coal mining operations throughout the **Subject Watershed**, which operations included underground coal mining, associated surface processing and transportation of extracted coal and **Overburden** from its Powellton No. 6 mine, and the creation, operation and maintenance of at least five (5) separate, associated piles of coal mining waste, each of which was constructed and maintained without a **Liner** and without any associated **Leachate** collection, control or monitoring system, on the surface of separate locations within the **Subject Watershed**.

   E. By Deed dated October 15, 1941 and recorded in the Office of the Fayette County Clerk, Koppers Company conveyed to **EGFA** fee simple title to all of the real property owned by Koppers Company in Fayette and Kanawha Counties, West Virginia,

consisting of tens of thousands of acres, and specifically included all of the real property within the **JF-LC Watershed** upon or under which all of the **EGFA** coal mining facilities and surface piles of coal mining waste at issue herein are located.

F. By the early 1950's, the underground mine works of the Powellton No. 6 coal mining facility spanned the entire east-west width of the **JF-LC Watershed** and entered well into the Armstrong Creek watershed, both wholly within Fayette County, WV, with miners entering those mine works daily from both the mining facilities on Johnson Fork and from a mine portal in McDunn, WV, more than two (2) miles to the East.

G. The management of the operation of the Powellton No. 6 mine by **Eastern Gas and Fuel Associates** later expanded to include all operations of the underground coal mining facilities and mining waste management practices of the Island Coal Mine, also located within the **JF-LC Watershed**, which was opened in approximately March 1944 to recover a long ridge of Powellton seam coal located on the opposite mountain of the Johnson Fork-Loop Creek watershed, and which was continuously operated until the early 1950s.

H. At the height of the productivity of its Powellton No. 6 coal mine in approximately 1933, **Eastern Gas and Fuel Associates** employed approximately Thirteen hundred (1,300) workers at its mining facilities within the **Subject Watershed** producing approximately Thirty-five hundred (3,500) tons of coal daily.

I. During the final days of its operation of its Powellton No. 6 mine (in approximately 1952) and its Island Coal mining facilities, **EGFA** produced from those facilities approximately Twelve hundred seventy-nine (1,279) tons of coal daily.

J. **Eastern Gas and Fuel Associates** ceased most of its coal mining operations at the Powellton No. 6 and Island coal mining sites in approximately 1952.

K. By warranty deed dated January 1, 1966 recorded in the Office of the Fayette County, West Virginia Clerk of the County Commission, **EGFA** conveyed fee simple title to all of its real property within Fayette County, West Virginia to **EACC**.

L. **EGFA** continued to operate several smaller coal mining and mining waste management operations within the Johnson Fork-Loop Creek watershed until the early 1960s. On information and belief, all its mining operations in Fayette County ceased by 1965.

M. Between the time of the commencement of its coal mining operations in the **JF-LC Watershed** and January 1, 1966, **EGFA** was the *Owner* and *Operator* of the Powellton # 6 coal mining *Facilities* within the **JF-LC Watershed** and of each of the five (5) surface piles of coal mining waste created by **EGFA** within the **JF-LC Watershed.**

N. Beginning on or about October 15, 1941 and continuing until January 1, 1966, **EGFA** was the *Owner* of the Powellton # 6 coal mining *Facilities* within the **JF-LC Watershed** and of each of the five (5) surface piles of coal mining waste therein created by **EGFA.**

O. Continuously since their original creation, each of the five (5) surface piles of coal mining waste created by **EGFA** in the **JF-LC Watershed** have *Discharged* and *Released Hazardous Substances*, *Hazardous Wastes*, **Solid Waste**, *Pollutants and Contaminants*, and **Leachate** into the *Environment.*

IN RE: Johnson Fork-Loop Creek Pollution Abatement Project
FCCEA Matter No. 2019-002 (Fayette Co., WV Code Enforcement Agency)

FINAL & BINDING TIME-SENSITIVE ABATEMENT ACTION ORDER NO. 2021-002-9.5(b)-001

Page 25 of 90 pages

P. The *Hazardous Substances*, *Hazardous Wastes*, **Solid Waste**, *Pollutants and Contaminants*, *and* **Leachate** continuously *Released* from each of the five (5) surface piles of coal mining waste created and maintained by **EGFA** within the **JF-LC Watershed** from the date of the creation until January 1, 1966 have commingled within the soils and groundwaters of the **JF-LC Watershed** with like *Hazardous Substances* and *Wastes Released* after January 1, 1966 from the coal mining *Facilities* and five (5) surface piles of coal mining waste piles created by **EGFA** within the **JF-LC** to form a single, indivisible harm to the Public Health, Safety, Welfare and the *Environment* at and within the **JF-LC Watershed** for which no reasonable basis of apportioning such harm among the separate time-periods or sources of the *Released Hazardous Substances* and *Wastes* exists.

Q. Effective April 28, 1989, **EGFA** formally changed its name as a Massachusetts Business Trust on file with the Massachusetts Commonwealth Secretary to **Eastern Enterprises**.

R. In 1990, **Eastern Enterprises** sold all of its stock holdings in Peabody Holding Company, Inc. and **MCBL** to HM Holdings, Inc. (hereinafter sometimes referred to as "**Hanson**"), an affiliate of Hanson PLC, among other parties.

S. In 1997 **MCBL** was merged into Peabody Holding Company, Inc. As a result of this merger, **MCBL** ceased to exist.

T. In 2000, KeySpan Corporation, a New York Domestic Business Corporation, (hereinafter sometimes referred to as "**KeySpan**") acquired **Eastern Enterprises** by way of a stock purchase agreement.

U. Effective May 31, 2002, KeySpan merged **Eastern Enterprises**, including its assets and liabilities, into a wholly owned subsidiary of one of its subsidiaries, KeySpan New England, LLC, a Massachusetts Limited Liability Company (Massachusetts Commonwealth Secretary Business ID Number 041270730).

V. In 2007, **KeySpan**, including KeySpan New England, LLC, merged with, and into, National Grid US 8 Inc., a wholly owned subsidiary of National Grid plc.

W. Effective April 14, 2008, KeySpan New England, LLC formally changed its name to **National Grid NE Holdings 2 LLC**.

Z. At no time during its period of ownership of the land upon which all five (5) surface piles of coal mining waste created by **EGFA** within the **JF-LC Watershed** was **EGFA** under any compliance schedule imposed by any responsible officer of the State of West Virginia with respect to any of the five (5) surface piles of coal mining waste created by **EGFA** with the **JF-LC Watershed**.

2. **Eastern Associated Coal, LLC (f.k.a. Eastern Associated Coal Corporation) (hereinafter sometime referred to as "EACC"), now a defunct West Virginia limited liability company, solely to the extent of its undistributed assets, non-exclusively including the available coverage and proceeds from its liability insurance policies, named herein only as nominal Respondent and not as a Real Party in Interest:**

A. Following the conclusion of its coal mining operation in Fayette County, **EGFA** created under West Virginia law a wholly owned subsidiary named **Eastern**

IN RE: Johnson Fork-Loop Creek Pollution Abatement Project
FCCEA Matter No. 2019-002 (Fayette Co., WV Code Enforcement Agency)

FINAL & BINDING TIME-SENSITIVE ABATEMENT ACTION ORDER NO. 2021-002-9.5(b)-001

Page 26 of 90 pages

**Associated Coal Corporation** (West Virginia Secretary of State Organization Number 8825) which received its corporate charter from the West Virginia Secretary of State effective March 27, 1963.

B. During the period beginning in 1963 and concluding by January 1, 1966, **EGFA** transferred to **EACC** all its coal properties, coal mining operations, coal marketing, and mining related assets, specifically including its fee simple title to the real property in Fayette County, West Virginia that specifically includes the real property at issue in the **Subject Watershed** and in this **Order**.

C. As part of the corporate transfer of its mining properties and its mining-related assets from **EGFA** to **EACC**, **National Grid NE Holdings 2 LLC** asserts that: **(i) EACC** assumed the liabilities of **EGFA** arising out of the coal mining and coal marketing operations of **EGFA**; and **(ii) EACC** repeatedly thereafter represented to the U.S. Supreme Court, U.S. Internal Revenue Service, and U.S. Securities and Exchange Commission that it was formed to be the successor to the **EGFA** Coal Division.

D. Sometime after creating **EACC**, **EGFA** created another wholly owned subsidiary, Coal Properties Corporation (hereinafter sometimes referred to as "**CPC**"), a Delaware corporation, and subsequently transferred all of its **EACC** stock to **CPC**.

E. In 1987, **EGFA** entered into a Stock Exchange Agreement with Peabody Holding Company, Inc., a New York corporation authorized to conduct business in the State of West Virginia by the West Virginia Secretary of State effective July 24, 1989 (WV Secretary of State Organization Number 127183) pursuant to which **EGFA** exchanged 100% of the common stock of **CPC** for 15.01% of the common stock of Peabody Holding Company, Inc. Simultaneously, **EGFA** entered into a separate stock exchange agreement with Mid-Continent Barge Lines, Inc. (hereinafter sometimes referred to as "**MCBL**"), an entity affiliated with Peabody Holding Company, Inc., pursuant to which **EGFA** exchanged 100% of the preferred stock of **CPC** for 15.01% of the common stock of **MCBL**. Upon consummation of these stock exchanges, **EGFA** no longer owned any interest in **CPC** directly.

F. By a Stock Purchase Agreement dated March 31, 1987, **EACC** was purchased by Peabody Holdings Company, Inc.

G. By Special Warranty Deed dated June 27, 2003, recorded in the Office of the Fayette County Clerk (DB 596/102) on that same date, **EACC** sold the surface estate, including timber rights, pertaining to its real property in Fayette County, WV, specifically including the surface estate of its real property in the **Subject Watershed** and the surface estate of all of the real property at issue in this **Order**, to Pardee and Curtin Realty LLC, a Delaware Limited Liability Company.

H. Also in 2003, **EACC** conveyed the coal, oil, and gas underlying its real property within Fayette County, West Virginia, and the residue to Pardee Minerals, LLC, a Delaware Limited Liability Company.

I. Effective August 1, 2005, **EACC** elected to convert from a corporation into a West Virginia Limited Liability Company and was qualified by the West Virginia Secretary of State to do business in West Virginia under the name **Eastern Associated Coal,**

IN RE: Johnson Fork-Loop Creek Pollution Abatement Project
FCCEA Matter No. 2019-002 (Fayette Co., WV Code Enforcement Agency)

**FINAL & BINDING TIME-SENSITIVE ABATEMENT ACTION ORDER NO. 2021-002-9.5(b)-001**

Page 27 of 90 pages

LLC (hereinafter sometimes referred to as "**EACLLC**").

**J.** In 2007 Peabody transfered13 percent (13%) of its coal reserves, specifically including all of its ownership of its subsidiary **EACLLC**, into a new company, Patriot Coal Corporation, a Delaware Corporation that was qualified to do business in West Virginia (WV Secretary of State Business Organization Number 259884) effective August 7, 2007.

**K.** As part of the Liquidation Plan approved by U.S. Bankruptcy Court for the Eastern District of Virginia in *In RE Patriot Coal Corporation, Debtor,* Case No. 15-32450 (KLP) (Bankr. E.D. VA 2015) (*i.e.,* Patriot Coal Corporation's second and final case brought under Chapter 11 of the U.S. Bankruptcy Code), the remaining assets of **EACLLC** were distributed and **EACLLC** was dissolved and its legal existence terminated by the West Virginia Secretary of State effective June 10, 2016.

**L.** Between no later than January 1, 1966 until June 27, 2003, **EACC** was the *Owner* and *Operator* of the Powellton # 6 coal mining *Facilities* within the **JF-LC Watershed** and of each of the five (5) surface piles of coal mining waste therein created by **EGFA**.

**M.** During its period of ownership of the five (5) surface piles of coal mining waste created by **EGFA** within the **JF-LC Watershed** and the real property upon which they are located, **EACC** did not take any action to abate any of the adverse impacts on the health or the *Environment* within the **JF-LC Watershed** that had resulted and were continuing to result during and after its period of ownership of that real property from the past and on-going *Releases of Hazardous Substances, Hazardous Wastes,* **Solid Wastes,** *Toxic* **Wastes** and **Leachate** from each of those surface piles of mining waste.

**N.** At no time during its period of ownership of the land upon which all five (5) surface piles of coal mining waste created by **EGFA** within the **JF-LC Watershed** was **EACC** under any compliance schedule imposed by any responsible officer of the State of West Virginia with respect to any of the five (5) surface piles of coal mining waste.

**3. Pardee and Curtin Realty LLC:**

**A.** From June 7, 2003 until June 27, 2013 Pardee and Curtin Realty LLC, a Delaware Limited Liability Company qualified to do business in West Virginia (effective October 3, 2001) and a subsidiary of Pardee and Curtin Holding Company LLC, a Delaware Limited Liability Company, owned and managed the surface estate appertaining to the real property in Fayette County, West Virginia that specifically includes the real property at issue in the **Subject Watershed** and in this **Order.**

**B.** By Special Warranty Deed dated June 27, 2013 and filed in the Office of the Fayette County Clerk, Pardee and Curtin Realty, LLC conveyed its interest in the Surface Estate appertaining to the real property in Fayette County, West Virginia that specifically includes the real property at issue in the **Subject Watershed** and in this **Order,** to Quercus West Virginia , LLC.

**C.** Between June 7, 2003 until June 27, 2013, Pardee and Curtin Realty LLC was the *Owner* of the Surface Estate to the real property upon which each of the five (5) surface piles of coal mining waste created by **EGFA** is located within the **JF-LC Watershed.**

**D.** During its period of ownership of the Surface Estate appertaining to the land upon which each **EGFA** created each of the five (5) surface piles of coal mining waste, Pardee and Curtin Realty LLC did not take any action to abate any of the adverse impacts on the health or the ***Environment*** within the **JF-LC Watershed** that had resulted and were continuing to result from the past and on-going ***Releases of Hazardous Substances, Hazardous Wastes***, Solid **Wastes**, ***Pollutants and Contaminants, Toxic*** **Wastes**, and **Leachate** from each of the five (5) surface piles of coal mining waste.

**E.** At no time during its period of ownership of the Surface Estate to the land upon which each of the five (5) surface piles of coal mining waste created by **EGFA** within the **JF-LC Watershed** was Pardee and Curtin Realty LLC under any compliance schedule imposed by any responsible officer of the State of West Virginia with respect to any of those five (5) surface piles of coal mining waste.

**4. Quercus West Virginia, LLC:**

**A.** a Delaware Limited Liability Company qualified to do business in West Virginia Continuously since June 10, 2013, Quercus West Virginia, LLC (West Virginia Secretary of State Business Organization Control Number 9A0TQ), has owned the Surface Estate appertaining to the real property in Fayette County, West Virginia that specifically includes the real property at issue in the **Subject Watershed** and in this **Order**, and continues to own that Surface Estate as of the issuance of this **Order**.

**B.** During its period of ownership of the Surface Estate appertaining to the real property upon which the five (5) surface piles of coal mining waste created by **EGFA** with the **JF-LC Watershed** are located, Quercus West Virginia, LLC took no action to abate or require the abatement of any of the adverse impacts on the health or the ***Environment*** within the **JF-LC Watershed** that had resulted and were continuing to result from the past and on-going ***Releases of Hazardous Substances*** and ***Toxic*** **Wastes** from each of the five (5) surface piles of coal mining waste within the **Subject Watershed.**

**C.** At no time during its period of ownership of the Surface Estate of the real property upon which the five (5) surface piles of coal mining waste created by **EGFA** within the **JF-LC Watershed** are located was Quercus West Virginia, LLC under any compliance schedule imposed by any responsible officer of the State of West Virginia with respect to any of those five (5) surface piles of coal mining **Wastes**.

**5. Hanover Insurance Company, solely to the extent of the available limits of liability under Hanover Insurance Company Commercial General Liability Insurance Policy Number CGL 60203 with respect to indemnification and other insurance coverage afforded to EACC for all sums it shall be obligated to pay by reason of its liability imposed upon it by law or assumed by it under contract or agreement for damages and expenses as defined by the term "property damage" within such policy caused by or arising out of each occurrence on or after January 1, 1966 (hereinafter: "Hanover/CGL 60203"):**

**A.** Hanover Insurance Company issued Commercial General Liability Insurance Policy Number CGL 60203 to **EGFA** providing, subject to the terms and conditions of the policy, insurance coverage for all sums any insured under the policy shall be obligated to pay by reason of liability imposed upon it by law or assumed by it under contract or agreement for damages and expenses as defined by the policy's term "ultimate net loss" on account of property damage caused by or arising out of each occurrence during the period of the policy, June 24, 1964 to June 24, 1967.

**B.** Hanover Insurance Company Policy Number CGL 60203 provides insurance coverage, subject to the terms and conditions of the policy to **EGFA** and each of its subsidiary companies.

**C.** At all times during the coverage period afforded by Hanover Insurance Company Policy Number CGL 60203, Eastern Associated Coal Corporation was a wholly-owned subsidiary of Eastern Gas and Fuel Associates.

**D.** By January 1, 1966, **EACC** had become owner and operator of all former **EGFA** mining **Facilities** and real estate within the **Subject Watershed** and had assumed by contract or agreement all of the liability of **EGFA** arising out of its prior mining operations within the **Subject Watershed.**

6. **Continental Insurance Company, solely to the extent of the available limits of liability under Continental Insurance Company Umbrella Excess Third Party Liability Insurance Policy Number RDU 9433461 with respect to indemnification and other insurance coverage afforded to EACC for all sums it shall be obligated to pay by reason of its liability imposed upon it by law or assumed by it under contract or agreement for damages and expenses as defined by the term "ultimate net loss" within such policy on account of property damage caused by or arising out of each occurrence on or after January 1, 1966 (hereinafter: "Continental/RDU9433461"):**

**A.** Continental Insurance Company issued Umbrella Excess Third Party Liability Insurance Policy Number RDU 9433461 to **EGFA** providing, subject to the terms and conditions of the policy, insurance coverage for all sums any insured under the policy shall be obligated to pay by reason of liability imposed upon it by law or assumed by it under contract or agreement for damages and expenses as defined by the policy's term "ultimate net loss" on account of property damage caused by or arising out of each occurrence during the period of the policy, June 24, 1964 to June 24, 1967.

**B.** Continental Insurance Company Policy Number RDU 9433461 provides insurance coverage, subject to the terms and conditions of the policy to **EGFA** and each of its subsidiary companies.

**C.** At all times between June 24, 1964 and June 24, 1967, Eastern Associated Coal Corporation was a wholly-owned subsidiary of Eastern Gas and Fuel Associates.

**D.** By January 1, 1966, **EACC** had become owner and operator of all former **EGFA** mining **Facilities** and real estate within the **Subject Watershed** and had assumed by contract or agreement all of the liability of **EGFA** arising out of its prior mining operations within the **Subject Watershed.**

7. **Continental Insurance Company** (with respect to all insurance policies issued by it to Eastern Gas and Fuel Associates, except Continental Insurance Company Umbrella Excess Third Party Liability Insurance Policy Number RDU 9433461), **Lexington Insurance Company, Certain Underwriters of Lloyd's London Subscribing to Liability Insurance Policies Expressly Providing Coverage to Coal Product Corporation or Eastern Associated Coal Corporation** (as more fully described in the Caption of this Order); **Travelers Casualty and Surety Company, The Insurance Company of the State of Pennsylvania, Munich Reinsurance America, Inc., National Union Fire Insurance Company of Pittsburgh, PA, Columbia Casualty Company, Allianz Global Risks US Insurance Company, Zurich American Insurance Company, Interstate Fire & Casualty Company, North Star Mutual Insurance Company, Fireman's Fund Insurance Company, Westport Insurance Corporation, Insurance Company of North America, Markel Insurance Company, Pacific Employers Insurance Company, Falcon Insurance Group, LLC, Hartford Fire Insurance Company, Associated Electric & Gas Insurance Services Limited ("AEGIS"), Illinois Union Insurance Company, Chicago Insurance Company, Essentia Insurance Company, First State Insurance Company, First State Insurance Company, Arrowood Indemnity Company, ACE American Insurance Company, Prosight Specialty Insurance Group, Inc., New York Marine and General Insurance Company, St. Paul Surplus Lines Insurance Company, Granite State Insurance Company, Medmarc Casualty Insurance Company, Navigators Insurance Company, TIG Insurance Company, Federal Insurance Company,** and **Hanover Insurance Company** (hereinafter sometimes referred to collectively as the "**Insurer Respondents**"):

   A. Each of the **Insurer Respondents** provided liability insurance to **EGFA, EACC,** or **CPC**, or any combination of them, during some part of the years 1961 through March 31, 1987, inclusive; each of which liability **Insurance Policies** provides, subject to the valid terms and conditions of the policy, indemnification, and other forms of insurance coverage to the covered insureds, including **EACC**, for property damage resulting from covered occurrences during the policy period.

   B. Respondent **EACC**, as a wholly owned subsidiary of **EGFA** from the date of its creation in 1963 until March 31, 1987, is a named insured under each liability insurance policy(ies) issued by each of the **Insurer Respondents** to **EGFA**, and is also as of the **Effective Date** a business entity described in Section **VI(j)(4(ii)** of **FCoWV Ordinance 2018-001**.

b. <u>**Subject Mining Facility Description:**</u>

   1. **EGFA** created and operated with the **Subject Watershed** underground coal mines, including the Powellton Number 6 Mine and the Island Mine, loadout facilities, material handling operations, and coal mining waste disposal areas on Johnson Fork from the early 20th century into the 1950's in the Powellton seam of coal.

   2. Additionally, the West Virginia Geologic and Economic Survey (WVGES) identifies Peabody Coal as operating an underground mine in the Powellton seam of coal on Johnson

IN RE:  Johnson Fork-Loop Creek Pollution Abatement Project
FCCEA Matter No. 2019-002 (Fayette Co., WV Code Enforcement Agency)

**FINAL & BINDING TIME-SENSITIVE ABATEMENT ACTION ORDER NO. 2021-002-9.5(b)-001**

Page 31 of 90 pages

Fork within the Johnson Fork-Loop Creek watershed.

3. On information and belief, the underground mine operated for some period of time by Peabody Coal within the **Subject Watershed** is the Powellton #6 mine originally operated by **EGFA**.

4. In 1966 **EGFA** created **EACC** as a wholly owned subsidiary and transferred all of its mining assets and mining liabilities, specifically including its mine land holdings and mining operation within the **JF-LC Watershed** to **EACC**. On March 31, 1987, **EACC** was purchased by Peabody Coal, which thereafter conducted its mining operations within the **JF-LC Watershed** through its **EACC** subsidiary.

5. Although the Powellton No.6 was a very large coal mine that extended into other watersheds, on information and belief all coal from it and from the Island Mine was extracted to, processed in, and transported from within the **Subject Watershed**.

c. <u>**Subject Mining Site and Facility Location:**</u>

1. The **Site** is located entirely within western Fayette County near Kincade, West Virginia on Johnson Fork, a tributary of Loop Creek of the Kanawha River. The Johnson Fork Watershed is a part of greater Loop Creek, of the Kanawha River.

2. The Johnson Fork-Loop Creek Watershed, as used in this **Order**, is from the confluence with Loop Creek, at the community of Kincaid (38° 2'17.35"N, 81°16'14.83"W), up-stream on Johnson Fork in a southerly direction to the headwaters of Johnson Fork and includes all tributaries of Johnson Fork, to the top of the watershed at Kingston Mountain (38° 0'5.72"N, 81°16'21.11"W) ("**JF-LC Watershed**").

d. <u>**Subject Mining Facility Processes and Mining Waste Management Practices:**</u>

1. **Respondents EGFA** and **EACC** utilized the underground mining method at the **Site**.

2. Until 1966, **Respondent EGFA** owned and operated its coal mining Facility within the **JF-LC Watershed** These mining operations included the creation, operation and maintenance of each of the five (5) coal mining waste piles within the **JF-LC Watershed**.

3. Continuously during their operations within the **JF-LC Watershed, Respondents EGFA** and **EACC** managed, handled, stored, treated, disposed of and ***Released*** into the ***Environment*** at least the following ***Hazardous Substances***, ***Hazardous Wastes***, hazardous waste constituents, **Solid Waste**, and **Leachate** at and from each of the five (5) the coal mining waste dumps and other locations within its mining ***Facility***:

   A. **Sulfate,** which is an indicator of adverse environmental impacts to surface waters from mining. The USGS reports background concentrations in WV streams to be less than 25 mg/L. The concentration of Sulfate in streams within the **JF-LC Watershed** are much higher, and data indicates sulfate concentrations exceed the level WVDEP considers a likely stressor to aquatic life;

   B. **Arsenic** is a ***Hazardous Substance***, a **RCRA** statutory ***Hazardous Waste***, a ***Pollutant and Contaminant,*** a federal CWA Priority Pollutant and CWA Toxic Pollutant under CWA § 307, 33 U.S.C. § 1317, and a **RCRA** toxicity characteristic contaminant (D004) under 40 C.F.R. § 261.24. Arsenic has been found in the groundwater in the Page-Kincaid PSD wellhead protection area within the **JF-LC Watershed**. Inorganic

arsenic has been recognized as a human poison since ancient times and is a carcinogen. Arsenic is a well-documented human carcinogen affecting numerous organs. The cancers that have been associated with Arsenic include cancer of the bladder, lungs, skin, kidney, nasal passages, liver, and prostate. USEPA set the arsenic standard for drinking water at 10 ppb (or 0.010 parts per million).Arsenic exerts its toxicity by inactivating up to 200 enzymes, especially those involved in cellular energy pathways and DNA synthesis and repair. Acute arsenic poisoning is associated initially with nausea, vomiting, abdominal pain, and severe diarrhea. Encephalopathy and peripheral neuropathy are reported as effects of arsenic poisoning. Arsenic compounds cause short-term and long-term adverse effects in individual plants and animals and in populations and communities of organisms. water at 10 ppb (or 0.010 parts per million). Arsenic is a teratogen and carcinogen that can traverse placental barriers and produce fetal death and malformations in many species of mammals. Many species of freshwater biota are adversely affected by high concentrations of arsenic or various organ arsenicals. Adverse effects of Arsenic include death and malformations of toad embryos, growth inhibition of algae, mortality of amphipods and gastropods, and behavioral impairment of goldfish.

C. **Cadmium** is a **CWA** Priority Pollutant and a CWA Toxic Pollutant under **CWA** § 307, 33 U.S.C. § 1317, and a **RCRA** toxicity characteristic contaminant (D006) under 40 C.F.R. § 261.24. Cadmium concentrations in groundwater within the **JF-LC Watershed** exceed the SDWA MCL. Cadmium is a non-essential metal with no biological function in aquatic animals. In addition to acute effects such as mortality, chronic exposure to cadmium can lead to adverse effects on growth, reproduction, immune and endocrine systems, development, and behavior dysfunction in aquatic organisms. Kidney damage has long since been described to be the main problem for humans chronically exposed to cadmium, and cadmium exposure is associated with bone damage. There is some proof that cadmium exposure can cause cancer.

D. **Iron**: Exceedances of federal Safe Drinking Water Act standards for iron are documented within the Page-Kincaid PSD groundwater source area on Johnson Fork, and iron precipitates have been observed associated with coal-waste dumps within the watershed. Precipitation of ferric hydroxide may result in a complete blanketing of the stream bottom, adversely affecting both macroinvertebrates and fish. Because the gill surface of the fish tends to be alkaline, soluble ferrous iron can be oxidized to insoluble ferric compounds which then cover the gill lamellae and inhibit respiration. At a low water temperature and in the presence of iron, iron-depositing bacteria will multiply rapidly on the gills and further contribute to the oxidation of ferrous iron compounds. Their filamentous colonies cover the gills. The precipitated iron compounds and tufts of the iron bacteria reduce the gill area available for respiration, damage the respiratory epithelium and may thus suffocate the fish. In a similar toxic action, iron compounds can precipitate on the surface of fish eggs which then die due to a lack of oxygen.

E. **Manganese** is another metal that is widely distributed in AMD mine drainage, including within the AMD drainage within the **JF-LC Watershed**. Manganese can be

present in a variety of forms and compounds and complexes with organic compounds. Manganese is persistent and can be carried for long distances downstream of a source of mine drainage. Manganese precipitates along with siltation significantly lower macroinvertebrate species diversity and change stream community structure. Manganese is an essential trace element in humans that can elicit a variety of serious toxic responses upon prolonged exposure to elevated concentrations either orally or by inhalation. The central nervous system is the primary target. Because of the greater bioavailability of manganese from water, USEPA has set a chronic and sub-chronic RID for drinking water of 0. 005 mg/kg/day.

F. **Selenium** has been found in discharges associated with the coal mining waste piles within the **JF-LC Watershed**. Selenium is a **CWA** Toxic Pollutant under **CWA** § 307, 33 U.S.C. § 1317, and **CWA** Priority Pollutant. Selenium bioaccumulates in the aquatic food chain and chronic exposure in fish and aquatic invertebrates can cause reproductive impairments (*e.g.*, larval deformity or mortality). Selenium can also adversely affect juvenile growth and mortality. Selenium is also toxic to waterfowl and other birds that consume aquatic organisms containing excessive levels of selenium. Selenium is toxic to humans at high concentrations, with symptoms of selenium poisoning including gastrointestinal disturbances, discoloration of the skin and decayed teeth.

4. Once *Released* into the *Environment*, these **Waste Materials**, together with increased pH of AMD *Releases*, continue to exist in a manner in which they enter into and migrate through either or both groundwater or surface water, contaminating those publicly-owned natural resources and *Waters of the State*.

5. The groundwater underlying the coal mining waste piles with the **JF-LC Watershed** in Fayette County is hydraulically connected to areas of known surface water and groundwater contamination both within and downgradient of the **JF-LC Watershed**.

e. **The Surface Coal Waste Dumps within the JF-LC Watershed and Their Substantial, Adverse Impact on the that Surface and Groundwaters within that Watershed:**

1. Respondent **EGFA** created and maintained five (5) coal mining waste dumps on the surface of the land within the **JF-LC Watershed**. These dumps were not constructed in a way in which the *Environment* is protected, including the protection of groundwater.

2. Each of the five (5) coal mining waste dumps on the surface of the land within the **JF-LC Watershed** received waste from mining and coal handling and processing activities. These coal mining waste dumps are unlined and were constructed and have been maintained without any **Leachate** control or collection system; therefore, some of the **Wastes** flowing through them is *Discharged* into the surrounding groundwater system. All *Discharges* from the coal mining waste dumps into the groundwater system are not now, and never have been, permitted by any authorized officer, agency or department of the United States or of the State of West Virginia. These coal mining waste disposal areas are above drainage, therefore groundwater in contact with or flowing through these coal mining waste dumps is also connected to surface water within the **JF-LC Watershed**.

3. Groundwater and surface water within the **JF-LC Watershed** associated with these coal

IN RE: Johnson Fork-Loop Creek Pollution Abatement Project
FCCEA Matter No. 2019-002 (Fayette Co., WV Code Enforcement Agency)

**FINAL & BINDING TIME-SENSITIVE ABATEMENT ACTION ORDER NO. 2021-002-9.5(b)-001**

Page 34 of 90 pages

mining waste dumps is continuously and adversely impacted by mining-related **Wastes**, which contribute to the impairment of the beneficial uses of the groundwater and surface water within the **JF-LC watershed** from other operations.

4. **WVDEP** describes the coal mining waste dumps within the **JF-LC Watershed** as "Coal Refuse Piles". The West Virginia Surface Mining Reclamation Rule, WV C.S.R. § 38-2-2.24 defines "Coal Refuse Site" as "a deposit of coal processing waste or underground development waste." Further, that Rule, at WV C.S.R. § 38-2-2.23, defines the term "Coal Processing Waste" as "materials which are separated and wasted from the product coal during its physical or chemical processing, cleaning or concentrating."

f. **Past Facility Investigations of the Coal Mining Waste Dumps within the JF-LC Watershed:**

1. Based upon its investigation of the coal mining waste dumps within the **JF-LC Watershed**, the **FCEEA** has determined that there exists within the **JF-LC Watershed** five (5) surface piles principally composed of coal processing wastes or underground development waste resulting from coal mining, physical coal cleaning, and coal preparation operations (*e.g.*, culm, gob, *etc.*), and each of those five (5) dumps contain discarded coal, matrix material, clay, and other organic and inorganic material.

2. The **Wastes** contained within and emanating from each of the coal mining waste dumps within the **JF-LC Watershed** are discarded material, including solid, liquid, and semisolids, resulting from the extraction, beneficiation or processing of coal mining.

3. **FCCEA** review of **WVDEP** records of dumps located within the **JF-LC Watershed** discloses that **WVDEP** determined that there are two (2) "Problem Area Descriptions" ("PADs") relating to mining waste dumps within that watershed. **WVDEP** records indicate these 2 areas of mine-waste dumping within the **JF_LC Watershed** contain five (5) separate mining waste "gob" piles. Those same **WVDEP** records indicate that **WVDEP** assigned Problem Area Description (PAD) numbers to the 2 areas: PAD WV004926 Spruce Hollow (Fox) Refuse Pile (1 gob pile) and WV002374 Johnson Fork Refuse Pile (4 gob piles). A purpose of the PAD is to score sites for potential reclamation under the WV Abandoned Mined Lands ("AML") program.

4. The Johnson Hollow coal mining waste Piles were evaluated by **WVDEP** in 1987. While **WVDEP** indicates 4 piles for PAD WV002374 in current on-line mapping, the **WVDEP** reporting document appears to only evaluate one (1) of the piles on the western side of Johnson Fork. The pile is described as 1.4 acres approximately 10 feet thick, or about 22,000 cubic yards. The **WVDEP** reporting document indicates that the biggest threat from this pile is a slope stability issue.

5. The Spruce Hollow coal mining waste pile was evaluated by WVDEP in 1995. The site of this coal mining waste pile is described as a five (5) acre gob pile with an average thickness of eight (8) feet, or roughly 64,000 cubic yards. This WVDEP report states that this coal mining waste pile resulted from mining in the 40's and 50's. This **WVDEP** report raised a concern regarding slippage of the pile into the adjoining stream, creating a dam in the stream that could eventually fail, creating a hazard for those downstream. The **WVDEP** 1995 scoring matrix indicates a potential (a score of 5 out of 10) for water quality impacts.

6. In May of 2019, an **FCCEA** site inspection of the coal mining waste piles in the **JF-LC Watershed** was conducted by D. Scott Simonton, Ph.D., P.E., a senior and experienced Environmental Engineer and duly-appointed **FCCEA** Special Investigator,. This **FCCEA** site inspection was conducted on the PAD Spruce Hollow (Fox) Coal Refuse Pile (identified by **WVDEP** as PAD WV004926) and 2 of the 4 Johnson Fork Coal Refuse Piles(the southernmost and easternmost) (all 4 of which Piles are collectively identified by **WVDEP** as PAD WV002374). Consequently, the **FCCEA** has determined that:

   A. There exists at each coal mining waste pile within the **JF-LC Watershed** one or more "point source," as that term is defined in the **CWA** § 502(14), 33 U.S.C. § 1362, discharges of **Leachate** and **Runoff** to *Waters of the State* and to "navigable waters," as that term is defined in **CWA** § 502(7), 33 U.S.C. § 1362(7).

   B. There is a very short, direct and certain hydraulic connection to **JF-LC Watershed** surface waters from the groundwater underlying each such coal mining waste pile.

   C. The coal mining waste dumps within the **JF-LC Watershed** are not lined, have no associated **Leachate** collection system or groundwater monitoring systems in place, and consist primarily of coal mining wastes and not **Overburden**;

   D. The Spruce Hollow (Fox) coal mining Refuse Pile (**WVDEP** PAD WV004926) within the **JF-LC Watershed** is partially located within the watercourse of a perennial stream;

   E. The *Discharge* of **Leachate** associated with each of these coal waste piles to both surface water and groundwaters in the **JF-LC Watershed** has had since the original creation of each of these coal waster piles, and is continuing to have, a substantial adverse impact on surface water and groundwater quality and on the beneficial uses of surface and groundwater within the **JF-LC Watershed**.

7. In the case of PAD WV004926, the Spruce Hollow (Fox) Refuse Pile, is immediately adjacent to and partially within the stream channel of a Perennial Stream. In the case of the other four (4) coal waste piles within the **JF-LC Watershed**, each of these coal waste piles are very close to or immediately adjacent to the stream channel of a Perennial Stream.

8. In all cases, the unlined sides and bottoms of each of the five (5) coal mining waste piles within the **JF-LC Watershed** are porous, and allow some of the **Solid Waste**, including Acid Mine Drainage ("AMD") contaminated **Leachate** and some of the mining **Waste Materials** those wastewaters are holding, to seep through and enter into the groundwater at and emanating from each of those coal mining waste piles.

9. The **Leachate** and **Wastes** *Discharged* from each of the coal mining waste piles within the **JF-LC Watershed** travel the very short distance from the unlined bottoms of the coal mining waste piles into the alluvial aquifer and then traverses within the aquifer the very short distances to the surface waters within the **JF-LC Watershed.** Often after precipitation events, the AMD contaminated **Leachate** emanating directly from these coal mining waste piles *Discharges* through ditches and gullies on the surface of the land directly to adjacent surface waters as AMD contaminated springs.

10. The valley aquifer system within the **JF-LC Watershed** is directly below and hydraulically connected to each of the unlined coal mine waste piles. Because each of these coal mining waste piles are unlined there is virtually no separation between the AMD contaminated

IN RE: Johnson Fork-Loop Creek Pollution Abatement Project
FCCEA Matter No. 2019-002 (Fayette Co., WV Code Enforcement Agency)

**FINAL & BINDING TIME-SENSITIVE ABATEMENT ACTION ORDER NO. 2021-002-9.5(b)-001**

Page 36 of 90 pages

Leachate generated within and *Discharged* from them and the alluvial groundwater system within the **JF-LC Watershed**. This now-contaminated groundwater is directly hydraulically connected back to the surface water of the **JF-LC Watershed** in each case located very proximately downgradient of these coal mining waste piles.

11. The Loop Creek watershed is "biologically impaired" based on the narrative water quality criterion set forth in the West Virginia Water Pollution Control Act regulations, 47 W. Va. C.S.R. § 2–3.2.i, which prohibits the presence of wastes in state waters that cause or contribute to significant adverse impacts on the chemical, physical, hydrologic, and biological components of aquatic ecosystems. The streams suffering these adverse impacts from coal mining operations and from the existing coal mine waste dumps in the **JF-LC Watershed** are receiving waters of Johnson Fork.

12. The FCCEA has determined that elevated levels of various *Toxic* contaminants in groundwater and surface water associated with the coal mining waste dumps within the **JF-LC Watershed** which are similar to elevated contaminant levels in the Page-Kincade PSD source water monitoring reported within the last several years. Sampling indicates that coal mining waste dumps in the **JF-LC Watershed** are adversely affecting surface water and groundwater, and render the groundwater within the **JF-LC Watershed** unfit for drinking and dermal contact purposes without significant and expensive treatment:

    a. Laboratory analysis indicates the presence of contaminants associated with mine-waste in the waters influenced by these mine-waste dumps.

    b. Sulfate was analyzed in water associated with the Spruce Hollow gob pile and the easterly Johnson Fork gob pile. Sulfate concentrations indicate obvious, adverse coal mining impacts.

    c. High iron concentrations (above 300 ug/L), high manganese (above 50 ug/L), and the presence of arsenic, beryllium and cadmium – especially *Toxic* metals – are particularly troublesome and indicative of generally poor water quality associated with the mine-waste dumps.

13. Within the last several years, Cadmium has been found within the Page-Kincade PSD (previously the public water system for a significant portion of the residents and businesses within the **JF-LC Watershed** whose source water is **JF-LC Watershed** groundwater) well-head protection area within the **JF-LC Watershed** above the Maximum Contaminant Level ("MCL") allowed by the federal and West Virginia Safe Drinking Water Acts.

14. The creation and the maintenance without any abatement of the significant, adverse environmental impacts resulting from the past and on-going *Discharges* of *Hazardous Substances* and **Solid Waste** from these coal mining waste dumps within the **JF-LC Watershed** have resulted in, and is continuing to contribute to, substantial, adverse impacts to groundwater and surface water quality within that watershed, including increases of iron and manganese concentrations well above that which is naturally occurring.

g. **FCCEA Findings Regarding Environmental Conditions within the JF-LC Watershed Impact of Coal Mine Waste Dump within the JF-LC Watershed on the Public Health, Safety, Welfare and the *Environment*:**

    1. Barring other influences, the flow of AMD contaminated water within the **JF-LC**

**Watershed** would be expected to follow natural gradients. The natural gradients for contaminated groundwater in the **JF-LC Watershed** would be into the surface water and valley floor groundwater systems and stream beds. At the hillside/valley floor interface, contaminants from individual mines and coal waste piles will commingle with contaminants introduced from upgradient mines and waste piles, creating a single indivisible plume of AMD contaminants in the valley floor sediments, groundwater and surface water system.

2. The unabated, unsealed and inadequately sealed coal mine portals and underground mine shafts themselves and the improperly **Disposed** of mining waste material has been and continues to be the primary sources of **Toxic** AMD contaminants in the **JF-LC Watershed**. It is through the mined coal seams and the coal mining waste dumps that air, water and disruptions in the hydrologic balance originate. AMD contaminated groundwater originates in the unabated, unsealed and poorly sealed coal mine portals and underground mine shafts, and from **Leachate Discharges** from coal-waste dumps and migrates through the coal seams and adjacent rock layers and into the groundwaters and surface waters.

3. The aquifer underlying each of the coal mining waste dumps within the **JF-LC Watershed** contains less than 10,000 mg/l total dissolved solids.

4. Cadmium in the groundwater within the "solid waste boundary," as that term is defined in 40 C.F.R. § 257-3.4(c)(5), of each of the coal mining waste piles within the **JF-LC Watershed** exceeds the MCL for Cadmium set forth in Appendix I to 40 C.F.R., Part 257.

5. Each of the coal mining waste **Disposal** sites within the **JF-LC Watershed** have since their creation introduced and are continuing to introduce Cadmium into the groundwater within the **JF-LC Watershed**.

6. Each of the coal mining waste piles within the **JF-LC Watershed** are now being, and have been since their construction and first use, maintained and allowed to operate in a manner that causes and contributes to contamination of the groundwater within the **JF-LC Watershed** beyond "the solid waste boundary," as that term is defined in 40 C.F.R. § 257-3.4(c)(5), of each of the coal mining waste piles within the **JF-LC Watershed**.

7. None of the coal mining waste dumps within the **JF-LC Watershed** are now or ever have been under a "Compliance Schedule" approved by the **WVDEP** Cabinet Secretary or any other responsible officer of the State of West Virginia.

8. Neither the placement nor **Disposal** of any of the coal mining waste in any of the coal mining waste piles in the **JF-LC Watershed** has ever been in conformance with a permit issued pursuant to W. Va. Code Chapters Twenty-two, Twenty-two-a, or Twenty-two-b.

9. From an environmental engineering standpoint, there exists not only a reasonable probability, but also complete certainty that each of the coal mining waste piles within the **JF-LC Watershed** is currently causing, and will, until properly abated, continue to cause significant adverse impact upon the quality and beneficial uses of the surface water therein.

10. There exists not only a reasonable probability, but also complete certainty that each of the coal mining waste piles within the **JF-LC Watershed** is currently causing, and will, until properly abated, continue to cause a significant adverse impact upon groundwater quality.

11. Each of the coal mining waste piles in the **JF-LC Watershed** is now and has, since their creation, been continuously *Discharging*, spilling, leaking, or otherwise placing *Hazardous Substances*, **Solid Waste** and **Leachate** into and on land and water within the **JF_LC Watershed** so that such **Solid Waste** or any constituent thereof may enter the *Environment* or be emitted into the air, or *Discharged* into any waters, including groundwaters without any specific authorization by permit issued by any authorized officer, agency, or department of the United States or of the State of West Virginia.

12. Each of the coal mining waste piles within the **JF-LC Watershed** is located within three hundred (300) feet of a Perennial surface stream.

13. No protective measures are now in place or have ever been taken at any of the coal mining waste piles within the **JF-LC Watershed** to prevent the *Discharge* of pollutants from the accumulated **Wastes** into the *Waters of the State* (*e.g.*, measures to prevent **Runoff** into surface water bodies or the infiltration of **Leachates** into local aquifers).

14. No protective measures are now in place or have ever been taken at any of the coal mining waste piles within the **JF-LC Watershed** to limit public access to the accumulated waste (*e.g.*, the erection of fencing to surround the accumulated waste).

15. Each of the five (5) coal mining waste piles within the **Subject Property** is a manmade accumulation of refuse or debris located on private lands within Fayette County, which is unsafe, unsanitary, dangerous or detrimental to the Public Health, Safety or Welfare.

## h. FCCEA Determinations Regarding Impact of the Coal Mining Waste Piles within the JF-LC Watershed on the Public Health, Safety, Welfare and the *Environment*:

1. Each of the coal mining waste piles within the **JF-LC Watershed** has contributed and is contributing to the *Release* of *Hazardous Substances*, *Hazardous Wastes*, *Pollutants and Contaminants*, **Solid Wastes**, and **Leachate** containing constituents of those **Wastes** and *Pollutants and Contaminants* into the groundwater and surface waters within the **JF-LC Watershed**. Additionally, this *Toxic* contamination has comingled within the *Environment* with other AMD contaminated wastewaters that have been and are continuing to be *Released* from unabated and unsealed coal mine portal and coal mine shafts and have contributed to degradation of surface waters and sediment within the **JF-LC Watershed** to the point that they can no longer meet their designated uses under the Clean Water Act, specifically the Loop Creek receiving watershed which appears on the WV 303(d)[1] list of Impaired Waters and are subject to TMDLs.

---

[1] Under the federal Clean Water Act § 303(d), 33 U.S.C. § 1313(d), states are required to evaluate all available water quality related data and information to develop a list of waters (*i.e.*, stream segments) that do not meet established Water Quality Standards (*i.e.*, impaired waters) and those that currently meet WQS, but may exceed the applicable WQS's for any given pollutant or contaminant in the next reporting cycle (*i.e.*, threatened waters). States then must develop a Total Maximum Daily Load ("TMDL") for every pollutant/waterbody combination on the list. An essential component of a TMDL is the calculation of the maximum amount of a "pollutant or contaminant" that can occur in waterbody and still meet WQS. Within the TMDL the state allocates this loading capacity among the various point sources and non-point sources discharging into that stream segment. The required permits for discharges of pollutants and contaminants

**IN RE: Johnson Fork-Loop Creek Pollution Abatement Project**
**FCCEA Matter No. 2019-002 (Fayette Co., WV Code Enforcement Agency)**

**FINAL & BINDING TIME-SENSITIVE ABATEMENT ACTION ORDER NO. 2021-002-9.5(b)-001**

Page 39 of 90 pages

2. The **Solid Wastes** within **Leachate** that has been emanating from and is continuing to be *Released* from each of the coal mining waste piles within the **JF-LC Watershed** pose a substantial present or potential hazard to human health and the ***Environment*** when they are, as they are now within each of such coal mining waste piles, improperly treated, *Disposed* of, and managed.

3. **Respondent EGFA**, by its creation and maintenance of each of the five (5) coal mining waste dumps within the **JF-LC Watershed** during its period of ownership of the **Subject Property** and during the period of its operation of the coal mining **Facilities** within the **Subject Watershed** that resulted in mining wastes being Disposed of at any of the five (5) coal mining waste dumps within the **JF-LC Watershed**, all without undertaking any actions to abate the on-going, adverse impacts on the Public Health, Safety, Welfare or the ***Environment*** result from each of the coal mining waste dumps within the **JF-LC Watershed**, has caused and contributed to and is continuing to cause and contribute to significant adverse impacts to the quality of the groundwater and its beneficial uses within the **Subject Watershed**. Most notably, because the unlined coal mining waste piles within the **JF-LC Watershed**, all of which were constructed and operated on the **Subject Property** to handle or **Dispose** of coal mining waste and mining waste discharges, are not now and never have been operated with any **Leachate** control or collection system; some of the ***Hazardous Substances, Hazardous Wastes,*** **Solid Wastes** and ***Pollutants and Contaminants*** in the coal mining wastes in each of those coal mining waste dumps has been and are continuing to be **Disposed** of into the surrounding groundwater system and ultimately into the receiving surface waters within the **Subject Watershed**.

4. **Remedial Respondents EACC** and **Pardee and Curtin Realty LLC**, by each of their past handling of and failure to abate the adverse impacts on the Public Health, Safety, Welfare and the ***Environment*** resulting from each of the five (5) coal mining waste dumps within the **JF-LC Watershed** during the period of time of each of their respective ownership of the **Subject Property**, all without undertaking any actions to abate the on-going, adverse impacts on the Public Health, Safety, Welfare or the ***Environment*** result from each of the coal mining waste dumps on the surface of their real property within the **Subject Watershed**, have each caused and contributed to significant adverse impacts to the quality of the groundwater and its beneficial uses within the **Subject Watershed**. Most notably, because the unlined coal mining waste piles within the **JF-LC Watershed**, all of which were constructed and operated on the **Subject Property** to handle and **Dispose** of,

---

from point sources are then issued or modified through the federal and state administered National Pollutant Discharge Elimination System ("NPDES") mandated by Congress in CWA §§ 301 & 402, 33 U.S.C. § 1311 and 1342. Listing a waterbody-pollutant combination as "impaired" has significant legal and environmental and public health protection consequences. It is interpreted by the public to put into serious question: (1) whether any dermal contact with, swimming in, or ingestion of the impaired waters is safe; and (2) whether the adversely impacting fish, macroinvertebrates, and vegetation that depend on the waters of the impaired stream segment. In addition, such a listing as "impaired waters" may significantly hinder efforts to attract people or businesses to an area. Businesses may also be faced with more stringent NPDES permit limits that have the practical effect of either encouraging relocation of existing businesses with NPDES permits or discouraging new business that will require an NPDES permit from locating within an impaired watershed.

IN RE: Johnson Fork-Loop Creek Pollution Abatement Project
FCCEA Matter No. 2019-002 (Fayette Co., WV Code Enforcement Agency)

**FINAL & BINDING TIME-SENSITIVE ABATEMENT ACTION ORDER NO. 2021-002-9.5(b)-001**

Page 40 of 90 pages

coal mining waste and mining waste **Discharges**, are not now and never have been operated with any **Leachate** control or collection system; some of the *Hazardous Substances, Hazardous Wastes*, **Solid Wastes**, *Pollutants and Contaminants*, and **Leachate** from the coal mining wastes in each of those coal mining waste dumps that was *Released* and *Discharged* into the *Environment* during each of their respective periods of ownership of real property on which those mining waste dumps are located have commingled in the soils, subsurface soils and groundwater with similar AMD wastes from other mining facilities at the **Subject Property** and with *Releases* from previous and subsequent periods of ownership of the mining waste dumps to present a single, indivisible harm to the health or the environment, which harm is not reasonably capable of apportionment to the various source of *Releases* and periods of ownership.

5.  **Remedial Respondent Quercus West Virginia, LLC**, as the owner of the surface rights appertaining to the real property on which all of the mining waste dumps within the Subject Watershed are located, has had since acquiring those surface right and continues to have the authority and responsibility under federal and West Virginia law to: **(i)** assure that no **Open Dump** is allowed to exist on the surface of the land to which its surface rights apply; and **(ii)** to abate or cause to abated the endangerments to health or the environment that may presented by its past and on-going handling of and failure to abate the adverse impacts on the Public Health, Safety, Welfare and the *Environment* resulting from each of the five (5) coal mining waste dumps within the **JF-LC Watershed** during the period of time of its ownership of the surface rights appertaining to the real property on which each of the mining waste dumps within the **Subject Property** Most notably, because the unlined coal mining waste piles within the **JF-LC Watershed**, all of which were constructed and operated to handle and **Dispose** of, coal mining waste and mining waste discharges, are not now and never have been operated with any **Leachate** control or collection system; some of the *Hazardous Substances, Hazardous Wastes*, **Solid Wastes**, *Pollutants and Contaminants*, and **Leachate** from the coal mining wastes in each of those coal mining waste dumps that was *Released* and *Discharged* and is continuing to be *Released* and *Discharged* into the *Environment* during the period of its ownership of the surface rights to the real property on which those mining waste dumps are located have commingled in the soils, subsurface soils and groundwater with similar AMD wastes from other mining facilities at the **Subject Property** and with *Releases* from previous periods of ownership of the mining waste dumps to present a single, indivisible harm to the health or the environment, which harm is not reasonably capable of apportionment to the various source of *Releases* and periods of ownership.

6.  **Respondent EGFA's** creation and maintenance of, and the maintenance during the period of ownership by each of the other **Remedial Respondents** of, each of the five (5) coal mining waste dumps within the **JF-LC Watershed**, all without undertaking any actions to abate the on-going, adverse impacts on the Public Health, Safety, Welfare and the *Environment* result from each of the coal mining waste dumps within the **JF-LC Watershed,** are continuing to cause and contribute to significant adverse impacts to groundwater within the **Subject Watershed**. Most notably, because the existing and

IN RE:  Johnson Fork-Loop Creek Pollution Abatement Project
FCCEA Matter No. 2019-002 (Fayette Co., WV Code Enforcement Agency)

FINAL & BINDING TIME-SENSITIVE ABATEMENT ACTION ORDER NO. 2021-002-9.5(b)-001

Page 41 of 90 pages

currently operating, unlined coal mining waste piles within the **JF-LC Watershed**, all of which were constructed and operated on the **Subject Property** to handle, **Dispose** of, convey or partially treat coal mining waste and mining waste discharges, are not now and never have been operated with any **Leachate** control or collection system; some of the *Hazardous Substance, Hazardous Wastes*, Solid Waste and *Pollutants and Contaminants* in the coal mining wastes in each of those coal mining waste dumps has been and is continuing to be **Disposed** of into the surrounding groundwater system and ultimately into the receiving waters of Johnson Fork.

i. **Consent of the Fayette County Prosecuting Attorney to the Assertion Herein by the FCCEA of Claims Authorized by Section VI(j) of FCoWV Ordinance 2018-002:**

1. Respondent Eastern Associated, LLC, the reformation of Eastern Associated Coal Corporation as a West Virginia Limited Liability Company, is a defunct business entity whose legal existence and authority to conduct business in West Virginia was terminated by the West Virginia Secretary of State effective June 10, 2016.

2. As reflected by his authorized signature below, the Fayette County Prosecuting Attorney has granted his consent pursuant to Section **VI(j)(4)** of **FCoWV Ordinance 2018-001** to the assertion by **FCCEA** of the liability imposed upon EACC pursuant to this **Order** directly against **Remedial Respondents Hanover/CGL 60203, Continental/RDU9433461** and the **Insurer Respondents**, subject to the provisions of Section **VI(j)** of **FCoWV Ordinance 2018-001** and Sections **II(f)** and **(g)** of this **Order**.

# V.  DETERMINATIONS AND CONCLUSIONS OF LAW:

Based on the Findings of Fact set out above, the Fayette County Code Enforcement Agency makes the following Determinations and Conclusions of Law:

a. Each **Respondent** is a *"Person"* within the meaning of that term as defined in Section **III(dd)** of **FCoWV Ordinance 2018-001**.

b. **EGFA** is a *"Person"* that created and maintained until January 1, 1966 the coal mining **Facilities** comprising the Powellton No. 6 coal mining operations within the **JF-LC Watershed**, non-exclusively including each of the five (5) coal mining waste piles therein.

c. By reason of the fact that **EACC**, an insured under the liability **Insurance Policy(ies)** issued by each of the **Insurer Respondents**, is at the time of issuance of this **Order** a "dissolved or defunct business organization" within the meaning of Section **VI(j)(4)(ii)** of **FCoWV Ordinance 2018-001**, each of the **Insurer Respondents** and **Respondents Hanover/CGL 60203** and **Continental/ RDU 9433461** are named as a **Respondent** to this **Order** pursuant to the provisions of Section **VI(j)** of **FCoWV Ordinance 2018-001**.

d. The Powellton No. 6 mine and associated surface and underground mining areas, non-exclusively including each of the five (5) coal mining waste piles with the **JF-LC Watershed** are a *"Facility."*

e. Beginning no later than January 1, 1966, **Respondent EACC** contractually assumed all of the

liability of **EGFA** arising out of and relating to the ownership and operation by **Respondent EGFA** the of the Powellton # 6 coal mining *Facilities* within Fayette County, West Virginia, non-exclusively including the liability arising out of **EGFA's** creation and maintenance of the five (5) coal mining waste piles within the **JF-LC Watershed**.

f. Notwithstanding **EGFA's** contractual assignment to **Respondent EACC** of its liabilities arising out of and relating to the ownership and operation by **EGFA** of the Powellton # 6 coal mining *Facilities* within Fayette County, West Virginia, non-exclusively including the liability arising out of **EGFA's** creation and maintenance of the five (5) coal mining waste piles within the **JF-LC Watershed**, and **Respondent EACC's** contractual assumption of those liabilities, pursuant to the provisions of Section **VI(i)(1)** of **FCoWV Ordinance 2018-001**, for purposes of liability under **FCoWV Ordinance 2018-001**, **EGFA** retained all of its liability imposed by **FCoWV Ordinance 2018-001** arising out of or relating to the ownership and operation of its Powellton # 6 coal mining *Facilities* within Fayette County, West Virginia, non-exclusively including the liability arising out of **EGFA's** creation and maintenance of the five (5) coal mining waste piles within the **JF-LC Watershed** and the *Releases* and *Discharges* of *Hazardous Substances*, *Hazardous Wastes*, **Solid Wastes**, *Pollutants and Contaminants*, and **Leachate** from any of those **Facilities** and coal mining waste piles, that occurred before January 1, 1966.

g. Beginning no later than June 1, 1966 until June 27, 2003, **Respondent EACC** was the *Owner* and *Operator* of each of the five (5) coal mining waste piles within the **JF-LC Watershed**.

h. During the period from January 1, 1966 until June 27, 2003, **Respondent EACC** maintained within Fayette County the Powellton No. 6 coal mining **Facilities**, non-exclusively including each of the five (5) coal mining waste piles within the **JF-LC Watershed**, without abatement of any of the past or on-going *Releases* of *Hazardous Substances*, *Hazardous Wastes*, **Solid Wastes**, and *Pollutants and Contaminants* from those **Facilities** and coal mining waste piles.

i. Each of the five (5) coal mining waste piles located within the **JF-LC Watershed** is composed of "**Solid Waste**" at that term is defined in RCRA § 1004(27), 42 U.S.C. § 6903(27), in the applicable provisions of W. Va. Code § 22-15-2(31), in the applicable provisions of Section **III(ww)** of **FCoWV Ordinance 2018-001**, and in **Section III(dd)** of this **Order**.

j. None of the placement or **Disposal** of the **Solid Waste** comprising each of the five (5) coal mining waste piles within the **JF-LC Watershed** is now or ever has been in conformance with a permit issued by the State of West Virginia, non-exclusively including any permit issued pursuant to Chapter twenty-two [*i.e.*, §§ 22-1-1 *et seq.*], twenty-two-a [*i.e.*, §§ 22A-1-1 *et seq.*] or twenty-two-b [*i.e.*, §§ 22B-1-1 *et seq.*] of the West Virginia Code.

k. Each of the five (5) coal mining waste piles located within the **JF-LC Watershed** is an instance of the site within Fayette County being used for the *Disposal* of **Solid Waste** which does not now have, and never has had, a West Virginia Solid Waste Disposal Permit issued pursuant to W. Va. Code Chapter 22, Article 15, and none of which is now or ever has been authorized by an order of any authorized officer, agency or department of the State of West Virginia.

l. Each of the five (5) coal mining waste piles located within the **JF-LC Watershed** is a place

IN RE: Johnson Fork-Loop Creek Pollution Abatement Project
FCCEA Matter No. 2019-002 (Fayette Co., WV Code Enforcement Agency)

**FINAL & BINDING TIME-SENSITIVE ABATEMENT ACTION ORDER NO. 2021-002-9.5(b)-001**

Page 43 of 90 pages

within Fayette County where **Solid Waste** is ***Disposed*** of in a manner that does not protect the ***Environment***.

m. Each of the five (5) coal mining waste piles located within the **JF-LC Watershed** is a "landfill" within the meaning of that term as defined in the West Virginia Solid Waste Management Rule, W. Va. C.S.R. § 33-1-2.64.

n. Each of the five (5) coal mining waste piles located within the **JF-LC Watershed** is a "Solid Waste Facility" within the meaning of that term as defined in the West Virginia Solid Waste Management Rule, W. Va. C.S.R. § 33-1-2.123

o. Each of the five (5) coal mining waste piles located within the **JF-LC Watershed** is an accumulation of refuse that is unsafe, unsanitary, dangerous, and detrimental to the public safety and public welfare located on private property within Fayette County, West Virginia.

p. Because each of the five (5) coal mining waste piles located within the **JF-LC Watershed** have continuously since their creation allowed the ***Discharging*** and leaking of **Solid Waste** and **Leachate** into or on any land or water within Fayette County so that such **Solid Waste** or any constituent thereof may enter the ***Environment*** or be emitted into the air, or discharged into any waters, including groundwaters, each of them is, and has been since the effective date of the West Virginia Solid Waste Management Rule, a Solid Waste Facility that violates the requirements of the West Virginia Solid Waste Management Rule, W.Va. C.S.R. § 33-1-1.6 and, therefore, by operation of West Virginia law an **Open Dump**.

q. In W. Va. Code § 22-15-1(c)(1) the State of West Virginia declared the uncontrolled, inadequately controlled and improper collection, and disposal of **Solid Waste** to be a public nuisance and a clear and present danger to people.

r. Continuously since at the latest March 31, 1993, West Virginia law has prohibited **Open Dumps**, and prohibited any landowner from allowing an "**Open Dump,**" as that term is defined in W. Va. Code § 22-15-2(23), to exist on the landowner's property unless that **Open Dump** is under a compliance schedule imposed by a designated officer of the State.

s. An "Open Dump" as that term is defined in W. Va. Code § 22-15-2(23) and W. Va. C.S.R. §§ 33-1-2.84, 33-1-1.6.b and 33-1-7.2(a) is an instance of both "inadequately controlled" and "improper disposal" of **Solid Waste** within the meaning of W. Va. Code § 22-15-1(c)(1) and, as a matter of law, is a ***Public Nuisance Per-se*** and a danger to the Public under West Virginia law.

t. Each of the five (5) coal mining waste piles located within the **JF-LC Watershed** is an "**Open Dump,**" as that term is defined in **RCRA** § 1004(14), 40 C.F.R. § 257.1(a)(1), W. Va. Code § 22-15-2(23) and W. Va. C.S.R. §§ 33-1-2.84 and 33-1-1.6.b and 33-1-7.2(a), is prohibited by **RCRA** § 4005(a) and W. Va. Code § 22-15-10(a), and, therefore, each of those mining waste piles is: **(A)** a ***Public Nuisance per se*** under West Virginia law West Virginia; and **(B)** a ***Public Nuisance*** as declared by Section **V(b)** of **FCoWV Ordinance 2018-001.**

u. By creating and maintaining throughout its period of ownership of the Powellton No. 6 coal mining ***Facilities*** within the **JF-LC Watershed**, non-exclusively including each of the five (5)

IN RE: Johnson Fork-Loop Creek Pollution Abatement Project
FCCEA Matter No. 2019-002 (Fayette Co., WV Code Enforcement Agency)

**FINAL & BINDING TIME-SENSITIVE ABATEMENT ACTION ORDER NO. 2021-002-9.5(b)-001**

Page 44 of 90 pages

coal mining waste piles within that watershed, without appropriate protection of the Public Health and *Environment* and, thereby, causing and contributing to an imminent and substantial endangerment to the Public Health, Safety, Welfare and the *Environment* within Fayette County, **EGFA** created and contributed to a Public Nuisance within the meaning of the common law of West Virginia, and, therefore, created and contributed to a *Public Nuisance* as declared by Section **V(b)** of **FCoWV Ordinance 2018-001.**

**v.** By contributing to and maintaining throughout each of their respective period of ownership of the land (or the Surface Estate appertaining to the land) upon which exists the Powellton No. 6 coal mining *Facilities* within the **JF-LC Watershed**, non-exclusively including each of the five (5) coal mining waste piles within that watershed, without providing appropriate protection of the Public Health and *Environment* within Fayette County and thereby causing and contributing to an imminent and substantial endangerment to the Public Health, Safety, Welfare and the *Environment* within Fayette County, **Respondents** EACC, Pardee and Curtin Realty LLC, and Quercus West Virginia, LLC each contributed to and maintained a condition of *Public Nuisance* within the meaning of the common law of West Virginia, and, therefore, contributed to and maintained a *Public Nuisance* as declared by Sections **V(a)(17)** and **V(b)** of **FCoWV Ordinance 2018-001.**

**w.** By "knowingly," within the meaning of that term as defined by Section **III(x)** of **FCoWV Ordinance**, allowing the five (5) coal mining waste piles within the **JF-LC Watershed**, each an **Open Dump**, to exist on their land within Fayette County during each of their periods of ownership of that land (or of the Surface Rights appertaining to that land) on or after March 31, 1993, **Respondents EACC**, Pardee and Curtin Realty LLC each knowingly allowed the use of their land within the **Subject Watershed** during their respective periods of ownership of that land, and **Respondent** Quercus West Virginia, LLC has allowed and is continuing to allow the use of the surface of the real property within the **Subject Watershed** to which its surface rights appertain, for a purpose declared illegal and expressly prohibited by W. Va. Code § 22-15-10(a); an act and condition declared to be a *Public Nuisance* by Section **V(a)(17)** of **FCoWV Ordinance 2018-002.**

**x.** **EGFA** and Respondents EACC, Pardee and Curtin Realty LLC and Quercus West Virginia, LLC are each a *Person* that "knowingly," within the meaning of Section **III(x)** of **FCoWV Ordinance 2018-002**, maintains or maintained a *Public Nuisance* within Fayette County and, therefore, each is a *Person* Liable for the abatement of the *Public Nuisance* required by this Order pursuant to Section **VI(a)(3)** of **FCoWV Ordinance 2018-002.**

**y.** **EGFA** and **Respondents EACC**, Pardee and Curtin Realty LLC and Quercus West Virginia, LLC are each a *Person* that, during the creation or existence of a *Public Nuisance* within Fayette County, owned or had control over the land at, on, in, from, or within which a *Public Nuisance* was created, maintained, or is being maintained, and each of whom, regardless of actual knowledge of the existence or nature of the nuisance condition, failed or refused appropriately to abate the *Public Nuisance,* and, therefore, each of them is, pursuant to Section **VI(a)(4)** of **FCoWV Ordinance 2018-001**, liable for the abatement of the *Public Nuisance* within Fayette County set forth in this **Order.**

**z.** **EGFA** and **Respondent EACC**, as sequential **Owners** and **Operators** of the Powellton No. 6

coal mining *Facilities* within Fayette County, West Virginia, each have, during their respective periods of ownership and operation, of the coal mining *Facilities* within the **Subject Watershed**, non-exclusively including the five (5) coal mining waste piles within that watershed, caused and contributed to a condition that unreasonably interferes with the reasonable and comfortable use and enjoyments within Fayette County of *Waters of the State*, as that term is defined in Section **III(vv)** of **FCoWV Ordinance 2018-001**; namely the groundwaters and surface waters of the Johnson Fork and Loop Creek Watersheds.

aa. **Respondent Pardee and Curtin Realty LLC,** as a former **Owner** of, and **Respondent Quercus West Virginia, LLC,** as current **Owners** of, the Surface Estate appertaining to the land upon which the surface **Facilities** of the Powellton No. 6 coal mine within Fayette County, West Virginia, non-exclusively including the five (5) coal mining waste piles within the **JF-LC Watershed,** are located has, by failing and refusing to abate or cause the abatement of the past and on-going *Releases* and *Discharges* of *Hazardous Substances*, *Hazardous Wastes*, **Solid Wastes***, Pollutants and Contaminants*, and **Leachate** from any of those *Facilities* and coal mining waste piles during their period of ownership, each caused or contributed to, a condition that unreasonably interferes with the reasonable and comfortable use and enjoyments within Fayette County of *Waters of the State*, namely the groundwaters and surface waters of the Johnson Fork and Loop Creek Watersheds.

bb. **EGFA** and **Respondents EACC**, and Pardee and Curtin Realty LLC, as sequential former owners of the land (or the Surface Rights appertaining to the land) upon which the Powellton No. 6 mining *Facilities,* non-exclusively including the five (5) coal mining waste piles within the **JF-LC Watershed**, by each of their failures or refusals during each of their respective periods of ownership to abate or control *Releases* of *Hazardous Substances*, *Hazardous Wastes*, **Solid Waste**, and *Pollutants and Contaminants* from those *Facilities* and coal mining waste piles, have each caused or contributed to the *Release*, into the *Environment* within Fayette County during each of their respective periods of ownership of *Pollutants and Contaminants* that have caused the presence within groundwaters within Fayette County of more than 50 µg/L of total manganese; a condition declared to be a *Public Nuisance* in Fayette County by Section **V(a)(10)(6)(iii)** of **FCoWV Ordinance 2018-001**.

cc. **Respondent Quercus West Virginia, LLC,** as the current owner of the Surface Estate appertaining to the land upon which the surface *Facilities* of the Powellton No. 6 coal mining operations within the **JF-LC Watershed** exist, non-exclusively including the Surface Estate of the land upon which each of the five (5) coal mining waste piles in the **JF-LC Watershed** exist, has, by its failure or refusal to abate or control *Releases* of *Hazardous Substances*, *Hazardous Wastes*, **Solid Waste***, Pollutants and Contaminants*, and **Leachate** from those *Facilities* and coal mining waste piles, caused or contributed to the *Release*, and is continuing to cause or contribute to the *Release*, into the *Environment* within Fayette County of *Pollutants and Contaminants* that have caused the presence within groundwaters within Fayette County of more than 300 µg/L of total iron; a condition declared to be a *Public Nuisance* in Fayette County by Section **V(a)(10)(6)(vi)** of **FCoWV Ordinance 2018-001**.

dd. **EGFA** is a former owner of *Waste Disposal Facilities*, to wit, the five (5) coal mining waste

IN RE: Johnson Fork-Loop Creek Pollution Abatement Project
FCCEA Matter No. 2019-002 (Fayette Co., WV Code Enforcement Agency)

**FINAL & BINDING TIME-SENSITIVE ABATEMENT ACTION ORDER NO. 2021-002-9.5(b)-001**

Page 46 of 90 pages

piles within the **JF-LC Watershed**, that has contributed to the past handling, or *Disposal* of a **Waste** or **Hazardous Waste**, to wit, the coal mining *Wastes* within those coal mining waste piles, which:

(1) may present an *Imminent* and *Substantial Endangerment* to the Public Health, Safety, Welfare or the *Environment* within Fayette County; or

(2) is detrimental to or impairs any beneficial uses within Fayette County of *Waters of the State* or Natural Resource owned by the State of West Virginia or Fayette County, or held in trust by either of them for the benefit of present and future generations of the public, to wit, the surface waters and groundwaters within the JF-LC Watershed;

an act declared to be a *Public Nuisance* in Fayette County by Sections **V(a)(6)** and **(8)** of **FCoWV Ordinance 2018-001**, and, therefore, is a *Person* liable for the abatement of such *Public Nuisance* conditions within the meaning of Section **VI(a)(5)** of **FCoWV Ordinance 2018-001**.

ee. **EGFA**, and **Respondents** EACC and Pardee and Curtin Realty LLC are each a *Person* that has, by reason of their past ownership, maintenance, and failure to abate the five (5) coal mining waste disposal facilities the surface of their real property during their period of ownership or maintenance of such real property within the **Subject Watershed**, created or contributed to within Fayette County the *Public Nuisance* conditions declared in Sections **V(a)(8)** and **(10)(6)(vi)** of **FCoWV Ordinance 2018-001**, and, therefore, are each a *Person* liable for the abatement of such *Public Nuisance* conditions within the meaning of Sections **VI(a)(1)** and **(2)** and **VIII(a)(1)** and **(b)**of **FCoWV Ordinance 2018-001**.

ff. **EGFA** and **Respondents** EACC, and Pardee and Curtin Realty LLC are each a *Person* that have contributed to *Public Nuisance* conditions within Fayette County declared in Sections **V(a)(8)** and **(10)(6)(vi)** of **FCoWV Ordinance 2018-001**, and are each, therefore, a *Person* liable for the abatement of such *Public Nuisance* conditions within the meaning of Sections **VI** and **VIII** of **FCoWV Ordinance 2018-001**.

gg. **Respondent** National Grid NE Holdings 2 LLC is the corporate successor to **EGFA**, and, pursuant to Section **VI(i)** of **FCoWV Ordinance 2018-001**, is liable for all of the remedial liabilities imposed upon **EGFA** by **FCoWV Ordinance 2018-001** respecting any of its acts or omissions, or it status as an *Owner or Operator* of the mining **Facilities** and mining waste **Disposal Facilities** within the **Subject Watershed**, that existed or occurred before January 1, 1966, non-exclusively including:

(1) **EGFA's** liability arising out of its creation and maintenance of the coal mining **Facilities** comprising the Powellton No. 6 coal mining operations within the **JF-LC Watershed**, specifically including the five (5) coal mining waste piles;

(2) **EGFA's** liability arising out of its ownership and maintenance until January 1, 1966 of the five (5) coal mining waste piles within the **JF-LC Watershed**; and

(3) **EGFA's** liability arising out of the *Disposal, Releases* and *Discharges* of *Hazardous Substances, Hazardous Wastes, Solid Wastes,* and *Pollutants and Contaminants* at and from any of those **Facilities** and coal mining waste piles.

hh. **EGFA** is a *Person* that during the creation and existence of a *Public Nuisance* declared in

IN RE: Johnson Fork-Loop Creek Pollution Abatement Project
FCCEA Matter No. 2019-002 (Fayette Co., WV Code Enforcement Agency)

**FINAL & BINDING TIME-SENSITIVE ABATEMENT ACTION ORDER NO. 2021-002-9.5(b)-001**

Page 47 of 90 pages

Section **V(a)(9)** of **FCoWV Ordinance 2018-001** owned or had control over real property in Fayette County at and on which a ***Public Nuisance*** was being created, contributed to or maintained.

ii. **Respondents** EACC, and Pardee and Curtin Realty LLC are each a ***Person*** that during the existence of a ***Public Nuisance*** declared in Section **V(a)(9)** of **FCoWV Ordinance 2018-001** owned or had control over real property in Fayette County at and on which a ***Public Nuisance*** was being maintained.

jj. **Respondent** Quercus West Virginia, LLC is a ***Person*** that during the existence of a ***Public Nuisance*** declared in Section **V(a)(9)** of **FCoWV Ordinance 2018-001** had and still has control over the surface of real property in Fayette County at and on which a ***Public Nuisance*** was being maintained.

kk. **Respondents** EACC, and Pardee and Curtin Realty LLC are each a subsequent owner of the real property within Fayette County on which each of the five (5) coal mining waste piles exist, and, consequently, are each a subsequent owner of **Facilities** described in Section **VI(a)(4)** of **FCoWV Ordinance 2018-001** on which the ***Public Nuisance*** continued unabated throughout each of their respective periods of ownership of such **Facility(ies)**; all within the meaning of Section **VI(d)** of **FCoWV Ordinance 2018-001.**

ll. Respondent Quercus West Virginia, LLC is a subsequent ***Person*** controlling the surface of the real property within Fayette County on which each of the five (5) coal mining waste piles exist, and, consequently, is a subsequent ***Person*** controlling **Facilities** described in Section **VI(a)(4)** of **FCoWV Ordinance 2018-001** on which the ***Public Nuisance*** has continued and still is continuing unabated throughout its period of ownership of the surface rights to the real property on which such **Facility(ies)** are located; all within the meaning of Section **VI(d)** of **FCoWV Ordinance 2018-001.**

mm. The costs of the ***Abatement Actions*** imposed by this Order properly to respond to the conditions of ***Public Nuisance*** within the **Subject Watershed** are sums which an Insured is obligated to pay by reason of liability imposed by law for damages, direct or consequential, on account of property damage resulting from an occurrence within the meaning of West Virginia law and Hanover Insurance Commercial General Liability Insurance Policy Number **CGL 60203** and Continental Insurance Company Umbrella Excess Third Party Liability Insurance Policy Number RDU 9433461.

nn. Subject to the provisions of Section **VI(j)** of **FCoWV Ordinance 2018-001** and Section **IV(a)(5)(E)** of this **Order**, each of the **Remedial Respondents** is a ***Person*** liable, within the meaning of Sections **VI** and **VIII** of **FCoWV Ordinance 2018-001,** for the abatement of the ***Public Nuisance*** conditions within the **Subject Watershed.**

oo. Each of the **Insurer Respondents** is a ***Person*** who has or may have information or ***Records*** that contain, comprise, directly or indirectly relate to, or may reasonably be calculated to lead to the discovery of, non-privileged information about any one or more of the matters described in Section **VIII(a)(2)** of **FCoWV Ordinance 2018-001.**

**IN RE: Johnson Fork-Loop Creek Pollution Abatement Project**
**FCCEA Matter No. 2019-002 (Fayette Co., WV Code Enforcement Agency)**

**FINAL & BINDING TIME-SENSITIVE ABATEMENT ACTION ORDER NO. 2021-002-9.5(b)-001**

Page 48 of 90 pages

**pp.** The *Releases* and *Discharges* of *Hazardous Substances*, *Hazardous Wastes*, **Solid Wastes**, *Pollutants and Contaminants*, and **Leachate** from the Powellton No. 6 coal mining *Facilities* within the **JF-LC Watershed**, non-exclusively including each of the five (5) coal mining waste piles within the **JF-LC Watershed**, that occurred during each of the periods of ownership of the land (or of the Surface Estate appertaining to the land) on which those *Facilities* are located by **EGFA**, and **Respondents EACC**, Pardee and Curtin Realty LLC, and Quercus West Virginia, LLC have commingled in the soils, subsurface soils, groundwater and sediments within the **JF-LC Watershed** to form a single, indivisible harm to, and to present or imminently threaten to present an endangerment of, the Public Health, Safety, Welfare and the *Environment* within the **JF-LC Watershed**, which harm and endangerment cannot reasonably and reliably be apportioned among the liable **Respondents**, and, accordingly, pursuant to Section **VI(f)** of **FCoWV Ordinance 2018-001**, **Respondents** National Grid NE Holdings 2 LLC, **EACC**, Pardee and Curtin Realty LLC, Quercus West Virginia, LLC, **Hanover/CGL 60203** and **Continental/RDU9433461** are each jointly and severally liable for performance of the *Abatement Actions* and reimbursement to Fayette County of all *Abatement Action Cost* required by this *Order*.

**qq.** This *Order's* requirements for the timely and competent performance of *Abatement Actions*, monitoring, testing, analysis, and reporting by and at the sole cost of the **Remedial Respondents**, each of which has been declared liable for *Public Nuisance Abatement* by **FCoWV Ordinance 2018-001**, are each proper and may be lawfully ordered by the **FCCEA** pursuant to Sections **VI, VIII(a)** and **(b)** and **IX** of **FCoWV Ordinance 2018-001**.

**rr.** The **FCCEA** has determined that the timely abatement, monitoring, testing, analysis and reporting requirements set forth in this **Order** are necessary and proper to: **(1)** securing the timely and competent performance of the *Abatement Actions* required by this **Order** with respect to such *Public Nuisance* conditions; and **(2)** timely ascertaining the nature and extent of any potential hazard to human health or the *Environment* that is or may be presented by such *Public Nuisance* conditions.

**ss.** The *Abatement Actions* required by this **Order** are necessary and appropriate to protect the Public Health, Safety, Welfare, and the *Environment*, and are consistent with the requirements of Section **IX** of **FCoWV Ordinance 2018-001**.

## VI.  ORDER REQUIRING TIME-SENSITIVE ABATEMENT ACTIONS:

**a.** Based upon the foregoing Findings of Fact and Conclusions of Law, the **FCCEA ORDERS** the **Remedial Respondents**, jointly and severally, timely and competently to comply with, and to perform and implement, or cause to be performed and implemented, all the applicable requirements, and timely to make all of the required payments set forth in this **Order;** and

**b.** The **FCCEA FURTHER ORDERS** the **Insurer Respondents** and Respondents **Hanover/RDU9433461** and **Continental/RDU9433461** timely to comply with the applicable requirements of **Sections VIII, XX, and XXII** of this **Order**.

IN RE:  Johnson Fork-Loop Creek Pollution Abatement Project
FCCEA Matter No. 2019-002 (Fayette Co., WV Code Enforcement Agency)

**FINAL & BINDING TIME-SENSITIVE ABATEMENT ACTION ORDER NO. 2021-002-9.5(b)-001**

Page 49 of 90 pages

## VII.  EFFECTIVE DATE:

**a.**  Unless a conference pursuant to **Section IX(a)(1)** is earlier requested or notice pursuant to **Section IX(a)(2)** is earlier given that written materials will be submitted in lieu of a conference, **THIS ORDER SHALL BE EFFECTIVE UPON EACH RESPONDENT THAT HAS RECEIVED COMPLIANT SERVICE OF THIS ORDER FOURTEEN (14) DAYS AFTER THE DATE OF SERVICE OF THIS ORDER BY OR ON BEHALF OF THE FCCEA.**

**b.**  If such conference is requested in compliance with the time requirement set forth in **Section VII(a)** of this **Order**, or such notice is submitted and filed in compliance with the time requirement set forth in **Section VII(a)** of this **Order**, this **Order** shall be effective on the 5th day following the day that the **FCCEA** gives written notice to all **Respondents** that:  **(1)** the last conference timely requested pursuant to **Section VII(a)** of this **Order**; or **(2)** if no conference is timely requested pursuant to **Section VII(a)** of this **Order**, the last set of written materials, if any, were timely submitted pursuant to **Section VIII(a)** of this **Order;** unless the **FCCEA** determines that this **Order** should be modified based on any conference(s) or written materials.  In such event, the **FCCEA** will notify **Respondents** that the **FCCEA** intends to modify the **Order**.  The modified **Order** shall be effective seven (7) working days after it is served by the **FCCEA**.

## VIII.  REQUIRED NOTICE OF INTENT TO COMPLY:

On or before the **Effective Date**, each **Respondent** shall notify the **FCEEA** in writing of its irrevocable intent timely and competently to comply with this **Order**.  The giving of such Notice shall be without prejudice to the **Respondent's** right to assert in any proceeding identified in Section **IX.V(g)** of **FCoWV Ordinance 2018-001** any "just and sufficient cause" defense(s) under Sections **IX.V(e)** and **XX(e)** of **FCoWV Ordinance 2018-001**.  Such written notice shall indicate that it is in reference to **FCCEA FINAL & BINDING TIME-SENSITIVE ABATEMENT ACTION ORDER NO. 2021-002-9.5(b)-001** be sent to the **FCCEA** in compliance with the requirements of **Paragraph XXIII(b)** of this **Order** and filed with the Office of the Fayette County Clerk.  Each **Respondent's** written notice shall describe, using facts that exist on or prior to the **Effective Date**, any defense, non-exclusively including any "just and sufficient cause" defense(s) claimed by such **Respondent** under Sections **IX.V(e)** and **XX(e)** of **FCoWV Ordinance 2018-001**, to any requirement of this **Order** claimed by such **Respondent**.  The absence of a response by the **FCCEA** to the notice required by this **Section** shall not be deemed to be acceptance of any **Respondent's** assertions.  Failure of any **Respondent** to provide such written notice within this time period shall, as of the **Effective Date**, constitute a violation of this **Order** by such **Respondent**.

## IX.  OPPORTUNITY TO CONFER:

**a.**  On or before thirty (30) days after its receipt of service of this **Order**, any **Respondent**(s) may, in a writing submitted and filed in compliance with the requirements of this **Order**:

**1.**  request a conference with an authorized representative of the **FCCEA** to discuss this **Order**, including its applicability, the factual findings, and the determinations upon

**IN RE:  Johnson Fork-Loop Creek Pollution Abatement Project**
**FCCEA Matter No. 2019-002 (Fayette Co., WV Code Enforcement Agency)**

**FINAL & BINDING TIME-SENSITIVE ABATEMENT ACTION ORDER NO. 2021-002-9.5(b)-001**

**Page 50 of 90 pages**

Case 2:21-cv-00307    Document 38-4    Filed 08/02/21    Page 52 of 92 PageID #: 1221

which it is based, the appropriateness of any actions any requesting **Respondent(s)** is ordered to take, or any other relevant and material issues or contentions that any requesting **Respondent**(s) may have regarding this **Order**; or

2.  notify the **FCCEA** in writing that they intend to submit written comments or a statement of position in lieu of requesting a conference.

**b.** If a conference is requested, **Respondent**(s) may appear in person or by an attorney or other representative. Any such conference shall be held no later than 5 working days after the conference is requested. Any written comments or statements of position on any matter pertinent to this **Order** must be submitted no later than five (5) days after the conference or fifteen (15) days after this **Order** was served upon the requesting **Respondent**(s) if **Respondents** do not request a conference.

**c.** The conference afforded by this **Section** will not delay the **Effective Date** of this **Order** unless it is timely requested pursuant to the requirements of **Section VII**, is not an evidentiary hearing, does not constitute a proceeding to challenge this **Order**, and does not give any requesting **Respondent** a right to seek review of this **Order** by any court, administrative agency or tribunal, or by the Fayette County Commission.

**d.** Any written request for a conference or written comments or statements submitted pursuant to this **Section** should reflect that they are in reference to **FCCEA FINAL & BINDING TIME-SENSITIVE ABATEMENT ACTION ORDER NO. 2021-002-9.5(b)-001** and be submitted to:

> Michael O. Callaghan, Esq.
> Chief Assistant Fayette County Prosecuting Attorney
> Environmental and Public Health Protection Unit
> c/o Neely and Callaghan
> 1337 Virginia Street East
> Suite 200
> Charleston, WV 25301-3011
> Telephone: 304-343-6500
> E-mail: mcallaghan@neelycallaghan.com

and filed with the Office of the Fayette County Clerk.

## X.   DESIGNATION OF THE FCCEA LEAD REMEDIAL LEGAL COUNSEL AND THE REMEDIAL RESPONDENTS' REMEDIAL LIAISON COUNSEL:

**a.** **Designation of FCCEA's Lead Remedial Legal Counsel**: Unless contrary notification is made in writing to the **Remedial Respondents** by or on behalf of the Fayette County Prosecuting Attorney, the **FCCEA's** Lead Legal Counsel with respect to all matters addressed by or arising out of this Order shall be:

> Michael O. Callaghan, Esq.
> Chief Assistant Fayette Co. Prosecuting Attorney

**IN RE: Johnson Fork-Loop Creek Pollution Abatement Project**
**FCCEA Matter No. 2019-002 (Fayette Co., WV Code Enforcement Agency)**

**FINAL & BINDING TIME-SENSITIVE ABATEMENT ACTION ORDER NO. 2021-002-9.5(b)-001**

**Page 51 of 90 pages**

Office of the Fayette County Prosecuting Attorney
ENVIRONMENTAL & PUBLIC HEALTH PROTECTION UNIT
c/o Neely & Callaghan
1337 Virginia Street East
Suite 200
Charleston, WV 25301-3011
Telephone: (304) 343-6500
E-Mail: mcallaghan@neelycallaghan.com

**b.** **Designation of Remedial Respondent's Remedial Liaison Counsel**: On or before the date that the **Remedial Respondents** are required to designate their Project Coordinator pursuant to **Section XI** of this **Order**, the **Remedial Respondents** shall designate to the **FCCEA** in writing the name, address and contact details for a single attorney at law authorized to act as their Remedial Liaison Legal Counsel who shall be authorized to represent the **Remedial Respondents** and to bind the **Remedial Respondents** with respect to all matters addressed by or arising out of this **Order**. Receipt by the **Remedial Respondents'** Remedial Liaison Counsel of any notice or communication from the **FCCEA**, its **RPM** or its Lead Legal Counsel relating to this **Order** shall constitute receipt by all **Remedial Respondents**.

## XI. DESIGNATION OF FCCEA REMEDIAL PROJECT MANANGER AND REMEDIAL RESPONDENTS' PROJECT PERSONNEL:

**a.** **Designation of the FCCEA Site Project Manager:** The **FCCEA** has designated D. Scott Simonton, Ph.D., P.E., as its Remedial Project Manager ("**RPM**") with regard to all **Work** required by or in connection with this **Order**. The **FCCEA** will notify in writing the **Remedial Respondents** of any change of its designated **RPM**. Communications between the **Remedial Respondents** and the **FCCEA**, and all documents concerning the activities performed pursuant to this **Order** and *Records* requested by the **FCCEA** or required to produced pursuant to this **Order** (excepting those *Records* required to be produced pursuant to **Section XX** of this **Order**), shall be directed to the **RPM** in accordance with **Section XIII** of this **Order**.

**b.** **Remedial Respondents Designation of Project Coordinator:** Within fourteen (14) days after the **Effective Date**, the **Remedial Respondents** shall designate a Project Coordinator who shall be responsible for administration of the **Work** required by this **Order** and shall submit to the **FCCEA** the designated Project Coordinator's name, title, address, telephone number, E-mail address, and qualifications. To the greatest extent possible, the Project Coordinator shall be present on-**Site** or readily available during the **Work**. The **FCCEA** retains the right to disapprove of a designated Project Coordinator who does not meet the requirements of Paragraph **(e)** of this **Section**. If the **FCCEA** disapproves of the designated Project Coordinator, the **Remedial Respondents** shall retain a different Project Coordinator and shall notify the **FCCEA** of that person's name, title, contact information, and qualifications within fourteen **(14)** days following the **FCCEA**'s disapproval. The **Remedial Respondents** shall have the right to change their Project Coordinator, subject to the right of the **FCCEA** to disapprove. Unless exigent circumstances necessitate a shorter advance notification period, the **Remedial Respondents** shall notify the **FCCEA** ten (10) days before such a change is made. The initial notification of the

IN RE: Johnson Fork-Loop Creek Pollution Abatement Project
FCCEA Matter No. 2019-002 (Fayette Co., WV Code Enforcement Agency)

**FINAL & BINDING TIME-SENSITIVE ABATEMENT ACTION ORDER NO. 2021-002-9.5(b)-001**

Page 52 of 90 pages

**Remedial Respondent's** designated Project Coordinator may be made orally to the **FCCEA RPM**, but shall be promptly followed by a compliant, written notification to the **FCCEA**.

    **c.** **Selection of Contractors, Personnel:** All **Work** performed under this **Order** shall be under the direction and supervision of qualified personnel. Within 30 days after the **Effective Date**, and before the **Work** outlined below begins, the **Remedial Respondents** shall notify the **FCCEA** in writing of the names, titles, addresses, telephone numbers, E-mail addresses, and qualifications of the personnel, including contractors, subcontractors, consultants, and laboratories to be used in carrying out such **Work**. If, after the commencement of **Work**, the **Remedial Respondents** retain additional contractors or subcontractors, the **Remedial Respondents** shall notify the **FCCEA** in writing of the names, titles, contact information, and qualifications of such contractors or subcontractors retained to perform the **Work** at least ten (10) days prior to commencement of **Work** by such additional contractors or subcontractors.

    **d.** **Experience and Qualifications Required of the Remedial Respondent's Project Coordinator, Contractor and Subcontractors:** With respect to any proposed Project Coordinator, contractor, or subcontractor the **Remedial Respondents** shall demonstrate that the proposed contractor demonstrates compliance with ASQ/ANSI E4:2014 "Quality management systems for environmental information and technology programs – Requirements with guidance for use" (American Society for Quality, February 2014), by submitting a copy of the proposed contractor's Quality Management Plan (QMP). The QMP should be prepared in accordance with "EPA Requirements for Quality Management Plans (QA/R-2)," EPA/240/B-01/002 (Reissued May 2006) or equivalent documentation as determined by the **FCCEA**. The qualifications of the persons undertaking the **Work** for the **Remedial Respondents** shall be subject to the **FCCEA's** review for verification based on objective assessment criteria (*e.g.*, experience, capacity, technical expertise, professional responsibility, *etc.*) and that she, he or they do not have a conflict of interest with respect to the project.

    **e.** **FCCEA Right to Disapprove of Any Project Coordinator, Contractor or Subcontractor Selected by the Remedial Respondents:** The **FCCEA** retains the right, at any time, to disapprove of any Project Coordinator designated by the **Remedial Respondents** or any contractors or subcontractors retained by the **Remedial Respondents** to conduct any part of the **Work** required by this **Order**. If the **FCCEA** disapproves of a designated Project Coordinator or any selected contractor or subcontractor, the **Remedial Respondents** shall designate a different Project Coordinator or retain a different contractor or subcontractor, as the case may be, and shall notify the **FCCEA** of any such Project Coordinator's, contractor's or subcontractor's name, title, contact information, and qualifications within fourteen (14) days after the **FCCEA's** disapproval.

## XII.   MINIMUM QUALIFICATIONS FOR PERSONNEL:

    All **Work** performed by or on behalf of the **Remedial Respondents** pursuant to this **Order** shall at all times be conducted under the direction and supervision of an individual who is qualified by professional education and training, and who has demonstrated expertise in *Hazardous Substances* and *Hazardous Waste* site investigation. Additionally, the **Remedial Respondents**

IN RE: Johnson Fork-Loop Creek Pollution Abatement Project
FCCEA Matter No. 2019-002 (Fayette Co., WV Code Enforcement Agency)

**FINAL & BINDING TIME-SENSITIVE ABATEMENT ACTION ORDER NO. 2021-002-9.5(b)-001**

Page 53 of 90 pages

shall ensure that when a license is required by applicable law for performance of any **Work** required by this **Order**, only licensed individuals shall be used to perform any such **Work** required by this **Order**.

## XIII.  ABATEMENT ACTION RELATED NOTICES AND COMMUNICATIONS:

**a.**  **Required Notification of Designated Public Agencies:**  Within fourteen (14) days of the **Effective Date**, the **Remedial Respondents** shall notify in writing each of the following public agencies that the **Remedial Respondents** will perform the **Work** required by this **Order** under the oversight and monitoring of the **FCCEA**, and provide to the **FCCEA** a copy of each such notifications required by this **Paragraph (a)**:

1.  **United States Environmental Protection Agency, Region III**
    c/o Regional Administrator
    1650 Arch Street
    Philadelphia, PA  19103

2.  **State of West Virginia, Department of Environmental Protection**
    Division of Water and Waste Management
    Office of Environmental Enforcement
    Fayetteville Regional Office
    1159 Nick Rahall Greenway
    Fayetteville, WV  25840
    Telephone:  (304) 574-4465
    Facsimile:  (304) 574-4477

3.  **Fayette County Solid Waste Authority**
    ATTN:  Gabriel Pena, Secretary
    P.O. Box 307
    Fayetteville, WV  25840
    Telephone:  (304) 574-4339

4.  **Fayette County Health Department**
    Environmental Health Division
    202 Church Street
    Fayetteville, WV  25840
    Telephone:  (304) 574-1617

**b.**  **Notification and Delivery of Documents to the FCCEA:**  Whenever, under the terms of this **Order** (other than pursuant to **Section XX** (Production of Records and Information by the Insurer Respondents), written notification is required to be given, or a written document is required to be delivered or produced to the **FCCEA**, the notification(s) or document(s) shall be sent:  **(1)** via E-mail transmission to the **FCCEA** Lead Remedial Liaison Counsel at the E-mail address designated in or pursuant to **Section X** of this **Order**; and **(2)** via E-mail transmission to the to the **RPM** at the following E-mail addresses, and, if requested by the **RPM**, a hard copy of such

IN RE:  Johnson Fork-Loop Creek Pollution Abatement Project
FCCEA Matter No. 2019-002 (Fayette Co., WV Code Enforcement Agency)

**FINAL & BINDING TIME-SENSITIVE ABATEMENT ACTION ORDER NO. 2021-002-9.5(b)-001**

Page 54 of 90 pages

notification or document shall be hand-delivered or sent via USPS Priority Mail to the **RPM** at the following address:

> **FCCEA Remedial Project Manager**:
> D. Scott Simonton, Ph.D., P.E.
> Ashby-Tucker Environmental, LLC
> 117 State Route 34 # 7013
> Hurricane, WV 25526
> Telephone: (304) 460-5166
> E-Mail: ashby.tucker.env.llc@gmail.com

and **(3)** a hard copy of each such notification or document shall be hand-delivered or sent via USPS Priority Mail to the **FCCEA** at the following address:

> **Fayette County Code Enforcement Agency**
> c/o Fayette County Administrator
> Fayette County Courthouse
> 100 Court Street
> P.O. Box 307
> Fayetteville, West Virginia 25840-0307
> Telephone: (304) 574-4290
> Facsimile: (304) 574-4255

Notice and delivery accomplished in compliance with this **Paragraph (b)** shall be deemed complete upon timely E-mail transmission and upon mailing, as evidenced by postmark or date of hand delivery.

   c. **Notification to the Remedial Respondents:** Whenever, under the terms of this **Order,** written notice is required to be given, a report or other document is required to be forwarded or delivered to the **Remedial Respondents** by the **FCCEA** or by one or more **Respondents,** it shall be directed by E-mail transmission either the **Remedial Respondent's** Project Coordinator or to **Remedial Respondent's** Remedial Liaison Counsel designated pursuant to **Section X** of this **Order** and a hard copy of each such notification or document shall be hand-delivered or sent via USPS Priority Mail to the same person to whom the E-mail notification was sent. Notice and delivery accomplished in compliance with this **Paragraph (c)** shall be deemed complete upon timely E-mail transmission and upon mailing, as evidenced by postmark or date of hand delivery.

## XIV.    PERFORMANCE OF A REMEDIAL INVESTIGATION/FEASIBILITY STUDY BY THE REMEDIAL RESPONDENTS:

   a. **The Remedial** Respondents shall conduct an **RI/FS** and prepare all plans in accordance with the provisions of this **Order** and consistent with **Applicable Requirements,** as that term is defined in Section III(d) of **FCoWV Ordinance 2018-001,** and, as determined appropriate by the **FCCEA: (1) CERCLA; (2)** the **NCP;** and **(3) WVDEP** and **USEPA Guidance Documents,** non-

exclusively including the "Interim Final Guidance for Conducting Remedial Investigations and Feasibility Studies under CERCLA" ("**RI/FS** Guidance"), OSWER Directive # 9355.3-01 (October 1988), available at https://semspub.epa.gov/src/document/11/128301, "Guidance for Data Useability in Risk Assessment (Part A), Final," OSWER Directive #9285.7-09A, PB 92-963356 (April 1992), available at http://semspub.epa.gov/src/document/11/156756, and guidance referenced therein; all interpreted and applied, in compliance with the provisions of Section **IX(b)(1)** of **FCoWV Ordinance 2018-001**, with the **FCCEA** serving as and exercising the authority and discretion therein assigned to the "USEPA/Lead Agency.

   **b.** The **Remedial Investigation** shall be focused on the *Releases* and threatened *Releases* of *Hazardous Substances* and **Wastes** from each of the coal mining waste **Open Dumps** within the **JF-LC Watershed** to ascertain in a manner consistent with the **NCP** the nature and extent of *Released* **Wastes** and the *Endangerments* to the Public Health, Safety, Welfare or the *Environment* within Fayette County that are and may be presented by such *Hazardous Substances* and **Waste(s)** at and *Released* from the coal mining waste **Open Dumps** within the **JF-LC Watershed**. The **Remedial Investigation (RI)** shall consist of collecting data to characterize site conditions, determining the nature and extent of the contamination at or from the **Site**, assessing risk to human health and the *Environment* and conducting treatability testing as necessary to evaluate the potential performance and cost of the treatment technologies that are being considered. The **Feasibility Study (FS)** shall determine and evaluate (based on treatability testing, where appropriate) alternatives for remedial action to prevent, mitigate, or otherwise respond to or remedy the release or threatened release of *Hazardous Substances* and **Wastes** at or from the **Site**. The alternatives evaluated must include, but shall not be limited to, the range of alternatives described in the **NCP**, 40 C.F.R. 300.430(e), and shall include *Remedial* actions that utilize permanent solutions and alternative treatment technologies or resource recovery technologies to the maximum extent practicable. In evaluating the alternatives, the **Remedial Respondents** shall address the factors required to be considered and evaluated by **CERCLA** §121, 42 U.S.C. § 9621, and by the **NCP**, 40 C.F.R. § 300.430(e).

   **c.** For any USEPA regulation or guidance document referenced in this **Order**, the reference is intended to, and shall be understood to, include any subsequent modification, amendment, or repromulgation from time to time of such regulation or guidance document.

   **d.** All written documents prepared by the **Remedial Respondents** pursuant to this **Order** shall be submitted by the **Remedial Respondents** in accordance with **Section XVI** (Submission and Approval of Deliverables). Except for progress reports and the Health and Safety Plan, all such submittals will be reviewed and approved by the **FCCEA** in accordance with **Section XVI**. The **Remedial Respondents** shall timely and competently implement all **FCCEA** approved, conditionally approved, or modified deliverables.

   **e.** Scoping: The **FCCEA**-determined **Site**-specific objectives of the **RI/FS** and its general management approach with respect to the **RI/FS** for this **Site** are set forth in **Paragraphs (a)** and **(b)** of this Section. The **Remedial Respondents** shall conduct the remainder of scoping activities as described referenced guidance. At the conclusion of the project planning phase, as referenced in Chapter 2.2 of the **RI/FS** Guidance, the **Remedial Respondents** shall provide the **FCCEA** with

**IN RE: Johnson Fork-Loop Creek Pollution Abatement Project**
**FCCEA Matter No. 2019-002 (Fayette Co., WV Code Enforcement Agency)**

**FINAL & BINDING TIME-SENSITIVE ABATEMENT ACTION ORDER NO. 2021-002-9.5(b)-001**

**Page 56 of 90 pages**

the following deliverables set forth in **Paragraph (f)** of this **Section**.

    **f.**  **Required Deliverables:**  The **Remedial Respondents** timely shall provide the **FCCEA** with the following deliverables:

      1.  *RI/FS Workplan.*  Within forty-five (45) days following the **Effective Date**, the **Remedial Respondents** shall submit to the **FCCEA** for its review and approval an **RI/FS** Workplan that shall include . The **RI/FS** Workplan shall include: **(1)** proposed site-specific objectives and general management approach for the **Site**; and **(2)** all the provisions set forth in this Subparagraph **(1)**. Upon approval by the **FCCEA** pursuant to **Section XVI**, the **RI/FS** Workplan, specifically including the provisions and plans required by this Paragraph **(f)** shall be incorporated into and become enforceable under this **Order**. The **RI/FS** Workplan must include the following:

          **A.**  Provision assuring:  **(i)** appropriate advance notice to the **RPM** of the **Remedial Respondent's** conduct of any activities required by this **Order** sufficient to allow appropriate **FCCEA** oversight of those activities; **(ii)** that all analytical laboratories used by the **Remedial Respondents** in carrying out this **Order** are directed in writing to provide any and all information requested of them by the **FCCEA** related to any sample taken or **Work** performed in connection with this **Order**; and

          **B.**  A timetable for the **Work** to be performed and properly and completely documented and reported to the **FCCEA**, including submittal of quarterly progress reports and a final report.

      2.  *Sampling and Analysis Plan.*  On or before thirty (30) days following the **FCCEA** approval of the **RI/FS** Workplan, the **Remedial Respondents** shall submit to the **FCCEA** for review and approval pursuant to **Section XVI** a written Sampling and Analysis Plan. This plan shall consist of a Field Sampling Plan (FSP) and a Quality Assurance Project Plan (QAPP), each of which is consistent with the **NCP** and applicable guidance documents. Upon its approval by the **FCCEA**, the terms and conditions of the approved Sampling and Analysis Plan shall be incorporated into and become enforceable under this **Order**.

      3.  *Health and Safety Plan.*  Within seven (7) days after the approval of the Sampling and Analysis Plan, the **Remedial Respondents** shall submit for **FCCEA** review and comment a Health and Safety Plan that contains procedures adequate to ensures the protection of on-site workers and the public during performance of on-site **Work** under this **Order**. This plan shall be prepared in accordance with "OSWER Integrated Health and Safety Program Operating Practices for OSWER Field Activities," Pub. 9285.0-O1C (November 2002), and "EPA's Emergency Responder Health and Safety Manual," OSWER Directive 9285.3-12 (July 2005 and updates). In addition, the plan shall comply with all currently applicable Occupational Safety and Health Administration (OSHA) regulations found at 29 C.F.R., Part 1910. If the **FCCEA** determines that it is appropriate, the plan shall also include contingency planning. Upon its approval by the **FCCEA**, the terms and conditions of the approved Health and Safety Plan shall be incorporated into and become enforceable under this **Order**. The **Remedial Respondents** shall implement the plan during the preparation for and

IN RE:  Johnson Fork-Loop Creek Pollution Abatement Project
FCCEA Matter No. 2019-002 (Fayette Co., WV Code Enforcement Agency)

**FINAL & BINDING TIME-SENSITIVE ABATEMENT ACTION ORDER NO. 2021-002-9.5(b)-001**

Page 57 of 90 pages

performance of all **Work** required by this **Order**.

4. *Community Involvement Plan*:  The **FCCEA** will prepare a Community Involvement Plan for this **Site** in accordance with the provisions Section **IX** of **FCoWV Ordinance 2018-001**, the **NCP** and appropriate USEPA guidance.

   A. If requested by the **FCCEA**, the **Remedial Respondents** shall participate in community involvement activities, including participation in:  **(i)** the preparation of information regarding the **Work** for dissemination to the public, with consideration given to including either or both mass media or Internet notification, and **(ii)** public meetings that may be held or sponsored by **FCCEA** to explain activities at or relating to the **Site**.  The **Remedial Respondents'** required support of the **FCCEA's** community involvement activities may include providing online access to submissions, **FCCEA** responses and directives, and updates of deliverables to any Community Advisory Groups, and other entities to provide them with a reasonable opportunity for review and comment.  The **FCCEA** may describe in its community involvement plan the **Remedial Respondents'** responsibilities for community involvement activities.  All community involvement activities conducted by the **Remedial Respondents** at **FCCEA's** request are subject to **FCCEA** oversight and monitoring.  Upon **FCCEA** request, the **Remedial Respondents** shall establish a community information repository at or near the **Site** to house hard copies of information regarding conditions at, and status of *Abatement Actions*, respecting this Site determined by the **FCCEA** to be relevant and appropriate for community participation and involvement purposes.

   B. If requested by the **FCCEA**, the **Remedial Respondents** shall, within fifteen (15) days, designate and notify the **FCCEA** of **Respondents'** Community Involvement Coordinator ("CI Coordinator").  The **Remedial Respondents** may hire a contractor for this purpose.  The **Remedial Respondents'** notice to the **FCCEA** must include the name, title, and qualifications of the **Remedial Respondents'** CI Coordinator.  The **Remedial Respondents'** CI Coordinator is responsible for providing support regarding the **FCCEA's** community involvement activities, including coordinating with either or both the **FCCEA's RPM** and CI Coordinator regarding responses to the public's inquiries about the **Site**.

g. **Implementation of RI/FS Workplan and Site Characterization**.  Following **FCCEA** approval or modification of the **RI/FS** Workplan and Sampling and Analysis Plan, the **Remedial Respondents** timely and competently shall implement the provisions of these plans to characterize the **Site**.  **The Remedial Respondents** shall complete **Site** characterization and submit all deliverables in accordance with the schedules and deadlines established in this **Order** and the **FCCEA**-approved plans that have been incorporated into this **Order**.

h. **Baseline Human Health Risk Assessment and Ecological Risk Assessment.**  The **Remedial Respondents** will perform the Baseline Human Health Risk Assessment and Ecological Risk Assessment ("Risk Assessments") in accordance with the **RI/FS** Workplan and applicable USEPA guidance determined to be appropriate by the **FCCEA**, non-exclusively including: "Interim Final Risk Assessment Guidance for Superfund, Volume I - Human Health Evaluation

IN RE:  Johnson Fork-Loop Creek Pollution Abatement Project
FCCEA Matter No. 2019-002 (Fayette Co., WV Code Enforcement Agency)

**FINAL & BINDING TIME-SENSITIVE ABATEMENT ACTION ORDER NO. 2021-002-9.5(b)-001**

Page 58 of 90 pages

Manual (Part A)," RAGS, EPA-540-1-89-002, OSWER Directive 9285.7-01A (December 1989); "Interim Final Risk Assessment Guidance for Superfund, Volume I - Human Health Evaluation Manual (Part D, Standardized Planning, Reporting, and Review of Superfund Risk Assessments)," RAGS, EPA-540-R-97-033, OSWER Directive 9285.7-01D (January 1998); and "Ecological Risk Assessment Guidance for Superfund: Process for Designing and Conducting Ecological Risk Assessments," ERAGS, EPA-540-R-97-006, OSWER Directive 9285.7-25 (June 1997).

i. **Draft RI Report**. Within thirty (30) days after the **FCCEA's** approval of the Risk Assessments, the **Remedial Respondents** shall submit to the **FCCEA** for review and approval pursuant to **Section XVI** (Submission and Approval of Deliverables), a draft **Remedial Investigation** Report (Draft **RI** Report) consistent with this **Order**, the **RI/FS** Workplan, and Sampling and Analysis Plan. The draft **RI** Report shall also contain the Risk Assessments.

k. **Treatability Studies**. The **Remedial Respondents** shall conduct treatability studies, except where the **Remedial Respondents** can demonstrate to **FCCEA's** satisfaction that they are not needed. In accordance with the schedules or deadlines to be determined, the **Remedial Respondents** shall provide to the **FCCEA** (if deemed appropriate by the **FCCEA**) for review and approval pursuant to **Section XVI** (Submission and Approval of Deliverables) the following deliverables with respect to the treatability studies, if any, required by the **FCCEA**:

    **a.** Identification of Candidate Technologies Memorandum;
    **b.** Treatability Test Statement of Work;
    **c.** Treatability Test Workplan, including a schedule of all included activities;
    **d.** Treatability Study Sampling and Analysis Plan;
    **e.** Treatability Study Evaluation Report; and
    **f.** Treatability Study Health and Safety Plan.

l. **Development and Screening of Alternatives**. The **Remedial Respondents** shall develop an appropriate range of waste management options that will be evaluated through the development and screening of alternatives, as provided in the **RI/FS** Workplan. In accordance with the schedules or deadlines established in this **Order** and the **FCCEA**-approved plans incorporated into this **Order**, the **Remedial Respondents** shall provide to the **FCCEA** for review and approval pursuant to **Section XVI** the following deliverables:

    **1.** *Memorandum on Remedial Action Objectives*. The Memorandum on Remedial Action Objectives shall include *Remedial* action objectives for Engineering Controls as well as for **Institutional Controls**;
    **2.** *Memorandum on Development and Screening of Alternatives*. The Memorandum on Development and Screening of Alternatives shall summarize the development and screening of remedial alternatives.

m. **Detailed Analysis of Alternatives**. The **Remedial Respondents** shall conduct a detailed analysis of *Remedial* alternatives, as described in the **RI/FS** Workplan. In accordance with the deadlines or schedules established in this **Order** and the **FCCEA**-approved plans incorporated into this **Order**. The **Remedial Respondents** shall provide to the **FCCEA** for review and approval pursuant to **Section XVI** the following deliverables:

    **1.** *Individual Analysis of Alternatives*. The **Remedial Respondents** shall assess

IN RE: Johnson Fork-Loop Creek Pollution Abatement Project
FCCEA Matter No. 2019-002 (Fayette Co., WV Code Enforcement Agency)

**FINAL & BINDING TIME-SENSITIVE ABATEMENT ACTION ORDER NO. 2021-002-9.5(b)-001**

Page 59 of 90 pages

individual alternatives against **FCCEA**-approved evaluation criteria and prepare a summary report;

2. ***Comparative Analysis of Alternatives***. The **Remedial Respondents** shall conduct a comparative analysis of alternatives to evaluate the relative performance of each alternative in relation to the nine evaluation criteria outlined in the **NCP** (40 C.F.R. § 300.430(e)(9)(iii)) and prepare a summary report;

3. The **Remedial Respondents** shall prepare a summary report of the findings of the **FS**, including the above analyses, and timely present the results to the **FCCEA**;

4. ***Alternatives Analysis for Institutional Controls and Screening***. The **Remedial Respondents** shall submit a memorandum on the **Institutional Controls** identified in the Memorandum on Development and Screening of Alternatives as potential ***Remedial*** or ***Abatement Actions***. The Alternatives Analysis for **Institutional Controls** and Screening shall: (**A**) describe the restrictions needed on land, water, or other resources and their relationship to the ***Remedial*** action objectives; (**B**) determine the specific types of **Institutional Controls** that can be used to address and implement the land, water, or other resource use restrictions; (**C**) investigate when the **Institutional Controls** need to be implemented and how long they must remain in place; (**D**) research, discuss, and document any proposed agreement or other arrangements with the proper entities (*e.g.*, state or local government, local landowners, conservation organizations, **Respondents**) specifying exactly who will be responsible for implementing, maintaining, and enforcing the **Institutional Controls**. The Alternatives Analysis for **Institutional Controls** and Screening shall also evaluate the **Institutional Controls** identified in the Memorandum on Development and Screening of Alternatives against the nine evaluation criteria outlined in the **NCP**, 40 C.F.R. § 300.430(e)(9)(iii), including but not limited to costs to implement, maintain, and enforce the **Institutional Controls**. The Alternatives Analysis for **Institutional Controls** and Screening shall be submitted as an appendix to the draft **Feasibility Study** Report ("FS Report").

**n.** **Draft FS Report**. The **Remedial Respondents** shall submit to the **FCCEA** for review and approval pursuant to **Section XVI** a draft **FS** Report. The draft **FS** Report as amended and the Administrative Record, shall provide the basis for the proposed selection of ***Abatement Action*** plan under Section **IX** of **FCoWV Ordinance 2018-001** by the **FCCEA** (or court of competent jurisdiction, if appropriate), and shall document the development and analysis of remedial alternatives.

**o.** **Modification of the RI/FS Workplan**:

1. If at any time during the RI/FS process, the **Remedial Respondents** identify a need for additional data, **the Remedial Respondents** shall submit to the **FCCEA's RPM** within 7 days after such identification a memorandum documenting the need for additional data. The **FCCEA** in its discretion will determine whether the additional data will be collected by the **Remedial Respondents** and whether it will be incorporated into deliverables.

2. In the event of unanticipated or changed circumstances at the **Site**, the **Remedial**

IN RE: Johnson Fork-Loop Creek Pollution Abatement Project
FCCEA Matter No. 2019-002 (Fayette Co., WV Code Enforcement Agency)

**FINAL & BINDING TIME-SENSITIVE ABATEMENT ACTION ORDER NO. 2021-002-9.5(b)-001**

Page 60 of 90 pages

**Respondents** shall notify the **FCCEA's RPM** by telephone and E-mail within 24 hours of discovery of the unanticipated or changed circumstances. In the **FCCEA** determines that the unanticipated or changed circumstances warrant a change(s) in the **RI/FS** Workplan, the **FCCEA** will modify the **RI/FS** Workplan in writing accordingly or direct the **Remedial Respondents** to modify and submit a modification to the **RI/FS** Workplan to **FCCEA** for approval.

3. The **RPM may** at any time during the **RI/FS** process issue in writing a Proposed Determination that, in addition to tasks defined in the initially approved **RI/FS** Workplan, other additional *Remedial* action(s)or Interim *Abatement Action(s)* are necessary or appropriate to accomplish the objectives of the **RI/FS** or to secure adequate protection of the Public Health, Safety, Welfare or *Environment* during the time required to complete the **RI/FS** processes required to be performed by this **Order**. Unless the Dispute Resolution process set forth in **Section XXVI(g)(2)** is timely invoked in compliance with the requirements of that **Section**, the **Remedial Respondents** shall perform such *Response* action(s) or Interim *Abatement Action(s)* set forth in the RPM's Proposed Determination in addition to those required by the initially approved **RI/FS** Workplan, including any approved modifications.

4. In the event that the **RPM** determines it to be necessary and proper to issue a Proposed Determination in exercise the authority granted by Subparagraph **(3)** of this **Section XIV(o)**, unless the Dispute Resolution process has been timely invoked in compliance with the requirements of **Section XXVI(g)(2)** of this **Order**, the **Remedial Respondents** shall confirm in writing to the **FCCEA** within seven (7) days after receipt of the **RPM's** Proposed Determination their intention timely and competently to perform the additional *Response* actions or Interim *Abatement Actions*.

5. When and if they become an enforceable part of the **RI/FS** Workplan required to be performed pursuant to this **Order**, the **Remedial Respondents** shall timely and competently complete such additional *Response* action(s) or Interim *Abatement Action(s)* according to the standards, specifications, and schedule set forth or approved by the **FCCEA** in a written modification to the **RI/FS** Workplan or written **RI/FS** Workplan supplement.

6. Nothing in this **Order** shall be construed to limit the **FCCEA's** authority to require performance of further *Response* action(s) or *Abatement Actions* at the **Site** as it determines may be necessary and proper to accomplish the goal and objectives for an appropriate *Abatement Action* as set forth in, or properly selected by the **FCCEA** in compliance with, the provisions of Section **IX** of **FCoWV Ordinance # 2018-001**.

p. **Off-Site Shipments:**

1. The **Remedial Respondents** may ship *Hazardous Substances* or *Pollutants and Contaminants* from the **Site** to an off-Site facility only if they comply with the applicable requirements of **CERCLA** § 121(d)(3), 42 U.S.C. § 9621(d)(3), and of the **NCP**, 40 C.F.R. § 300.440. The **Remedial Respondents** will be deemed to comply with **CERCLA** § 121(d)(3) and 40 C.F.R. § 300.440 regarding such a shipment if the **Remedial Respondents** obtain a prior determination from USEPA that the proposed

IN RE: **Johnson Fork-Loop Creek Pollution Abatement Project**
**FCCEA Matter No. 2019-002 (Fayette Co., WV Code Enforcement Agency)**

**FINAL & BINDING TIME-SENSITIVE ABATEMENT ACTION ORDER NO. 2021-002-9.5(b)-001**

Page 61 of 90 pages

receiving facility for such shipment is acceptable under the criteria of 40 C.F.R. § 300.440(b).

2. The **Remedial Respondents** may ship **Waste** material from the **Site** to an out-of-state waste management facility only if, prior to any shipment, they provide advance written notice of such proposed shipment to the appropriate state environmental official in the receiving facility's state and to the **FCCEA RPM**. This notice requirement shall not apply to any off-**Site** shipments when the total quantity of all such shipments will not exceed ten (10) cubic yards. This written notice must include the following information: **(A)** the name and location of the receiving facility; **(B)** the type and quantity of **Waste** material to be shipped; **(C)** the schedule for the shipment; and **(D)** the method of transportation. The **Remedial Respondents** shall also notify the state environmental official referenced above and the **FCCEA RPM** of any major changes in the shipment plan, such as a decision to ship the **Waste** material to a different out-of-state facility. The **Remedial Respondents** shall provide the written notice before the **Waste** material is shipped.

3. The **Remedial Respondents** may ship Investigation Derived Waste (IDW) from the **Site** to an off-**Site** facility only if they comply with the applicable requirements of **CERCLA** § 121(d)(3), 42 U.S.C. § 9621(d)(3), and of the **NCP**, 40 C.F.R. § 300.440, and USEPA's "Guide to Management of Investigation Derived Waste," OSWER 9345.3-03FS (Jan. 1992). **Wastes** shipped off-**Site** to a laboratory for characterization, and **RCRA** Subtitle C *Hazardous Wastes* that meet the requirements for an exemption from **RCRA** under 40 C.F.R. § 261.4(e) shipped off-**Site** for treatability studies, are not subject to 40 C.F.R. § 300.440 or the requirements of this Subparagraph **(3)**.

q. <u>**Progress Reports**</u>. In addition to the deliverables set forth in this **Order**, the **Remedial Respondents** shall submit written monthly progress reports to the **FCCEA** by the 10th day of the following month. At a minimum, with respect to the preceding month, these progress reports shall:

1. describe the actions that have been taken to comply with this **Order**;
2. include all results of sampling and tests and all other data received by the **Remedial Respondents**;
3. describe **Work** planned for the next two (2) months with schedules relating such **Work** to the overall project schedule for **RI/FS** completion; and
4. describe all problems encountered in complying with the requirements of this **Order** and any anticipated problems, any actual or anticipated delays, and solutions developed and implemented to address any actual or anticipated problems or delays.

# XV.  QUALITY ASSURANCE, SAMPLING, AND DATA ANALYSIS:

a. The **Remedial Respondents** shall use quality assurance, quality control, and other technical activities and chain of custody procedures for all samples consistent with "EPA Requirements for Quality Assurance Project Plans (QA/R5)," USEPA/240/B-01/003 (March 2001, reissued May 2006), "Guidance for Quality Assurance Project Plans (QA/G-5)," FCCEA/240/R-02/009 (December 2002), and "Uniform Federal Policy for Quality Assurance Project Plans, Parts 1-3, FCCEA/505/B-04/900A-900C (March 2005).

b. **Laboratories**:

1. The **Remedial Respondents** shall ensure that the **FCCEA** personnel and attorneys and their authorized representatives are allowed access at reasonable times to all laboratories utilized by the **Remedial Respondents** pursuant to this **Order**. In addition, the **Remedial Respondents** shall ensure that such laboratories shall analyze all samples submitted by the **FCCEA** pursuant to the Quality Assurance Project Plan (QAPP) for quality assurance, quality control, and technical activities that will satisfy the stated performance criteria as specified in the QAPP.

2. Upon prior approval by **FCCEA**, the **Remedial Respondents** may use other appropriate analytical methods, as long as: **(A)** quality assurance/quality control (QA/QC) criteria are contained in the methods and the methods are included in the QAPP; **(B)** the analytical methods are at least as stringent as the methods listed above, and **(C)** the methods have been approved for use by a nationally recognized organization responsible for verification and publication of analytical methods (*e.g.*, USEPA, ASTM, NIOSH, OSHA, *etc.*).

3. The **Remedial Respondents** shall ensure that all field methodologies utilized in collecting samples for subsequent analysis pursuant to this **Order** are conducted in accordance with the procedures set forth in the approved QAPP.

c. **Sampling**:

1. Upon request, the **Remedial Respondents** shall provide split or duplicate samples to **FCCEA** or its authorized representatives. The **Remedial Respondents** shall notify the **FCCEA** not less than seven (7) days in advance of any sample collection activity unless shorter notice is agreed to by **FCCEA RPM**. In addition, the **FCCEA** shall have the right to take any additional samples that the **FCCEA** or the **FCCEA RPM** deems necessary and proper. Upon request, the **FCCEA** will provide to the **Remedial Respondents** split or duplicate samples of any samples it takes as part of the FCCEA's oversight and monitoring of the **Remedial Respondents'** implementation of the Work, and any such samples shall be analyzed in accordance with the approved QAPP.

2. The **Remedial Respondents** shall submit to the **FCCEA** the results of all sampling and tests or other data obtained or generated by or on behalf of the **Remedial Respondents** with respect to the **Site** or to the implementation of this **Order** in the next monthly progress report.

3. The **Remedial Respondents** may not object to any data gathered, generated, or evaluated by the **FCCEA** or by or on behalf of the **Remedial Respondents** in the performance or oversight of the **Work** that has been verified according to the quality assurance/quality control (QA/QC) procedures required by the **Order** or any **FCCEA**-approved **RI/FS** Workplans or Sampling and Analysis Plans. If the **Remedial Respondents** wish to limit or restrict the use or application of any other data relating to the **RI/FS**, the **Remedial Respondents** shall submit to the **FCCEA** a written report specifically identifying and explaining the limitations or restrictions it seeks, describes and the acceptable uses of the data, if any. This report must be submitted to the **FCCEA** within fourteen (14) days after the submission of the monthly progress report containing the data in question.

## XVI.  SUBMISSION AND APPROVAL OF DELIVERABLES:

a. **General Requirements for Deliverables:**

   1. Except as otherwise provided in this **Order**, the **Remedial Respondents** shall direct all submissions required by this **Order** to the  **RPM**. The **Remedial Respondents** shall submit all deliverables required by this **Order**, or any approved workplan in accordance with the schedule set forth in such plan.

   2. The **Remedial Respondents** shall submit all deliverables in electronic form specified by the **RPM**. If any deliverable includes maps, drawings, or other exhibits that are larger than 8.5 x 11 inches, the **Remedial Respondents** shall also provide paper copies of such exhibits.

b. **Approval of Deliverables:**

   1. *Initial Submissions*:

      A. Following **FCCEA** review of any deliverable required to be submitted for **FCCEA** approval under this **Order**, the **FCCEA** shall:  (i) approve, in whole or in part, the submission; (ii) approve the submission upon specified conditions; (iii) disapprove, in whole or in part, the submission; or (iv) any combination of the foregoing.

      B. The **FCCEA** also may modify an initial submission to cure deficiencies in the submission if:  (i) the **FCCEA** determines that disapproving the submission and awaiting a resubmission would cause substantial disruption to the **Work**; or (ii) previous submission(s) have been disapproved due to material defects and the deficiencies in the initial submission under consideration indicate a bad faith lack of effort to submit an acceptable deliverable.

   2. *Resubmissions:*  Upon receipt of a notice of disapproval, or if required by a notice of approval upon specified conditions, the **Remedial Respondents** shall, within ten (10) days or such longer time as specified by **FCCEA** in such notice, correct the deficiencies and resubmit the deliverable for approval. After review of the resubmitted deliverable, the **FCCEA** may: (A) approve, in whole or in part, the resubmission; (B) approve the resubmission upon specified conditions; (C) modify the resubmission; (D) disapprove, in whole or in part, the resubmission, requiring the **Remedial Respondents** to correct the deficiencies; or (E) any combination of the foregoing.

   3. *Implementation*:  Upon approval, approval upon conditions, or modification by the **FCCEA**, of any deliverable, or any portion thereof, such deliverable, or a portion thereof, will be incorporated into and enforceable under the **Order**; and the **Remedial Respondents** shall timely and competently take any action required by such deliverable, or portion thereof.  Implementation of any non-deficient portion of a submission shall not relieve the **Remedial Respondents** of any liability for penalties for violations of this **Order**.

   c. Notwithstanding the receipt of a notice of disapproval, the **Remedial Respondents** shall proceed to take any action required by any non-deficient portion of the submission, unless otherwise directed by **FCCEA**.

   d. If the **FCCEA** takes over some or all of the **Work**, but not the preparation of the **Remedial**

IN RE:  Johnson Fork-Loop Creek Pollution Abatement Project
FCCEA Matter No. 2019-002 (Fayette Co., WV Code Enforcement Agency)

**FINAL & BINDING TIME-SENSITIVE ABATEMENT ACTION ORDER NO. 2021-002-9.5(b)-001**

Page 64 of 90 pages

Investigation Report ("**RI** Report") or the **FS** Report, the **Remedial Respondents** shall incorporate and integrate information supplied by **FCCEA** into those reports.

    **e.** The **Remedial Respondents** shall not proceed with any activities or tasks dependent on the following deliverables until receiving the **FCCEA** approval, approval on condition, or modification of such deliverables: **RI/FS** Workplan; Sampling and Analysis Plan; draft **RI** Report; Treatability Testing Workplan; Treatability Testing Sampling and Analysis Plan; Treatability Testing Health and Safety Plan; and draft **FS** Report. While awaiting **FCCEA** approval, approval on condition, or modification of these deliverables, the **Remedial Respondents** shall proceed with all other tasks and activities that may be conducted independently of these deliverables, in accordance with the schedule set forth under this **Order** or otherwise defined.

    **f.** For all remaining deliverables not listed in **Paragraph F** of this **Section**, the **Remedial Respondents** shall proceed with all subsequent tasks, activities, and deliverables without awaiting **FCCEA** approval of the submitted deliverable. The **FCCEA** reserves the right to stop the **Remedial Respondents** from proceeding further, either temporarily or permanently, on any task, activity, or deliverable at any point during the **Work**.

    **g.** <u>**Material Defects**</u>. If an initially submitted or resubmitted plan, report, or other deliverable contains a material defect, and the plan, report, or other deliverable is disapproved or modified by the **FCCEA** due to such material defect, the **Remedial Respondents** shall be deemed in violation of this **Order** for failure to submit such plan, report, or other deliverable timely and adequately.

    **h.** Neither any failure or refusal of the **FCCEA** to expressly approve of, disapprove of, or comment on all or any portion of any submission(s) to it by the **Remedial Respondents** shall be construed as approval by the **FCCEA**.

# XVII.  <u>REQUIRED INSURANCE:</u>

    **a.** <u>**Liability Insurance Requirements**</u>: No later than fifteen (15) days before commencing any on-site **Work**, the **Remedial Respondents** shall secure, and shall maintain for the duration of this **Order** the following insurance coverage, with coverage terms, conditions and exclusions reasonably acceptable to the **FCCEA**:

        **1.** Commercial General Liability Insurance with limits of liability of $1 million per occurrence and an annual aggregate limit of liability not less than $2 million;

        **2.** Automobile Liability Insurance with limits of liability of $1 million per accident;

        **3.** Excess or Umbrella Liability Insurance with limits of liability of $5 million in excess of the required commercial general liability and automobile liability limits;

        **4.** Environmental Impairment/Pollution Liability Insurance with limits of liability of not less than $5 million per occurrence;

naming the County Commission of Fayette County, West Virginia, the **FCCEA**, and the **FCCEA RPM**, and any contractors retained by the **FCCEA** or the **FCCEA RPM** with the approval of the **FCCEA** as additional insureds with respect to: **(i)** all liability arising out of the activities performed by or on behalf of the **Remedial Respondents** pursuant to this **Order**; and **(ii)** . claims, suits, or liabilities of any nature, including any required environmental or other investigation, clean

IN RE: Johnson Fork-Loop Creek Pollution Abatement Project
FCCEA Matter No. 2019-002 (Fayette Co., WV Code Enforcement Agency)

**FINAL & BINDING TIME-SENSITIVE ABATEMENT ACTION ORDER NO. 2021-002-9.5(b)-001**

Page 65 of 90 pages

up, or other response action, based upon, arising from, or relating to the actual, alleged or threatened discharge, dispersal, release or escape of contaminants or pollutants, arising out of or in connection with the performance of the **Work**. The Environmental Impairment\Pollution Liability Insurance required by this **Section** shall be specific to the **Work** and to the **Site** and shall be in a form reasonably satisfactory to the **FCCEA**. Within the same time period, the **Remedial Respondents** shall provide the **FCCEA** with certificates of such insurance and a complete copy of each required insurance policy(ies). The **Remedial Respondents** shall submit such certificates and complete copies of policies each year on the anniversary of the **Effective Date**.

**b.** <u>**Workers Compensation Insurance Requirements**</u>: For the duration of the **Order**, the **Remedial Respondents** shall satisfy, or shall ensure that their contractors or subcontractors satisfy, all applicable laws and regulations regarding the provision of worker's compensation insurance for all persons performing **Work** on behalf of the **Remedial Respondents** in furtherance of this **Order**. If the **Remedial Respondents** demonstrate by evidence satisfactory to the **FCCEA** that any contractor or subcontractor maintains insurance equivalent to that described above, or insurance covering some or all of the same risks but in a lesser amount, then, with respect to that contractor or subcontractor, the **Remedial Respondents** need provide only that portion of the insurance described above that is not maintained by the contractor or subcontractor. The **Remedial Respondents** shall ensure that all submittals to the **FCCEA** under this **Paragraph** identify the **FCCEA** docket number for this **Order**.

## XVIII.  <u>SITE AND RELATED PROPERTY, ACCESS AND INSTITUTIONAL CONTROLS REQUIREMENTS</u>:

**a.** If any **Area of the Site**, any other real property (or surface or sub-surface property rights controlling access to and use of any such location) where access is or reasonably may be required adequately to implement, oversee, and monitor, or both, any **Work** required by this **Order**, is owned, or controlled by, any **Respondent**(s), such **Respondent**(s), non-exclusively including **Respondent** Quercus West Virginia, LLC, shall:

1. commencing on the **Effective Date**, provide the **FCCEA**, the **FCCEA** Site Project Manager, the authorized agents, attorneys, or contractors of either of them, the other **Respondents**, and their representatives, contractors, and subcontractors with access at all reasonable times to all such real property owned or controlled by such **Respondent** to conduct any activity required or authorized by this **Order**; and

2. refrain from using or authorizing the use of such real property owned or controlled by such **Respondent** in any manner that the **FCCEA** reasonably determines will pose an unacceptable risk to the Public Health, Safety, Welfare or the ***Environment*** due to exposure to ***Hazardous Substances***, ***Hazardous Wastes***, **Solid Wastes**, or ***Pollutants and Contaminants***, or interfere with or adversely affect the timely or competent implementation or integrity of the **Work**.

**b.** Where any portion of the **Work** required by this **Order** is to be performed in areas owned by or in the possession or control of someone other than a **Respondent**, the **Remedial Respondents** shall use their best efforts to obtain all necessary access and **Institutional Controls**

IN RE:  Johnson Fork-Loop Creek Pollution Abatement Project
FCCEA Matter No. 2019-002 (Fayette Co., WV Code Enforcement Agency)

**FINAL & BINDING TIME-SENSITIVE ABATEMENT ACTION ORDER NO. 2021-002-9.5(b)-001**

Page 66 of 90 pages

agreements, enforceable by the **Remedial Respondents** and the **FCCEA**, within thirty (30) day following the **Effective Date**, or within such longer time as may be authorized in writing by the **FCCEA** Site Project Manager. The **Remedial Respondents** shall immediately notify the **FCCEA** if, after using their best efforts, they are unable to obtain such agreements. For purposes of this **Paragraph**, "best efforts" means the efforts that a reasonable person in the position of the **Remedial Respondents** would use to achieve the goal in a timely manner, including the cost of employing professional assistance and the payment of reasonable sums of money to secure either or both access and **Institutional Controls** agreements, as required by this **Section**; provided, however, that the **Remedial Respondents** shall not be required to pay sums of money for access to property owned or controlled by another ***Person*** whose potential liability for response costs and response actions at the **Site** is based on a theory of liability other than: **(1)** current owner/operator status under **CERCLA** § 107(a)(1), 42 U.S.C. § 9607(a)(1), or **(2)** as a ***Person*** described in Section **VI(a)(3) or (4)** of **FCoWV Ordinance # 2018-001**. The **Remedial Respondents** shall describe to the **FCCEA** in writing their efforts to obtain access.

    **c.** If the **Remedial Respondents**, exercising their "best efforts," cannot timely obtain appropriate access and **Institutional Control** agreements, if any, necessary and proper to the timely and efficient conduct of the **Work** or to any selected interim or final ***Abatement Action*** for this **Site**, the **FCCEA** may: **(1)** obtain access for the **Remedial Respondents**; **(2)** perform those tasks or activities with **FCCEA** contractors, or **(3)** request the Fayette County Prosecuting Attorney to seek appropriate equitable relief necessary and proper to the timely and appropriate abatement of the ***Public Nuisance*** conditions at issue in this **Order** from a court of competent jurisdiction. All costs incurred by Fayette County in providing such assistance or taking such action, including the cost of attorney time and the amount of monetary consideration or just compensation paid, constitute **Future *Response* Costs**. In the event that **FCCEA** performs those tasks or activities with **FCCEA** contractors and does not find that the **Remedial Respondents** have failed or refused to exercise their "best efforts' to obtain the necessary and proper access or **Institutional Control** agreements, the **Remedial Respondents** shall perform all other activities not requiring access to that property, and timely shall reimburse the **FCCEA** for all costs incurred in performing such activities. The **Remedial Respondents** shall integrate the results of any such tasks undertaken by the **FCCEA** into its reports and deliverables.

    **d. Access Requirements:** The following is a list of activities for which access is required regarding the **Affected Property**:

    1. Monitoring any part of the **Work**;
    2. Verifying any data or information submitted to **FCCEA**;
    3. Conducting investigations regarding contamination at or near the **Site**;
    4. Obtaining samples;
    5. Assessing the need for, planning, implementing, or monitoring ***Response Actions***;
    6. Assessing implementation of quality assurance and quality control practices as defined in the approved QAPP;
    7. Inspecting and copying records, operating logs, contracts, or other documents maintained or generated by the **Remedial Respondents** or their agents;
    8. Assessing the **Remedial Respondents'** compliance with the **Order**;

9. Determining whether the **Affected Property** is being used in a manner that is prohibited or restricted, or that may need to be prohibited or restricted under the **Order**; and

10. Implementing, monitoring, maintaining, reporting on, and enforcing any land, water, or other resource use restrictions or **Institutional Controls** regarding the **Affected Property**.

e. If the **FCCEA** determines in a decision document prepared in accordance with Section **IX** of **FCoWV Ordinance 2018-001** that **Institutional Controls** in the form of state or local laws, regulations, ordinances, zoning restrictions, or other governmental controls or notices are necessary and proper to adequate **Abatement** at this **Site**, the **Remedial Respondents** shall cooperate with the **FCCEA's** efforts to secure and ensure compliance with such **Institutional Controls**.

f. In the event of any **Transfer** of any portion of the **Affected Property**, unless the **FCCEA** otherwise consents in writing, the **Remedial Respondents** shall continue to comply with their obligations under this **Order**, including their obligation to secure access and ensure compliance with any land, water, or other resource use restrictions or **Institutional Controls** with respect to the **Affected Property**.

g. Any **Respondent** that owns fee simple title to, or any surface rights or mineral rights that appertain to all or any portion of the real property comprising the **Site** (hereinafter: "Owner/**Respondent**"), non-exclusively including **Respondent** Quercus West Virginia, LLC, shall, within fifteen (15) days after the **Effective Date**, submit to the **FCCEA** for its approval a notice to be filed in the Office of the Clerk of the Fayette County Commission regarding the Owner/**Respondent's Affected Property**. The notice must: **(1)** include a proper legal description of the **Affected Property**; **(2)** provide notice to all successors-in-title: **(A)** that the **Affected Property** is part of, or related to, the **Site**; **(B)** that the **FCCEA** has determined that an **RI/FS** must be performed at the **Site**; and **(C)** that the **FCCEA** has issued an order to potentially responsible parties requiring implementation of such **RI/FS**; and **(D)** identify this **Order** and the date this **Order** was issued by the **FCCEA**. The Owner/**Respondent** shall record the notice within five (5) days after the **FCCEA's** approval of the notice and submit to the **FCCEA**, within 10 days thereafter, a certified copy of the recorded notice.

h. Each Owner/**Respondent**, non-exclusively including **Respondent** Quercus West Virginia, LLC, shall, prior to entering into a contract to Transfer such Owner/**Respondent's Affected Property**, or 60 days prior to transferring Owner/**Respondent's Affected Property**, whichever is earlier:

1. Notify the proposed transferee that the **FCCEA** has determined that an **RI/FS** must be performed at the **Site**, and that the **FCCEA** has issued an order to potentially responsible parties requiring implementation of such **RI/FS**, and identifying this **Order** and the date it was issued by the **FCCEA**; and

2. Notify the **FCCEA** in writing of the name and address of the proposed transferee and provide the **FCCEA** with a copy of the notice provided to the proposed transferee.

IN RE:  Johnson Fork-Loop Creek Pollution Abatement Project
FCCEA Matter No. 2019-002 (Fayette Co., WV Code Enforcement Agency)

**FINAL & BINDING TIME-SENSITIVE ABATEMENT ACTION ORDER NO. 2021-002-9.5(b)-001**

Page 68 of 90 pages

i.  Notwithstanding any provision of this **Order**, the **FCCEA** and **Fayette County** retain all of their access rights and authorities and *Public Nuisance* investigation and abatement authority and legal rights, non-exclusively including all related enforcement authorities and available summary and judicial remedies, under federal and West Virginia statutes and regulations and all ordinances of Fayette County.

## XIX.    FCCEA ACCESS TO THE SITE AND TO *RECORDS* AND INFORMATION:

**a.**  At all reasonable times, **FCCEA**, the **FCCEA RPM**, and **FCCEA** authorized agents and attorneys shall have the authority to enter and freely move about any property at the **Site** and off-site areas, if any, where **Work** is being performed, for the purposes of inspecting conditions, activities, the results of activities, *Records*, operating logs, and contracts related to the **Site** or the **Work**; reviewing the progress of the **Remedial Respondents** in carrying out the requirements of this **Order**; conducting such sampling, investigation or tests as the **FCCEA** or its authorized representatives deem necessary; using a camera, sound recording device or other documentary type equipment; and verifying the data submitted to the **FCCEA** by or on behalf of the **Remedial Respondents**.  The **Remedial Respondents** shall allow these *Persons* to inspect and copy all *Records*, files, photographs, documents, sampling and monitoring data, and other Writings related to the **Work**.

**b.**  All *Persons* accessing the **Site** under this **Section** shall comply with all approved Health and Safety Plans.

**c.**  The **Remedial Respondents** shall provide to the **FCCEA**, upon request, copies of all *Records* within the **Remedial Respondents'** possession or control or that of their contractors or agents relating to conditions or activities at the **Site** or to the implementation of this **Order**, including, but not limited to, sampling, analysis, chain of custody records, manifests, trucking logs, receipts, reports, sample traffic routing, correspondence, or other documents or information regarding the **Work**.  The **Remedial Respondents** shall also make available to **FCCEA**, for purposes of investigation, information gathering, or testimony, their employees, agents, or representatives with knowledge of relevant facts concerning the performance of the **Work**.

**d.** **Claims of Privilege and Confidentiality Protection:**
1.  Except to the extent prohibited by the provisions of subparagraph **(3)** of this **Paragraph**, any **Respondent** may assert that all or any part of a *Record* or of any information demanded by the **FCCEA** or required to be produced by this **Order** or by the **FCCEA** is privileged as provided under applicable federal or state law, in lieu of providing the *Record*.
2.  If any **Respondent** assert a claim of privilege with respect to any *Record* or information demanded by the **FCCEA** or required to be produced by this **Order**, it shall provide to the **FCCEA** and serve and file in compliance with the requirements of Section VIII(e) of **FCoWV Ordinance 2018-001** within three (3) business days of their assertion of a claim of privilege in response to a demand by the **FCCEA RPM** for *Records* or Information from the **Remedial Respondents**, or at least ten (10) days prior to date and time of

production for any **Record** or Information required to be produced pursuant to **Section XX** of this **Order**, the Privilege Log information regarding such withheld **Record(s)** and information required by Section **VIII(e)** of **FCoWV Ordinance 2018-001**. If a claim of privilege applies only to a portion of a **Record** or a portion of the information demanded by any information demand set forth in this **Order**, the **Respondent(s)** shall timely provide the **Record(s)** or Information requested in redacted form to mask the asserted privileged portion only. The **Respondent(s)** shall retain all **Records** and Information that they claim to be privileged until the **FCCEA** and the Office of the Fayette County Prosecuting Attorney have had a reasonable opportunity to dispute the privilege claim.

3. The **Remedial Respondents** may not make any claim of privilege or claim of entitlement to confidentiality protection relating, directly or indirectly, to: **(1)** any **Record** regarding environmental conditions at or emanating, in whole or in part, from the **Site**, including, but not limited to, all sampling, analytical, monitoring, hydrogeologic, scientific, chemical, radiological, or engineering data, or the portion of any other **Record** that relates, directly or indirectly, to any such environmental conditions at, around, or emanating, in whole or in part from, the **Site**; **(2)** the portion of any **Record** that any **Respondents** is required to create or generate pursuant to this **Order**; or **(3)** the nature and extent of any **Endangerment** to health or the **Environment** that is or may be presented by **Releases** at or from, or environmental conditions at or emanating from, the **Site**.

4. **Any Respondent required by subparagraph (2) of this Paragraph (d), by Section XX of this Order, or by Section VIII(e) of FCoWV Ordinance 2018-001 to provide Privilege Log information that failed or refused timely to serve and file the Privilege Log information required by subparagraph (2) of this Paragraph (d) shall be BARRED from asserting or relying upon any privilege for which a compliant Privilege Log information was not timely served and filed, and shall further be BARRED from withholding, based upon any assertion of any such privilege, any demanded Record, item of information, document or thing for which all of the Privilege Log information required by subparagraph (2) of this Paragraph (d) were not timely served and filed. The Bar established by this subparagraph (4) shall apply only to the assertion of any privilege or other asserted legal basis for withholding the demanded Record, item of information, document, or thing with respect to which claim of privilege subparagraph (2) of this Paragraph (d) required the filing of compliant Privilege Log information, but for which no compliant Privilege Log information was timely served and filed. Such bar shall not apply to any failure or refusal to produce such Record, information or thing based upon the claimed application with prima facie validity of the privilege against self-incrimination.**

   d. **Business Confidentiality Claims**: Except to the extent prohibited by the provisions of subparagraph **(3)** of this **Paragraph (d)** of this **Section**, any **Respondent** may assert that all or part of a **Record** requested by, or required to be provided to, the **FCCEA** pursuant to any provision of this **Order** is confidential to the extent permitted by and in accordance the requirements of Section X of **FCoWV Ordinance 2018-001**. Any request for treatment of any **Record** requested by the **FCCEA** or required to be provided by this **Order** as confidential shall be presented,

addressed and resolved in strict compliance with the requirements and procedures set forth in Section X of **FCoWV Ordinance 2018-001**. The requesting **Respondent(s)** is required to exhaust all remedies provided by Section **X** of **Fayette County Ordinance 2018-001** with respect to any decision made on or in connection with any request for treatment of any such **Record** as confidential before seeking any judicial relief with respect to such a claim.

**e.** Notwithstanding any other provision of this **Order**, the **FCCEA** retains all of its information gathering and inspection authorities and rights, including its rights to bring or request enforcement actions related thereto, under any applicable law or ordinances.

## XX. _RECORDS_ AND INFORMATION REQUIRED TO BE PRODUCED:

**a.** **Production of _Records_ and Information Required:** Each **Insurer Respondent** and **Respondents Hanover/CGL 60203** and **Continental/RDU9433461** shall produce at the date, time and place designated in **Paragraph (b)** of this **Section**, and permit inspection and copying of, all the **Records** and **Information** required to be produced pursuant to this **Section** that are in its possession, custody or control or that of any **Person** acting on its behalf, at its direction, or under its control, non-exclusively including, its affiliates, subsidiaries, parent companies, agents, employees, consultants, tenants, subcontractors, insurance brokers and their agents, and attorneys, accountants and investigators.

**b.** **Time and Place of Required Production:** Each **Insurer Respondent** and **Respondents Hanover/CGL** and **60203 Continental/RDU9433461**shall produce the **Records** and its written response to the demands for **Information** required by this **Section** on or before the date and time and at the place set forth in this **Paragraph (b)**:

DATE & TIME OF PRODUCTION: **April 2, 2021 at 11:00 a.m. EST**

PLACE OF PRODUCTION:     Office of the Fayette County Prosecuting Attorney
108 East Maple Avenue
Fayetteville, WV 25840

**c.** _Records_ Required to Be Produced:
1. *By Each Insurer Respondent:* Each **Insurer Respondent** shall produce the following *Records* in compliance with the requirements of this **Section**:
   A. Complete copies of the **Insurance Policy(ies)** identified by the letters, numbers, or both, set forth with respect to each such **Insurer Respondent** in the caption of this **Order**;
   B. Complete copies of each **Insurance Policy** issued by it providing coverage during all or any part of the years 1946 through 1988, inclusive, that provide any insurance coverage or benefit to any of the following:
      (i) **Eastern Gas and Fuel Associates, Eastern Associated Coal Corporation**, or **Coal Properties Corporation**; or
      (ii) any **Person** identified by name or category in any such **Insurance Policy** or related underwriting materials as being an officer or director of

Eastern Gas and Fuel Associates, Eastern Associated Coal Corporation, or Coal Properties Corporation with respect to any liability arising out of or related to such *Person's* position as such an officer or director;

C. Each *Record* related to any search made by each Insurer Respondent to respond to the requirements of this Section to identify, find, or produce the *Records* or Information required to be produced by this Section. (Please note that this subparagraph requires each Insurer Respondent to produce all results of computer searches, even if such printout only shows the search terms and that no results were found.);

D. Each *Record* related to each Insurance Policy, or any portion thereof, described in Subparagraphs (1) and (2) of this Paragraph (c);

E. Each *Record* that relates to any underwriting file, or portion thereof, for, about or concerning, in whole or in part, directly or indirectly, Eastern Gas and Fuel Associates, Eastern Associated Coal Corporation, or Coal Properties Corporation, any officer or director of any of them, or any liability insurance that does or may provide coverage to any of them;

F. Each *Record* that relates to any claim filed for any benefits, indemnification, or defense filed under, against, or with any respect to each Insurance Policy, or any portion thereof, described in Subparagraphs (A) and (B) of this Subsection (c)(1);

G. Each *Record* that relates to any application for any Insurance Policy, or any portion thereof, described in Subparagraphs (A) or (B) of this Subparagraph;

H. Each *Record* that relates to any Communication by or behalf of any Insurance Agent, Insurance Broker, Insurance Placement Agency, or Insurance Company, to, with, on behalf of, or relating to, directly or indirectly, Eastern Gas and Fuel Associates, Eastern Associated Coal Corporation, or Coal Properties Corporation, or any officer or director of any of them;

I. Each *Record* that relates to any proposed or completed commutation, or buy-back of any insurance policy that provides or provided liability insurance in any form to Eastern Gas and Fuel Associates, Eastern Associated Coal Corporation, or Coal Properties Corporation during the time period of 1946 to March 31, 1987, inclusive;

I. Each *Record* that relates to the current or historical extent of mining, business or commercial operations of Eastern Gas and Fuel Associates, Eastern Associated Coal Corporation, or Coal Properties Corporation, or any officer or director of any of them, conducted at, on, under, or adjoining to any real property within the Subject Watershed; and

J. Each *Record* that relates to any *Record* or Information required to be produced by this Section that has been destroyed, discarded, recycled, or lost.

2. *By Respondent Continental/RDU9433461*:

A. Each *Record* that relates to any underwriting file, or portion thereof, for, about

IN RE: Johnson Fork-Loop Creek Pollution Abatement Project
FCCEA Matter No. 2019-002 (Fayette Co., WV Code Enforcement Agency)

FINAL & BINDING TIME-SENSITIVE ABATEMENT ACTION ORDER NO. 2021-002-9.5(b)-001

Page 72 of 90 pages

or concerning, in whole or in part, directly or indirectly, **Eastern Gas and Fuel Associates**, **Eastern Associated Coal Corporation**, or **Coal Properties Corporation**, any officer or director of any of them, or any liability insurance that does or may provide coverage to any of them;

**B.** Each *Record* that **relates to** any reinsurance, commutation, or buy-back of any insurance policy identified in Continental Insurance Company Umbrella Excess Third Party Liability Insurance Policy Number RDU 9433461 as Underlying Insurance;

**C.** Each *Record* that **relates to** any claim made, whether or not honored or paid, for any benefits, coverage, indemnification or expenses of any kind with respect, in whole or in part, to Continental Insurance Company Umbrella Excess Third Party Liability Insurance Policy Number RDU 9433461;

**3.** *By Respondent Hanover/CGL 60203:*

    **A.** Each *Record* that **relates to** any underwriting file, or portion thereof, for, about or concerning, in whole or in part, directly or indirectly, **Eastern Gas and Fuel Associates**, **Eastern Associated Coal Corporation**, or **Coal Properties Corporation**, any officer or director of any of them, or any liability insurance that does or may provide coverage to any of them;

    **B.** Each *Record* that **relates to** any reinsurance, commutation, or buy-back of any insurance policy issued by Hanover Insurance Company to Eastern Gas and Fuel Associates;

    **C.** Each *Record* that **relates to** any claim made, whether or not honored or paid, for any benefits, coverage, indemnification or expenses of any kind with respect, in whole or in part, to Hanover Insurance Company Commercial General Liability Insurance Policy Number CGL 60203;

    **D.** Every *Record* that **relates to** any communication between Hanover Insurance Company, KeySpan New England, LLC or anyone acting on behalf of either, or either of them, and Continental Insurance Company regarding any insurance provided to Eastern Gas and Fuel Associates or KeySpan New England, LLC as successor to **EGFA**.

**d.** <u>**Information Required to Be Produced:**</u>

**1.** *By Each Insurer Respondent:*

    **A.** Each **Insurer Respondent** shall produce in compliance with the requirements of this **Section** complete and accurate written responses to the following Information Demands:

    **B.** If complete copies of any **Insurance Policy** or **Insurance Policies** required to be produced pursuant to this **Section** are not available to any **Respondent** required by the Section to produce *Records* or information, please identify the name and last known mailing address for:

        **i.** each *Person* that purchased or otherwise procured the issuance of each such **Insurance Policy**;

        **ii.** each insurance carrier, insurance agent, and insurance broker that had, may

have had, has, or may have any information **relating to** each such **Insurance Policy**(ies);

C.   Please identify each ***Person*** who provided any factual information that is reflected in any of your responses to the Demands for Information set forth in this **Subsection (d)**, or who otherwise assisted in the drafting of any of your responses to such Requests for Information, and for each such ***Person***, please provide his or her full name, address, and telephone number, position held with each **Insurer Respondent** at the time such information or assistance was provided, and describe the information or drafting assistance provided;

D.   Please identify each ***Person*** who participated in the effort to search for or identify any ***Records*** responsive to the Demand for Production of ***Records*** set forth in in **Subsection (c)** of this **Section**, and for each such ***Person***, please provide his or her full name, address, and telephone number, and describe with particularity the collection(s), file(s), or location(s) which he or she searched.

E.   Please identify each ***Person*** who determined that any item of information or ***Record*** required to be produced by this **Section** was destroyed, deleted, or is no longer available to you, and for each such ***Person***, please provide his or her full name, address, and telephone number, position held with each **Insurer Respondent** at the time such determination was made, and describe the item(s) of information or ***Records*** as to which such determination was made.

2.   ***By Respondent Continental/RDU9433461:***

A.   Without regard to any aggregate limit of liability, please state the remaining limits of liability available under Continental Insurance Company Umbrella Excess Third Party Liability Insurance Policy Number RDU 9433461 to indemnify a Named Insured under that policy found by a court of competent jurisdiction to be liable to a Third Party for damages imposed by law for a single occurrence of covered Property Damage in each of the calendar years 1964, 1965, 1966 and 1967;

B.   Please provide all information available to you that indicates that any of the limits of liability for covered Property Damage under any insurance policy identified as an Underlying Policy in Continental Insurance Company Umbrella Excess Third Party Liability Insurance Policy Number RDU 9433461 have or may have been eroded, reduced, commuted, or bought back since the issuance of Continental Insurance Company Umbrella Excess Third Party Liability Insurance Policy Number RDU 9433461;

C.   Please identify each ***Record*** by author, date, title, current custodian and current location that was relied upon to provide the Response to the Request for Information in **Subparagraphs (A)** and **(B)** of this **Subsection (d)(2)**;

D.   Please identify each ***Person*** who provided any factual information that is reflected in any of your responses to the Demands for Information set forth in this **Subsection (d)**, or who otherwise assisted in the drafting of any of your responses to such Requests for Information, and for each such ***Person***, please

IN RE:  Johnson Fork-Loop Creek Pollution Abatement Project
FCCEA Matter No. 2019-002 (Fayette Co., WV Code Enforcement Agency)

**FINAL & BINDING TIME-SENSITIVE ABATEMENT ACTION ORDER NO. 2021-002-9.5(b)-001**

Page 74 of 90 pages

provide his or her full name, address, and telephone number, position held with each **Insurer Respondent** at the time such information or assistance was provided, and describe the information or drafting assistance provided;

D. Please identify each ***Person*** who participated in the effort to search for or identify any ***Records*** responsive to the Demand for Production of ***Records*** set forth in in **Subsection (c)(2)** of this **Section**, and for each such ***Person***, please provide his or her full name, address, and telephone number, and describe with particularity the collection(s), file(s), or location(s) which he or she searched.

E. Please identify each ***Person*** who determined that any item of information or ***Record*** required to be produced by this **Section** was destroyed, deleted, or is no longer available to you, and for each such ***Person***, please provide his or her full name, address, and telephone number, position held with each **Respondent** at the time such determination was made, and describe the item(s) of information or ***Records*** as to which such determination was made.

3. ***By Respondent Hanover/CGL 60203:***

A. Please state the aggregate limit of liability provide at the time of first issuance of each liability insurance policy that Hanover Insurance Company issued to Eastern Gas and Fuel Associates;

B. Without regard to any aggregate limit of liability, please state for Commercial General Liability Policy Number CGL 60203 that Hanover Insurance Company issued to Eastern Gas and Fuel Associates the limits of liability insurance coverage provided for a covered occurrence of property damage at the time of issuance of each such policy, and state whether the limits provide apply separately to any annual period of time;

C. Without regard to any subsequent revocation, buy-back or commutation of any such insurance policy, please state the remaining, available (as of January 1, 2020) limits of liability coverage for a covered occurrence in West Virginia, which occurrence is wholly unrelated to any prior covered occurrences under the policy outside of West Virginia, of property damage under Commercial General Liability Policy Number CGL 60203 issued by Hanover Insurance Company to Eastern Gas and Fuel Associates;

D. Please provide all information available to you that indicates that any of the limits of liability for covered Property Damage under Commercial General Liability Policy Number CGL 60203 issued by Hanover Insurance Company to Eastern Gas and Fuel Associates have or may have been eroded, reduced, or exhausted by any payment made by Hanover Insurance Company;

E. Please identify each ***Record*** by author, date, title, current custodian and current location that was relied upon to provide the Response to the Request for Information in this **Subsection XX(d)(3)** of this **Order**;

D. Please identify each ***Person*** who provided any factual information that is reflected in any of your responses to the Demands for Information set forth in this **Subsection (d)**, or who otherwise assisted in the drafting of any of your

IN RE: Johnson Fork-Loop Creek Pollution Abatement Project
FCCEA Matter No. 2019-002 (Fayette Co., WV Code Enforcement Agency)

**FINAL & BINDING TIME-SENSITIVE ABATEMENT ACTION ORDER NO. 2021-002-9.5(b)-001**

Page 75 of 90 pages

responses to such Requests for Information, and for each such **Person**, please provide his or her full name, address, and telephone number, position held with each **Insurer Respondent** at the time such information or assistance was provided, and describe the information or drafting assistance provided;

**D.** Please identify each **Person** who participated in the effort to search for or identify any **Records** responsive to the Demand for Production of **Records** set forth in in **Subsection (c)(2)** of this **Section**, and for each such **Person**, please provide his or her full name, address, and telephone number, and describe with particularity the collection(s), file(s), or location(s) which he or she searched.

**E.** Please identify each **Person** who determined that any item of information or **Record** required to be produced by this **Section** was destroyed, deleted, or is no longer available to you, and for each such **Person**, please provide his or her full name, address, and telephone number, position held with each **Respondent** at the time such determination was made, and describe the item(s) of information or **Records** as to which such determination was made.

**e.  Verification Required for Response to Information Demands:**  The production of **Records** required by **Subsection (c)** of this **Section** and the written response(s) of each **Respondent** required to respond to the Information Demands set forth in **Subsection (d)** of this **Section** must be accompanied by a written certification, signed under oath administered before a notary public or other official authorized by law to administer such an oath attesting by or on authorized behalf of each **Respondent** required to provide information pursuant to this **Section** to each of the following:

**1.** that the information provided, if any, is truthful and complete;

**2.** that the information and **Records(s)** produced, if any, together with those withheld from production as privileged or for any other reason and for which the information required by **Subsection (f)** of this **Section** has been timely produced, if any, constitutes the truthful and complete results of a diligent search conducted in good faith, for the information and **Records** demanded in this **Order**; and

**3.** that all information and **Records**, required to be produced by this **Section** have been produced or identified in a Privilege Log required by and timely submitted in compliance with the requirements of **Subsection (f)** of this **Section**.

**f.  Timely Filing of Compliant Privilege Log Required:**  With respect to its response to the **Records** and Information demanded in this **Section**, each **Respondent** required to provide information pursuant to this **Section** that seeks to withhold production of any demanded **Record** or Information on the basis of any legal privilege or for any other reason is subject to, and must strictly comply with, the provisions and requirements of **Subsection (d)** of this **Section XIX**.

**g.  Business Confidentiality Claims**:  Any **Insurer Respondent** may assert that all or part of a **Record** or Information required to be provided pursuant to the **Section** this **Order** is confidential to the extent permitted by and in accordance the requirements of Section **X** of **FCoWV Ordinance # 2018-001**.  Any request for treatment of any **Record** or Information required to be provided by this **Order** as confidential shall be presented, addressed and resolved in strict

IN RE:  Johnson Fork-Loop Creek Pollution Abatement Project
FCCEA Matter No. 2019-002 (Fayette Co., WV Code Enforcement Agency)

**FINAL & BINDING TIME-SENSITIVE ABATEMENT ACTION ORDER NO. 2021-002-9.5(b)-001**

Page 76 of 90 pages

compliance with the requirements and procedures set forth in Section **X** of **FCoWV Ordinance 2018-001**. The requesting **Insurer Respondent** is required to exhaust all remedies provided by Section **X** of **Fayette County Ordinance 2018-001** with respect to any decision made on or in connection with any request for treatment of any such *Record* as confidential before seeking any judicial relief with respect to such a claim of confidentiality.

    **h.**  **Designated Responsible Fayette County Attorney:**  For purposes of the requirement to produce *Records* and Information set forth in this **Section**, the **FCCEA**, at the direction of the Office of the Fayette County Prosecuting Attorney, designates the following Fayette County Chief Assistant Prosecuting Attorney as the Responsible Attorney for Fayette County.  The Fayette County Prosecuting Attorney may at any time following issuance of this Order designate any other Fayette County Assistant Prosecuting Attorney(ies) to serve as the Designated Responsible Attorney(ies) for purposes of this **Subsection (h)**  All communications and requests regarding any aspect of the requirement to produce *Records* and Information set forth in this **Section** should be directed to the Fayette County Assistant Prosecuting Attorney designated in or pursuant to this **Paragraph (h):**

> Michael O. Callaghan, Esq.
> Chief Asst. Fayette Co. Prosecuting Attorney
> ENVIRONMENTAL & PUBLIC HEALTH PROTECTION UNIT
> c/o Neely and Callaghan
> 1337 Virginia Street East
> Charleston, WV  25301-3011
> Telephone:  (304) 343-6500
> E-Mail:  mcallaghan@neelycallaghan.com

## XXI.  EMERGENCY RESPONSE AND NOTIFICATION OF RELEASES:

    **e.**  **Emergency Response.**  If any event occurs during performance of the **Work** that causes or threatens to cause a *Release* of **Wastes** on, at, or from the **Site** that either constitutes an emergency situation or that may present an immediate threat to Public Health, Safety, Welfare, or the *Environment*, the **Remedial Respondents** shall immediately take all appropriate action to prevent, abate, or minimize such *Release* or threat of *Release*. The **Remedial Respondents** shall take these actions in accordance with all applicable provisions of this **Order**, including, but not limited to, the Health and Safety Plan. **The Remedial Respondents** shall also immediately notify the **FCCEA RPM** or, in the event of his unavailability, both the WVDEP Spill Response Center at (800) 642-3074, and the Ranking Duty Officer at the Fayette County Sheriff's Office of the incident or **Site** conditions.

    **b.**  **Release Reporting.**  Upon the occurrence of any event during performance of the **Work** that the **Remedial Respondents** are required to report pursuant to **CERCLA** § 103, 42 U.S.C. § 9603, or Section 304 of the Emergency Planning and Community Right-To-Know Act (EPCRA), 42 U.S.C. § 11004, as amended, the **Remedial Respondents** shall immediately orally notify the **FCCEA RPM**, or, in the event of his unavailability, the Regional Duty Officer at USEPA Region III at (800) 438-2474, and the USEPA National Response Center

at (800) 424-8802. This reporting requirement is in addition to, and not in lieu of, reporting under Section 103 of **CERCLA**, 42 U.S.C. § 9603, and Section 304 of the Emergency Planning and Community Right-To-Know Act of 1986, as amended, 42 U.S.C. § 11004.

**c.** For any event covered under this **Section**, the **Remedial Respondents** shall submit a detailed, written report to the **FCCEA** within five (5) days after the onset of such event, setting forth the action or event that occurred and the measures taken, and to be taken, to mitigate any *Release* or threat of *Release* or *Endangerment* caused or threatened by the *Release* and to prevent the reoccurrence of such a *Release* or threat of *Release*.

## XXII.  RECORD RETENTION:

**a.** Until ten (10) years after the **FCCEA** provides **Respondents** with notice that all **Work** has been fully performed in accordance with this **Order**, each **Respondent** shall preserve and retain all non-identical copies of *Records* now in its possession or control or that of any of its agents or attorneys, or that come into its possession or control or that of any of its agents or attorneys, that relate in any manner to its liability with regard to the **Site**, provided, however, that **Respondents** who are potentially liable as owners or operators of any *Facility* at, or portion of, the **Site** must retain, in addition, all *Records* that relate to the liability of any other *Person* with respect to the **Site**. Each **Respondent** must also retain, and instruct its contractors and agents to preserve, for the same period of time specified above all non-identical copies of the last draft or final version of any *Records* now in its possession or control or that come into its possession or control that relate in any manner to the performance of the **Work**, provided, however, that each **Respondent** (and its contractors, agents and attorneys) must retain, in addition, copies of all data generated during the performance of the **Work** and not contained in the aforementioned *Records* required to be retained. Each of the above record retention requirements shall apply regardless of any corporate retention policy to the contrary.

**b.** At the conclusion of the document retention period set forth in **Paragraph (a)** of this **Section**, **Respondents** shall notify the **FCCEA** in writing at least ninety (90) days prior to the destruction of any such *Records*, and, upon request by **FCCEA**, **Respondents** shall deliver any such *Record(s)* requested by the **FCCEA** to the **FCCEA**.

**c.** Each **Respondent** shall notify the **FCCEA** within one (1) business day of it acquiring any reliable information : **(1)** that any *Record(s)* (other than identical copies) relating to its potential liability regarding the **Site** has been or is reasonably suspected to have been altered, mutilated, discarded, destroyed, or otherwise disposed of on or after the date that **Respondent** was notified of its liability or potential liability with respect to the **Site** by the **FCCEA** or the Fayette County Prosecuting Attorney's Office; and **(2)** that it or its agents or attorneys have not fully complied with any **FCCEA** requests for information or **Record**(s) regarding the **Site**.

## XXIII  MODIFICATION OF ANY REQUIREMENT OF THIS ORDER:

**a.** The **FCCEA RPM** may make any modification to any plan or schedule in writing or by oral direction. Any such oral modification will be memorialized in writing by the **FCCEA** within

five (5) days, but shall have as its effective date the date of the **FCCEA RPM**'s oral direction. Any other requirements of this **Order** may be temporarily modified pending final action by the **FCCEA** in writing by signature of both the Chairperson (or in her/his absence, the Vice Chairperson) of the **FCCEA** and the **FCCEA RPM**.

**b.** If the **Remedial Respondents** seek permission to deviate from any approved Workplan, or schedule, the **Remedial Respondents'** Project Coordinator shall submit a written request to the **FCCEA** for approval outlining the proposed modification and its basis. The **Remedial Respondents** may not proceed with the requested deviation until receiving approval from the **RPM** pursuant to **Section XVI** of this **Order**.

**c.** No informal advice, guidance, suggestion, or comment by the **FCCEA RPM** or other **FCCEA** representatives regarding any deliverables submitted by **Remedial Respondents** shall relieve the **Remedial Respondents** of their obligation to obtain any formal approval required by this **Order**, or to comply with all requirements of this **Order**, unless it is formally modified.

## XXIV.  DELAY IN PERFORMANCE:

**a.** The **Remedial Respondents** shall notify the **FCCEA** of any delay or anticipated delay in performing any requirement of this **Order**. Such notification shall be made by telephone and E-mail to the **FCCEA RPM** within forty-eight (48) hours after the **Remedial Respondents** first knew or should have known that a delay might occur. The **Remedial Respondents** shall adopt all reasonable measures to avoid or minimize any such delay. Within seven (7) days after notifying the **FCCEA RPM** by telephone and E-mail, the **Remedial Respondents** shall provide to the **FCCEA** written notification fully describing the nature of the delay, the anticipated duration of the delay, any justification for the delay, all actions taken or to be taken to prevent or minimize the delay or the effect of the delay, a schedule for implementation of any measures to be taken to mitigate the effect of the delay, and any reason(s) why the **Remedial Respondents** should not be held strictly accountable for failing to comply with any relevant requirements of this **Order**.

**b.** Increased costs or expenses associated with implementation of the activities called for in this **Order** is not a justification for any delay in performance of any requirement of this **Order**.

## XXV.  ENFORCEMENT/WORK TAKEOVER:

**a.** <u>Imposition of Civil Penalties</u>: Any **Respondent(s)** who **without just and sufficient cause** willfully violates or fails or refuses to comply with any provision of this **Order** may be subject to civil penalties of not less than Five thousand dollars ($5,000) nor more than Ten thousand dollars ($10,000) for each day in which such violation occurs or such failure to comply continues imposed by an adjudicatory proceeding before the Fayette County Commission or in a civil action brought by the Fayette County Prosecuting Attorney before a court of competent jurisdiction. Section **IX.V(g)** of **FCoWV Ordinance 2018-001**.

**b.** <u>Criminal Penalties</u>: Any **Respondent(s)** properly served with this **Order** pursuant to Section **IX.V** of **FCoWV Ordinance 2018-001** who, **without just and sufficient cause**, willfully

IN RE:  Johnson Fork-Loop Creek Pollution Abatement Project
FCCEA Matter No. 2019-002 (Fayette Co., WV Code Enforcement Agency)

**FINAL & BINDING TIME-SENSITIVE ABATEMENT ACTION ORDER NO. 2021-002-9.5(b)-001**

Page 79 of 90 pages

violates the requirements of this **Order** may in a criminal action brought by the Fayette County Prosecuting Attorney before a court of competent jurisdiction be fined not less than one thousand dollars ($1,000) nor more than ten thousand dollars ($10,000), or imprisoned in a county or regional jail not more than one (1) year, or both fined and imprisoned.

    **c.**   **Takeover of Work by FCCEA and Punitive Damages:**   In the event that any **Respondent(s)** to this Order willful violates, or fails or refuses to comply with this Order, the **FCEEA** may, pursuant to Section XIX of FCoWV Ordinance 2018-001, unilaterally carry out any action required by this Order. Instead of, or in addition to, unilaterally carrying out any actions required by this Order, the **FCCEA** may seek immediate judicial enforcement of this Order pursuant to Sections XIX, XX and XXII of FCoWV Ordinance 2018-001. In addition, any such **Respondent(s)** to this Order who fails or refuses without just and sufficient cause properly and timely to provide any *Abatement Action* required by this Order shall be liable to Fayette County for punitive damages in an amount equal to, and not more than three (3) times, the amount of any *Abatement Action Costs* incurred or to be incurred by or on behalf of Fayette County.

## XXVI.   REIMBURSEMENT OF *ABATEMENT ACTION COSTS* INCURRED BY FAYETTE COUNTY AND DISPUTE RESOLUTION UNDER THIS ORDER:

    **a.**   **Reimbursement to Fayette County of *Abatement Action Costs*:**   In exercise of its authority under Section IX.V(c) of FCoWV Ordinance 2018-001, the **FCCEA** hereby Orders the **Remedial Respondents**, jointly and severally, timely to pay to in full within twenty-one (21) days of their receipt of any Proposed Invoice (or any item(s) in or part(s) thereof) that has become a Final Invoice of *Abatement Action Costs* incurred by Fayette County pursuant to the provisions of this Section, non-exclusively including *Abatement Action Costs* incurred by the **FCCEA** or the Office of the Fayette County Prosecuting Attorney, in connection with: **(1)** the investigation of known and suspected conditions of *Public Nuisance* within and emanating from the **JF-LC Watershed** within Fayette County, West Virginia; and **(2)** in connection with the suspected existence of, appropriate *Response* to, and the selection and oversight and monitoring of (and, when authorized or required, implementation of), any *Abatement Action* required to be performed by any **Respondent** pursuant to any provision or requirement of this **Order** ("**JF-LC** *Abatement Action Costs*"), in full compliance with the requirement of this **Order**.

    **b.**   **Authority of FCCEA Chairperson to Direct Invoicing of *Abatement Action Costs*:** The **FCCEA** hereby designates its Chairperson to act as the authorized representative of the **FCCEA** in the preparation of and service on the **Remedial Respondents** of each of the **FCCEA**'s Proposed invoices for reimbursement of *Abatement Action Cost* incurred required pursuant to this **Section**. In that capacity, the **FCCEA** Chairperson shall have and my exercise, subject to review by the **FCCEA**, the authority of the **FCCEA** to determine:

        **(1)**   the required formatting and documentation of such invoices;

        **(2)**   to determine whether any cost incurred by any officer, agency, board or commission of Fayette County qualifies as an *Abatement Action Cost* within the meaning of

Sections **III(b)** and **IX.V(c)** of **FCoWV Ordinance 2018-001** and this this **Order**; and

(3) to reject invoicing of any cost(s) incurred by or on behalf of any officer, agency, board or commission of Fayette County determined by the **FCCEA** Chairperson to be unnecessary or unjustifiably duplicative;

(4) to apply the established policies of the Fayette County Commission and the **FCCEA** to the preparation and service of invoices pursuant to this **Section**.

**c. FCCEA Deliberative Process Regarding Determination of Appropriate JF-LC** ***Abatement Action Costs***: The **FCCEA** has determined that its receipt of free and open communication with any officer, agency, board or commission of Fayette County, West Virginia, non-exclusively including the employees, agents, contractors and subcontractors, and employees of such contractors and subcontractors, regarding all matters related to any **JF-LC** ***Abatement Action Costs*** that were or may have been incurred by any such officer, agency, board or commission is necessary and essential to the proper discharge by the **FCCEA** of its authority and responsibility properly to determine and apply the definitions, non-exclusively including the definition of the term ***Abatement Action Costs***, set forth in **FCoWV Ordinance**, for all purposes related to the discharge of its authority under that Ordinance and to issuance and enforcement of the provisions of this **Order**. The **FCCEA** has further determined that same need for and necessity of such free and open communication exists with respect to and applies to all communications by and between the **FCCEA** Chairperson, exercising the authority and responsibility of the **FCCEA** delegated in Paragraph **(b)** of this **Section**, and any officer, agency, board or commission of Fayette County, West Virginia, non-exclusively including each of their employees, agents, contractors and subcontractors, and employees of such contractors and subcontractors, regarding all matters related to any **JF-LC** ***Abatement Action Costs*** that were or may have been incurred by Fayette County.

**d. Invoicing of *Abatement Action Costs* Incurred as of the Effective Date:** Within forty-five (45) day of the **Effective Date**, the **FCCEA** Chairperson shall tender to the **Remedial Respondents** the **FCCEA's** Proposed Invoice of **JF-LC** ***Abatement Action Costs*** incurred as of the **Effective Date**. Unless objected to in whole or in part by the **Remedial Respondents** in a writing served and filed in compliance with **Section XIII(b)** of this **Order** within fourteen (14) days of the receipt of the Proposed Invoice by the **Remedial Respondents**, such Proposed Invoice shall become a Final Invoice due and payable in full by the **Remedial Respondents** pursuant to the provisions of **Paragraph (a)** of this **Section**.

**e. Service of Subsequent FCCEA Invoices of JF-LC *Abatement Action Costs* Incurred:** Unless otherwise agreed in writing between the **FCCEA** and the **Remedial Respondents**, no less frequently than on a bi-monthly basis the **FCCEA** Chairperson shall tender to the **Remedial Respondents** the **FCCEA's** Proposed Invoice of **JF-LC** ***Abatement Action Costs*** incurred during the Invoice period. Unless objected to in whole or in part by the **Remedial Respondents** in a writing served and filed in compliance with **Section XIII(b)** of this **Order** within fourteen (14) days of the receipt of any such Proposed Invoice by the **Remedial Respondents**, such Proposed Invoice shall become a Final Invoice due and payable in full by the **Remedial Respondents** pursuant to the provisions of **Paragraph (a)** of this **Section**.

**f. Required Method of Payment:** The **Remedial Respondents** shall make all payments to

IN RE: Johnson Fork-Loop Creek Pollution Abatement Project
FCCEA Matter No. 2019-002 (Fayette Co., WV Code Enforcement Agency)

**FINAL & BINDING TIME-SENSITIVE ABATEMENT ACTION ORDER NO. 2021-002-9.5(b)-001**

Page 81 of 90 pages

Fayette County required by this **Order** by wire transfer to the bank account of Fayette County designated in writing by the **FCCEA**, and all such payments shall reference "Fayette County Code Enforcement Agency ABATEMENT ACTION ORDER NO. 2021-002-9.5(b)-001." At the time any payment required by this **Order** is made, the **Remedial Respondents** shall notify in writing the **FCCEA RPM** and its Lead Remedial Legal Counsel and include within that notice all available details and confirmation numbers necessary to track the wire transfer.

    **g.** <u>**Informal Process for Resolution of Disputes Arising Out of any Proposed Invoice under this Section or any Matter Arising under Sections XVI(o)(3) and (4):**</u>

        1. *Requirements for Invoking Dispute Resolution Process Regarding Any FCCEA Proposed Invoice of JF-LC Abatement Action Costs*: Any Proposed Invoice of **JF_LC** *Abatement Action Costs* tendered to the **Remedial Respondents** pursuant to this **Section** shall become a Final Invoice unless:

            **A.** within fourteen (14) days of the **Remedial Respondents'** receipt of the Proposed Invoice the **Remedial Respondents** notify in writing the **FCCEA** and the Office of the Fayette County Prosecuting Attorney and file a copy of such notification with the Fayette County Clerk of the **Remedial Respondents'** specific objection(s) to all or any part of a Proposed Invoice of **JF_LC** *Abatement Action Costs*, including a brief summary of the factual and legal grounds asserted to support of the **Remedial Respondents'** specific objection(s) to specific item(s) set forth in the Proposed Invoice; and

            **B.** in the event that the **Remedial Respondents** object to less than all items included in any Proposed Invoice, the **Remedial Respondents** shall, as a condition of their right to invoke the Dispute Resolution process set forth in this **Section**, pay in full on or before twenty-one (21) days from the **Remedial Respondents'** receipt of the Proposed Invoice all undisputed items included in the Proposed Invoice.

        2. *Requirements for Invoking Dispute Resolution Process Regarding Any Proposed Determination of the RPM Issued Pursuant to Section XIV(o)(3) [Requiring the performance of* additional *Remedial* action(s) or Interim *Abatement Action(s)]*: The requirements set forth in any Proposed Determination by the **RPM** issued in compliance with the requirements of **Section XIV(o)(3)** of this **Order** shall become a binding and enforceable part of the **RI/FS** Workplan unless:

            **A.** within seven (7) days of the **Remedial Respondents'** receipt of the Proposed Determination of the RPM Issued Pursuant to Section **XIV(o)(3)** of this **Order**, the **Remedial Respondents** shall notify in writing the **FCCEA** and the Office of the Fayette County Prosecuting Attorney and file a copy of such notification with the Fayette County Clerk of the **Remedial Respondents'** specific objection(s) to all or any part of the requirement set forth in the Proposed Determinant, including a brief summary of the factual and legal grounds asserted to support of the **Remedial Respondents'** specific objection(s) to specific item(s); and

            **B.** In order to secure timely completion of any additional *Remedial Action(s)* or Interim *Abatement Action(s)* set forth in the Proposed Determination in the event that any such actions(s), or any part thereof, should be upheld by a Final and non-

appealable Order resolving any Formal Dispute brought pursuant to this **Section**, the **Remedial Respondents** shall, as a condition of their right to invoke the Dispute Resolution process set forth in this **Section** regarding any Proposed Determination by the **RPM** issued pursuant to **Section XIV(o)(3)** of this **Order**, the **Remedial Respondents** shall secure and timely post with the **FCCEA** financial assurance in the amount of the total costs of timely completing the required additional **Work** required by the Proposed Determination reasonably estimated by the **Remedial Respondents** and approved by the **RPM**. The **RPM** shall not unreasonably refuse approval of the **Remedial Respondents'** estimation of the amount of the total costs of timely completing the required additional **Work**. The financial assurance required by this Subparagraph **(2)** shall be one of the following mechanisms, the terms and conditions of which are reasonably satisfactory to the **FCCEA**:

    i. **a trust fund**: *(1)* established in compliance with West Virginia law to ensure that funds will be available as and when needed for performance of the **Work** set forth in the **RPM's** Proposed Determination; *(2)* administered by a trustee that has the authority to act as a trustee and whose trust operations are regulated and examined by a federal or West Virginia agency; and *(3)* governed by an agreement that requires the trustee to make payments from the fund only when the **FCCEA** advises the trustee in writing that: (*a*) payments are necessary to fulfill the **Remedial Respondents'** obligations under this **Order**; or (*b*) funds held in trust are in excess of the funds that are necessary to complete the **Work**;

    ii. **a surety bond**, issued by a surety company authorized to do business in West Virginia guaranteeing payment or performance of the additional **Work** required by the Proposed Determination, as it may be modified or altered pursuant to the Final, Non-appealable Decision rendered pursuant to the Dispute Resolution process described or authorized by this **Section**; or

    iii. **an irrevocable letter of credit**, issued by an entity that has the authority to issue letters of credit and whose letter-of-credit operations are regulated and examined by a federal or West Virginia state agency, guaranteeing payment or performance of all or any portion of the additional **Work** required by the Proposed Determination, as it may be modified or altered pursuant to the Final, Non-appealable Decision rendered pursuant to the Dispute Resolution process described or authorized by this **Section**.

**C.** *FCCEA Access to Financial Assurance*:

    i. If the **FCCEA** determines that the **Remedial Respondents**: **(1)** have ceased implementation of any portion of the additional **Work** required by the Proposed Determination, as it may be modified or altered pursuant to the Final, Non-appealable Decision rendered pursuant to the Dispute Resolution process described or authorized by this **Section**; **(2)** are seriously or repeatedly deficient or late in their performance of the additional **Work** required by the Proposed Determination, as it may be modified or altered pursuant to the Final Decision rendered pursuant to the Dispute Resolution process described or authorized by

IN RE: Johnson Fork-Loop Creek Pollution Abatement Project
FCCEA Matter No. 2019-002 (Fayette Co., WV Code Enforcement Agency)

**FINAL & BINDING TIME-SENSITIVE ABATEMENT ACTION ORDER NO. 2021-002-9.5(b)-001**

Page 83 of 90 pages

this **Section**, or **(3)** are implementing the additional **Work** required by the Proposed Determination, as it may be modified or altered pursuant to the Final Decision rendered pursuant to the Dispute Resolution process described or authorized by this **Section** in a manner that may cause an endangerment to human health or the environment, the **FCCEA** may issue a written notice ("Performance Failure Notice") to both the **Remedial Respondents** and the financial assurance provider regarding the **Remedial Respondents'** failure to perform. Any Performance Failure Notice issued by the **FCCEA** will specify the grounds upon which such notice was issued and will provide the **Remedial Respondents** a period of ten (10) days within which to remedy the circumstances giving rise to the **FCCEA's** issuance of such notice. If, after expiration of this 10-day period, the **Remedial Respondents** have not remedied to the **FCCEA's** satisfaction the circumstances giving rise to the **FCCEA's** issuance of the relevant Performance Failure Notice, then, in accordance with any applicable financial assurance mechanism, the **FCCEA** may at any time thereafter direct the financial assurance provider to immediately: **(i)** deposit any funds assured pursuant to this **Section** into the separate subaccount of the Fayette County Environmental and Public Health Protection Special Settlement Fund created by the Fayette County Commission Formal Order 2018-01 designated by Order of the Fayette County Commission; or **(ii)** arrange for performance of the additional **Work** required by the Proposed Determination, as it may be modified or altered pursuant to the Final, Non-appealable Decision rendered pursuant to the Dispute Resolution process described or authorized by this **Section** in accordance with this Order.

ii. If the **FCCEA** is notified by the provider of a financial assurance mechanism that it intends to cancel the mechanism, and the Remedial Respondents fails to provide an alternative financial assurance mechanism in accordance with this Section at least thirty (30) days prior to the cancellation date, the **FCCEA** may, prior to cancellation, direct the financial assurance provider to deposit any funds assured pursuant to this **Section** into the separate subaccount of the Fayette County Environmental and Public Health Protection Special Settlement Fund created by the Fayette County Commission Formal Order 2018-001 designated by Order of the Fayette County Commission.

**h.** **Commencement of Formal Dispute Resolution before the FCCEA:** Provided that the **Remedial Respondents** fully complied with the requirements of **Paragraph (g)** of this **Section**, the **Remedial Respondents** may request formal resolution by the **FCCEA** of any disputed item(s) of a Proposed Invoice, or all or any part of a Proposed Determination of the **RPM** issued pursuant to **Section XIV(o)(3)** of this **Order** not resolved in the mandatory Meet and Confer Process by filing with the **FCCEA** and the Fayette County Clerk and serving on the **FCCEA RPM** and Office of the Fayette County Prosecuting Attorney a written Petition for Resolution of Objection(s) on or before the end of regular business hours on the tenth (10th) day following the last Meet and Confer session conducted pursuant to the requirements of **Subparagraph (1)** of this **Paragraph (e)** of

IN RE: Johnson Fork-Loop Creek Pollution Abatement Project
FCCEA Matter No. 2019-002 (Fayette Co., WV Code Enforcement Agency)

FINAL & BINDING TIME-SENSITIVE ABATEMENT ACTION ORDER NO. 2021-002-9.5(b)-001

Page 84 of 90 pages

this **Section**. Any such Petition by the **Remedial Respondents** shall set forth in concise and plain terms the **Remedial Respondent's** specific objections to specific item of the Proposed Invoice at issue and the specific legal and factual grounds relied upon by the **Remedial Respondents** to support each such specific objection. The **FCCEA** Chairperson shall, and the **FCCEA RPM** may, file with the **FCCEA** and the Fayette County Clerk and serve on the **FCCEA RPM** and Office of the Fayette County Prosecuting Attorney a written response to the **Remedial Respondents'** Petition within ten (10) days of the filing of the **Remedial Respondents'** Petition. Unless otherwise agreed to in writing by the **FCCEA** Chairperson and the **Remedial Respondents**, the **FCCEA** shall conduct a formal Dispute Resolution proceeding to resolve all matters properly raised in the **Remedial Respondents'** Petition during a properly noticed regular or special meeting of the **FCCEA** conducted not less than thirty (30) nor more than forty-five (45) days of the date of filing of the **Remedial Respondent's** Petition.

A. *Presentation of Live Direct Testimony*:  Unless leave to present live, direct testimony of any witness to the **FCCEA** in any formal Dispute Resolution proceeding before the **FCCEA** is requested in writing no later than twenty (20) days before the scheduled formal Dispute Resolution proceeding and granted by the **FCCEA**, the **Remedial Respondents** and the **FCCEA** Chairperson and the **FCCEA RPM** shall present in the scheduled formal Dispute Resolution proceeding any direct testimony of any witness by way of concise, written statement from that witness subscribed to under oath and filed with the **FCCEA** and with the Fayette County Clerk not later than fourteen (14) days prior to the scheduled, formal Dispute Resolution Proceeding.

B. *Pre-hearing Deposition of Witness Who Can or May Be Able to Present Competent and Relevant Testimony*:  All parties to the **FCCEA** formal Dispute Resolution proceeding shall make available to the opposing party(ies) for pre-hearing deposition under oath any employee, agent, contractor or subcontractor, or employee or agent of a contractor or subcontractor of the **Remedial Respondents**, the **FCCEA RPM** or of Fayette County who can or my present competent testimony relevant and material to the matters properly at issue in the **FCCEA** formal Dispute Resolution proceeding.

C. *Presentation of Live Adverse Examination or Cross-examination Testimony*:  Unless leave to present live, adverse examination or cross-examination testimony of any witness to the **FCCEA** in any formal Dispute Resolution proceeding before the **FCCEA** is requested in writing no later than ten (10) days before the scheduled formal Dispute Resolution proceeding and granted by the **FCCEA**, the **Remedial Respondents** and the **FCCEA** Chairperson and the **FCCEA RPM** shall present in the scheduled formal Dispute Resolution proceeding any adverse or cross-examination testimony of any witness by way of submission to the **FCCEA** and filing with the Fayette County Clerk not later than fourteen (14) days prior to the scheduled, formal Dispute Resolution Proceeding of the record of the pre-hearing deposition of any such witness.

D. *Participation of the FCCEA Chairperson in any formal Dispute Resolution Proceeding under this Section Concerning a Proposed Invoice*:  Other than by formal testimony properly presented to the **FCCEA**, the **FCCEA** Chairperson shall not: **(i)** communicate, directly or indirectly, with any Member of the **FCCEA** about any matter that is or may be

IN RE:  Johnson Fork-Loop Creek Pollution Abatement Project
FCCEA Matter No. 2019-002 (Fayette Co., WV Code Enforcement Agency)

**FINAL & BINDING TIME-SENSITIVE ABATEMENT ACTION ORDER NO. 2021-002-9.5(b)-001**

Page 85 of 90 pages

at issue in any formal Dispute Resolution proceeding commenced before the **FCCEA** under this **Section**; **(ii)** preside over any **FCCEA** formal Dispute Resolution proceedings commenced pursuant to this **Section**; and **(iii)** participate in any deliberations of the **FCCEA** regarding any matter at issue in any formal Dispute Resolution proceeding concerning a Proposed Invoice commenced pursuant to this **Section**.

**i.** **Effect of FCCEA Final Order Entered in a Formal Dispute Resolution Proceeding Pursuant to this Section:**

1. All or any portion of disputed item of a Proposed Invoice of **JF-LC** *Abatement Action Costs* approved by the **FCCEA** in a Final Order issued in a formal Dispute Resolution Proceeding conducted pursuant to this **Section** shall be considered an item of a Final Invoice as of the effective date of the **FCCEA** Final Order and due and payable in full pursuant to the provisions of **Paragraph (a)** of this **Section**, unless such payment, or any part of it, is stayed by Order of the **FCCEA** pending judicial review in one of the proceedings delineated in **Section IX.V(g)** of **FCoWV Ordinance 2018-002** by Order of the **FCCEA**, or unless such payment, or any part of it, is stayed pending judicial review in one of the proceedings delineated in **FCoWV Ordinance 2018 002 Section IX.V(g)** by Order of a court of competent jurisdiction.

2. All or any portion of disputed requirement(s) of a Proposed Determination by the **RPM** issued pursuant to **Section XIV(o)(3)** of this **Order**, as the same may be replaced or modified by the **FCCEA,** approved by the **FCCEA** in a Final Order issued in a formal Dispute Resolution Proceeding conducted pursuant to this **Section** shall be considered an enforceable requirement(s) of the **RI/FS** Workplan pursuant to this **Order** as of the effective date of the **FCCEA** Final Order, unless such requirement(s), or any part of it, is stayed by Order of the **FCCEA** pending judicial review in one of the proceedings delineated in Section **IX.V(g)** of **FCoWV Ordinance 2018-002** by Order of the **FCCEA**, or unless such requirement(s), or any part of it, is stayed pending judicial review in one of the proceedings delineated in **Section IX.V(g)** of **FCoWV Ordinance 2018-002** by Order of a court of competent jurisdiction.

**j.** **Petition to the Fayette County Commission for Review of a Final Order of the FCCEA entered in a Formal Dispute Resolution Proceeding:** Any **Respondent** aggrieved by a Final Order of the **FCCEA** entered in a formal Dispute Resolution Proceeding pursuant to this **Section** may petition the County Commission of Fayette County for review of any such Final Order. Any such petition must be in writing and filed with the Office of the Fayette County Clerk within fourteen (14) days of the Respondent's receipt of service of the Final Order of the **FCCEA.** A copy of any such petition must be timely served on the **FCCEA Site Project Manager** and the **FCCEA** Lead Remedial Legal Counsel. Such petition must state in plain and concise language the provision or provisions of the Final Order with respect to which review is sought, the precise relief requested and all the factual and legal grounds upon which the Petitioner relies for entitlement to the requested relief. If such aggrieved Respondent also seeks from the Fayette County Commission a Stay of the Final Order of the **FCCEA** pending the completion of the review

IN RE: Johnson Fork-Loop Creek Pollution Abatement Project
FCCEA Matter No. 2019-002 (Fayette Co., WV Code Enforcement Agency)

**FINAL & BINDING TIME-SENSITIVE ABATEMENT ACTION ORDER NO. 2021-002-9.5(b)-001**

Page 86 of 90 pages

of the challenged Final Order, the petitioning Respondent may petition the Fayette County Commission for the requested Stay by filing with the Fayette County Clerk a separate, written motion for a Stay of the Final Order pending completion of review. Such motion, which may not exceed twenty (20) pages, must set forth in concise and clear language the provision or provisions of the Final Order for which a Stay pending review is sought, and all the factual and legal grounds upon which the Petitioner relies for entitlement to the requested Stay. A copy of any such motion for a Stay must be timely served on the **FCCEA Site Project Manager** and the **FCCEA** Lead Remedial Legal Counsel.

   **k.** Recovery of Costs Incurred by Fayette County in a Dispute Resolution Proceeding Pursuant to this Section: Regardless of the outcome of: (1) any formal Dispute Resolution proceeding conducted pursuant to this **Section; or (2)** any proper application for reconsideration or **review of any Final Order of the** FCCEA rendered in a Dispute Resolution Procee**ding conducted pursuant to this** Section **to the Fayette County Commission or** any trial or appellate court, the costs and expenses, non-exclusively including the attorneys' fees and costs and the expert witness fees and costs, incurred by Fayette County **in connection with any dispute resolution proceedings under this** Section, **and in connection with any proper application for reconsideration or review to the Fayette County Commission or** any trial or appellate court, are **JF-LC** *Abatement Action Costs* **and shall be timely paid in full by the** Remedial Respondents, jointly and severally, as and when required by the applicable provisions of this Order, unless it is finally determined that the position of the FCCEA Chairperson or the holding of the FCCEA in any Final Order issued in a formal Dispute Resolution procee**ding pursuant to this Section was manifestly unreasonable, in which case Fayette County shall not be entitled to recover any of its costs and attorneys' fees incurred in connection with any such position in any** formal Dispute Resolution proceedings **or application for review to the Fayette County Commission or** any trial or appellate court concerning such position or holding.

   **l.** **Required Interest on Delinquent Payments:**   In the event that any payment for *Abatement Action Costs* is not timely made in compliance with the requirements of this **Section,** the **Remedial Respondents** shall pay Interest on the unpaid balance. Such Interest shall accrue at the rate described in **Section III(b)(6) of FCoWV Ordinance 2018-001,** and shall begin to accrue on the date the invoice for those costs became a Final Invoice and shall continue to accrue until the date of payment. Payments of Interest made under this **Paragraph** shall be in addition to such other remedies or sanctions available to the **FCCEA** or Fayette County by virtue of the failure of the **Remedial Respondents** to make timely payments in compliance with the requirements of this **Section.** The **Remedial Respondents** shall make all payments required by this **Paragraph (k)** in the manner described in **Paragraph (f)** of this **Section.**

## XXVII.  NOTICE OF COMPLETION OF WORK:

   When the **FCCEA** determines that all **Work** has been fully performed in accordance with this **Order**, with the exception of any continuing obligations required by this **Order**, non-exclusively including any land, water, or other resource use restrictions or **Institutional Controls**, payment of *Abatement Action Costs* or Future *Abatement Action Costs*, and record retention requirements, the **FCCEA** will provide written notice to Respondents. If the **FCCEA** determines

IN RE:  Johnson Fork-Loop Creek Pollution Abatement Project
FCCEA Matter No. 2019-002 (Fayette Co., WV Code Enforcement Agency)

**FINAL & BINDING TIME-SENSITIVE ABATEMENT ACTION ORDER NO. 2021-002-9.5(b)-001**

Page 87 of 90 pages

that any **Work** has not been completed in accordance with this **Order**, the **FCCEA** will notify the **Remedial Respondents**, provide a list of the deficiencies, and require that the **Remedial Respondents** modify the **RI/FS** Workplan, if appropriate, in order to correct such deficiencies within ten (10) days after receipt of the **FCCEA** notice. The modified **RI/FS** Workplan shall include a schedule for correcting such deficiencies. Within three (3) days after receipt of written approval of the modified **RI/FS** Workplan, the **Remedial Respondents** shall timely commence and pursue to completion implementation of the modified and approved **RI/FS** Workplan and shall submit either or both (as warranted) a modified draft **RI** Report and **FS** Report in accordance with the **FCCEA** notice. Failure by the **Remedial Respondents** to implement the approved modified **RI/FS** Workplan shall be a violation of this **Order**.

## XXVIII.    RESERVATIONS OF RIGHTS BY FAYETTE COUNTY AND THE FCCEA:

Nothing in this **Order** shall limit the authority of the County Commission of Fayette County, West Virginia, the Fayette County Prosecuting Attorney or the **FCCEA** to take, direct, or order all actions necessary to protect Public Health, Safety, Welfare, or the ***Environment*** or to prevent, abate, or minimize an actual or threatened ***Release*** of ***Hazardous Substances***, ***Pollutants or Contaminants***, or ***Hazardous Wastes*** or **Solid Waste** on, at, or from the **Site**. Further, nothing in this **Order** shall prevent the **FCCEA** from seeking from a court of competent jurisdiction legal or equitable relief to enforce the terms of this **Order**, from taking other legal or equitable action as it deems appropriate and necessary, or from requiring any **Respondent** in the future to perform additional activities pursuant to **FCoWV Ordinance 2018-001** or any other applicable law. Nor is any provision of this Order intended to, nor shall any provision of it be construed to, limit or restrict in any manner the authority of the County Commission of Fayette County, West Virginia or the **FCCEA** to commence appropriate proceedings against any **Respondent**(s) under applicable federal, West Virginia or Fayette County ordinance to recover of any ***Abatement Action Costs***, ***Response*** costs, or damages incurred by Fayette County related to this **Order** or the **Site** and not timely paid by such **Respondent**(s) pursuant to the terms of this **Order**.

## XXIX.    OTHER CLAIMS:

**a.** By issuance of this **Order**, the County Commission of Fayette County, West Virginia and the **FCCEA** assume no liability for any injuries or damages to persons or property resulting from any acts or omissions of **Respondents**, or any of them. The County Commission of Fayette County, West Virginia and the **FCCEA** are not, and shall not be deemed, a party to any contract entered into by any **Respondent(s)** or their directors, officers, employees, agents, successors, representatives, assigns, contractors, or consultants in carrying out actions pursuant to this **Order**.

**b.** Nothing in this **Order** constitutes a satisfaction of, or any release from, any claim or cause of action against any **Respondent**(s) or any ***Person*** not a party to this **Order**, for any liability such ***Person*** may have under federal or West Virginia statutes, regulations, or common law, or under any local laws or Fayette County ordinances, non-exclusively including **FCoWV**

IN RE:  Johnson Fork-Loop Creek Pollution Abatement Project
FCCEA Matter No. 2019-002 (Fayette Co., WV Code Enforcement Agency)

**FINAL & BINDING TIME-SENSITIVE ABATEMENT ACTION ORDER NO. 2021-002-9.5(b)-001**

Page 88 of 90 pages

Ordinance 2018-001.

   **c.** No action or decision by the **FCCEA** pursuant to this **Order** shall give rise to any right to judicial review of this **Order**, except as set forth in Section **IX.V(g)** of **FCoWV Ordinance 2018-001.**

## XX.   COMPLIANCE WITH OTHER LAWS:

   **a.** Nothing in this **Order** limits or conditions any **Respondent's** obligations to comply with applicable federal, state and local law, non-exclusively including applicable ordinances of Fayette County, West Virginia, and duly promulgated Rules of the Fayette County Solid Waste Authority and the Fayette County Board of Health, when performing **Work** pursuant to this **Order**.

   **b.** This **Order** is not intended, and shall not be construed, to be a permit for purposes of any federal, state or local statute, regulation or ordinance.

## XXXI.   ADMINISTRATIVE RECORD:

   **a.** In compliance with the provisions of Section **IX(g)** of **FCoWV Ordinance 2018-001**, the **FCCEA** has established an Administrative Record that contains the documents that form the basis for the issuance of this **Order**. A copy of the Administrative Record is available for viewing at: https://www.dropbox.com/sh/y4gcrj8sqpj4jzn/AAA9bAxvNuoXZnG87MvAD6Gha?dl=0. In addition, the Administrative Record relating to this **Order** is available for review by appointment on weekdays during the normal business hours at the **FCCEA** Offices located in the Fayette County Courthouse, Fayetteville, WV.

   **b.** In accord with the of the Section **IX(g)** of **FCoWV Ordinance 2018-001**, the **FCCEA** will determine the contents of the Administrative Record for selection of the *Abatement Action(s)* for this **Site**. The **Remedial Respondents** shall submit to the **FCCEA** documents developed during the course of the **RI/FS** upon which selection of *Abatement Action(s)* for this **Site** shall be based. Upon request of the **FCCEA**, the **Remedial Respondents** shall provide to the **FCCEA** copies of plans, task memoranda for further action, quality assurance memoranda and audits, raw data, field notes, laboratory analytical reports, and other reports for review and consideration for inclusion in the Administrative Record for this **Site**. Upon request of the **FCCEA**, any **Respondent(s)** shall additionally submit any previous studies conducted under federal, state, local, or other governmental or scholarly authorities that may relate to selection of any *Abatement Action* for this **Site**, and all communications between any **Respondent(s)** and federal, state, or other local governmental authorities concerning selection of any *Abatement Action* for this **Site**.

## XXXII.  SEVERABILITY:

   If a court of competent jurisdiction issues an order not void on its face that invalidates any provision of this **Order** or finds that any **Respondent(s)** has sufficient cause not to comply with one or more provisions of this **Order**, the **Respondents** shall remain bound to comply with all provisions of this **Order** not invalidated or determined to be subject to a sufficient cause defense

IN RE:  Johnson Fork-Loop Creek Pollution Abatement Project
FCCEA Matter No. 2019-002 (Fayette Co., WV Code Enforcement Agency)

**FINAL & BINDING TIME-SENSITIVE ABATEMENT ACTION ORDER NO. 2021-002-9.5(b)-001**

Page 89 of 90 pages

by the court's order.

    **IT IS SO ORDERED** by the [unanimous] [majority] vote of the members of the Fayette County Code Enforcement Agency entitled to vote, a quorum being present, at its duly noticed Public Meeting in Fayette County, West Virginia on this ___ day of May 2021.

<div align="right">

**FAYETTE COUNTY CODE
ENFORCEMENT AGENCY
FAYETTE COUNTY, WV**

</div>

**By:** ~~Ruth A. Lanier~~
      Fayette County Administrator
      Its Chairperson

**ATTEST:**

    ~~Aletha L. Stolar~~
    Secretary & Member, Fayette County Code Enforcement Agency

**APPROVED AS TO FORM AND ASSERTION OF LIABILITY PURSUANT TO SECTION VI(j) OF FCoWV ORDINANCE 2018-001:**

**ANTHONY CILIBERTI, ESQ.
FAYETTE COUNTY PROSECUTING ATTORNEY**

**By:** _____
      Michael O. Callaghan, Esq.
      Chief Assistant Fayette County Prosecuting Attorney
        Environmental and Public Health Protection Unit

---

**IN RE:  Johnson Fork-Loop Creek Pollution Abatement Project
FCCEA Matter No. 2019-002 (Fayette Co., WV Code Enforcement Agency)**

**FINAL & BINDING TIME-SENSITIVE ABATEMENT ACTION ORDER NO. 2021-002-9.5(b)-001**

Neely & Callaghan
1337 Virginia St. E.
Charleston, WV 25301







7020 2450 0001 9558 7896

U.S. POSTAGE PAID
FM 2-DAY
CHARLESTON, WV
25301
MAY 05, 21
AMOUNT
$14.70
R2307M152640-8
1006    02109

Corporation Service Company
National Grid NE Holdings 2, LLC
84 State St
Boston, MA 02109