# UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
## CHARLESTON DIVISION

| | |
|---|---|
| **The County Commission of Fayette County, West Virginia**, a political subdivision of the State of West Virginia, | } } } } |
| **- Plaintiff;** | } } |
| **Ex Rel. Anthony Ciliberti, Esq, Fayette County Prosecuting Attorney,** | } } } **CASE NO. 2:21-cv-00307** |
| **- Relator;** | } } |
| | } } **Hon. Thomas E. Johnston, Chief** |
| **v.** | } } **Judge, Presiding** |
| | } } |
| **National Grid NE Holdings 2 LLC,** *et al.* | } } |
| **- Defendants.** | } } |
| | } } **VERIFIED SECOND AMENDED** |
| | } } **COMPLAINT** |
| | } } } |

# TABLE OF CONTENTS

**PAGE #**

| | | | |
|---|---|---|---|
| I. | **NATURE OF THIS CASE** | ……………………….. | 9 |
| II. | **JURISDICTION AND VENUE** | …………………… | 16 |
| III. | **STATUTORY PREREQUISITES TO SUIT** | …………………… | 18 |
| IV. | **DEFINITIONS** | …………………… | 19 |
| V. | **THE SITE, THE PARTIES & THEIR RELATIONSHIPS** | …………… | 30 |
| | a.   **The Site** | …………………… | 30 |
| | b.   **The Governmental Plaintiff** | …………………… | 30 |
| | c.   **National Grid NE Holdings 2 LLC** | …………………… | 32 |
| | d.   **Eastern Associated Coal, LLC** | …………………… | 37 |
| | e.   **Pardee and Curtin Realty LLC** | …………………… | 41 |
| | f.   **Quercus West Virginia, LLC** | …………………… | 43 |
| | g.   **The Owners of the Wriston Subject Property** | …………………… | 44 |
| | h.   **Associated Electric & Gas Insurance Services Limited** | ……………………… | 44 |
| | i.   **Century Indemnity Company** | …………………… | 45 |
| | j.   **Continental Casualty Company** | …………………… | 47 |
| | k   **First State Insurance Company** | …………………… | 48 |
| | l.   **Hartford Accident and Indemnity Company** | …………………… | 49 |
| | m.  **Hartford Casualty Insurance Company** | …………………… | 50 |
| | n.   **The Navigators Management Corporation** | …………………… | 51 |
| | o.   **Pacific Employers Insurance Company** | …………………… | 52 |
| | p.   **The Travelers Casualty and Surety Company** | …………………… | 53 |

**TABLE OF CONTENTS**

   q.  **Zurich American Insurance Company** ............................... 54

VI.  **FACTUAL ALLEGATIONS COMMON TO ALL COUNTS** ............ 55

   a.  **The JF-LC Surface Waters and Groundwaters** .................... 55

   b.  **The JF-LC Mining Facilities** .............................. 57

   c.  **The JF-LC Unlined Coal Waste Dumps** .............................. 62

   d.  **Past Facility Investigations of the Coal Mining Waste** .................... 68

   e.  **Environmental Conditions within the Subject Watershed** ............ 79

   f.  **Impact of the Coal Mining Waste Piles** .............................. 82

   g.  **Released AMD is a Hazardous Substances under CERCLA** ................ 89

   h.  **AMD is a RCRA Subtitle G Solid Waste & Hazardous Waste** ............. 91

   i.  **Actual or Potential Endangerment to Health and the Environment** ....... 94

   j.  **Response Activities by the Governmental Plaintiff** .................... 95

**COUNT ONE: RCRA CITIZEN SUIT** .............................. 108

   a.  **Part One- On-going Violations of RCRA § 4005(a)** .................... 108

   b.  **Part Two - Violations of the WV Solid Waste Management Act** ........... 115

**COUNT TWO: "CITIZEN SUIT" RELIEF PURSUANT
    TO RCRA § 7002(a)(1)(B)** .............................. 119

**COUNT THREE: ENFORCEMENT OF CERCLA § 111(g)** .................... 130

**COUNT FOUR: "CITIZEN SUIT" RELIEF PURSUANT TO
    FEDERAL CLEAN WATER ACT** .............................. 132

**COUNT FIVE: JUDICIAL ABATEMENT OF
    *PER SE* PUBLIC NUISANCE** .............................. 142

**TABLE OF CONTENTS**

    a.   *Per Se* Public Nuisances under WV Law  ………………………  **142**

    b.   **All Open Dumps in West Virginia Are
a *Per-Se* Public Nuisance**  ………………………  **145**

**COUNT SIX:  PUBLIC NUISANCE ABATEMENT
UNDER FAYETTE CO. ORDINANCE**  ………………………  **151**

    a.   *Public Nuisance* Pursuant to Section V(b)  ………………………  **157**

    b.   *Public Nuisance* Pursuant to Section V(a)(17)  ………………………  **159**

    c.   *Public Nuisance* Pursuant to Section V(a)(5)  ………………………  **161**

    d.   *Public Nuisance* Pursuant to Section V(a)(10)  ………………………  **164**

**COUNT SEVEN:  ENFORCEMENT OF FAYETTE CO.
FINAL ABATEMENT ACTION ORDER**  ………………………  **168**

**COUNT EIGHT:  GOVERNMENTAL "DIRECT ACTION"
AGAINST LIABILITY INSURERS OF EACC**  ……….……………  **172**

**COUNT NINE:  JUDICIAL ABATEMENT OF PUBLIC NUISANCE
UNDER WEST VIRGINIA COMMON LAW**  ………………………  **175**

**COUNT TEN:  RECOVERY OF FAYETTE CO. RESPONSE COSTS
& ATTORNEY FEES AND COSTS PURSUANT TO
W. Va. CODE § 7-1-3ff(h)(3) & (4)**  ………………………  **179**

**COUNT ELEVEN:  UNJUST ENRICHMENT**  ………………………  **183**

**VIII.   PRAYER FOR RELIEF**  ………………………  **184**

**TABLE OF CONTENTS**

# UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
### CHARLESTON DIVISION

| | | |
|---|---|---|
| **The County Commission of Fayette County, West Virginia**, a political subdivision of the State of West Virginia, | } } } } } } } | |
|                 - Plaintiff; | } } } | |
| **Ex Rel. Anthony Ciliberti, Esq, Fayette County Prosecuting Attorney,** | } } } } | **CASE NO. 2:21-cv-00307** |
|                 - Relator; | } } } | **Hon. Thomas E. Johnston, Chief Judge, Presiding** |
|          v. | } } } | |
| **National Grid NE Holdings 2 LLC,** a Massachusetts Limited Liability Company, [successor in interest to the remedial liabilities of: **Eastern Gas and Fuel Associates (l.k.a. Eastern Associates),** a Massachusetts Business Trust, **incurred as a result of its status, acts or omissions prior to January 1, 1966,** arising out of its mining operations and mining waste disposal practices conducted within Fayette County, WV]; | } } } } } } } } } } } | **VERIFIED SECOND AMENDED COMPLAINT** |
|                 **- Defendant;** | } } } | |
| **Eastern Associated Coal, LLC,** a defunct West Virginia Limited Liability Company (**f.k.a. Eastern Associated Coal Corporation**), solely to the extent of its undistributed assets, non-exclusively including the available coverage and proceeds from its liability insurance policies, named herein as a Nominal Defendant Only, and not as a Real Party in Interest; | } } } } } } } } } | |
|               **- Nominal Defendant;** | } } } | |
| **Pardee and Curtin Realty LLC,** a Delaware Limited Liability Company qualified to do business in West Virginia; | } } } } | |
|                 **- Defendant;** | } } } | |
| **Quercus West Virginia, LLC,** a Delaware Limited Liability Company authorized to do | } } | |

business in West Virginia,

**- Defendant;**

**Associated Electric & Gas Insurance Services Limited ("AEGIS")**, a Bermuda corporation and an eligible Surplus Lines Insurer in West Virginia, solely to the extent of the remaining proceeds available pursuant to AEGIS insurance policy numbers 010A, 010NJ and 010CNJ providing liability insurance coverage to **Eastern Consolidated Coal Corporation** for its liability to the **Governmental Plaintiff** for all property damages alleged herein arising out of occurrences during the policy period of those policies;

**- Defendant;**

**Century Indemnity Company**, a Pennsylvania corporation and a member company of the Chubb Ltd. Group [as successor to **CCI Insurance Company, as successor to Insurance Company of North America**, as successor to **CIGNA Specialty Insurance Company (**formerly known as **California Union Insurance Company**), **Insurance Company of North America**, and **Pacific Employers Insurance Company (solely as successor to Illinois Union Insurance Company**)] solely to the extent of the remaining proceeds available pursuant to Insurance Company of North America policy numbers ISL 1176, ISL 1330, ISL GO 002701-7, ISL 209166 and XCP 3856, California Union Insurance Company policy number ZCX 00 66 06, and Illinois Union Insurance Company policy number CX020268 providing liability insurance coverage to **Eastern Consolidated Coal Corporation** for its liability to the **Governmental Plaintiff** for all property damages alleged herein arising out of occurrences during the policy period of those policies;

**- Defendant;**

**Columbia Casualty Company**, a Illinois corporation and member company of CNA Financial Corporation, a Delaware corporation,

solely to the extent of the remaining proceeds available pursuant to Continental Casualty Company Policy Numbers RD 9972829 and RDU 9433461 providing liability insurance coverage to **Eastern Consolidated Coal Corporation** for its liability to the **Governmental Plaintiff** for all property damages alleged herein arising out of occurrences during the policy period of those policies;

                             **- Defendant;**

**First State Insurance Company,** a Delaware corporation and a member company of the Hartford Financial Services Group, Inc., a Connecticut corporation, solely to the extent of remaining proceeds available pursuant to First State Insurance Company policy numbers 928241, 934489, 980061, 980081, and 980591, **and** (as successor in interest to **Royal Indemnity Company**) solely to the extent of remaining proceeds available pursuant to Royal Indemnity Company policy numbers EC 102071, EC 102072, and EC 102073, providing coverage to **Eastern Consolidated Coal Corporation** for its liability to the **Governmental Plaintiff** for all property damages alleged herein arising out of occurrences during the policy period;

                             **- Defendant;**

**Hartford Accident and Indemnity Company,** a Connecticut corporation and a member company of The Hartford Financial Services Group, Inc., a Connecticut corporation, solely to the extent of remaining proceeds available pursuant to Hartford insurance policy numbers 08 C J31005, 08 C J31014, 08 C J31024, and 08 C J31028 providing coverage to **Eastern Consolidated Coal Corporation** for its liability to the **Governmental Plaintiff** for all property damages alleged herein arising out of occurrences during the policy periods of those policies;

                             **- Defendant;**

**Hartford Casualty Insurance Company,** an Indiana corporation and a member company of The Hartford Financial Services Group, Inc., a Connecticut corporation, solely to the extent of remaining proceeds available pursuant to Hartford insurance policy number 08 XS 102705 providing coverage to **Eastern Consolidated Coal Corporation** for its liability to the **Governmental Plaintiff** for all property damages alleged herein arising out of occurrences during the policy period of that policy;

**- Defendant;**

**The Travelers Casualty and Surety Company,** a Connecticut corporation (successor in interest to **Aetna Casualty and Surety Co.**) and a member company of The Travelers Companies, Inc., a Minnesota corporation, solely to the extent of remaining proceeds available pursuant to Aetna Casualty and Surety liability insurance policy numbers 06AL013817SC, 06AL122094SCY 06AL1220SCY, 06AL125194SCY, 06AL127247SRAY, 06AL128702SRAY, 06AL131419SRAY, 06AL133503SRAY, 06AL133534SRA(Y), 06AL133562SRA(Y), 06AL133588SRA, 06AL230021SRA, and 06AL230063SCA providing coverage to **Eastern Consolidated Coal Corporation** for its liability to the **Governmental Plaintiff** for all property damages alleged herein arising out of occurrences during the policy periods of each of those policies;

**- Defendant;**

**Navigators Management Corporation,** a New York corporation and a member company of The Hartford Financial Services Group, Inc., a Connecticut corporation, solely to the extent of remaining proceeds available pursuant to Navigator Management Corporation liability insurance policy number 85L1159/01 providing liability insurance coverage to **Eastern Consolidated Coal Corporation** for its liability to the **Governmental Plaintiff** for all property damages alleged herein

arising out of occurrences during the policy periods;

        **- Defendant;**

**Zurich American Insurance Company**, a New York corporation, solely to the extent of remaining proceeds available pursuant to Zurich Insurance Company policy numbers 82-60-827 and 85-49-352 providing coverage to **Eastern Consolidated Coal Corporation** for its liability to the **Governmental Plaintiff** for all property damages alleged herein arising out of occurrences during the policy periods of those policies;

        **- Defendant;**

---

**COMPLAINT FOR: (1)** CITIZEN SUIT" RELIEF TO ENJOIN ONGOING VIOLATIONS OF COMPLIANCE REQUIREMENT REGARDING, AND TO ENFORCE THE PROHIBITION OF, "OPEN DUMPS" IN RCRA § 4005(a) AND THE PROVISIONS OF THE WEST VIRGINIA SOLID WASTE MANAGEMENT ACT AND IMPLEMENTING REGULATIONS THAT HAVE BECOME EFFECTIVE PURSUANT TO RCRA; **(2)** "CITIZEN SUIT" RELIEF PURSUANT TO RCRA § 7002(a)(1)(B), 42 U.S.C. § 6972(a)(1)(B), TO SECURE JUDICIAL ABATEMENT OF CONTINUING CONDITIONS THAT MAY PRESENT AN IMMINENT AND SUBSTANTIAL ENDANGERMENT TO HEALTH OR THE ENVIRONMENT ARISING FROM THE PAST AND ONGOING HANDLING OR DISPOSAL OF A SOLID WASTE OR HAZARDOUS WASTE; **(3)** "CITIZEN SUIT" RELIEF PURSUANT TO CERCLA § 310(a)(1), 42 U.S.C. § 9659(a)(1), TO COMPEL COMPLIANCE WITH THE MANDATORY NOTIFICATION REQUIREMENT OF CERCLA § 111(g), 42 U.S.C. § 9611(g); **(4)** "CITIZEN SUIT" RELIEF PURSUANT TO THE FEDERAL CLEAN WATER ACT § 505, 33 U.S.C. § 1365, TO RESTRAIN ONGOING "DISCHARGES OF A POLLUTANTS" BY DEFENDANT QUERCUS WEST VIRGINIA, LLC WITHOUT THE REQUIRED NPDES PERMIT IN VIOLATION OF CLEAN WATER ACT §§ 311(a) & 402, AND TO IMPOSE A CIVIL PENALTY PAYABLE TO THE UNITED STATES FOR PAST VIOLATIONS; **(5)** JUDICIAL ABATEMENT OF A CONTINUING *PER SE* PUBLIC NUISANCE DECLARED BY THE WEST VIRGINIA SOLID WASTE MANAGEMENT ACT AND THE WEST VIRGINIA SOLID

**WASTE MANAGEMENT RULE; (6) JUDICIAL ABATEMENT OF A CONTINUING *PER SE* PUBLIC NUISANCES DECLARED BY SECTION V OF FAYETTE CO. ORDINANCE NO. 2018-001, PURSUANT TO SECTION XXII OF THAT ORDINANCE; (7) JUDICIAL ORDER COMPELLING DEFENDANTS TO COMPLY WITH A FINAL AND BINDING TIME-SENSITIVE ABATEMENT ACTION ORDER ISSUED BY THE FAYETTE CO. CODE ENFORCEMENT AGENCY PURSUANT TO ITS AUTHORITY UNDER SECTION IX.V OF THE FAYETTE COUNTY PUBLIC NUISANCE ABATEMENT ORDINANCE REQUIRING PERFORMANCE BY THE REMEDIAL DEFENDANTS OF AN NCP-COMPLIANT REMEDIAL INVESTIGATION AND FEASIBILITY STUDY ADDRESSING ENDANGERMENTS TO HEALTH OR THE ENVIRONMENT THAT ARE OR MAY BE PRESENTED BY PUBLIC NUISANCE CONDITIONS WITHIN FAYETTE COUNTY; (8) "DIRECT ACTION" PURSUANT TO SECTION VI(j) OF THE FAYETTE COUNTY PUBLIC NUISANCE ABATEMENT ORDINANCE TO ESTABLISH THE LIABILITY OF EACH OF THE INSURER DEFENDANTS TO PAY FOR OR PERFORM THE REMEDIAL LIABILITIES IMPOSED UPON REMEDIAL DEFENDANT EACC BY THAT ORDINANCE SUBJECT ONLY TO THE REMAINING LIMITS OF LIABILITY UNDER, AND THE VALID TERMS AND CONDITIONS OF, THE LIABILITY INSURANCE POLICY(IES) EACH INSURER DEFENDANT ISSUED TO REMEDIAL DEFENDANT EACC; (9) JUDICIAL ABATEMENT OF CONTINUING PUBLIC NUISANCE PURSUANT TO THE COMMON LAW OF WEST VIRGINIA; (10) DECLARATORY AND CORRESPONDING INJUNCTIVE RELIEF REGARDING SITE ACCESS FOR COUNTY AGENTS AND RECOVERY OF: (i) COUNTY COSTS INCURRED WITH RESPECT TO SUBJECT PROPERTY; AND (ii) RECOVERY OF COUNTY'S REASONABLE ATTORNEYS' FEES AND COURT COSTS INCURRED HEREIN PURSUANT TO W. Va. CODE § 7-1-3ff(h)(3) & (4); (11) RESTITUTION FOR UNJUST ENRICHMENT.**

---

Plaintiff's Relator, Anthony Ciliberti, Esq., the duly-elected Fayette County Prosecuting Attorney, brings the original claims in this civil action in the name of, and on behalf of, Plaintiff, THE COUNTY COMMISSION OF FAYETTE COUNTY, WEST VIRGINA (hereinafter:

"**Governmental Plaintiff**")[1] pursuant to the express authority conferred upon him by:  **(1)** W. Va. Code § 7-4-1 to attend to, bring, prosecute or defend, as the case may be, all matters, actions, suits and proceedings in which Fayette County is interested; and **(2)** Sections **XX**[2] and **XXII**[3] of the

---

[1]  W. Va. Code § 7-1-1 conveys to each County Commission within West Virginia the authority to sue and be sued in its own name.

[2]  Section **XX** of Fayette Co. Ordinance 2018-002 provides, in relevant part:

> **(a) Judicial enforcement of Public Nuisance Abatement Action Order:**  As an alternative to or in addition to any other remedies available to the County, whenever any **Person** fails or refuses to comply with a properly served Public Nuisance Abatement Action Order that is or has become a final and binding Order pursuant to the Ordinance, the County Commission may direct the Fayette County Prosecuting Attorney to apply to, or the Fayette County Prosecuting Attorney may *sua sponte* commence before, any court of competent jurisdiction, or to the judge thereof in vacation, for an injunction forthwith to enforce any Binding Public Nuisance Abatement Action Order, non-exclusively including any Binding Temporary or Preliminary Public Nuisance Abatement Action Order, issued pursuant to this Ordinance, and upon proper proof to recover judgment for the **Abatement Action Costs** incurred by the County, and, where appropriate, to seek a declaratory judgment for **Abatement Action Costs** to be incurred by the County as authorized by Section **VI(g)** of this Ordinance.  In any such action, upon presentation to the court of proof by a preponderance of the evidence on the required elements of its claims, the court shall award the Fayette County Commission an injunction in the form of a judicial Public Nuisance Abatement Order, requiring the liable pa1ty timely and competently to abate the ***Public Nuisance*** consistent with the terms and conditions of the final and binding Abatement Action Order and applicable requirements of this Ordinance, at their sole cost, under the supervision and oversight of the Code Enforcement Agency or a designated member or authorized agent appointed by it.

[3]  Section **XXII** of Fayette Co. Ordinance 2018-002 provides, in relevant part:

> With respect to an actual or imminently threatened ***Public Nuisance***, or with respect to any act or condition which is detrimental to any beneficial uses within Fayette County of any **Natural Resource** owned by the State of West Virginia or Fayette County or held in trust by either for the benefit of present and future generations of the public, **the Fayette County Prosecuting Attorney may, in addition to or in lieu of any other remedy available to Fayette County, bring a civil action in the name of the Fayette County Commission in any court of competent jurisdiction,** and may seek in any such action any or all of the following forms of relief, and upon presentation to the court of the proof required by law on the required elements of it claims under applicable law, non-exclusively including this Ordinance, the court shall award the Fayette County Commission:
>
> > **(1)** an injunction in the form of a judicial public nuisance abatement order, requiring the liable party timely and competently to abate the ***Public Nuisance*** consistent with the applicable requirements of this Ordinance at their sole cost, under the supervision and oversight of the Fayette County Code Enforcement Agency;
> >
> > ***            ***            ***            ***            ***

---

Fayette Co. Comprehensive Public Nuisance Abatement Ordinance, Fayette Co. Ordinance # 2018-001 (hereinafter: "**FCoWV Public Nuisance Ordinance**"),. In addition, on June 22, 2021 by the Fayette County Code Enforcement Agency ("**FCoWV CEA**") adopted its Resolution No. 2021-06, a copy of which the **Governmental Plaintiff** has previously filed herein as ECF # 31-1 and which is incorporated herein by reference as **Exhibit 1**, requesting the Fayette County Prosecuting Attorney to commence enforcement of the provisions of **FCoWV CEA** Final & Binding Time-Sensitive Abatement Action Order No. 2021-02-9.5(b)-002 (hereinafter: "**JF-LC Abatement Action Order**") against the **Remedial Respondents**[4] to that Order, a copy of which the **Governmental Plaintiff** has previously filed herein as ECF # 3-1 and which is incorporated herein by reference as **Exhibit 2**, which Order was issued pursuant to the authority vested in the Fayette Co. Code Enforcement Agency by Section **IX.V** of the **FCoWV Public Nuisance Ordinance**, a copy of which the **Governmental Plaintiff** has previously filed herein as ECF # 01-1 and which is incorporated herein by reference as **Exhibit 3**, against the **Remedial Respondents** to that Order, several of which have failed or refused to comply with requirements of that Order. In response to that request from the **FCoWV CEA**, the **Governmental Plaintiff's** Relator, acting pursuant to the authority conveyed by Section **XX**[5] of the **FCoWV Public**

---

**(3)** recovery of all **Abatement Action Costs** incurred by Fayette County with respect to such **Public Nuisance;**

       \*\*\*      \*\*\*      \*\*\*      \*\*\*      \*\*\*

**(6)** where appropriate, a declaratory judgment on liability for further *Abatement Action* Costs to be incurred by the County with respect to the *Public Nuisance* in accord with the provisions of Section **VI(g)** of this Ordinance; …

[4] Section **III(x)** of the **FCoWV CEA JF-LC Abatement Action Order** defines the term "**Remedial Respondent**" identically with the term "**Remedial Defendant**" defined in Section **IV(w)** herein.

[5] Section **XX** of Fayette Co. Ordinance 2018-002 provides, in relevant part:

**(a) Judicial enforcement of Public Nuisance Abatement Action Order:** As an alternative to or in addition to any other remedies available to the County, whenever any **Person** fails or refuses to comply with a properly served Public Nuisance Abatement Action Order that is or

---

**Nuisance Ordinance**, asserts herein the Claim set forth in Count Seven of this Verified Second Amended Complaint seeking enforcement of that Order.

The **Governmental Plaintiff**, by and through its Relator, makes the following allegations upon knowledge as to itself and upon information and belief as to all other matters:

## I.   <u>NATURE OF THIS CASE:</u>

**1.**   Beginning at least in the last decade of the 19th Century and continuing into the mid-20th Century, the real property located within the Johnson Fork-Loop Creek Watershed, all of which is situated within Fayette County, West Virginia, was the locus of **very extensive** underground coal mining and related mining operations and mining waste disposal on the surface of that real property and immediately adjacent real property, virtually all of which was conducted in connection with the operations of the Powellton No. 6 and Island Coal mining Facilities within that watershed by Eastern Gas and Fuel Associates, a Massachusetts Business Trust (hereinafter:   "**EGFA**"), and **Remedial Defendant**[6] Eastern Associated Coal, LLC, a now-dissolved West Virginia Limited Liability Company (f.k.a. Eastern Associated Coal Corporation, a West Virginia Business

---

has become a final and binding Order pursuant to the Ordinance, the County Commission may direct the Fayette County Prosecuting Attorney to apply to, or the Fayette County Prosecuting Attorney may *sua sponte* commence before any court of competent jurisdiction, or to the judge thereof in vacation, for an injunction forthwith **to enforce any Binding Public Nuisance Abatement Action Order, non-exclusively including any Binding Temporary or Preliminary Public Nuisance Abatement Action Order, issued pursuant to this Ordinance, and upon proper proof to recover judgment for the Abatement Action Costs incurred by the County, and, where appropriate, to seek a declaratory judgment for Abatement Action Costs to be incurred by the County as authorized by Section VI(g) of this Ordinance.** In any such action, upon presentation to the court of proof by a preponderance of the evidence on the required elements of its claims, the court shall award the Fayette County Commission an injunction in the form of a judicial Public Nuisance Abatement Order, requiring the liable party timely and competently to abate the **Public Nuisance** consistent with the terms and conditions of the final and binding Abatement Action Order and applicable requirements of this Ordinance, at their sole cost, under the supervision and oversight of the FCoWV Code Enforcement Agency or a member or authorized agent appointed by it.

[6] The term "**Remedial Defendants**" is defined in Section **IV(u)**, *infra,* of this Complaint.

Corporation) (hereinafter: "**EACC**") that was from its formation in 1963 until 1987 a wholly owned subsidiary of **EGFA**.

2.    Through their acts, omissions, violations of federal and state environmental and public health protection laws, and their creation, contributions to, maintenance of, and failure and refusals to abate conditions of Public Nuisance within the Johnson Fork-Loop Creek Watershed, and breaches of common law duties owed to the **Governmental Plaintiff** and the public at large, **EGFA** and Nominal **Remedial Defendant EACC**, by **EGFA's** and **EACC's** failure properly to seal the seams and portals resulting from its underground coal mining operations on the **Subject Property**, and by the negligent and harmful mining waste disposal practices and operations on the **Subject Property** and the negligent and improper uses of the land within that watershed for improper purposes by **EGFA**, Nominal **Remedial Defendant EACC** and **Remedial Defendants** Pardee and Curtin Realty LLC and Quercus West Virginia, LLC, caused and contributed to the **Release** of *Toxic*, noxious, harmful and hazardous contaminants into the subsurface soils, groundwater and surface waters of the **Subject Watershed**, which *Toxic* contaminants have become present and threaten to become further present at, on, under, and emanating from the **Subject Property** and throughout the **Subject Watershed** downgradient of the **Subject Property.** These released, toxic contaminants contribute to the further degradation of Loop Creek, a "Section 303d" listed "impaired stream" of which Johnson Fork is a tributary.[7]

---

[7] Under Section 303(d) of the federal Water Pollution Control Act, as amended by the Clean Water Act, as further amended, 33 U.S.C. § 1313, (hereinafter: "Clean Water Act" or "**CWA**"), states are required to evaluate all available water quality-related data and information to develop a list of waters that do not meet established Water Quality Standards ("WQS") (*i.e.,* impaired waters) and those that currently meet WQS, but that may fail to meet those standards in the next reporting cycle (*i.e.,* threatened waters).  States then must develop a Total Maximum Daily Load ("TMDL") for every pollutant/waterbody combination on the list.  An essential component of a TMDL is the calculation of the maximum amount of a pollutant that can occur in waterbody and still meet WQS.  Within the TMDL the state allocates this loading capacity among the various point sources and non-point sources.  Required permits for each point source discharge are then issued through the federal and state

3.    By its illegal use of its Surface Estate appertaining to the real property comprising the **EGFA/EACC Subject Property** during the time period of its ownership of that Surface Estate between June 7, 2003 until June 27, 2013, its maintenance of, and failure and refusals to abate, conditions of Public Nuisance on the surface of that real property, and its breaches of common law duties owed to **Governmental Plaintiff** and the public at large, **Remedial Defendant** Pardee and Curtin Realty, LLC contributed to and maintained:  **(1)** *Per Se* ***Public Nuisances*** within Fayette County; and **(2)** Public Nuisances under the common law of West Virginia within Fayette County.

4.    By its illegally allowing the existence on its surface estate appertaining to the real property comprising the **EGFA/EACC Subject Property** during the time period of its ownership of that Surface Estate of the four (4) **Open Dumps** of mining waste located on the surface of that real property, through its past and ongoing acts, omissions, violations of federal and state environmental and public health protection laws, and its past and ongoing maintenance of, and failure and refusals to abate those conditions of *Per Se* Public Nuisance within the Johnson Fork-Loop Creek Watershed, and breaches of common law duties owed to Plaintiff and the public at large, **Remedial Defendant** Quercus West Virginia, LLC has contributed to and maintained and is continuing to contribute to and a maintain:  **(1)** *Per Se* Public Nuisances within Fayette County; and **(2)** Public Nuisances under the common law of West Virginia within Fayette County.

5.    For all the foregoing reasons and by each of their acts and omissions as set forth in detail in this Verified Second Amended Complaint, **EGFA**, Nominal **Remedial Defendant EACC**, and

---

implementation of the National Pollutant Discharge Elimination System ("NPDES") established pursuant to **CWA** §§ 301 and 402, 33 U.S.C. § 1311 and 1342.  Listing a waterbody-pollutant combination as "impaired" under the **CWA** has significant legal and environmental consequences.  It is interpreted by the public as justification to question whether it is safe to have any form of dermal contact with, or to fish within, the impaired waters, and it may hinder efforts to attract people or businesses to an area.  **Persons** that **Discharge** or seek to **Discharge** effluent into impaired waters may also be subject to more stringent NPDES permit discharge limits that either encourages relocation or discourages initially locating within an "impaired" watershed.

**Remedial Defendants** National Grid NE Holdings 2 LLC (as the corporate successor to the pre-1966 remedial liability imposed on **EGFA** and retained by **EGFA** pursuant to applicable law), Pardee and Curtin Realty LLC, and Quercus West Virginia, LLC are each a ***Person*** declared liable by Sections **VI(a)(1-9)(A)** and **(B)** of the **FCoWV Public Nuisance Ordinance** timely to:  **(1)** perform at each of their sole costs the **Abatement Actions** selected in compliance with Section **IX** of that Ordinance to secure appropriate protection of the Public Health, Safety, Welfare and the **Environment** with the respect to the endangerments presented by the ***Public Nuisance*** conditions to which each of them contributed; and **(2)** reimburse Fayette County for the **Abatement Action Costs** incurred and to be incurred in responding to the ***Public Nuisance*** conditions to which each of them contributed.

6.    The **Governmental Plaintiff** bring this civil action to:

(a)    obtain timely judicial abatement to be conducted at the sole cost of **Remedial Defendants** National Grid NE Holdings 2 LLC, **EACC**, Pardee and Curtin Realty LLC and Quercus West Virginia, LLC, jointly and severally, pursuant to this Court's Orders and with appropriate oversight and supervision by the Fayette Co. Code Enforcement Agency[8], the governmental agency charged with securing and overseeing appropriate abatement of *Public Nuisance* conditions within Fayette County, of conditions at and emanating from the **Subject Property** that present or may present an imminent and substantial endangerment to health or the environment within the **Subject Watershed** arising from the past handling of a **Solid Waste** or **Hazardous Waste** pursuant to Section 7002(a)(1)(b) of the Solid Waste Disposal Act, as amended by the Resource Conservation and Recovery Act of 1976, as further amended, 42 U.S.C. § 6972(a)(1)(b) ("**RCRA**"); all

---

[8]  In compliance with the statutory mandate set forth in W. Va. Code § 7-1-3ff(c), the Fayette Co. Code Enforcement Agency was created by the Co. Commission of Fayette County, West Virginia by its enactment of Section **VII** of the **FCoWV Public Nuisance Ordinance**.  In that Ordinance, the FCoWV Co. Commission vested the FCoWV Code Enforcement Agency with appropriate authorities and tasks that the Commission determined were necessary and proper to the effective discharge of its legal mandate and authorities, including portions of authorities conveyed to it by **both** W. Va. Code  7-1-3ff and 3kk.

in a manner consistent with the requirements of the **National Contingency Plan[9]**;

**(b)** compel **Remedial Defendant** Quercus West Virginia, LLC to comply with the mandatory provision of Section 111(g) of the Comprehensive Environmental Response, Compensation and Liability Act of 1980, as amended ("**CERCLA**"), 42 U.S.C. § 9611(g), requiring it, as the current owner of the Surface Estate appertaining to the real property at the **Site** from which **Hazardous Substances** have been, and are continuing to be, released into the **Environment,** give the required newspaper notice to the potential injured parties.

**(c)** secure timely judicial abatement of the on-going conditions within the **Subject Watershed** declared by the **FCoWV Public Nuisance Ordinance** to be a *Public Nuisance*; all such judicial abatement binding and compelling **Remedial Defendants** National Grid NE Holdings 2 LLC, **EACC**, Pardee and Curtin Realty LLC and Quercus West Virginia, LLC at their sole costs, jointly and severally, timely and competently to undertake under in full compliance with this Court's Orders and with appropriate oversight and supervision by the FCoWV Code Enforcement Agency (hereinafter sometimes referred to as:  **FCoWV CEA**"), all actions necessary to address and abate the continuing *Public Nuisance* conditions and endangerments to the public health, safety, welfare and the **Environment** caused and contributed to by the past and ongoing acts and omissions for which remedial liability has been imposed by Section **VI** of the **FCoWV Public Nuisance Ordinance**"), all in a manner consistent with the requirements of the **NCP** and Section **IX** of the **FCoWV Public Nuisance Ordinance**;

**(d)** secure timely judicial abatement of on-going conditions declared by the General Law of West Virginia to be a "public nuisance and clear and present danger to people"[10] as *Per Se* Public Nuisance conditions pursuant to the common law of West Virginia; all such judicial abatement binding and compelling **Remedial Defendant** National Grid NE

---

[9]  Codified at 40 C.F.R., Part 300, the National Oil and Hazardous Substances Pollution Contingency Plan (hereinafter:  "**NCP**" or "**National Contingency Plan**"), was originally promulgated in 1968 and greatly expanded in 1972 by the Administrator of the U.S. Environmental Protection Agency pursuant to the Spill Response provisions of Section 311 of the federal Clean Water Act, 33 U.S.C. § 1321.  In the 1980's and 1990's, pursuant to the Congressional mandate in Section 105(a) of **CERCLA**, 42 U.S.C. § 9605(a), the **NCP** was substantially amended and re-promulgated comprehensively to address the **Responses** (*i.e.,* the precise scope and nature of the necessary and proper course of investigation and clean-up actions) appropriate to **Releases** and threatened **Releases** into the **Environment** of **Hazardous Substances** that are the central focus of **CERCLA**.

[10]  W. Va. Code § 22-15-1(c)(1).

Holdings 2 LLC (as legal successor to the remedial liabilities imposed by applicable law, including the **FCoWV Public Nuisance Ordinance**, on Eastern Gas and Fuel Associates (l.k.a. Eastern Associates) as a result of its acts or omissions on or before January 1, 1966), Nominal **Remedial Defendant EACC**, and **Remedial Defendants** Pardee and Curtin Realty LLC and Quercus West Virginia, LLC at their sole costs, jointly and severally undertake, in full compliance with this Court's Orders and with appropriate oversight and supervision by the **FCoWV** Code Enforcement Agency, all actions necessary to abate the **<u>continuing</u>** Public Nuisance conditions pursuant to the remedial liability imposed upon each **Remedial Defendant** by the common law of West Virginia;

**(e)**   secure timely judicial abatement of on-going Public Nuisance conditions pursuant to the common law of West Virginia; all such judicial abatement binding and compelling **Remedial Defendant** National Grid NE Holdings 2 LLC (as legal successor to the remedial liabilities imposed by applicable law, including the **FCoWV Public Nuisance Ordinance**, on Eastern Gas and Fuel Associates (l.k.a. Eastern Associates) as a result of its acts or omissions on or before January 1, 1966), Nominal **Remedial Defendant EACC**, and **Remedial Defendants** Pardee and Curtin Realty LLC and Quercus West Virginia, LLC, at their sole costs, jointly and severally, to undertake, in full compliance with this Court's Order and with appropriate oversight and supervision by the Fayette Co. Code Enforcement Agency, all actions necessary to abate the **continuing** Public Nuisance conditions pursuant to the remedial liability imposed upon each such Defendant by the common law of West Virginia;

**(f)**   recover from **Remedial Defendant** National Grid NE Holdings 2 LLC (as legal successor to the remedial liabilities imposed by applicable law, including the **FCoWV Public Nuisance Ordinance**, on Eastern Gas and Fuel Associates (l.k.a. Eastern Associates) as a result of its acts or omissions on or before January 1, 1966), Nominal **Remedial Defendant EACC**, and **Remedial Defendants** Pardee and Curtin Realty LLC and Quercus West Virginia, LLC, jointly and severally, the ***Abatement Action Costs*** incurred and to be incurred by Fayette County in investigating and responding to the ***Public Nuisance*** conditions within and emanating from the **Subject Watershed** for which each

such Defendant is, strictly[11] liable, jointly and severally[12], pursuant to Section **VI(a)(1-9)(B)** of the **FCoWV Public Nuisance Ordinance**;

**(g)** obtain a Declaratory Judgment and corresponding Injunctive Relief that each **Insurer Defendant** is liable, subject only to the limitations of liability[13] within each liability insurance policy each such **Insurer Defendant** issued to **EACC** providing liability insurance coverage for any part of the time period of 1963 to March 31, 1987, jointly and severally to Fayette Co. for all liability imposed upon Nominal **Remedial Defendant EACC** by operation of law or assumed by it by contract or agreement as or for property damage, non-exclusively including the liability to pay for or perform required **Abatement Actions** and to reimburse Fayette Co. for all **Abatement Actions Costs** incurred and to be incurred in responding to the *Public Nuisance* conditions within the **Subject Watershed** pursuant to Sections **VI(a)(1-9)(A)** and **(B)**, **(g)** and **(j)** of the **FCoWV Public Nuisance Ordinance**;

**(h)** recover restitution under the law of Unjust Enrichment for the benefits received by each **Remedial Defendant** resulting from the **Governmental Plaintiff's** incurrence of costs of responding to the harms to, loss of value of, and loss of water at the **Subject Property** that was and is the legal responsibility of each of the **Remedial Defendants**;

**(i)** recover from **Remedial Defendant** National Grid NE Holdings 2 LLC, Nominal **Remedial Defendant EACC**, and **Remedial Defendants** Pardee and Curtin Realty LLC and Quercus West Virginia, LLC, jointly and severally, the **Governmental Plaintiff's** reasonable litigation costs, non-exclusively including its attorney fees and costs, expert witness fees and costs, and litigation costs incurred in obtaining such relief pursuant to **RCRA** § 7002(e), 42 U.S.C. § 6972(e), W. Va. Code § 7-1-3ff(h)(4) and Section **XI(c)** of the **FCoWV Public Nuisance Ordinance**;

---

[11] Sections **VI(a)(1-9)(B)** and **(e)** of the **FCoWV Public Nuisance Ordinance**.

[12] Sections **VI(a)(1-9)(B)** and **(f)** of the **FCoWV Public Nuisance Ordinance**.

[13] As used herein, the term "limits of liability" refers not only to the "per occurrence" and "aggregate limits" of liability set forth in the declarations page of each insurance policy, as the same may be modified by endorsement, but also to: **(1)** any deductible or self-insured retention that is an enforceable term or condition of the insurance policy; and **(2)** with respect to excess or umbrella liability insurance policies, the valid, applicable requirements of the insurance policy with respect to underlying insurance.

**(j)**  recover from **Remedial Defendant** National Grid NE Holdings 2 LLC (as legal successor to the remedial liabilities imposed by applicable law, including the **FCoWV Public Nuisance Ordinance**, on Eastern Gas and Fuel Associates (l.k.a. Eastern Associates) as a result of its acts or omissions on or before January 1, 1966), Nominal **Remedial Defendant EACC**, and **Remedial Defendants** Pardee and Curtin Realty LLC and Quercus West Virginia, LLC, jointly and severally, appropriate prejudgment interest pursuant to West Virginia law and Sections **III(b)(6)** and **VI(a)(1-9)(B)** of the **Fayette Co. Public Nuisance Ordinance**; and

**(k)**  for such other relief as this Court may deem necessary and proper.

## II.  JURISDICTION AND VENUE:

**7.**    This Court has original jurisdiction over the subject matter of Counts One [*i.e.,* the **Governmental Plaintiff's** claim under the "Citizen Suit" provisions of **RCRA** § 7002(a)(1)(A), 42 U.S.C. § 6972(a)(1)(A)] and Two [*i.e.,* **Governmental Plaintiff's** "Citizen Suit" claim under **RCRA** § 7002(a)(1)(B), 42 U.S.C. § 6972(a)(1)(B)] herein without regard to the amount in controversy or the citizenship of the parties pursuant to **RCRA** § 7002(a), 42 U.S.C. § 6972(a), and 28 U.S.C. § 1331.

**8.**    This Court has original jurisdiction over the subject matter of Counts Three [*i.e.,* the **Governmental Plaintiff's** claim under the "Citizen Suit" provisions of the federal Clean Water Act § 505, 33 U.S.C. § 1365] herein without regard to the amount in controversy or the citizenship of the parties pursuant to **CWA** Section 505(a), 33 U.S.C. § 505(a), and 28 U.S.C. § 1331.

**9.**    This Court has **exclusive**, original jurisdiction over the subject matter of Count Four herein [*i.e.,* the **Governmental Plaintiff's** "Citizen Suit" claim under **CERCLA** § 310(a)(1), 42 U.S.C. § 9659(a)(1)] without regard to the amount in controversy or the citizenship of the parties pursuant to **CERCLA** §§ 113(b) and 310(c), 42 U.S.C. §§ 9613(b) and 9659(c), and 28 U.S.C. § 1331.

**10.**    This Court has supplemental jurisdiction over the subject matter of the **Governmental Plaintiff's** remaining causes of action [*i.e.,* Counts Five through Eleven, inclusive] herein pursuant to 28 U.S.C. § 1367 because each of those claims are so related to the causes of actions arising under federal law asserted in Counts One through Four, inclusive, herein that they form the same case and controversy under Article III of the United States Constitution.

**11.**    Pursuant to **RCRA** § 7002(a), 42 U.S.C. § 6972(a), venue lies in this Judicial District, since a substantial part of the acts, omissions, and events which are described herein and the imminent and substantial endangerments to health and the environment asserted herein have occurred and are occurring within this federal judicial district, and those acts, omissions, events and endangerments which give rise to claims of the **Governmental Plaintiff**, including the **Discharges** and **Disposal** of **Solid Waste**, **Hazardous Wastes** and **Pollutants and Contaminants** into the *Environment* within the **Subject Watershed**, have occurred and are occurring in this federal judicial district, causing harmful impacts and endangerments within this federal judicial district.  Moreover, pursuant to **CWA** § 505(c)(1), 33 U.S.C. § 1365(c)(1), venue lies in the judicial district because it is the judicial district in which the sources of the past and ongoing discharges of pollutants are located.  Finally, pursuant to **CERCLA** § 310(b)(1), 42 U.S.C. § 9659(b)(1), venue also lies in this judicial district because it is the judicial district within which the alleged violation of **CERCLA** § 111(g), 42 U.S.C. § 9611(g), occurred and is continuing to occur.

### III.
### ALL STATUTORY PREREQUISITES FOR THE COMMENCEMENT OF THIS CIVIL ACTION ARE SATISFIED:

**12.**    In compliance with the requirements of **RCRA** § 7002(b)(2), 42 U.S.C. § 6972(b)(2), on October 8, 2019 the **Governmental Plaintiff** sent its "Notice of Endangerment," a copy of which the **Governmental Plaintiff** has previously filed herein as ECF # 01-2 and which is incorporated

herein by reference as **Exhibit 4**, to **Remedial Defendant** National Grid NE Holdings 2 LLC, the subsidiary, member companies of **Remedial Defendants** Pardee and Curtin Realty LLC, and Quercus West Virginia, LLC, and to all required federal and WV governmental officers and entities.

13.   In compliance with the requirements of **RCRA** § 7002(b)(1), 42 U.S.C. § 6972(b)(1), **CWA** § 505(b), 33 U.S.C. § 1365(b), and **CERCLA** § 310(d), 42 U.S.C.§ 9659(d), on September 22, 2020 the **Governmental Plaintiff** sent to **Remedial Defendants** Quercus West Virginia, LLC, and to all required federal and West Virginia governmental officers and entities its "notice of violation" of:   **(1) RCRA** § 4005(a), 42 U.S.C. § 6945(a), and of the requirements of W. Va. Solid Waste Management Act, W. Va. Code Chapter 22, Article 15, and the W. Va. Solid Waste Management Rule, W. Va. C.S.R. Chapter 33, Series 1, each a part of the West Virginia Solid Waste Management Plan submitted to and approved by USEPA pursuant to **RCRA** Subtitle D that were each enacted to accomplish minimum compliance with the requirements for federal approval of such a Plan pursuant to **RCRA** Subtitle D; **(2) CWA** §§ 311 & 402(a), 33 U.S.C. §§ 1321 & 1342(a); and **(3) CERCLA** § 111(g), a copy of which the **Governmental Plaintiff** has previously filed herein as ECF # 01-3 and which is incorporated herein by reference as **Exhibit 5**.

14.   More than ninety (90) days have elapsed since the **Governmental Plaintiff** sent its Notice of Endangerment and its Notice of Violations regarding the claims at issue herein.

15.   As of the date of filing of this Complaint, neither the United States, the U.S. Environmental Protection Agency ("USEPA"), the State of West Virginia, nor the West Virginia Department of Environmental Protection ("**WVDEP**") have:   **(i)** taken, commenced, or is diligently prosecuting any of the actions, incurred any of the costs, issued any of the Orders or entered into any of the Consent Decrees described in **RCRA** § 7002(b)(2)(B) or (C),

42 U.S.C. § 6972(b)(2)(B) or (C); **(ii)** commenced, or is diligently prosecuting any of the civil or criminal actions described in **CWA** § 505(b)(1)(B), 33 U.S.C. § 1365(b)(1)(B); or **(iii)** commenced, or is diligently prosecuting any of the actions described in **CERCLA** § 310(d)(2), 42 U.S.C. § 9659(d)(2), with respect to any of the violations or endangerments by the **Remedial Defendants** at issue herein.

16. In compliance with the requirements of **RCRA** § 7002(b)(1), 42 U.S.C. § 6972(b)(1), **RCRA** § 7002(b)(2), 42 U.S.C. § 6972(b)(2), **CWA** § 505(b), 33 U.S.C. § 1365(b), and **CERCLA** § 310(d), 42 U.S.C.§ 9659(d), on February 3, 2022 the **Governmental Plaintiff** sent its "Notice of Violations" and its "Notice of Endangerment," a copy of each of which is attached hereto as **Exhibits 6-A** and **6-B**, respectively, and incorporated herein, to current owners of the **Wriston Subject Property** and to all required federal and WV governmental officers and entities.

## IV.  DEFINITIONS:

17. Words used in this Complaint are intended to be taken and understood in their natural and ordinary sense unless this Complaint clearly indicates that a different meaning was intended. Unless otherwise provided herein, terms used in this Complaint that are defined in the **FCoWV Public Nuisance Ordinance** (indicated herein by both bolding and italics emphasis) shall have the meaning assigned to them in that Ordinance.  Whenever terms listed below are used in this Complaint, the following definitions shall apply:

   a.  The term "**CERCLA**" shall mean the Comprehensive Environmental Response, Compensation, and Liability Act of 1980, as amended, 42 U.S.C. §§ 9601 - 9675.

   b.  The term "**Discharge**" means the accidental or intentional spilling, leaking, pumping, pouring, emitting, emptying, or dumping of a **Hazardous Waste**, **Solid Waste**, **Hazardous Substance**, or **Leachate** into or on any land or water;

   c.  Consistent with its definition in **CERCLA** § 101(29), 42 U.S.C. § 9601(29), and in **RCRA** § 1004(3), 42 U.S.C. § 6903(3), the term "**Disposal**" means the **Discharge**,

deposit, injection, dumping, spilling, leaking, or placing of any **Solid Waste** or **Hazardous Waste** into or on any land or water so that such **Solid Waste** or **Hazardous Waste** or any constituent thereof, may enter the **Environment** or be emitted into the air or discharged into any waters, including ground waters;

d.   The term "**EGFA/EACC Subject Property**" means all of the real property within the **Subject Watershed** that was conveyed by the Koppers Company to **EGFA** by Deed dated October 15, 1941 and recorded in the Office of the Fayette Co. Clerk of the Co. Commission.

e.   The term "**Environment**" means any surface water, groundwater, soil water, drinking water supply, soil, land surface, subsurface strata, or ambient air within Fayette County;

f.   Consistent with its definition in **CERCLA** § 101(9), 42 U.S.C. § 9601(9), the term "**Facility**" means:  **(A)** any building, structure, installation, equipment, pipe or pipeline (including any pipe into a sewer or publicly owned treatment works), well, pit, pond, lagoon, impoundment, ditch, landfill, storage container, motor vehicle, rolling stock, or aircraft; or **(B)** any site or area where a hazardous substance has been deposited, stored, disposed of, or placed, or otherwise come to be located; but does not include any consumer product in consumer use or any vessel;

g.   Consistent with its definition in the **NCP,** 40 C.F.R. § 300.5, the terms "**Feasibility Study**" and "**FS**" shall each mean a study undertaken by, under order of, or under the oversight and supervision of, the **FCoWV** Code Enforcement Agency to develop and evaluate options for an *Abatement Action* or *Remedial Action,* or both.  The **FS** emphasizes data analysis and is generally performed concurrently and in an interactive fashion with the **Remedial Investigation,** using data gathered during the **RI**.  The **RI** data are used to define the objectives of the *Abatement Action, Response Action,* or both, to develop *Abatement Action* or *Remedial Action* alternatives, and to undertake an initial screening and detailed analysis of the alternatives.  Each of these terms also refers to a report that describes the results of the study.

h.   The term "**Future Abatement Action Costs**" shall mean: **(1)** all *Abatement Action Costs,* non-exclusively including direct and indirect costs, that the **FCoWV** Code Enforcement Agency, the Office of the Fayette Co. Prosecuting Attorney, or Fayette County, West Virginia incur in reviewing, commenting on, responding to, or developing plans, reports,

technical memoranda and other items appropriate to the response to conditions at this **Site**, conducting community relations and implementing the Community Involvement Plan, providing technical assistance to community groups (if any), monitoring and overseeing the planning and performance of any part of the **Work,** or otherwise implementing, overseeing, or enforcing the **FCoWV Public Nuisance Ordinance** with respect to this **Site,** non-exclusively including payroll costs, contractor costs (including fees), travel costs, and laboratory costs; **(2)** *Response* costs incurred by the Fayette County Board of Health; and **(3)** Costs of *Response* and *Abatement Action Costs* incurred by Fayette County to: **(i)** enforce **Institutional Controls**, if any, determined to be applicable to this Site, **(ii)** to secure access to property(ies) necessary and proper to accomplishment of appropriate abatement of the *Public Nuisance* conditions at and emanating from this **Site**, non-exclusively including costs and attorneys' fees and any monies paid to secure access (including the amount of just compensation paid).

i.    Consistent with its definition in **CERCLA** § 101(14), 42 U.S.C. § 9601(14), the term "**Hazardous Substance**" means: **(A)** any substance designated pursuant to section 311(b)(2)(A) of the Federal Water Pollution Control Act; **(B)** any element, compound, mixture, solution, or substance designated pursuant to section 102 of this Act [*i.e.,* **CERCLA**]; **(C)** any hazardous waste having the characteristics identified under or listed pursuant to section 3001 of the Solid Waste Disposal Act (but not including any waste the regulation of which under the Solid Waste Disposal Act has been suspended by Act of Congress); **(D)** any toxic pollutant listed under section 307(a) of the Federal Water Pollution Control Act; **(E)** any hazardous air pollutant listed under section 112 of the Clean Air Act; and **(F)** any imminently hazardous chemical substance or mixture with respect to which the Administrator has taken action pursuant to section 7 of the Toxic Substances Control Act. The term does not include petroleum, including crude oil or any fraction thereof which is not otherwise specifically listed or designated as a hazardous substance under subparagraphs **(A)** through **(F)** of this paragraph, and the term does not include natural gas, natural gas liquids, liquefied natural gas, or synthetic gas usable for fuel (or mixtures of natural gas and such synthetic gas);

j.    Consistent with its definition in **RCRA** § 1004(5), 42 U.S.C. § 6903(5), and in Section **III(u)** of the **FCoWV Public Nuisance Ordinance**, the term "**Hazardous Waste**" means a **Solid Waste**, or combination of **Solid Wastes**, which because of its quantity,

concentration, physical, chemical, or infectious characteristics **may-**

    **(A)** cause, or significantly contribute to an increase in mortality or an increase in serious irreversible, or incapacitating reversible, illness; or

    **(B)** pose a substantial present or **potential** hazard to human health or the environment when improperly treated, stored, transported, or disposed of, or otherwise managed;

**k.**  The term "**Institutional Controls**" means non-engineered instruments, such as legislative, administrative, or judicial legal controls, that help to minimize the potential for human or adverse ecological exposure to contamination or protect the integrity and effectiveness of an *Abatement Action* by limiting land or resource use. Examples of **Institutional Controls** include easements and restrictive covenants, zoning restrictions, special building permit requirements, and well drilling restrictions or prohibitions.

**l.**  The term "**Insurance Policy**" means any policy of insurance, or part thereof, hold harmless agreement, or any contract to indemnify or to provide any guarantee of any kind with respect to the liability of any **Person,** that does or may provide any insurance coverage, including the provision of any legal defense of, or indemnification to, any *Person,* including but not limited to any and all insurance *Records,* whether or not **related to** insurance policies, whether those policies were placed, issued, quoted, canceled, or terminated, and that has or may have a provision that provides or may provide defense or indemnity coverage for any actual or potential liability of any *Person* to any third party arising from any action, omission or condition on, at or under any real property within or comprising the **Site** which might have or might cause damage or injury to any *Person* or the property of any *Person,* regardless of: **(a)** how such coverage may be limited, excepted or conditioned, **(b)** whether such liability is for property damage, personal injury or otherwise, **(e)** whether such coverage is primary, excess, or umbrella in nature, **(d)** whether the policy follows form, (e) who issued the policy, and **(f)** whether or not the policy(ies), contract(s) or agreement(s) is or was terminated, canceled, bound, placed, or not renewed. The term "**Insurance Policy**" also includes all rating agreements, renewal agreements, separately issued endorsements, and other *Records* that change, modify, add to, delete or supplement the terms of any **Insurance Policy** or demonstrate the existence or possible existence of any prior or additional **Insurance Policy(ies)**.

**m.** The term "**Insurer Defendants**" means:    **(1) Associated Electric & Gas Insurance Services Limited ("AEGIS"),** solely to the extent of the remaining proceeds available pursuant to AEGIS insurance policy numbers 010A, 010NJ and 010CNJ Hanover Insurance Company; **(2) Century Indemnity Company**, as successor to **Insurance Company of North America**, as successor to **CIGNA Specialty Insurance Company**, formerly known as **California Union Insurance Company**, **Insurance Company of North America**, and **Pacific Employers Insurance Company** solely to the extent of the remaining proceeds available pursuant to Insurance Company of North America policy numbers ISL 1176, ISL 1330, ISL GO 002701, ISL 209166 and XCP 3856, California Union Insurance Company policy number ZCX 00 66 06; **(3) Columbia Casualty Company**, solely to the extent of the remaining proceeds available pursuant to Columbia Casualty Company Policy Numbers RD 9972829 and RDU 9433461; **(4) First State Insurance Company**, solely to the extent of remaining proceeds available pursuant to First State Insurance Company policy numbers 928241, 934489, 980061, 980081, and 980591, <u>and</u> (as successor in interest to **Royal Indemnity Company**) solely to the extent of remaining proceeds available pursuant to Royal Indemnity Company policy numbers EC 102071, EC 102072, and EC 102073; **(5) Hanover Insurance Company**, solely to the extent of the remaining proceeds available under Hanover Insurance Company Commercial General Liability Insurance Policy Number CGL 60203; **(6) The Hartford Accident and Indemnity Company**, solely to the extent of remaining proceeds available pursuant to Hartford liability insurance policy numbers 08 C J31005, 08 C J31014, 08 C J31024, and 08 C J31028 for which it is responsible; **(7) The Hartford Casualty Insurance Company**, solely to the extent of remaining proceeds available pursuant to Hartford liability insurance policy number 08 XS 102705 for which it is responsible; **(8) The Travelers Casualty and Surety Company**, solely to the extent of remaining proceeds available pursuant to Aetna Casualty and Surety liability insurance policy numbers 06AL013817SC, 06AL122094SCY    06AL1220SCY,    06AL125194SCY,    06AL127247SRAY, 06AL128702SRAY,  06AL131419SRAY,  06AL133503SRAY,  06AL133534SRA(Y), 06AL133562SRA(Y), 06AL133588SRA, 06AL230021SRA, and 06AL230063SCA; **(9) The Navigators Management Corporation**, solely to the extent of remaining proceeds available pursuant to Navigator Management Corporation liability insurance policy number 85L1159/01; and **(10) The Zurich American Insurance Company**, solely to the

extent of remaining proceeds available pursuant to Zurich Insurance Company liability insurance policy numbers 82-60-827 and 85-49-352; all with respect to indemnification and other insurance coverage afforded to **EACC** for all sums it shall be obligated to pay by reason of liability imposed upon it by law or assumed by it under contract or agreement for property damages, non-exclusively including the costs of performing any *Abatement Actions* and reimbursing Fayette Co. for *Abatement Action Costs* incurred and to be incurred in responding to the *Public Nuisance* conditions for which **EACC** is liable pursuant to applicable law, non-exclusively including the **FCoWV Public Nuisance Ordinance**, caused by or arising out of each covered occurrence during the policy period of each of the foregoing insurance policies.

**n.**  Consistent with its definition in the West Virginia Solid Waste Management Act, W. Va. Code § 22-15-2(17) and the West Virginia Solid Waste Management Rule, W. Va. C.S.R. § 33-1-2.64, the term "**Landfill**" means any solid waste facility for the disposal of solid waste on or in the land for the purpose of permanent disposal. Such facility is situated, for purposes of the West Virginia Solid Waste Management Act in located in the county where the majority of the spatial area of such facility is located.

**o.**  Consistent with its definition in federal **RCRA** Subtitle D regulations, 40 C.F.R. § 257.2, and in the West Virginia Solid Waste Management Rule, W. Va. C.S.R. § 33-1-2.66, the term "**Leachate**" means any liquid that has come into contact with, passed through or emerged from **Solid Waste** and contains soluble, suspended, or miscible materials removed from such waste;

**p.**  Consistent with its definition in the West Virginia Solid Waste Management Rule, W. Va. C.S.R. § 33-1-2.68, the term "**Liner**" means a continuous layer of natural or manmade materials beneath or on the sides of a surface impoundment, landfill or landfill cell, which restricts the downward or lateral escape of solid waste, any constituents of such waste or leachate and which complies with the W. Va. Solid Waste Management Rule.

**q.**  The terms "**National Contingency Plan**" and "**NCP**" each means the National Oil and Hazardous Substances Pollution Contingency Plan formally promulgated by the U.S. Environmental Protection Agency and codified at 40 C.F.R., Part 300, in accordance with Section 105 of **CERCLA,** 42 U.S.C. § 9605, as the same may be amended or repromulgated from time to time**.**

**r.** The term "**Open Dump**" means:

    **(1)** consistent with its definition in **RCRA** § 1004(14), 42 U.S.C. § 9603(14) any *Facility* or site where **Solid Waste** is disposed of which is not a sanitary landfill which meets the criteria codified at 40 C.F.R, Part 257, and which is not a facility required to have a permit for disposal of hazardous waste;

    **(2)** consistent with its definition in W. Va. Code § 22-15-2, any *Facility* or site where *Solid Waste* is disposed in a manner that does not protect the *Environment*; or

    **(3)** consistent with its definition in the West Virginia Solid Waste Management Rule, W. Va. C.S.R. §§ 33-1-2.84, promulgated by **WVDEP** pursuant to its authority under W. Va. Code § 22-15-5, which Rule is a component of the West Virginia Solid Waste Management Plan approved by USEPA pursuant to RCRA § 4007, 42 U.S.C.§ 6947, any solid waste disposal that does not have a permit under W. Va. Code §22-15-1 *et seq.*, and is not otherwise authorized by an order of the Secretary; or is in violation of state law; or where solid waste is disposed in a manner that does not protect the environment;

    **(4)** consistent with the following provisions of the West Virginia Solid Waste Management Rule, which Rule is a component of the West Virginia Solid Waste Management Plan approved by USEPA pursuant to RCRA § 4007, 42 U.S.C.§ 6947, any site or location at which Solid Waste is disposed of which is declared to be an **Open Dump** by the following provisions of the West Virginia Solid Waste Management Rule:  **(i)** W. Va. C.S.R. §§ 33-1-1.6 [solid waste disposed of at other than a permitted site or which violates requirements of W. Va. C.S.R.§ 33-1-1.6(b)]; **(ii)** 33-1-7.2.a.1 (solid waste disposal location at which measure have not been taken to "prevent" the discharge of pollutants from the accumulated waste into the *Waters of the State*); 33-1-7.2.a (solid waste disposed of at other than a permitted site); and 33-1-7.2.a.1 (solid waste disposal location at which measure have not been taken to limit public access to the accumulated waste).

**s.** Consistent with its definition in the federal **SMCRA** regulations, 30 C.F.R. § 701.5, the term "**Overburden**" means material of any nature, consolidated or unconsolidated, that overlies a coal deposit, excluding topsoil and mining waste containing ore or minerals resulting from the extraction, beneficiation, or processing of coal.

t.   The term "**Pardee and Curtin Subject Property**" means all of the real property interests within the **Subject Watershed** that was conveyed by **EACC** to Pardee and Curtin Realty LLC by Special Warranty Deed dated June 27, 2003 and recorded in the Office of the Fayette Co. Clerk of the Co. Commission in Fayette Co. Deed Book 596 at page 101, specifically include all of the real property purportedly excluded from that conveyance as "Reserved Surface Tract".

u.   Consistent with its definition in **CERCLA** § 101(33), 42 U.S.C. § 9601(33), the term "**Pollutant or Contaminant**" shall include, but not be limited to, any element, substance, compound, or mixture, including disease-causing agents, which after release into the environment and upon exposure, ingestion, inhalation, or assimilation into any organism, either directly from the environment or indirectly by ingestion through food chains, will or may reasonably be anticipated to cause death, disease, behavioral abnormalities, cancer, genetic mutation, physiological malfunctions (including malfunctions in reproduction) or physical deformations, in such organisms or their offspring; except that the term "pollutant or contaminant" shall not include petroleum, including crude oil or any fraction thereof which is not otherwise specifically listed or designated as a hazardous substance under subparagraphs (A) through (F) of paragraph (14) [of **CERCLA** § 101(14)] and shall not include natural gas, liquefied natural gas, or synthetic gas of pipeline quality (or mixtures of natural gas and such synthetic gas);

v.   The term "**RCRA**" shall mean the Solid Waste Disposal Act, as amended by the Resource Conservation and Recovery Act of 1976, as further amended, 42 U.S.C. §§ 6901 - 6991m, as the same may be amended or re-enacted from time to time.

w.   Consistent with the relevant provisions of its definition in **CERCLA** § 101(22), 42 U.S.C. § 9601(22), the term "**Release**" means any spilling, leaking, pumping, pouring, emitting, emptying, discharging, injecting, escaping, leaching, dumping, or disposing into the environment (including the abandonment or discarding of barrels, containers, and other closed receptacles containing any hazardous substance or pollutant or contaminant), but excludes:  **(A)** any release which results in exposure to persons solely within a workplace, with respect to a claim which such persons may assert against the employer of such persons; and **(B)** emissions from the engine exhaust of a motor vehicle, rolling stock, aircraft, vessel, or pipeline pumping station engine . . . .;

x.   The terms "**relates to**" and "**related to**" each means in any way, directly or indirectly, evidencing, demonstrating, describing, explaining, supporting, mentioning, discussing, commenting on, constituting, concerning, comprising, containing, reflecting upon, identifying, stating, depicting, illustrating, recording, or referring to the given subject.

y.   The term "**Remedial Defendants**" means:  **(1)** National Grid NE Holdings 2 LLC (as successor to the remedial liabilities imposed upon **EGFA** by operation of law with respect to its acts, omissions alleged herein, and its status as **Owner** or **Operator** of mining and mining waste *Disposal* **Facilities** within the **Subject Watershed** that existed or occurred on or before January 1, 1966); **(2) EACC**, as a nominal party and not a real party in interest, solely to the extent of its undistributed assets, non-exclusively including the available proceeds from each of its liability insurance policies; **(3)** Pardee and Curtin Realty LLC; and **(4)** Quercus West Virginia, LLC.

z.   Consistent with its definition in the **NCP,** 40 C.F.R. § 300.5, the terms "**Remedial Investigation**" or "**RI**" each means the process undertaken by, under order of, or under the oversight and supervision of the **FCoWVCEA** or a court of competent jurisdiction to determine the nature and extent of the problem(s) presented by a *Release.*   The RI emphasizes data collection and site characterization and is generally performed concurrently and in an interactive fashion with the **Feasibility Study.**  The **RI** includes sampling and monitoring, as necessary, and includes the gathering of sufficient information to determine the necessity for *Remedial Action* or *Abatement Action* and properly and fully to support the evaluation of remedial alternatives.

aa.   Consistent with its definition in **CERCLA** § 101(25), 42 U.S.C. § 9601(25), the terms "**Respond**" or "**Response**" each means remove, removal, remedy, and remedial action, as those terms are defined in **CERCLA** § 101, 42 U.S.C. § 9601;

bb.   Consistent with its definition in the West Virginia Solid Waste Management Rule, W. Va. C.S.R. § 33-1-2.106, the term "**Runoff**" means any rainwater, **Leachate,** or other liquid that drains over land from any part of a **Solid Waste Facility.**

cc.   Consistent with its definition in **RCRA** § 1004(27), 42 U.S.C. § 6903(27), in the WV Solid Waste Management Act, W. Va. Code § 22-15-2(31), and in Section **III(ww)** of the **FCoWV Public Nuisance Ordinance**, the term "**Solid Waste**" means any garbage, refuse, sludge from a waste treatment plant, water supply treatment plant or air pollution control

facility, and other discarded material including solid, liquid, semisolid or contained gaseous material resulting from industrial, commercial, **mining**, agricultural operations, or from community activities, but does not include:

(1) solid or dissolved material in domestic sewage;

(2) any mixture of domestic sewage and other wastes that passes through a sewer system to a publicly-owned treatment works for treatment;

(3) industrial discharges which are point sources subject to permits under Section 402 of the federal Water Pollution Control Act, as amended; and

(4) materials subjected to in-situ mining techniques which are not removed from the ground as part of the extraction process.

dd. Consistent with relevant parts of its definition in the West Virginia Solid Waste Management Rule, W. Va. C.S.R. § 33-1-2.123, the term "**Solid Waste Facility**" means any system, facility, land, contiguous land, improvements on the land, structures or other appurtenances or methods used for processing, recycling or disposing of solid waste, including landfills, and solid waste disposal surface impoundments, and other facilities not specified in the WV Solid Waste Management Rule, W. Va. C.S.R., Chapter 33, Series 1.

ee. The term "**Site**" means: **(1)** all geographical areas, sites, facilities and locations, both above ground and underground, that are within the Johnson Fork-Loop Creek watershed where the Public Health, Safety, Welfare or the **Environment** are or maybe adversely impacted by any condition of *Public Nuisance* existing within the Johnson Fork-Loop Creek watershed; and (2) any adjacent area within Fayette County where the Public Health, Safety, Welfare or the **Environment** are or maybe adversely impacted by any condition of *Public Nuisance* existing at, within or emanating from the **Subject Watershed**.

ff. The term "**Subject Property**" means:  **(1)** the **EGFA/EACC Subject Property**; **(2)** the **Wriston Subject Property**.

gg. The terms "**Surface Mining Control & Reclamation Act**" and "**SMCRA**" each means the federal Surface Mining Control and Reclamation Act, 33 U.S.C. §§ 1201 - 1328, as it may be amended from time to time.

hh. The term "**Waste Materials**" means:  **(1)** any **Hazardous Waste***;* **(2)** any **Pollutant or Contaminant***;* or **(3)** any **Solid Waste**;

ii. Consistent with the definition of "Waters" in the WV Water Pollution Control Act, W. Va. Code § 22-11-3(23) and in the WV Water Resources Protection and Management Act, W. Va. Code § 22-26-2(18), the term "**Waters of the State**" means: any and all water on or beneath the surface of the ground, whether percolating, standing, diffused or flowing, wholly or partially within this state, or bordering this state and within its jurisdiction, and includes, without limiting the generality of the foregoing, natural or artificial lakes, rivers, streams, creeks, branches, brooks, ponds (except farm ponds, industrial settling basins and ponds and water treatment facilities), impounding reservoirs, springs, wells, watercourses and wetlands;

jj. The term "**Wriston Subject Property**" means the real property within the **Subject Watershed** upon which most, if not all, of the northern-most of the five (5) known **Open Dumps** of coal mining waste within that Watershed created by **EGFA** is located, which real property is not currently and never has been within the boundaries of the **EGFA/EACC Subject Property**, and which real property is currently owned by Roy Henry Wriston, Velda V. Wriston and Susan Johnson and is identified as Property 23/75 Johnson Br., 409/543 R/S, Map 58, Parcel 0001 0000 0000, Deed Book 684 Page 210, Fayette County, West Virginia.

kk. The term "**WVDEP**" means the West Virginia Department of Environmental Protection and any successor departments or agencies of the State of West Virginia.

## V.  THE SITE, THE PARTIES & THEIR RELATIONSHIPS TO THE SUBJECT PROPERTY:

a.  **The Site:**

18.  The Johnson Fork of Loop Creek Watershed, which is a part of the Watershed of the greater Loop Creek, which is a tributary of the Kanawha River, is located entirely within Fayette County, WV.  The Johnson Fork Watershed, as used herein, is from the confluence with Loop Creek, at the community of Kincaid, WV (38° 2'17.35"N, 81°16'14.83"W), up-stream on Johnson Fork in a southerly direction to the headwaters of Johnson Fork and includes all tributaries of Johnson Fork, to the top of the watershed at Kingston Mountain (38° 0'5.72"N, 81°16'21.11"W)

(collectively, the "**Subject Watershed**").

19.   The Johnson Fork is a "navigable water" for purposes of Section 502 of the Federal Water Pollution Control Act (commonly known as the federal "Clean Water Act"), 33 U.S.C. § 1362, because it is "waters of the United States" as that term is defined in 40 C.F.R. § 122.2.  It is also "waters of West Virginia" as that term is defined in W. Va. Code § 22-11-3.

20.   All of the **Subject Property** is located within the **Subject Watershed**.

21.   Several months after filing its Verified Supplemental and Amended Complaint herein on July 16, 2021, the **Governmental Plaintiff** first learned that all of the northern-most of the five (5) unlined, surface pile of mining waste created by **EGFA** within the **Subject Watershed** is not located on the **EGFA/EACC Subject Property**, but rather on the **Wriston Subject Property**, which is immediately adjacent to the **EGFA/EACC Subject Property**.

**b.**   **The Governmental Plaintiff:**

22.   The **Governmental Plaintiff** herein is the County Commission of Fayette County, West Virginia, which, pursuant to W. Va. Code § 7-1-1, is a public corporation that may sue and be sued in its own name, and a political subdivision of the State of West Virginia.

23.   Pursuant to W. Va. Code § 7-1-3, the **Governmental Plaintiff** herein is vested "under rules prescribed by law" with superintendence of the internal "police" (*i.e.,* public protection) and fiscal affairs of Fayette County, a political subdivision of the State of West Virginia.

24.   Pursuant to W. Va. Code § 7-1-3kk, the **Governmental Plaintiff** herein is vested with the following "Police Powers" of the State of West Virginia:

> In addition to all other powers and duties now conferred by law upon county commissions, **commissions are hereby authorized to enact ordinances, issue orders and take other appropriate and necessary actions for the elimination of hazards to public health and safety and to abate or cause to be abated anything which the commission determines to be a public nuisance.**  The ordinances may provide for a misdemeanor penalty for its violation.  The ordinances may further be

applicable to the county in its entirety or to any portion of the county as considered appropriate by the county commission.

**Id.** [Bolding and underscoring emphasis added].

25.  Pursuant to W. Va. Code § 7-1-3ff, the **Governmental Plaintiff** is also vested with the following "Police Powers" of the State of West Virginia:

> **(b) Plenary power and authority** are hereby conferred upon every county commission to adopt ordinances regulating the removal and clean up of **any accumulation** of refuse or debris, overgrown vegetation **or toxic spillage or toxic seepage located on private lands** which is determined to be unsafe, unsanitary, dangerous, or detrimental to the public safety or welfare, whether the result of natural or manmade force or effect.

> **(e)** Any ordinance adopted pursuant to the provisions of this section shall provide fair and equitable rules of procedure and any other standards considered necessary to guide the enforcement agency, or its agents, in the investigation of dwelling or building conditions, accumulation of refuse or debris, overgrown vegetation, or toxic spillage or toxic seepage and shall provide for fair and equitable rules of procedure for instituting and conducting hearings in the matters before the county commission. . . .

**Id.** [Bolding emphasis added].

26.  In exercise of the Sovereign's "Police Powers" conveyed to it by W. Va. Code §§ 7-1-3, 7-1-3-ff and 7-1-3kk,[14] on August 17, 2018 the **Governmental Plaintiff** herein, following

---

[14]  In the **FCoWV Public Nuisance Ordinance**, the FCoWV Co. Commission vested in the FCoWV Code Enforcement Agency created [in compliance with the requirement in W. Va. Code § 7-1-3ff(c)] by that Ordinance appropriate authorities granted to the **Governmental Plaintiff** by **both** W. Va. Code §§ 7-1-3ff and 3kk.  In drafting that Ordinance, the Fayette Co. Commission recognized the plain fact that its broad authority to declare, prohibit and abate *Public Nuisance* condition within Fayette Co. under W. Va. Code § 7-1-3kk clearly applies to "accumulations of toxic spillage and toxic seepage located on private property" (that are also separately addressed by W. Va. Code § 7-1-3kk) when such an accumulation presents or may present either an unacceptable endangerment of the Public Health, Safety, Welfare or the *Environment*; or impairs or imminently threatens to impair the beneficial use of any *Natural Resource* held in Public Trust within Fayette Co.  Accordingly, the Fayette Co. Commission resolved the clear overlap of authorities and concomitant requirements between the two statutes by its enactment of Section **XII.V** of the Ordinance.  That section of the Ordinance requires that any complaint involving "a toxic spillage or toxic seepage on private property" that does not also assert the existence of an associated actual or imminently threatened harm or endangerment to the Public Health, Safety, Welfare or the *Environment* or impairment of the beneficial uses of *Natural Resources* held in Public Trust beyond the boundaries of the private property involved otherwise declared and defined in the Ordinance must be responded to and prosecuted **only** as authorized by W. Va Code §7-1-3ff (*i.e.,* before the Co. Commission and subject to the procedures specified in W. Va. Code § 7-1-3ff).

---

conclusion of a public comment period on the proposed ordinance, and its conduct of several public hearings on the proposed ordinance, duly enacted Fayette County Ordinance No. 2018-001, entitled "The Fayette County Comprehensive Public Nuisance Abatement Ordinance" (hereinafter: **"FCoWV Public Nuisance Ordinance"**).

**c.    National Grid NE Holdings 2 LLC, legal successor to the remedial liabilities imposed by law on Eastern Gas and Fuel Associates (l.k.a. Eastern Associates) as a result of its status, acts or omissions on or before January 1, 1966:**

27.  **Eastern Gas and Fuel Associates**, (Secretary of the Commonwealth of Massachusetts, Corporations Division File# T00299956), was a Voluntary Business Trust organized and declared under the law of the Commonwealth of Massachusetts on July 18, 1929 when the Massachusetts Gas Company and some units of Koppers Company of Pittsburgh formed a voluntary association under the name **Eastern Gas and Fuel Associates** (hereinafter sometimes referred to as **"EGFA").**

28.  Although it had (as a functioning joint venture of the Massachusetts Gas Co. and the Koppers Company, conducted mining and mining-related business in West Virginia for well over a decade, when changes in West Virginia corporations law first required it, **EGFA** applied to the West Virginia Secretary of State for authority to conduct business in the State of West Virginia, which authorization was granted by the West Virginia Secretary of State, effective April 28, 1947, and remained in effect until its application for qualified status in West Virginia was withdrawn effective May 23, 1968.

29.  At and after the time of its formation, **EGFA** consolidated and conducted the coal mining operations of the Massachusetts Gas Co. and the Koppers Company, specifically including coal mining operations in **Subject Watershed**.

30.  Beginning no later than the late 1920s, **EGFA** continuously conducted, until at least the mid-1950s, extensive coal mining operations throughout the **Subject Watershed,** which

operations included very extensive underground coal mining, associated surface processing and transportation of extracted coal and **Overburden** from its Powellton No. 6 mine, and the creation, operation and maintenance of at least five (5) separate, associated piles of coal mining waste, each of which was constructed and maintained without a **Liner** and without any associated **Leachate** collection, control or monitoring system, on the surface of separate locations within the **Subject Watershed.**

31.  By Deed dated October 15, 1941 and recorded in the Office of the Fayette Co. Clerk of the County Commission, the Koppers Company conveyed to **EGFA** fee simple title to all of the real property owned by Koppers Company in Fayette and Kanawha Counties, West Virginia, consisting of <u>tens of thousands of acres</u>, and specifically included all of the **EGFA/EACC Subject Property** within the **Subject Watershed** upon the surface of which the four (4) southern-most, mining waste **Open Dumps** of the five (5) known **Open Dumps** of coal mining waste in the **Subject Watershed** created by **EGFA** at issue herein are located.

32.  By the early 1950s, the underground mine works of the Powellton No. 6 coal mining **Facility** spanned the entire east-west width of the **Subject Watershed** and entered well into the Armstrong Creek watershed, both wholly within Fayette County, WV, with miners entering those mine works daily from both the mining facilities on Johnson Fork and from a mine portal in McDunn, WV, more than two (2) miles to the East.

33.  The management of the operation of the Powellton No. 6 mine by **Eastern Gas and Fuel Associates** later expanded to include all operations of the underground coal mining facilities and mining waste management practices of the Island Coal Mine, also located within the **Subject Watershed,** which was opened in approximately March 1944 to recover a long ridge of Powellton seam coal located on the opposite mountain of the Johnson Fork-Loop Creek watershed, and which was continuously operated by **Eastern Gas and Fuel Associates** until the early 1950s.

**34.**  At the height of the productivity of its Powellton No. 6 coal mine in approximately 1933, **Eastern Gas and Fuel Associates** employed approximately Thirteen hundred (1,300) workers at its mining facilities within the **Subject Watershed** producing approximately Thirty-five hundred (3,500) tons of coal **daily**.

**35.**  Upon information and belief, during the final days of its operation of its Powellton No. 6 mine (in approximately 1952) and its Island Coal mining facilities, **EGFA** produced from those facilities approximately Twelve hundred seventy-nine (1,279) tons of coal **daily**.

**36.**  **EGFA** ceased most of its coal mining operations at the Powellton No. 6 and Island coal mining sites in approximately 1952, but continuously maintained until at least 1963 a staff of managers and employees at its mining sites within the **Subject Watershed** to maintain the facilities and equipment remaining at those sites.

**37.**  By Special Warranty deed dated January 1, 1966 recorded in the Office of the Fayette County, WV Clerk of the Co. Commission, **EGFA** conveyed fee simple title to all of its real property within Fayette County, West Virginia to **EACC**, then a wholly owned subsidiary of **EGFA.**

**38.**  **EGFA** continued to operate several smaller coal mining and mining waste management operations within the Johnson Fork-Loop Creek watershed until the early 1960s.  On information and belief, all its major mining operations in Fayette County ceased by 1965.

**39.**  Between the time of the commencement of its coal mining operations in the **Subject Watershed** and January 1, 1966, **EGFA** was the **Owner** and **Operator** of the Powellton # 6 and Island coal mining **Facilities** located on, at and under the **EGFA/EACC Subject Property**, and of the real property upon which each of the four (4) southern-most of the five (5) known surface piles of coal mining waste it created on **Subject Property.**

**40.**  Beginning at least by 1929 and continuing until January 1, 1966, **EGFA** was the ***Operator*** of the Powellton # 6 coal mining ***Facilities*** within the **Subject Watershed** and of each of the five (5) surface piles of coal mining waste therein created by **EGFA.**

**41.**  Beginning on or about October 15, 1941 and continuing until January 1, 1966, **EGFA** was the ***Owner*** of the Powellton # 6 coal mining ***Facilities*** located on, at and under the **EGFA/EACC Subject Property** within the **Subject Watershed** and of each of the four (4) surface piles of coal mining waste created by **EGFA** on the **EGFA/EACC Subject Property** located therein.

**42.**  At some time prior to 1966, **EGFA** created the northern-most of the five known, unlined surface piles of coal mining waste, all of which is located on the **Wriston Subject Property** within the **Subject Watershed**, a parcel of real property immediately adjacent to the **EGFA/EACC Subject Property**.  Upon information and belief, at no time before, during, or after its creation of that unlined, surface pile of coal mining waste did **EGFA** have any lease or other authorization from the owner(s) of that parcel of real property allowing the use of that property for any purpose by **EGFA**.

**43.**  Continuously since their original creation, each of the five (5) surface piles of coal mining waste created by **EGFA** in the **Subject Watershed** have **Discharged** and **Released Hazardous Substances, Hazardous Wastes**, **Solid Waste**, **Pollutants and Contaminants,** and **Leachate** into the **Environment.**

**44.**  The **Hazardous Substances, Hazardous Wastes, Solid Waste, Pollutants and Contaminants**, and **Leachate** continuously **Released** from each of the five (5) surface piles of coal mining waste created by **EGFA** within the **Subject Watershed** from the date of their creation until January 1, 1966 have commingled within the soils and groundwaters of the **Subject Watershed** with like ***Hazardous Substances*** and ***Wastes Released*** after January 1, 1966 from the coal mining ***Facilities*** at, on or under the **EGFA/EACC Subject Property** and from the five (5) surface piles of coal

mining waste piles created by **EGFA** within the **Subject Property** to form a single, indivisible harm to the Public Health, Safety, Welfare and the ***Environment*** at, within and emanating from the **Subject Watershed** for which no reasonable basis of apportioning such harm among the separate time-periods or sources of the ***Released Hazardous Substances*** and ***Wastes*** exists.

45.  Effective April 28, 1989, **EGFA** formally changed its name as a Massachusetts Business Trust on file with the Massachusetts Commonwealth Secretary to **Eastern Enterprises**.

46.  ln 1990, **Eastern Enterprises** sold all of its stock holdings in Peabody Holding Company, Inc. and **MCBL** to HM Holdings, Inc. (hereinafter sometimes referred to as **"Hanson"**), an affiliate of Hanson PLC, among other parties.

47.  ln 1997 **MCBL** was merged into Peabody Holding Company, Inc.  As a result of this merger, **MCBL** ceased to exist.

48.  ln 2000, KeySpan Corporation, a New York Domestic Business Corporation, (hereinafter sometimes referred to as **"KeySpan")** acquired **Eastern Enterprises** by way of a stock purchase agreement.

49.  Effective May 31, 2002, KeySpan merged **Eastern Enterprises,** including its assets and liabilities, into a wholly owned subsidiary of one of its subsidiaries, KeySpan New England, LLC, a Massachusetts Limited Liability Company (Massachusetts Commonwealth Secretary Business Number 041270730).

50.  ln 2007, **KeySpan,** including KeySpan New England, LLC, merged with, and into, National Grid US 8 Inc., a wholly owned subsidiary of National Grid plc.

51.  Effective April 14, 2008, KeySpan New England, LLC formally changed its name to **National Grid NE Holdings 2 LLC** (hereinafter sometimes referred to as "**National Grid**")**.**

52.  At no time during its period of ownership of the **EGFA/EACC Subject Property** or thereafter was **EGFA** under any compliance schedule imposed by any responsible officer of the

State of West Virginia or of Fayette County with respect to any of the five (5) surface piles of coal mining waste created by **EGFA** with the **Subject Watershed.**

**d.    Eastern Associated Coal, LLC (f.k.a. Eastern Associated Coal Corporation) (hereinafter sometime referred to as "EACC"), now a defunct and dissolved West Virginia limited liability company, solely to the extent of its undistributed assets, non-exclusively including the available coverage and proceeds from its liability insurance policies, named herein only as Nominal Respondent and not as a Real Party in Interest:**

53.    Following the conclusion of its major coal mining operations in Fayette County, **EGFA** created under West Virginia law a wholly owned subsidiary named **Eastern Associated Coal Corporation** (West Virginia Secretary of State Organization Number 8825) which received its corporate charter from the West Virginia Secretary of State effective March 27, 1963.

54.    During the period beginning in 1963 and concluding by January 1, 1966, **EGFA** transferred to **EACC** all its coal exploration and mining properties, coal mining operations, coal marketing, and mining related assets located within Fayette Co., specifically including its fee simple title to the **EGFA/EACC Subject Property** in Fayette County, West Virginia.  A copy of the October 15, 1941 Deed from the Koppers Company to **EGFA** is attached hereto as **Exhibit 7** is incorporated herein by reference.

55.    As part of the corporate transfer of its mining properties and its mining-related assets from **EGFA** to **EACC**, **National Grid NE Holdings 2 LLC** asserts that:  **(i) EACC** assumed all of the past, present and future liabilities of **EGFA** arising out of the coal mining and coal marketing operations of **EGFA**; and **(ii) EACC** repeatedly thereafter represented to the U.S. Supreme Court, the U.S. Internal Revenue Service, and the U.S. Securities and Exchange Commission that **EACC** was formed to be the successor to the **EGFA** Coal Division.

56.    Sometime after creating **EACC**, **EGFA** created another wholly owned subsidiary, Coal Properties Corporation (hereinafter sometimes referred to as "**CPC**"), a Delaware corporation, and subsequently transferred all of its **EACC** stock to **CPC**.

**57.**  In 1987, **EGFA** entered into a Stock Exchange Agreement with Peabody Holding Company, Inc., a New York corporation authorized to conduct business in the State of West Virginia by the West Virginia Secretary of State effective July 24, 1989 (WV Secretary of State Organization Number 127183) pursuant to which **EGFA** exchanged 100% of the common stock of **CPC** for 15.01% of the common stock of Peabody Holding Company, Inc.  Simultaneously, **EGFA** entered into a separate stock exchange agreement with Mid-Continent Barge Lines, Inc. (hereinafter sometimes referred to as "**MCBL**"), an entity affiliated with Peabody Holding Company, Inc., pursuant to which **EGFA** exchanged 100% of the preferred stock of **CPC** for 15.01% of the common stock of **MCBL**.  Upon consummation of these stock exchanges, **EGFA** no longer owned any interest in **CPC** directly.

**58.**  By a Stock Purchase Agreement dated March 31, 1987, **EACC** was purchased by Peabody Holdings Company, Inc.

**59.**  Subject only to a purported exception for a "Reserved Surface Tract" purportedly depicted by shapes drawn on a contour map, but not defined either by survey reference or by any "metes and bounds" description, on Exhibit C-7 to a Special Warranty Deed dated June 27, 2003 and filed in the Office of the Fayette County Clerk of the County Commission on that same date, a copy of which has previously filed herein by **Remedial Defendant** Quercus West Virginia, LLC as ECF # 362-1 and which is incorporated herein by reference as **Exhibit 8**, **EACC** sold the surface estate, including timber rights, appertaining to all of its real property within the **Subject Watershed** within Fayette County, WV to **Remedial Defendant** Pardee and Curtin Realty LLC, a Delaware Limited Liability Company.

**60.**  As regards the purported "Reserved Surface Tract" depicted by a shape drawn on contour map (with no reference to any designated property boundaries or Property Tax plats) on Exhibit  C-7 to the June 27, 2003 Special Warranty Deed incorporated herein as **Exhibit 8**, which

Tract of real property is <u>not</u> defined by any reference to any survey or by any "metes and bounds" description, that Special Warranty Deed provides:

> Grantor and Grantee agree to obtain surveys or otherwise develop mutually acceptable metes and bounds descriptions of each Reserved Surface Tract within 90 days after the date hereof, and to execute and deliver a corrected deed reflecting such descriptions. The parties will share any third party surveying costs equally.

**61.**  Notwithstanding the commitment of both Nominal **Remedial Defendant EACC** and **Remedial Defendant** Pardee and Curtin Realty LLC to "obtain surveys or otherwise develop acceptable metes and bounds descriptions of each Reserved Surface Tract within 90 days after the date hereof, and to execute and deliver a corrected deed" recited in the June 27, 2003 Special Warranty Deed, neither a "corrected deed" nor any "survey or other acceptable metes and bounds description" of the purported "Reserved Surface Tract" depicted in Exhibit C-7 to that Special Warranty Deed has ever been filed in the Office of the Fayette County Clerk of the County Commission within 90 days of June 27, 2003 or any subsequent time prior to the filing of this Verified Second Amended Complaint.

**62.**  Because both **(a)** the depiction of the real property purportedly addressed by Exhibit C-7 to the June 27, 2003 Special Warranty Deed does **not** adequately define the real property to which it purports to refer in detail sufficient to give adequate notice to 3rd parties or to Governmental entities, and **(b)** the future contingency recited in that Special Warrant Deed regarding the preparation and delivery of a corrected deed applicable to the real property purportedly addressed by Exhibit C-7 to that deed **never occurred**, the **Governmental Plaintiff** asserts that the attempt in the Special Warranty Deed to exempt the real property purportedly depicted in Exhibit C-7 to that deed from the conveyance otherwise effected by that deed was ineffective as a matter of law to exclude the Surface Estate appertaining to that real property from the conveyance effected by that Special Warranty Deed.  Accordingly, the **Governmental Plaintiff** asserts that all of the

Surface Rights to all of the **EGFA/EACC Subject Property** within the **Subject Watershed** were conveyed to **Remedial Defendant** Pardee and Curtin Realty LLC by the June 27, 2003 Special Warranty Deed.

**63.** Effective August 1, 2005, **EACC** elected to convert from a business corporation into a West Virginia Limited Liability Company and was qualified by the West Virginia Secretary of State to do business in West Virginia under the name **Eastern Associated Coal, LLC** (hereinafter sometimes referred to as "**EACLLC**").

**64.** In 2007 Peabody I13 percent (13%) of its coal reserves, specifically including all of its ownership of its subsidiary **EACLLC**, into a new company, Patriot Coal Corporation, a Delaware Corporation that was qualified to do business in West Virginia (WV Secretary of State Business Organization Number 259884) effective August 7, 2007.

**65.** As part of the Liquidation Plan approved by U.S. Bankruptcy Court for the Eastern District of Virginia in *In RE Patriot Coal Corporation, Debtor,* Case No. 15-32450 (KLP) (Bankr. E.D. VA 2015) (*i.e.,* Patriot Coal Corporation's second and final case brought under Chapter 11 of the U.S. Bankruptcy Code), the remaining assets of **EACLLC** were distributed and **EACLLC** was dissolved and its legal existence terminated by the West Virginia Secretary of State effective June 10, 2016.

**66.** Beginning sometime in 1963 until June 27, 2003, **EACC** was the ***Operator*** of the Powellton # 6 coal mining ***Facilities*** within the **Subject Watershed** and of each of the five (5) surface piles of coal mining waste created therein by **EGFA**.

**67.** Between no later than January 1, 1966 until June 27, 2003, **EACC** was the ***Owner*** of the Powellton # 6 coal mining ***Facilities*** within the **Subject Watershed** and of the real property upon which the four (4) southern-most of the five (5) known surface piles of coal mining waste created by **EGFA** therein are located**.**

68.  During its periods of ownership or operation of the **EGFA/EACC Subject Property** within the **Subject Watershed** and thereafter, **EACC** did not take any action to abate any of the adverse impacts on the health or the ***Environment*** at, within or emanating from the **Subject Watershed** that had resulted and were continuing to result during and after its period of ownership or operation of those **Facilities** from the past and on-going **Releases** of **Hazardous Substances**, **Hazardous Wastes**, **Solid Wastes**, ***Toxic*** **Wastes** and **Leachate** from each of those surface piles of mining waste.

69.  At no time during its period of ownership of the **EGFA/EACC Subject Property** within the **Subject Watershed** was **EACC** under any compliance schedule imposed by the State of West Virginia or of Fayette County with respect to any of the five (5) surface piles of coal mining waste created by **EGFA** with the **Subject Property**.

**e.    Pardee and Curtin Realty LLC:**

70.  From June 7, 2003 until June 27, 2013 Pardee and Curtin Realty LLC, a Delaware Limited Liability Company qualified to do business in West Virginia (effective October 3, 2001) and a subsidiary of Pardee and Curtin Holding Company LLC, a Delaware Limited Liability Company, owned and managed the surface estate appertaining to the real property in Fayette County, West Virginia that specifically includes the real property upon the surface of which the four (4) southern-most of the five (5) known, surface piles of coal mining waste piles created by **EGFA** within the **Subject Watershed** are located.

71.  Pardee and Curtin Realty LLC conveyed to Quercus West Virginia, LLC by Special Warranty Deed on file with the Office of the Clerk of the Fayette Co. Commission its interest in the Surface Estate appertaining to the real property in Fayette County, West Virginia that specifically includes the real property within the **Subject Watershed** upon the surface of which the four (4) southern-most, known surface piles of coal mining waste within the **Subject**

Watershed are located. A copy of the June 27, 2013 Special Warranty Deed between Remedial Defendant Pardee and Curtin Realty LLC and Remedial Defendant Quercus West Virginia, LLC has been previously filed herein by Remedial Defendant Quercus West Virginia, LLC as ECF # 362-2, which is incorporated herein by reference as **Exhibit 9.**

72. Between June 7, 2003 and June 27, 2013, Pardee and Curtin Realty LLC was the ***Owner*** of the Surface Estate appertaining to the real property within the **Subject Watershed** upon which each of the four (4) southern-most, known surface piles of coal mining waste created by **EGFA** is located**.**

73. During its period of ownership of the Surface Estate appertaining to the real property upon which **EGFA** created each of the four (4) southern-most, known surface piles of coal mining waste within the **Subject Watershed**, Pardee and Curtin Realty LLC had the legal authority to control the use of the surface of the real property to which its Surface Rights appertained, but wholly failed or refused to take any action to abate: **(a)** the illegal existence of the four (4) **Open Dumps** of coal mining waste on the of the surface of that real property; and **(b)** any of the adverse impacts on the health or the ***Environment*** within the **Subject Watershed** that had resulted and are continuing to result from the past and on-going **Releases** of **Hazardous Substances**, **Hazardous Wastes**, **Solid Wastes**, **Pollutants and Contaminants**, ***Toxic*** **Wastes**, and **Leachate** from each of those four (4) unlined, surface piles of coal mining waste.

74. At no time during its period of ownership of the Surface Estate appertaining to the real property upon which each of the four (4) southern-most surface piles of coal mining waste created by **EGFA** within the **Subject Watershed** are located was Pardee and Curtin Realty LLC under any compliance schedule imposed by the United States, the State of West Virginia, or of Fayette County with respect to any of those four (4) unlined, surface piles of coal mining waste.

f. **Quercus West Virginia, LLC:**

**75.**  Quercus West Virginia, LLC, a Delaware Limited Liability Company, qualified to do business in West Virginia continuously since June 10, 2013 (West Virginia Secretary of State Business Organization Control Number 9A0TQ), has owned since June 27, 2013 the Surface Estate appertaining to the real property in Fayette County, West Virginia that specifically includes the real property at issue in the **Subject Watershed** upon which the four (4) southern-most of the five (5) known **Open Dumps** of coal mining waste created by **EGFA** in that watershed are located, and continues to own that Surface Estate as of the date of this Complaint.

**76.**  During its period of its ownership of the Surface Estate appertaining to the real property comprising the **EGFA/EACC Subject Property** upon the surface of which the four (4) southern-most, known, piles of coal mining waste created by **EGFA** are located, **Remedial Defendant** Quercus West Virginia, LLC had the legal authority to control the use of the surface of the real property to which its Surface Rights appertained, but wholly failed or refused, and is continuing to fail or refuse, to take any action to abate:  **(a)** the illegal existence of the four (4) **Open Dumps** of coal mining waste on the of the surface of that real property; and **(b)** any of the adverse impacts on the health or the *Environment* within the **Subject Watershed** that had resulted and are continuing to result from the past and on-going **Releases** of **Hazardous Substances**, **Hazardous Wastes**, **Solid Wastes**, **Pollutants and Contaminants**, *Toxic* **Wastes**, and **Leachate** from each of those four (4) unlined, surface piles of coal mining waste.

**77.**  At no time during its period of ownership of the Surface Estate appertaining to the real property comprising the **EGFA/EACC Subject Property** was Quercus West Virginia, LLC under any compliance schedule imposed by any responsible officer of the United States, the State of West Virginia, or of Fayette County with respect to any of those four (4) unlined, surface piles of coal mining **Wastes** located on that Property.

**(g)  The Owners of the Wriston Subject Property:**

**78.** All of the northern-most of the five (5) **Open Dumps** of coal mining waste created by **EGFA** on the surface of the **Subject Property** is located on the parcel of real property owned by Roy Henry Wriston, Velda V. Wriston and Susan Johnson, c/o Shaun Wriston, P.O. Box 124, Kincaid, West Virginia 25119, which parcel is identified as Property 23/75 Johnson Br., 409/543 R/S, Map 58 Parcel 0001 0000 0000, Deed Book 684 Page 210, Fayette County, WV. A copy of the August 24, 2012 Deed conveying Fee Simple Title to the Wriston Subject Property to Roy Henry Wriston, Velda V. Wriston and Susan Johnson, c/o Shaun Wriston is attached hereto as **Exhibit 10** and incorporated herein.

**(h)  Associated Electric & Gas Insurance Services Limited ("AEGIS"), solely to the extent of the remaining proceeds available pursuant to AEGIS insurance policy numbers 010A, 010NJ and 010CNJ providing liability insurance coverage to Eastern Consolidated Coal Corporation for all sums it shall be obligated to pay by reason of liability imposed upon it by law or assumed by it under contract or agreement for damages and expenses for its liability to the Governmental Plaintiff for all property damages alleged herein arising out of occurrences during the policy period of those policies** (hereinafter sometimes referred to as the **"Designated AEGIS Policies").**

**79.  AEGIS** issued liability insurance policy number 010A, 010NJ and 010CNJ to **EGFA** and to **EACC** providing, subject to the terms and conditions of the policy, liability insurance coverage to **EACC** for all sums it shall be obligated to pay by reason of liability imposed upon it by law or assumed by it under contract or agreement for damages and expenses as defined by each such policy on account of property damage caused by or arising out of each covered occurrence during the period of each such policy. (A copy of available, relevant portions of each such policy are attached hereto as **Exhibits 11-A, 11-B** and **11-C** respectively, and incorporated herein by reference.)

**80.** At all times during the coverage period afforded by the **AEGIS Designated Policies** until

March 31, 1987, Eastern Associated Coal Corporation was a wholly-owned subsidiary of Eastern Gas and Fuel Associates.

**81.  EACC** is a "Named Insured" pursuant to the terms of each of the **Designated AEGIS Policies.**

**(i)   Century Indemnity Company (as successor to Insurance Company of North America) to the extent of the remaining proceeds available pursuant to Insurance Company of North America policy numbers ISL 1176, ISL 1330, ISL GO 002701, ISL 209166 and XCP 3856, <u>and</u>, [as successor to CIGNA Specialty Insurance Company (formerly known as California Union Insurance Company)] to the extent of the remaining proceeds available pursuant to California Union Insurance Company policy number ZCX 00 66 06, all providing liability insurance coverage to Eastern Consolidated Coal Corporation for all sums it shall be obligated to pay by reason of liability imposed upon it by law or assumed by it under contract or agreement for damages and expenses for its liability to the Governmental Plaintiff for all property damages alleged herein arising out of occurrences during the policy period of those policies (**hereinafter sometimes referred to as the **"Designated Century Indemnity Policies")**

**82.**  The Insurance Company of North America issued liability insurance policy numbers ISL 1176, ISL 1330, ISL GO 002701, ISL 209166 and XCP 3856 to **EGFA** and to **EACC** providing, subject to the terms and conditions of the policy, liability insurance coverage to **EACC** for all sums it shall be obligated to pay by reason of liability imposed upon it by law or assumed by it under contract or agreement for damages and expenses as defined by each such policy on account of property damage caused by or arising out of each covered occurrence during the period of each such policy.  (A copy of available, relevant portions of Insurance Company of North America issued liability insurance policy numbers ISL 1176, ISL 1330, ISL GO 002701, and ISL 209166 are attached to Defendant National Grid's Motion for Partial Summary Judgment-Primary Insurers' Duty to Defend filed herein as ECF Nos. 483-5 through and including 483-8, respectively, and incorporated herein by reference as **Exhibits 12-A through and including**

**Exhibit 12-D**.  A copy of available, relevant portions of Insurance Company of North America issued liability insurance policy number XCP 3856 are attached hereto as **Exhibit 12-E** and incorporated herein by reference.)

83.  California Union Insurance Company issued liability insurance policy number ZCX 00 66 06 to **EGFA** and to **EACC** providing, subject to the terms and conditions of the policy, liability insurance coverage to **EACC** for all sums it shall be obligated to pay by reason of liability imposed upon it by law or assumed by it under contract or agreement for damages and expenses as defined by each such policy on account of property damage caused by or arising out of each covered occurrence during the period of that policy.  (A copy of available, relevant portions of this California Union Insurance Co. policy are attached hereto as **Exhibit 13** and incorporated herein by reference.)

84.  As legal successor to the Insurance Company of North America, Century Indemnity Company is liable for all sum that become due and owning pursuant to Insurance Company of North America policy numbers ISL 1176, ISL 1330, ISL GO 002701, ISL 209166 and XCP 3856**.**

85.  As legal successor to the California Union Insurance Company, Century Indemnity Company is liable for all sum that become due and owning pursuant to California Union Insurance Company policy ZCX 00 66 06**.**

86.  At all times during the coverage period afforded by the **Designated Century Indemnity Policies** beginning in 1963, Eastern Associated Coal Corporation was a wholly-owned subsidiary of Eastern Gas and Fuel Associates.

87.  **EACC** is a "Named Insured" pursuant to the terms of each of the **Designated Century Indemnity Policies.**

**(j)   Continental Casualty Company**, **solely to the extent of the remaining proceeds available pursuant to Continental Accident & Indemnity policy numbers RD 9972829 and RDU 9433461 providing liability insurance coverage to EGFA and Eastern Consolidated**

**Coal Corporation for all sums EACC shall be obligated to pay by reason of liability imposed upon EACC by law or assumed by it under contract or agreement for damages and expenses for its liability to the Governmental Plaintiff for all property damages alleged herein arising out of occurrences during the policy period of those policies** (hereinafter sometimes referred to as the **"Continental Casualty Designated Policies"**):

88.  Continental Accident & Indemnity Company issued liability insurance policy numbers RD 9972829 and RDU 9433461 to **EGFA** and to **EACC** providing, subject to the terms and conditions of the policy, liability insurance coverage to **EACC** for all sums it shall be obligated to pay by reason of liability imposed upon it by law or assumed by it under contract or agreement for damages and expenses as defined by each such policy on account of property damage caused by or arising out of each covered occurrence during the period of that policy.  (A copy of available, relevant portions of each such policy are attached hereto as **Exhibits 14-A** & **14-B**, respectively, and incorporated herein by reference.)

89.  At all times during the coverage period afforded by the **Designated Continental Casualty Policies** beginning in 1963, Eastern Associated Coal Corporation was a wholly-owned subsidiary of Eastern Gas and Fuel Associates.

90.  **EACC** is a "Named Insured" pursuant to the terms of each of the **Designated Continental Casualty Policies.**

**(k) First State Insurance Company, to the extent of the remaining proceeds available pursuant to First State Insurance Company policy numbers 928241, 934489, 980061, 980081, and 980591, <u>and</u> (as successor in interest to Royal Indemnity Company) to the extent of remaining proceeds available pursuant to Royal Indemnity Company policy numbers EC 102071, EC 102072, and EC 102073, all providing liability insurance coverage to EGFA and Eastern Consolidated Coal Corporation for all sums EACC shall be obligated to pay by reason of liability imposed upon it by law or assumed by it under contract or agreement for damages and expenses for its liability to the Governmental Plaintiff for all property damages alleged herein arising out of occurrences during the policy period of those policies**

**(hereinafter sometimes referred to as the "Designated First State Policies"):**

91.  First State Insurance Company issued liability insurance policy numbers 928241, 934489, 980061, 980081, and 980591 providing, subject to the terms and conditions of the policy, liability insurance coverage to **EACC** for all sums it shall be obligated to pay by reason of liability imposed upon it by law or assumed by it under contract or agreement for damages and expenses as defined by each such policy on account of property damage caused by or arising out of each covered occurrence during the period of that policy.  (A copy of available, relevant portions of each such policy are attached hereto as **Exhibits 15A** through **15-E**, respectively, and incorporated herein by reference.)

92.  **Royal Indemnity Company** issued liability insurance policy numbers EC 102071, EC-102072, and EC 102073  to **EGFA** and to **EACC** providing, subject to the terms and conditions of the policy, liability insurance coverage to **EACC** for all sums it shall be obligated to pay by reason of liability imposed upon it by law or assumed by it under contract or agreement for damages and expenses as defined by each such policy on account of property damage caused by or arising out of each covered occurrence during the period of that policy.  (A copy of available, relevant portions of each such policy are attached hereto as **Exhibits 15-F** through and including Exhibit **15-H** and incorporated herein by reference.)

93.  As the entity with the legal responsibility for the obligations set forth in Royal Indemnity Company liability insurance policy numbers EC 102071, EC-102072, and EC 102073, First State Insurance Company is liable for all sum that become due and owning pursuant to Royal Indemnity Company policy numbers EC 102071, EC 102072, and EC 102073**.**

94.  At all times during the coverage period afforded by the **Designated First State Policies** beginning in 1963, **EACC** was a wholly-owned subsidiary of Eastern Gas and Fuel Associates.

95.  **EACC** is a "Named Insured" pursuant to the terms of each of the Designated **First State**

Policies.

**(l)   Hartford Accident and Indemnity Company**, **solely to the extent of the remaining proceeds available pursuant to Hartford liability insurance policy numbers 08 C J31005, 08 C J31014, 08 C J31024, and 08 C J31028 for which it is responsible that provide liability insurance coverage to Eastern Consolidated Coal Corporation for all sums EACC shall be obligated to pay by reason of liability imposed upon EACC by law or assumed by it under contract or agreement for damages and expenses for its liability to the Governmental Plaintiff for all property damages alleged herein arising out of occurrences during the policy period of those policies** (hereinafter sometimes referred to as the **"Designated Hartford Accident and Indemnity Co. Policies"):**

96.   Hartford Accident and Indemnity Company is responsible for the obligations set forth in Hartford liability insurance policy numbers 08 C J31005, 08 C J31014, 08 C J31024, and 08 C J31028 to **EGFA** and to **EACC** providing, subject to the terms and conditions of the policy, liability insurance coverage to **EACC** for all sums it shall be obligated to pay by reason of liability imposed upon it by law or assumed by it under contract or agreement for damages and expenses as defined by each such policy on account of property damage caused by or arising out of each covered occurrence during the period of that policy.  (A copy of available, relevant portions of each such policy are attached to Defendant National Grid's Motion for Partial Summary Judgment-Primary Insurers' Duty to Defend filed herein as ECF Nos. 483-9 through and including 483-12, respectively, and incorporated herein by reference as **Exhibits 16-A through and including Exhibit 16-D**.)

97.   At all times during the coverage period afforded by the **Designated Hartford Accident and Indemnity Co. Policies**, Eastern Associated Coal Corporation was a wholly-owned subsidiary of Eastern Gas and Fuel Associates.

98.   **EACC** is a "Named Insured" pursuant to the terms of each of the **Designated Hartford Accident and Indemnity Co. Policies.**

**(m) Hartford Casualty Insurance Company**, **solely to the extent of the remaining proceeds available pursuant to Hartford liability insurance policy number 08 XS 102705 for which it is responsible that provides liability insurance coverage to Eastern Consolidated Coal Corporation for all sums EACC shall be obligated to pay by reason of liability imposed upon EACC by law or assumed by it under contract or agreement for damages and expenses for its liability to the Governmental Plaintiff for all property damages alleged herein arising out of occurrences during the policy period of those policies** (hereinafter sometimes referred to as the **"Designated Hartford Casualty Insurance Co. Policy")**:

99.    Hartford Casualty Insurance Company is responsible for the obligations set forth in Hartford liability insurance policy number 08 XS 102705 to **EGFA** and to **EACC** providing, subject to the terms and conditions of the policy, liability insurance coverage to **EACC** for all sums it shall be obligated to pay by reason of liability imposed upon it by law or assumed by it under contract or agreement for damages and expenses as defined by each such policy on account of property damage caused by or arising out of each covered occurrence during the period of that policy.  (A copy of available, relevant portions of such policy are attached hereto as **Exhibits 17** and incorporated herein by reference.)

100.    At all times during the coverage period afforded by the **Designated Hartford Casualty Insurance Co. Policy**, Eastern Associated Coal Corporation was a wholly-owned subsidiary of Eastern Gas and Fuel Associates.

101.    **EACC** is a "Named Insured" pursuant to the terms of the **Designated Hartford Casualty Insurance Co. Liability Insurance Policy.**

**(n)  The Navigators Management Corporation**, **solely to the extent of the remaining proceeds available pursuant to Navigator Management Corporation liability insurance policy number 85L1159 providing liability insurance coverage to EGFA and Eastern Consolidated Coal Corporation for all sums EACC shall be obligated to pay by reason of liability imposed upon EACC by law or assumed by it under contract or agreement for damages and expenses for its liability to the Governmental Plaintiff for all property damages alleged herein arising**

**out of occurrences during the policy period of those policies** (hereinafter sometimes referred to as the **"Navigators Designated Policies"):**

102. The Navigators Management Corporation issued liability insurance policy number **85L1159** to **EGFA** and to **EACC** providing, subject to the terms and conditions of the policy, liability insurance coverage to **EACC** for all sums it shall be obligated to pay by reason of liability imposed upon it by law or assumed by it under contract or agreement for damages and expenses as defined by each such policy on account of property damage caused by or arising out of each covered occurrence during the period of that policy. (A copy of available, relevant portions of such policy are attached hereto as **Exhibit 20** and incorporated herein.)

103. At all times during the coverage period afforded by the **Navigators Designated Policies**, **EACC** was a wholly-owned subsidiary of Eastern Gas and Fuel Associates.

104. **EACC** is a "Named Insured" pursuant to the terms of each of the **Navigators Designated Policy.**

**(o)　Pacific Employers Insurance Company (as successor in interest to the Illinois Union Insurance Company) to the extent of remaining proceeds available pursuant to Illinois Union Insurance Company policy number CX020268 providing liability insurance coverage to EGFA and Eastern Consolidated Coal Corporation for all sums EACC shall be obligated to pay by reason of liability imposed upon it by law or assumed by it under contract or agreement for damages and expenses for its liability to the Governmental Plaintiff for all property damages alleged herein arising out of occurrences during the policy period of those policies (**hereinafter sometimes referred to as the **"Designated Pacific Employers Policy"):**

105. Illinois Union Insurance Company issued liability insurance policy number CX020268, to **EGFA** and to **EACC** providing, subject to the terms and conditions of the policy, liability insurance coverage to **EACC** for all sums it shall be obligated to pay by reason of liability imposed upon it by law or assumed by it under contract or agreement for damages and expenses as defined by each such policy on account of property damage caused by or arising out of each covered

occurrence during the period of that policy. (A copy of available, relevant portions of such policy are attached hereto as **Exhibit 18** and incorporated herein by reference.)

106. As legal successor to the Illinois Union Insurance Company, Pacific Employers Insurance Company is liable for all sum that become due and owning pursuant to Illinois Union Insurance Company policy number CX020268.

107. At all times during the coverage period afforded by the **Designated Pacific Employers Policy**, **EACC** was a wholly-owned subsidiary of Eastern Gas and Fuel Associates.

108. **EACC** is a "Named Insured" pursuant to the terms of the **Designated Pacific Employers Policies.**

**(p)   The Travelers Casualty and Surety Company (as successor in interest to the Aetna Casualty and Surety Company) to the extent of remaining proceeds available pursuant to Aetna Casualty and Surety Company policy numbers 06AL013817SC, 06AL122094SC(Y), 06AL125194SC(Y),    06AL127247SRAY,    06AL128702SRA(Y),    06AL131419SRA(Y), 06AL133503SRA(Y),    06AL133534SRA(Y),    06AL133562SRA(Y),    06AL133588SRA, 06AL230021SRA, and 06AL230063SCA providing liability insurance coverage to EGFA and Eastern Consolidated Coal Corporation for all sums EACC shall be obligated to pay by reason of liability imposed upon it by law or assumed by it under contract or agreement for damages and expenses for its liability to the Governmental Plaintiff for all property damages alleged herein arising out of occurrences during the policy period of those policies (**hereinafter sometimes referred to as the **"Designated Travelers Policies"):**

109. Aetna Casualty and Surety Company issued Third Party Liability Insurance Policy Numbers   06AL013817SC,   06AL122094SC(Y)   06AL1220SC(Y),   06AL125194SC(Y), 06AL127247SRA(Y),   06AL128702SRA(Y),   06AL131419SRA(Y),   06AL133503SRA(Y), 06AL133534SRA(Y),   06AL133562SRA(Y),   06AL133588SRA,   06AL230021SRA,   and 06AL230063SCA providing liability insurance coverage to **EGFA** and to its non-excepted subsidiary companies, subject to the terms and conditions of the policy, for all sums it shall be

obligated to pay by reason of liability imposed upon it by law or assumed by it under covered contract or agreement for damages and expenses as defined by the terms of each of those policies on account of property damage caused by or arising out of each covered occurrence during the policy periods of any of those liability insurance policies; all of which policies incepted after January 1, 1966.  (A copy of available, relevant portions of such policy are attached hereto as **Exhibit 19-A** through **19-M**, respectively, and incorporated herein by reference.)

110.    As legal successor to the Aetna Casualty and Surety Company, Travelers Casualty and Surety Company is liable for all sum that become due and owning pursuant to Aetna Casualty and Surety Company policy numbers 06AL013817SC, 06AL122094SCY  06AL1220SCY, 06AL125194SCY,    06AL127247SRAY,    06AL128702SRAY,    06AL131419SRAY, 06AL133503SRAY,    06AL133534SRA(Y),    06AL133562SRA(Y),    06AL133588SRA, 06AL230021SRA, and 06AL230063SCA**.**

111.    At all times during the coverage periods afforded by the **Designated Travelers Policies**, **EACC** was a wholly-owned subsidiary of **EGFA**.

112.    **EACC** is a "Named Insured" pursuant to the terms of the **Designated Travelers Policies.**

**(q) Zurich American Insurance Company**, **solely to the extent of remaining proceeds available pursuant to Zurich Insurance Company liability insurance policy numbers 82-60-827 and 85-49-352 providing liability insurance coverage to EGFA and Eastern Consolidated Coal Corporation for all sums EACC shall be obligated to pay by reason of liability imposed upon EACC by law or assumed by it under contract or agreement for damages and expenses for its liability to the Governmental Plaintiff for all property damages alleged herein arising out of occurrences during the policy period of those policies (**hereinafter sometimes referred to as the **"Designated ZAIC Policies")**:

113.    Zurich    American    Insurance    Company    issued    liability    insurance    policy numbers 82-60-827 and 85-49-352 to **EGFA** and to **EACC** providing, subject to the terms and

conditions of the policy, liability insurance coverage to **EACC** for all sums it shall be obligated to pay by reason of liability imposed upon it by law or assumed by it under contract or agreement for damages and expenses as defined by each such policy on account of property damage caused by or arising out of each covered occurrence during the period of that policy.  (A copy of available, relevant portions of each such policy are attached to Defendant National Grid's Motion for Partial Summary Judgment-Primary Insurers' Duty to Defend filed herein as ECF # 483-3 and 483-4, respectively, and ach is incorporated herein as **Exhibits 21-A and 21-B** by reference.)

114.   At all times during the coverage period afforded by the **Designated ZAIC Policies**, Eastern Associated Coal Corporation was a wholly-owned subsidiary of Eastern Gas and Fuel Associates.

115.   **EACC** is a "Named Insured" pursuant to the terms of the **Designated ZAIC Policies.**

116.   **Notwithstanding any other provision of this Verified Second Amended Complaint, the liability asserted against each of the Designated Policies set forth in Subsections (h) through (q), inclusive, of this Section V of this Complaint is subject to the provisions of Section VI(i) of the FCoWV Public Nuisance Ordinance and is limited to the available proceeds of the insurance coverage afforded by those insurance policies providing liability insurance coverage to Eastern Associated Coal Corporation on account of:  (i) the liability imposed upon EACC by operation of law for all property damage arising out of occurrences during the policy period; and (ii) the liability for property damage resulting from occurrences during the policy period imposed upon Eastern Gas and Fuel Associates by operation of law, which liability was assumed by EACC.**

## VI.   FACTUAL ALLEGATIONS COMMON TO ALL COUNTS:

a.   **The Surface Waters and Groundwaters within the Johnson Fork Watershed in Fayette County, WV Are *Waters of the State* Held in Trust by the State of West**

**Virginia for the Beneficial Use of Present and Future Generations of the Public:**

117.   W. Va. Code § 22-11-3 defines the terms "Water Resources," "Water" and "Waters" of West Virginia for the purposes of the West Virginia Water Pollution Control Act, W. Va. Code, Chapter 22, Article 11 as:

> [A]ny and all water on or beneath the surface of the ground, whether percolating, standing, diffused or flowing, wholly or partially within this state, or bordering this state and within its jurisdiction, and includes, without limiting the generality of the foregoing, natural or artificial lakes, rivers, streams, creeks, branches, brooks, ponds (except farm ponds, industrial settling basins and ponds and water treatment facilities), impounding reservoirs, springs, wells, watercourses and wetlands

118.   Consequently, the surface waters and groundwaters within the **Subject Watershed** in Fayette County, West Virginia are "Waters of West Virginia."

119.   With respect to its waters, the State of West Virginia has clearly stated its public policy to protect the beneficial uses of those waters for present and future generations of the public:

> **(a)** It is declared to be the public policy of the State of West Virginia to maintain reasonable standards of purity and quality of the water of the State consistent with **(1)** public health and public enjoyment thereof; **(2)** the propagation and protection of animal, bird, fish, aquatic and plant life; and **(3)** the expansion of employment opportunities, maintenance and expansion of agriculture and the provision of a permanent foundation for **healthy** industrial development.
>
> **(b)** It is also the public policy of the State of West Virginia that the water resources of this State with respect to the quantity thereof be available for reasonable use by all of the citizens of this State.

WV Water Pollution Control Act, W. Va. Code § 22-11-2 [Bolding emphasis added].  Further, West Virginia law provides:

> The West Virginia Legislature further finds that it is the public policy of the State that the water resources of the State be available for the benefit of the citizens of West Virginia, **consistent with and preserving all other existing rights and remedies recognized in common law or by statute**, **while also preserving the resources within its sovereign powers for the common good.**

WV Water Resources Protection and Management Act, W. Va. Code § 22-26-1(b)(2) [Bolding emphasis added].

120.    The State of West Virginia has been equally clear in declaring its public policy to protect the beneficial uses of its groundwaters for present and future generations of the public:

> [**T**]**he Legislature establishes that it is the public policy of the State of West Virginia to maintain and protect the State's groundwater so as to support the present and future beneficial uses and further to maintain and protect groundwater at existing quality where the existing quality is better than that required to maintain and protect the present and future beneficial uses.** Such existing quality shall be maintained and protected unless it is established that **(1)** the measures necessary to preserve existing quality are not technically feasible or economically practical and **(2)** a change in groundwater quality is justified based upon economic or societal objectives. **Such a change shall maintain and protect groundwater quality so as to support the present and future beneficial uses of such groundwater.**

West Virginia Groundwater Protection Act, W. Va. Code § 22-12-2 (b) [Bolding emphasis added].

b.    **The Mining Facilities and The Mining and Mining Waste Management Practices Utilized within the Subject Watershed:**

121.    **EGFA** created and operated within the **Subject Watershed** underground coal mines, including the Powellton Number 6 Mine and the Island Mine, loadout facilities, material handling operations, and coal mining waste disposal areas within the Johnson Fork-Loop Creek Watershed from the early 20th century into the 1950's in the Powellton seam of coal.

122.    Additionally, the West Virginia Geologic and Economic Survey ("WVGES") identifies Peabody Coal as operating an underground mine in the Powellton seam of coal on Johnson Fork within the Johnson Fork-Loop Creek Watershed.

123.    On information and belief, the underground mine operated for some time by Peabody Coal within the **Subject Watershed** is the Powellton #6 mine originally operated by **EGFA**.

124.    In 1966 **EGFA** created **EACC** as a wholly owned subsidiary and transferred all of its mining assets and mining liabilities, specifically including its mine land holdings and mining operation within the **Subject Watershed**, to **EACC**. On March 31, 1987, **EACC** was purchased by Peabody Coal, which thereafter conducted its mining operations and maintained its real

property within the **Subject Watershed** through its **EACC** subsidiary.

**125.**    Although the Powellton No.6 was a very large coal mine that extended into other watersheds, on information and belief all coal from it and from the Island Mine was extracted to, processed in, and transported from within the **Subject Watershed**.

**126.**    The following maps, created by the West Virginia Geologic and Economic Survey with labeling added by the **Governmental Plaintiff**, present a true and accurate portrayal of the geographic relationship of the mining operations within the **Subject Watershed** with relations to the other principal geographic features of that watershed:





127.    The groundwater underlying the coal mining waste piles on the surface of the **Subject Property** in Fayette Co. is hydraulically connected to areas of known surface water and groundwater contamination both within and downgradient of the **Subject Watershed**.

128.    Both the subsurface mining and the related mining and mining waste disposal **Facilities** and operations conducted, maintained, or allowed to remain on the surface of the land within the **Subject Watershed** by each of **EGFA**, and **Remedial Defendants EACC**, Pardee and Curtin Realty LLC, and Quercus West Virginia, LLC disturbed the hydrogeological environment within the **Subject Watershed** by changing hydraulic conductivity, secondary porosity, vertical connectivity, and geochemistry within the waters of that Watershed.  Each such  mining and mine waste disposal operations, or allowance of the continuing use of that land for purpose of maintaining the five (5) surface piles of mining waste, at, on and under the **Subject Property** caused and contributed to, and continue to cause and contribute to, the **Release** and **Discharge** of the mining waste **Pollutants and Contaminants** into the **Environment** which led to, and continues to lead to, the generation and **Release** of *Toxic* **Acid Mine Drainage ("AMD")** at and

emanating from each of the Defendants' historical, current, and improperly abandoned and closed mining an mining waste disposal **Facilities** at, on and under the **Subject Property**. All such **Released AMD** contains increased acidity, iron, manganese, aluminum, iron hydroxide, sulfuric acid, and numerous other inorganic contaminants which seriously injure or destroy plant and animal life and endanger human health.

129.    Each of the mining and mine waste management operations by, or the allowance of the continuing use of its real property for purpose of maintaining the four (4) surface piles of mining waste, at, on and under the **Subject Property** by, **EGFA**, Nominal **Remedial Defendant EACC**, and **Remedial Defendants** Pardee and Curtin Realty LLC, and Quercus West Virginia, LLC increased aeration within the layers in and around the mined seams on the **Subject Property**. This aeration in effect jump-started and accelerated the oxidation of iron and sulfur minerals through chemical and biological processes. While normally stable, sulfide and iron minerals are oxidized by microorganisms at reaction rates several orders of magnitude greater than non-biologically mediated processes. Thus, while many of the elements required for oxidation of these minerals have been present since these layers were originally laid down, the introduction of air and more water into the subsurface through each of the such mining and mining waste disposal operations, and each such continued allowance of use of the surface of the land within the **Subject Watershed** for maintenance of the five (5) unlined, surface piles of coal mining waste within the **Subject Watershed**, greatly increased the rates at which these minerals are oxidized and are dissolved in groundwater by stimulating biological activity that continues to this day. Also, each such mining waste disposal practices and each allowance of the continuing use of the land within the **Subject Watershed** to maintain those five (5) surface piles of mining waste at, on and under the **Subject Property** similarly has increased, and continues to increase, the rates at which these *Toxic* mining waste **Pollutants and Contaminants** are introduced into the **Environment**.

130.    Each of **EGFA's** and Nominal **Remedial Defendant EACC's** mining **Facilities** and mining and mining waste disposal operations at, on and under the **Subject Property** created or contributed to conditions that have not been adequately controlled or mitigated at, on and under the **Subject Property** and within the **Subject Watershed** by Nominal **Remedial Defendant EACC**, and **Remedial Defendants** Pardee and Curtin Realty LLC or Quercus West Virginia, LLC during or after such mining operations, non-exclusively including unsealed and improperly sealed voids, open and abandoned tunnels and shafts, and subsidence which are in and of themselves hazardous to public welfare and safety, and which have been and remain a significant source of **AMD** in the **Subject Watershed**.

131.    Each of **EGFA's** and Nominal **Remedial Defendant EACC's** mining **Facilities** and mining operations at, on and under the **Subject Property** created or contributed to fracture zones associated with heaving of mine floors and roof falls that, in turn, cause or contribute to vertical fracturing, thereby connecting strata vertically from below the lowest mine works to the surface and greatly increasing secondary porosity in the mined area. From a water supply standpoint, this fracturing dramatically changed the natural hydrogeologic system (flow of water within the environment) - from what was once a system dominated by shallow local aquifers defined by local topography to one in which vertical and horizontal connectivity is vastly increased. This increase in fracturing and vertical and horizontal preferential pathways also has contributed, and continues to contribute, to significant adverse changes in local geochemistry, increased porosity, changes in groundwater flows and volumes, and increased contact area between solutes and solvents (*i.e.,* water). Accordingly, each of **EGFA's** and Nominal **Remedial Defendant EACC's** mining **Facilities** and operations at, on and under the **Subject Property** has increased, and continues to increase, the connectivity of water contaminated by each of their mining activities to the surrounding groundwater and surface water environment within the **Subject Watershed**.

**132.** Each of **EGFA's** and Nominal **Remedial Defendant EACC's** mining activities in the **Subject Watershed** were conducted above drainage (*i.e.*, up-gradient of Johnson Fork) in the Powellton seam of coal; mining of which is notorious for contaminating groundwater and surface waters with ***Toxic*** **Pollutants and Contaminants** if either or both appropriate controls are not utilized throughout, during and after the coal mining process, or mining wastes are disposed above drainage in a manner that does not afford adequate protection of the **Environment**. Neither **EGFA** or any of the **Remedial Defendants** properly utilized such controls, and **EGFA**, Nominal **Remedial Defendant EACC**, and **Remedial Defendants** Pardee and Curtin Realty LLC, and Quercus West Virginia, LLC either **Disposed** of mining waste in unlined **Facilities** and without use of any **Leachate** control or collection system, including within the mine works and in unlined mining waste "gob piles" on the surface of the   **Subject Property**, thereby allowing the continuing use of the surface of the land within the **Subject Watershed** for the purpose of maintaining such mining waste disposal **Facilities**; all of which are above drainage.

### c.    The Unlined Coal Waste Dumps on the Surface of the Real Property within the Subject Watershed and Their Substantial, Adverse Impact on the Surface Waters and Groundwaters within that Watershed:

**133.** Continuously during their operations within the **Subject Watershed**, **EGFA** and Nominal **Remedial Defendant EACC** managed, handled, stored, treated, **Disposed** of and **Released** into the **Environment** at least the following **Hazardous Substances**, **Hazardous Wastes**, hazardous waste constituents, **Solid Waste**, and **Leachate** at and from each of the five (5) unlined, coal mining waste dumps on the surface of the **Subject Property**:

> **A.** **Sulfate**, which is an indicator of adverse environmental impacts to surface waters from mining. The United States Geological Survey ("USGS") reports background concentrations in WV streams to be less than 25 mg/L. The concentration of Sulfate in streams within the **Subject Watershed** are much higher, and data indicates sulfate concentrations exceed the level **WVDEP** considers a likely stressor to aquatic life;

B. **Arsenic** is a **Hazardous Substance**, a **RCRA** statutory **Hazardous Waste**, a **Pollutant and Contaminant**, a federal **CWA** Priority Pollutant and **CWA** Toxic Pollutant under **CWA** § 307, 33 U.S.C. § 1317, and a **RCRA** toxicity characteristic contaminant (D004) under 40 C.F.R. § 261.24. Arsenic has been found in the groundwater in the Page-Kincaid PSD wellhead protection area within the **Subject Watershed**. Inorganic arsenic has been recognized as a human poison since ancient times and is a carcinogen. Arsenic is a well-documented human carcinogen affecting numerous organs. The cancers that have been associated with Arsenic include cancer of the bladder, lungs, skin, kidney, nasal passages, liver, and prostate. USEPA set the arsenic standard for drinking water at 10 ppb (or 0.010 parts per million).Arsenic exerts its toxicity by inactivating up to 200 enzymes, especially those involved in cellular energy pathways and DNA synthesis and repair. Acute arsenic poisoning is associated initially with nausea, vomiting, abdominal pain, and severe diarrhea. Encephalopathy and peripheral neuropathy are reported as effects of arsenic poisoning. Arsenic compounds cause short-term and long-term adverse effects in individual plants and animals and in populations and communities of organisms. water at 10 ppb (or 0.010 parts per million). Arsenic is a teratogen and carcinogen that can traverse placental barriers and produce fetal death and malformations in many species of mammals. Many species of freshwater biota are adversely affected by high concentrations of arsenic or various organ arsenicals. Adverse effects of Arsenic include death and malformations of toad embryos, growth inhibition of algae, mortality of amphipods and gastropods, and behavioral impairment of goldfish.

C. **Cadmium** is a **CWA** Priority Pollutant and a **CWA** Toxic Pollutant under **CWA** § 307, 33 U.S.C. § 1317, and a **RCRA** toxicity characteristic contaminant (D006) under 40 C.F.R. § 261.24. Cadmium concentrations in groundwater within the **Subject Watershed** exceed the federal Safe Drinking Water Act Maximum Contaminant Level ("MCL"). Cadmium is a non-essential metal with no biological function in aquatic animals. In addition to acute effects such as mortality, chronic exposure to cadmium can lead to adverse effects on growth, reproduction, immune and endocrine systems, development, and behavior dysfunction in aquatic organisms. Kidney damage has long since been described to be the main problem for humans chronically exposed to cadmium, and cadmium exposure is associated with

bone damage.  There is some proof that cadmium exposure can cause cancer.

**D. Iron**:  Exceedances of federal Safe Drinking Water Act standards for iron are documented within the Page-Kincaid PSD groundwater source area on Johnson Fork, and iron precipitates have been observed associated with coal-waste dumps within the watershed.  Precipitation of ferric hydroxide may result in a complete blanketing of the stream bottom, adversely affecting both macroinvertebrates and fish.  Because the gill surface of the fish tends to be alkaline, soluble ferrous iron can be oxidized to insoluble ferric compounds which then cover the gill lamellae and inhibit respiration. At a low water temperature and in the presence of iron, iron-depositing bacteria will multiply rapidly on the gills and further contribute to the oxidation of ferrous iron compounds. Their filamentous colonies cover the gills.  The precipitated iron compounds and tufts of the iron bacteria reduce the gill area available for respiration, damage the respiratory epithelium and may thus suffocate the fish.  In a similar toxic action, iron compounds can precipitate on the surface of fish eggs which then die due to a lack of oxygen.

**E. Manganese** is another metal that is widely distributed in **AMD** mine drainage, including within the **AMD** drainage within the **Subject Watershed**.  Manganese can be present in a variety of forms and compounds and complexes with organic compounds.  Manganese is persistent and can be carried for long distances downstream of a source of mine drainage.  Manganese precipitates along with siltation significantly lower macroinvertebrate species diversity and change stream community structure. Manganese is an essential trace element in humans that can elicit a variety of serious toxic responses upon prolonged exposure to elevated concentrations either orally or by inhalation.  The central nervous system is the primary target.  Because of the greater bioavailability of manganese from water, USEPA has set a chronic and sub-chronic RID for drinking water of 0. 005 mg/kg/day.

**F. Selenium** has been found in discharges associated with the coal mining waste piles within the **Subject Watershed**. Selenium is a **CWA** Toxic Pollutant under **CWA** § 307, 33 U.S.C.  § 1317, and **CWA** Priority Pollutant. Selenium bioaccumulates in the aquatic food chain and chronic exposure in fish and aquatic invertebrates can cause reproductive impairments (*e.g.*, larval deformity or mortality).  Selenium can also adversely affect juvenile growth and mortality.  Selenium is also toxic to waterfowl and other birds that consume aquatic

organisms containing excessive levels of selenium. Selenium is toxic to humans at high concentrations, with symptoms of selenium poisoning including gastrointestinal disturbances, discoloration of the skin and decayed teeth.

134.    Once *Released* into the *Environment*, these **Waste Materials**, together with increased pH of **AMD Releases**, continue to exist in a manner in which they enter into and migrate through either or both groundwater or surface water, contaminating those publicly-owned *Natural Resources* and *Waters of the State*.

135.    **EGFA's** and Nominal **Remedial Defendant EACC's** past mining of the coal seams on the **Subject Property** and within the **Subject Watershed** without implementation of adequate **AMD**-mitigation measures and controls to prevent and mitigate adverse impacts on the **Environment** continue to be a source of **Solid Waste**, **Hazardous Waste** and **Hazardous Substance** contamination in the **Subject Watershed.** It is through creation and maintenance of the unsealed or improperly sealed, mined coal seams and use of unlined mining waste disposal sites within the **Subject Watershed** by **EGFA** and Nominal **Remedial Defendant EACC** that mining waste has been further exposed to air and water at and emanating from the mining **Facilities**, which exposure generated **AMD Solid Waste** and **Hazardous Waste** that caused or contributed to the disruption in the geological and hydrologic balance within the **Subject Watershed.** The allowance of the continued use of the land within the **Subject Watershed** to maintain each of the five (5) unlined, surface piles of coal mining waste located with that Watershed by Nominal **Remedial Defendant EACC**, and the allowance of the continued use of the land within the **Subject Watershed** to maintain the four (4) southern-most of the five (5) unlined surface piles of coal mining waste located with that Watershed by **Remedial Defendants** Pardee and Curtin Realty LLC and Quercus West Virginia, LLC during each of their respective periods of ownership contributed to that same generation and **Release** of **AMD Solid Waste** and **Hazardous Waste** that caused or contributed to that same disruption in the geological and

hydrologic balance within the **Subject Watershed**.  Without adequate and effective **Leachate** and **Runoff** mitigation and control measures, these disruptions in the geological and hydrologic balance within the **Environment** within the **Subject Watershed** have caused or contributed to, and continue to cause or contributes to, the comingling of *Toxic* mine waste materials and oxidation of materials to create Acid Mine Drainage ("**AMD**") and its **Release** into and **Disposal** at and within the **Subject Watershed**.

136.  **AMD** contaminated water originates in the altered environmental conditions in the mined coal seams and surface piles of coal mining waste and migrates through the seams and adjacent rock layers and into the groundwaters and surface waters of the Johnson Fork Watershed. The **AMD** and mining waste materials **Released** from these altered pathways are freed to comingle with **AMD** contamination **Released** from the mining waste piles and unlined ditches on the **Subject Property** and to further cause and contribute to the environmental degradation of the **Subject Watershed**.  Johnson Fork is a tributary of Loop Creek, which is listed on the WV Water Pollution Control Act, W. Va. Code, Chapter 22, Article 11, Section 303(d) List ("WV 303d") of "impaired waters" and has a completed Total Maximum Daily Load plan ("TMDL")[15] established by **WVDEP** for the Upper Kanawha River Watershed and approved by USEPA.

137.  **EGFA** created each of the five (5) unlined, coal mining waste dumps on the surface of the **Subject Property**.

138.  Nominal **Remedial Defendant EACC** maintained and failed or refused properly to abate during its period of ownership of the **EGFA/EACC Subject Property**, the four (4) unlined, coal mining waste dumps on the surface of that real property.  These mining waste dumps were

---

[15] A "TMDL" is the calculation of the maximum amount of a pollutant allowed to enter a waterbody so that the waterbody will meet and continue to meet legally applicable water quality standards for that particular pollutant.  A TMDL determines a pollutant reduction target and allocates load reductions necessary to achieve that target to each of the contributing source(s) of the pollutant.

not constructed, or maintained or operated, in a way in which the **Environment** is protected, including the protection of groundwater.

**139.** Nominal **Remedial Defendant EACC** maintained and failed or refused properly to abate during its period of ownership of the **EGFA/EACC Subject Property**, the northern-most of the five (5) known, unlined, coal mining waste dumps on the surface of the land within the **Subject Watershed**. This mining waste dump was not constructed, maintained or operated in a way in which the **Environment** is protected, including the protection of groundwater.

**140.** **Remedial Defendants** Pardee and Curtin Realty LLC and Quercus West Virginia, LLC each maintained during their respective periods of ownership of the Surface Estate appertaining to the real property comprising the **EGFA/EACC Subject Property**, each of the four (4) southern-most of the five (5) known, coal mining waste dumps on the surface of the land within the **Subject Watershed**. These mining waste dumps were not constructed, or maintained or operated, in a way in which the **Environment** is protected, including the protection of groundwater.

**141.** Each of the five (5) coal mining waste dumps on the surface of the land within the **Subject Watershed** received coal mining waste from **EGFA** and **EACC** coal mining and coal handling and processing activities. These coal mining waste dumps are unlined and were constructed and have been maintained without any **Leachate** control or collection system; therefore, some of the **Wastes** flowing through them is *Discharged* into the surrounding groundwater system. All *Discharges* from these waste dumps into the groundwater system are not now, and never have been, permitted either by the United States or the State of West Virginia. These mining waste disposal areas are above drainage, therefore the groundwater in contact with or flowing through these unlined, coal mining waste dumps is also connected to surface water within the **Subject Watershed**.

**142.** Groundwater and surface water within the **Subject Watershed** associated with these

coal mining waste dumps is continuously and adversely impacted by mining-related **Pollutants and Contaminants** and **Wastes**, which contribute to the impairment of the beneficial uses of the groundwater and surface water within the **Subject Watershed** from other operations.

143.   **WVDEP** describes the coal mining waste dumps within the **Subject Watershed** as "Coal Refuse Piles".    The West Virginia Surface Mining Reclamation Rule, WV C.S.R. § 38-2-2.24 defines "Coal Refuse Site" as "a deposit of coal processing waste or underground development waste."  Further, that Rule, at WV C.S.R. § 38-2-2.23, defines the term "Coal Processing Waste" as "materials which are separated and wasted from the product coal during its physical or chemical processing, cleaning or concentrating."

   d.   **Past Facility Investigations of the Coal Mining Waste Dumps within the Subject Watershed:**

144.   Based upon its investigation of the coal mining waste dumps within the **Subject Watershed** described in this Section **VI.d** of this Verified Second Amended Complaint, the **FCoWV** Code Enforcement Agency has determined that there exists within the **Subject Watershed** five (5) unlined, surface piles principally composed of coal processing wastes or underground development mining waste resulting from coal mining, physical coal cleaning, and coal preparation operations (*e.g.*, culm, gob, *etc*.), and each of those five (5) coal mining waste dumps contain discarded coal, matrix material, clay, and other organic and inorganic material.

145.   The **Wastes** contained within and emanating from each of the surface coal mining waste dumps within the **Subject Watershed** are discarded material, including solid, liquid, and semisolids, resulting from the extraction, beneficiation or processing of coal.  None of the surface coal mining waste dumps within the **Subject Watershed** are comprised either exclusively or primarily of **Overburden**.  The following photographs of the coal mining waste pile on the surface of the land within the **Subject Watershed** identified by **WVDEP** as "PAD WV004926" were

taken by D. Scott Simonton, Ph.D., P.E., a Special Investigator of the **FCoWV** Code Enforcement agency, on May 31, 2019.  The 1st photograph below displays coal waste and "Red Dog" waste (*i.e.,* waste resulting from an earlier fire within the Gob Pile) on the Spruce Hollow (Fox) Coal Refuse Pile.  The 2nd photograph below displays coal mining waste on the surface of the eastern most Gob Pile identified by **WVDEP** as "PAD WV002374".  Both of the photographs below are a fair and accurate representation of what each displays:





146.   **FCoWV** Code Enforcement Agency review of **WVDEP** records of mining waste dumps located within the **Subject Watershed** discloses that **WVDEP** determined that there are two (2) "Problem Area Descriptions" ("PADs") relating to mining waste dumps within that watershed. **WVDEP** records indicate these 2 areas of mine-waste dumping within the **Subject Watershed** contain five (5) separate mining waste "gob" piles.  Those same **WVDEP** records indicate that **WVDEP** assigned Problem Area Description (PAD) numbers to the 2 areas:  PAD WV004926 Spruce Hollow (Fox) Refuse Pile (1 gob pile) and WV002374 Johnson Fork Refuse Pile (4 gob piles).  A purpose of the PAD is to score sites for potential reclamation under the WV Abandoned Mined Lands ("AML") program.

147.   **WVDEP** evaluated the Johnson Hollow mining waste piles in 1987.  While **WVDEP** shows 4 piles for PAD WV002374 in current on-line mapping, its reporting document appears to only evaluate one (1) of the piles on the western side of Johnson Fork.  That pile is described as 1.4 acres approximately 10 feet thick, or about 22,000 cubic yards.  The **WVDEP** reporting document indicates that the biggest threat from this pile is a slope stability issue.

148.   The Spruce Hollow coal mining waste pile was evaluated by **WVDEP** in 1995.  The site of this coal mining waste pile is described as a five (5) acre gob pile with an average thickness of eight (8) feet, or roughly 64,000 cubic yards.  This **WVDEP** report states that this coal mining waste pile resulted from mining in the 1940's and 1950's.  This **WVDEP** report raised a concern regarding slippage of the pile into the adjoining stream, creating a dam in the stream that could eventually fail, creating a hazard for those downstream.

149.   On May 30, 2019, a **FCoWV** Code Enforcement Agency site inspection of the coal mining waste piles in the **Subject Watershed** was conducted by D. Scott Simonton, Ph.D., P.E., a senior and experienced Environmental Engineer and duly-appointed **FCoWVCEA** Special Investigator.  This site inspection was conducted on the PAD Spruce Hollow (Fox) Coal Refuse

Pile (identified by **WVDEP** as PAD WV004926) and 2 of the 5 Johnson Fork Coal Refuse Piles(the southernmost and easternmost) (4 of which Piles are collectively identified by **WVDEP** as PAD WV002374).   A complete copy of Dr. Simonton's Report to the Fayette Co. Code Enforcement Agency regarding his May 30, 2019 field investigation of the coal mining waste piles in the Subject Watershed is set forth in the FCoWVCEA formally Proposed Administrative Record for the JF-LC Watershed Pollution Abatement Site published on the FCoWVCEA Official website and       may       be       viewed       via       the       following       weblink: https://www.dropbox.com/sh/y4gcrj8sqpj4jzn/AAD2MVn19dvgyzmVpEoCsacta/JF-LC%20TECHNICAL/Key%20Docs?dl=0&preview=20190613+DSS+JF-LC+Field+Investigation+Report.pdf&subfolder_nav_tracking=1  This document is **Exhibit 21** to this Verified Second Amended Complaint and is incorporated herein by reference.

150.   On November 30, 2021, Dr. Simonton, the FCoWV Code Enforcement Agency duly appointed Special Investigator, conducted a further field investigation of Gob Pile # 3 within the **Subject Watershed**.  Dr. Simonton was accompanied on this field investigation by attorneys and environmental consultants representing one or more of the Potentially Responsible Parties at the JF-LC Watershed Pollution Abatement Site.  A copy of Dr. Simonton's June 13, 2022 Report to the FCoWV Code Enforcement Agency of the results of his November 30, 2021 field investigation of Gob Pile # 3 in the **Subject Watershed** is attached hereto as **Exhibit 22** and incorporated herein by reference.

151.   Attached to **Exhibit 22** is the following map prepared by Dr. Simonton to display the geographical relationship of the five (5) unlined coal mining waste piles within the Subject Watershed.  The map displayed below fairly and accurately represents the geographical and spatial relationship existing between the five (5) unlined Gob Piles within the **Subject Watershed**:



Figure 1 – Johnson Fork Gob Piles

**152.** As a result of the aforementioned review of public records relating to, and field investigation of, the Gob Piles located within the **Subject Watershed**, the **FCoWV Code Enforcement Agency** has determined that:

    **A.** There exists at coal mining waste piles 1, 2, 3, and 5,[16] within the **Subject Watershed** one or more "point source," as that term is defined in the **CWA** § 502(14), 33 U.S.C. § 1362, discharges of **Leachate** and **Runoff** to *Waters of the State of West Virginia* and to "navigable waters," as that term is defined in **CWA** § 502(7), 33 U.S.C. § 1362(7).

    **B.** There is a very short, direct and certain hydraulic connection to surface waters within

---

[16] For the sake of consistency, all references in this Verified Second Amended Complaint to coal waste pile (or Gob Pile) numbers refer to the locations and waste piles identified in the map attached to **Exhibit 21**.

the **Subject Watershed** from the groundwater underlying each of the unlined coal mining waste piles 1, 2, 3 and 5 within the **Subject Watershed**.

**C.** Coal mining waste dumps 1, 2, 3, and 5 within the **Subject Watershed** are not lined, do not now have and never have had an associated **Leachate** collection system or groundwater monitoring systems in place, and consist primarily of coal mining wastes and not **Overburden**;

**D.** Gob Pile # 2, the Spruce Hollow (Fox) coal mining Refuse Pile (**WVDEP** PAD WV004926) within the **Subject Watershed** is partially located within the watercourse of a perennial stream;

**E.** The *Discharge* of **Leachate** associated with each of these coal waste piles to both surface water and groundwaters in the **Subject Watershed** has had since the original creation of each of these coal waste piles, and is continuing to have, a substantial, adverse impact on surface water and groundwater quality and on the beneficial uses of surface and groundwater within the **Subject Watershed**.

153. In the case of Gob Pile # 2, the Spruce Hollow (Fox) Refuse Pile (PAD WV004926) is immediately adjacent to and partially within the stream channel of a Perennial Stream. In the case of the other four (4) coal waste piles within the **Subject Watershed**, each of these coal waste piles are very close to or immediately adjacent to the stream channel of a Perennial Stream.

154. In all cases, the unlined sides and bottoms of each of coal mining waste piles 1, 2, 3 and 5 within the **Subject Watershed** are porous, and allow some of the **Solid Waste**, including **AMD** contaminated **Leachate** and some of the mining **Wastes** those wastewaters are holding, to seep through and enter into the groundwater at and emanating from each of those unlined coal mining waste piles.

155. The **Leachate** and **Wastes** *Discharged* from each of the coal mining waste piles on the surface of the **Subject Property** within the **Subject Watershed** travel the very short distance from the unlined bottoms of the coal mining waste piles into the alluvial aquifer and then traverses within the aquifer the very short distances to the surface waters within the **Subject Watershed.** Often after precipitation events, the **AMD** contaminated **Leachate** emanating directly from these

coal mining waste piles **_Discharges_** through ditches and gullies on the surface of the land directly to adjacent surface waters as **AMD** contaminated springs.  The photograph below, which displays both a "seep" on the surface of the easternmost mining waste pile on the **Subject Property** identified by **WVDEP** as "PAD WV004926" that is **Discharging Runoff** and **Leachate** into a gulley formed by that surface **Discharge** that conveys the **Runoff** and **Leachate** to surface waters within the **Subject Watershed**, was taken by D. Scott Simonton, Ph.D., P.E., a Special Investigator of the **FCoWV CEA**, on May 31, 2019.  The photograph below is a fair and accurate representation of what it displays:



**156.** The valley aquifer system within the **Subject Watershed** is directly below and hydraulically connected to each of the unlined coal mining waste piles. Because each of these coal mining waste piles are unlined there is virtually no separation between the **AMD** contaminated **Leachate** generated within and ***Discharged*** from them and the alluvial groundwater system within the **Subject Watershed**. This now-contaminated groundwater is directly hydraulically connected back to the surface water of the **Subject Watershed** in each case located very proximately downgradient of these coal mining waste piles.

157.   The Loop Creek watershed is "biologically impaired" based on the narrative water quality criterion set forth in the West Virginia Water Pollution Control Act regulations, 47 W. Va. C.S.R. § 2–3.2.i, which prohibits the presence of wastes in state waters that cause or contribute to significant adverse impacts on the chemical, physical, hydrologic, and biological components of aquatic ecosystems.  The streams suffering these adverse impacts from coal mining operations and from the existing coal mine waste dumps in the **Subject Watershed** are receiving waters of Johnson Fork.

158.   The **FCoWVCEA** has determined that the elevated levels of various ***Toxic* Pollutants and Contaminants** in groundwater and surface water associated with the coal mining waste dumps within the **Subject Watershed** are similar to elevated contaminant levels in the Page-Kincade PSD source water monitoring reported within the last several years.  Sampling indicates that coal mining waste dumps in the **Subject Watershed** are adversely affecting surface water and groundwater, and render the groundwater within the **Subject Watershed** unfit for drinking and dermal contact purposes without significant and expensive treatment:

    A.   Laboratory analysis indicates the presence of contaminants associated with mine-waste in the waters influenced by these mine-waste dumps.

    B.   Sulfate was analyzed in water associated with the Spruce Hollow gob pile and the easterly Johnson Fork gob pile.  Sulfate concentrations indicate obvious, adverse coal mining impacts.

    C.   High iron concentrations (above 300 ug/L), high manganese (above 50 ug/L), and the presence of arsenic, beryllium and cadmium – especially ***Toxic*** metals – are particularly troublesome and indicative of generally poor water quality associated with the mine-waste dumps.

159.   Within the last several years, Cadmium has been found in the groundwater from within the Well-head Protection Area of the Page-Kincade Public Service District ("PSD") (previously the public water system for a significant portion of the residents and businesses within the **Subject**

**Watershed**) within the **Subject Watershed** above the Maximum Contaminant Level ("MCL") allowed by the federal and West Virginia Safe Drinking Water Acts.

160.   The creation and the maintenance without any abatement of the significant, adverse environmental impacts resulting from the past and on-going *Discharges* of *Hazardous Substances* and **Solid Waste** from these coal mining waste dumps on the surface of the land within the **Subject Watershed** have resulted in, and is continuing to contribute to, substantial, adverse impacts to groundwater and surface water quality within that watershed, including increases of iron and manganese concentrations well above that which is naturally occurring.

e.   <u>Environmental Conditions within the Subject Watershed</u>:

161.   Barring other influences, the flow of **AMD** contaminated water within the **Subject Watershed** would be expected to follow natural gradients.   The natural gradients for contaminated groundwater in the **Subject Watershed** would be into the surface water and valley floor groundwater systems and stream beds.  At the hillside/valley floor interface, contaminants from individual mines and coal waste piles will commingle with contaminants introduced from upgradient mines and waste piles, creating a single indivisible plume of **AMD** contaminants in the valley floor sediments, groundwater and surface water system.

162.   The unabated, unsealed and inadequately sealed coal mine portals and underground mine shafts themselves and the improperly *Disposed* of mining waste material on the surface of the **Subject Property** has been and continues to be the primary sources of *Toxic* **AMD** contaminants in the **Subject Watershed**.  It is through the mined coal seams and the surface coal mining waste dumps that air, water and disruptions in the hydrologic balance originate.  **AMD** contaminated groundwater originates in the unabated, unsealed and poorly sealed coal mine portals and underground mine shafts, and from **Leachate** *Discharges* from coal-waste dumps and migrates through the coal seams and adjacent rock layers and into the groundwaters and surface

waters.

**163.**    The aquifer underlying each of the coal mining waste dumps within the **Subject Watershed** contains less than 10,000 mg/l total dissolved solids.

**164.**    Cadmium in the groundwater within the "solid waste boundary,"[17] as that term is defined in 40 C.F.R. § 257-3.4(c)(5), of each of coal mining waste piles 1. 2. 3 and 5 within the **Subject Watershed** exceeds the Maximum Concentration Limit ("MCL") for Cadmium set forth in Appendix I to 40 C.F.R., Part 257.

**165.**    Each of the coal mining waste **Disposal** sites within the **Subject Watershed** have since their creation introduced and are continuing to introduce Cadmium into the groundwater within the **Subject Watershed**.

**166.**    Each of the coal mining waste piles within the **Subject Watershed** are now being, and have been since their construction and first use, maintained and allowed to operate in a manner that that "contaminates," within the meaning of that term in 40 C.F.R. § 257-3.4(c)(2) [18], and causes and contributes to contamination of, the groundwater within the **Subject Watershed** beyond "the solid waste boundary," as that term is defined in 40 C.F.R. § 257-3.4(c)(5), of each of the coal mining waste piles within that Watershed.

**167.**    None of the coal mining waste dumps within the **Subject Watershed** are now or ever have been under a "Compliance Schedule" approved by the **WVDEP** Cabinet Secretary or any other responsible officer of the State of West Virginia or of Fayette County.

**168.**    Neither the placement nor **Disposal** of any of the coal mining waste in any of the coal mining waste piles in the **Subject Watershed** has ever been authorized by or undertaken in conformance with a permit issued pursuant to W. Va. Code, Chapters 22, 22A, or 22B.

---

[17]  *See:*  Footnote # 31, *infra.*

[18]  *See*:  Footnote # 31, *infra.*

169.    From an environmental engineering standpoint, there exists not only a reasonable probability, but also complete certainty that each of the coal mining waste piles within the **Subject Watershed** is currently causing, and will, until properly abated, continue to cause significant adverse impact upon the quality of, and significantly and adversely impair the beneficial uses of, the surface water therein.

170.    There exists not only a reasonable probability, but also complete certainty that each of the coal mining waste piles within the **Subject Watershed** is currently causing, and will, until properly abated, continue to cause a significant, adverse impact upon groundwater quality within the **Subject Watershed**.

171.    Each of the coal mining waste piles in the **Subject Watershed** is now and has been continuously since their creation ***Discharging***, spilling, leaking, or otherwise placing *Hazardous Substances,* **Solid Waste** and **Leachate** into and on land and water within the **Subject Watershed** so that such **Solid Waste** or **Hazardous Waste**, or any constituent thereof may enter the ***Environment*** or be emitted into the air, or ***Discharged*** into any waters, including groundwaters, without any specific authorization by permit issued by any authorized officer, agency, or department of the United States or of the State of West Virginia.

172.    As indicated in Dr. Simonton's Report regarding his May 31, 2019 field investigation of the coal mining waste piles within the Subject Watershed incorporated herein as **Exhibit 21: (1)** the lower portions of coal mining waste piles numbers 1, 2, and 5 are located immediately adjacent to surface waters within the **Subject Watershed**; **(2)** portions of coal mining waste piles numbers 1, 2, and 5 have surface waters running across them; **(3)** in the case of coal mining waste pile number 2, groundwater was observed emanating from within that Gob Pile; and **(4)** also in the case of coal mining waste pile number 2, mining threatened blockage of the surface water stream channel.

**173.**   As indicated in Dr. Simonton's Report regarding his November 20, 2021 field investigation of the coal mining waste pile number 3 within the **Subject Watershed** incorporated herein as **Exhibit 22:**  **(1)** stormwater flowing across that dump is collected and conveyed by erosional gullies present on portions of that dump to the surface water stream located at the base of the hill generally to the north of that dump; and **(2)** some amount of stormwaters also infiltrate through the waste material in dump number 3 and joins groundwater in the near-surface fracture zone and into the deeper groundwater zones.  Necessarily, at least some contaminants will be introduced to groundwater in this manner.  At least some of this **Leachate** contaminated groundwater will join the alluvial groundwater system associated with the adjacent stream.  This groundwater system is hydraulically connected to the greater Johnson Fork groundwater system, from which the Page-Kincaid system draws its water.

**174.**   No protective measures are now in place or have ever been taken at any of the coal mining waste piles within the **Subject Watershed** to prevent the ***Discharge*** of pollutants from the accumulated **Wastes** into the ***Waters of the State*** (*e.g.*, measures to prevent **Runoff** into surface water bodies or the infiltration of **Leachates** into local aquifers).

**175.**   No protective measures are now in place or have ever been taken at any of the coal mining waste piles within the **Subject Watershed** to limit public access to the accumulated waste (*e.g.*, the erection of fencing to surround the accumulated waste).

**f.**   **Impact of the Coal Mining Waste Piles within the Subject Watershed on the Public Health, Safety, Welfare and the *Environment*:**

**176.**   Each of the five (5) coal mining waste piles within the **Subject Property** is a man-made accumulation of refuse or debris located on private lands within Fayette County, each of which is unsafe, unsanitary, dangerous or detrimental to the Public Health, Safety or Welfare, and each of which has caused and contributed to, and each of which is continuing to cause and contribute to,

endangerments to health or the **Environment** beyond the boundaries of the private property upon which each is located and adverse impairments to the beneficial uses of *Natural Resources* within Fayette Co. held in Public Trust.

177.    Each of the coal mining waste piles within the **Subject Watershed** has contributed and is contributing to the **Release** of **Hazardous Substances**, **Hazardous Wastes**, **Pollutants and Contaminants**, **Solid Wastes**, and **Leachate** containing constituents of those **Wastes** and **Pollutants and Contaminants** into the groundwater and surface waters within the **Subject Watershed**. Additionally, this *Toxic* contamination has comingled within the **Environment** with other **AMD** contaminated wastewaters that have been and are continuing to be **Released** from unabated and unsealed coal mine portal and coal mine shafts and have contributed to degradation of surface waters and sediment within the **Subject Watershed** to the point that they can no longer meet their designated uses under the Clean Water Act, specifically the Loop Creek receiving watershed, which appears on the WV "§ 303(d)"[19] list of Impaired Waters, are subject to TMDLs.

---

[19]   Under the federal Clean Water Act § 303(d), 33 U.S.C. § 1313(d), states are required to evaluate all available water quality related data and information to develop a list of waters *(i.e.,* stream segments) that do not meet established Water Quality Standards ("WQS") *(i.e.,* impaired waters) and those that currently meet WQS, but may exceed the applicable WQS's for any given pollutant or contaminant in the next reporting cycle *(i.e.,* threatened waters). States then must develop a Total Maximum Daily Load ("TMDL") for every pollutant/waterbody combination on the list. An essential component of a TMDL is the calculation of the maximum amount of a "pollutant or contaminant" that can occur in waterbody and still meet WQS. Within the TMDL the state allocates this loading capacity among the various point sources and non-point sources discharging into that stream segment. The required permits for discharges of pollutants and contaminants from point sources are then issued or modified through the federal and state administered National Pollutant Discharge Elimination System ("NPDES") mandated by Congress in **CWA** §§ 301 & 402, 33 U.S.C. § 1311 and 1342. Listing a waterbody-pollutant combination as "impaired" has significant legal, environmental and public health protection consequences. It is interpreted by the public to put into serious question: **(1)** whether any dermal contact with, swimming in, or ingestion of the impaired waters is safe; and **(2)** whether the impacted waters are adversely impacting fish, macroinvertebrates, and vegetation that depend on the waters of the impaired stream segment. In addition, such a listing as "impaired waters" may significantly hinder efforts to attract people or businesses to an area. Businesses may also be faced with more stringent NPDES permit limits that have the practical effect of either encouraging relocation of existing businesses with NPDES permits or discouraging new business that will require an NPDES permit from locating within an impaired watershed.

**178.**  The **Solid Wastes** within the **Leachate** that has been emanating from and is continuing to be **Released** from each of the coal mining waste piles within the **Subject Watershed** may pose an imminent and substantial present or potential hazard to human health or the **Environment** when they are, as they are now within each of such coal mining waste piles, improperly treated, **Disposed** of, and managed.

**179.**  **EGFA**, by its creation and maintenance of each of the five (5) unlined, coal mining waste dumps within the **Subject Watershed** during its period of ownership of the **EGFA/EACC Subject Property** and during the period of its operation of the coal mining **Facilities** within the **Subject Watershed** that resulted in mining wastes being **Disposed** of at any of the five (5) coal mining waste dumps within the **Subject Watershed**, all without undertaking any actions to abate the on-going, adverse impacts on the Public Health, Safety, Welfare or the **Environment** result from each of the coal mining waste dumps within the **Subject Watershed**, has caused and contributed to and is continuing to cause and contribute to significant adverse impacts to the quality of the groundwater and its beneficial uses within the **Subject Watershed**.  Most notably, because the underlined coal mining waste piles within the **Subject Watershed**, all of which were constructed and operated on the **Subject Property** to handle or **Dispose** of coal mining waste and mining waste discharges, are not now and never have been operated with any **Leachate** control or collection system; some of the **Hazardous Substances**, **Hazardous Wastes**, **Solid Wastes** and **Pollutants and Contaminants** in the coal mining wastes in each of those coal mining waste dumps has been and are continuing to be **Disposed** of into the surrounding groundwater system and ultimately into the receiving surface waters within the **Subject Watershed**.

**180.**  Nominal **Remedial Defendant EACC**, by its past ownership of the **EGFA/EACC Subject Property** on the surface of which each of the four (4) southern-most coal mining waste dumps within the **Subject Property** is located, and by its failure or refusal to abate the adverse

impacts on the Public Health, Safety, Welfare and the **Environment** resulting from each of those four (4) coal mining waste dumps during or after the period of time of each of its respective ownership of the **EGFA/EACC Subject Property**, has caused and contributed to significant adverse impacts to the quality of the groundwater and its beneficial uses within the **Subject Watershed**. Most notably, because the unlined coal mining waste piles within the **EGFA/EACC Subject Property**, all of which were constructed and maintained to handle and **Dispose** of coal mining waste and mining waste **Discharges**, are not now and never have been operated with any **Leachate** control or collection system; some of the *Hazardous Substances*, **Hazardous Wastes**, **Solid Wastes**, **Pollutants and Contaminants**, and **Leachate** from each of those unlined, surface piles of coal mining wastes that was **Released** and **Discharged** into the **Environment** during its respective period of ownership of **EGFA/EACC Subject Property** on which those mining waste dumps are located have commingled in the soils, subsurface soils and groundwater with similar **AMD** wastes from other mining facilities at the **Subject Property** and with **Releases** from previous and subsequent periods of ownership of the mining waste dumps to present a single, indivisible endangerment of or harm to the health or the **Environment**, which harm or endangerment is not reasonably capable of apportionment to the various source of **Releases** and periods of ownership.

181.    **Remedial Defendant Pardee and Curtin Realty LLC**, by its past handling of, failure to abate the adverse impacts on the Public Health, Safety, Welfare and the **Environment** resulting from, and by allowing the use of the surface of the real property comprising the **EGFA/EACC Subject Property** for the continued existence of, each of the four (4) southern-most of the five (5) coal mining waste dumps within the **Subject Watershed** during the period of time of its ownership of the Surface Estate appertaining to the real property comprising the **EGFA/EACC Subject Property**, all without undertaking any actions to abate the on-going, adverse impacts on the Public

Health, Safety, Welfare or the **Environment** result from each of the coal mining waste dumps on the surface of their real property within the **Subject Watershed**, have each caused and contributed to significant adverse impacts to the quality of the groundwater and its beneficial uses within the **Subject Watershed**. Most notably, because the unlined coal mining waste piles on the **Subject Property**, all of which were constructed and operated on the **Subject Property** to handle and **Dispose** of, coal mining waste and mining waste **Discharges**, are not now and never have been operated with any **Leachate** control or collection system; some of the *Hazardous Substances*, **Hazardous Wastes**, **Solid Wastes**, **Pollutants and Contaminants**, and **Leachate** from the coal mining wastes in each of those coal mining waste dumps that was **Released** and **Discharged** into the **Environment** during its respective periods of ownership of the Surface Estate appertaining to that real property on which those mining waste dumps are located have commingled in the soils, subsurface soils and groundwater with similar **AMD** wastes from other mining facilities at the **Subject Property** and with **Releases** from previous and subsequent periods of ownership of the mining waste dumps to present a single, indivisible endangerment of or harm to the health or the environment, which endangerment or harm is not reasonably capable of apportionment to the various source of **Releases** and periods of ownership.

**182.** **Remedial Defendant** Quercus West Virginia, LLC, as the current owner of the surface rights appertaining to the real property on which the four (4) southern-most of the five (5) known mining waste dumps on the **Subject Property** are located, has had since acquiring those surface right and continues to have the authority and responsibility under federal and West Virginia law to: **(i)** assure that no **Open Dump** is allowed to exist on the surface of the land to which its surface rights apply; and **(ii)** to abate or cause to abated the endangerments to health or the environment that may presented by its past and on-going handling of and failure to abate the adverse impacts on the Public Health, Safety, Welfare and the **Environment** resulting from each of those four (4)

unlined, coal mining waste dumps during the period of time of its ownership of the surface rights appertaining to the real property comprising the **EGFA/EACC Subject Property**.  Most notably, because the unlined, surface coal mining waste piles within the **EGFA/EACC Subject Property**, all of which were constructed and operated to handle and **Dispose** of, coal mining waste and mining waste **Discharges**, are not now and never have been operated with any **Leachate** control or collection system; some of the **Hazardous Substances**, **Hazardous Wastes**, **Solid Wastes**, **Pollutants and Contaminants**, and **Leachate** from the coal mining wastes in each of those coal mining waste dumps that was **Released** and **Discharged** and is continuing to be **Released** and **Discharged** into the **Environment** during the period of its ownership of the surface rights appertaining to the real property on which those mining waste dumps are located have commingled in the soils, subsurface soils and groundwater with similar **AMD** wastes from other mining facilities at the **Subject Property** and with **Releases** from previous periods of ownership of the mining waste dumps to present a single, commingled, indivisible harm to the health or the **Environment**, which harm is not reasonably capable of apportionment to the various source of **Releases** and periods of ownership.

**183.**   **EGFA's** creation and maintenance of each of the five (5) unlined, coal mining waste dumps on the **Subject Property**, and the maintenance during the period of ownership by each of the other **Remedial Respondents** of each of the four (4) coal mining waste dumps within the real property comprising (or the Surface Estate appertaining to the real property comprising) the **EGFA/EACC Subject Property**, all without undertaking any actions to abate the on-going, adverse impacts on the Public Health, Safety, Welfare or the **Environment** that has resulted and is continuing to result from each of the coal mining waste dumps within the **Subject Watershed,** are continuing to cause and contribute to significant adverse impacts to groundwater within the **Subject Watershed**.  Most notably, because the existing and currently operating, unlined coal

mining waste piles within the **Subject Watershed**, all of which were constructed and operated on the **Subject Property** to handle, **Dispose** of, convey or partially treat coal mining waste and mining waste discharges, are not now and never have been operated with any **Leachate** control or collection system; some of the ***Hazardous Substance***, ***Hazardous Wastes***, **Solid Waste** and ***Pollutants and Contaminants*** in the coal mining wastes in each of those coal mining waste dumps has been and is continuing to be **Disposed** of into the surrounding groundwater system and ultimately into the receiving waters of Johnson Fork.

    **184.**   Unpermitted **AMD Discharges** resulting from past mining and mining waste disposal activities in the **Subject Watershed** have caused and continue to cause serious and substantial impairments to the healthfulness and beneficial uses of the waters of the **Subject Watershed**.  The following graphic accurately portrays the geographical area of the prevailing groundwater gradient within the **Subject Watershed**, and the locations of the waste piles that continue to contaminate surface water and groundwater and adversely impact the beneficial uses of ***Natural Resource***s within Fayette County held in Public Trust:





**g.** __AMD Released at and Emanating from the Surface Piles of Coal Mining Wastes on Subject Property is a Hazardous Substances under CERCLA:__

185.   The federal Comprehensive Environmental Response, Compensation & Liability Act of 1980, as amended ("**CERCLA**" or "federal Superfund Act"), 42 U.S.C. §§ 9601-9675, provides a comprehensive mechanism, and a statutory and a remedial (*i.e.,* the National Oil and Hazardous Substances Pollution Contingency Plan, 40 C.F.R., Part 300) framework, to direct governmental entities and private parties responding to the **Release** of **Hazardous Substances** into the **Environment**, and provides guidance, procedures, and cleanup criteria for such remedial activities.

186.   In **CERCLA** §102(a), 42 U.S.C. § 9602(a), Congress directed the Administrator of the U.S. Environmental Protection Agency to designate "as hazardous substances . . . such elements, compounds, mixtures, solutions, and substances which, when released into the environment may present substantial danger to the public health or welfare or the environment." 42 U.S.C. § 9602(a).   The Administrator's resulting designations are set forth in duly promulgated "notice and comment" regulations codified at 40 C.F.R. § 302.4.

**187.**   Arsenic, beryllium, cadmium, antimony, manganese, and selenium are each a substance listed in 40 C.F.R. § 302.4.  Consequently, each such substance is a **Hazardous Substance** as the term is defined in **CERCLA** § 101(14), 42 U.S.C. § 9601(14).

**188.**   In interpreting and applying the provisions of **CERCLA** § 102(a) and 40 C.F.R. § 302.4, Federal Courts, in exercise of their **exclusive**, original jurisdiction[20] over all controversies arising under **CERCLA**, have consistently held that where a mixture contains a designated **Hazardous Substance**, like arsenic, beryllium, cadmium, antimony, manganese, or selenium, then the entirety of that mixture is, itself, a **Hazardous Substance** for the purposes of **CERCLA**.  *See, e.g., New York* v. *Exxon Corp.,* 766 F. Supp. 177, 180 (S.D.N.Y. 1991), *State of Arizona and the City of Phoenix* v. *Motorola, Inc.,* 774 F. Supp. 566 (D. AZ, 1991), *United States* v. *Carolawn,* 1984 U.S. Dist. LEXIS 15937, 21 Env't Rep. Cases 2124, 2126 (D.S.C. 1984).  Consequently, all of the untreated **AMD** that has been and is being **Released** into the **Environment** at and emanating from the unlined, surface piles of coal mining waste on the **Subject Watershed** is a **Hazardous Substance** as that term is defined herein and in **CERCLA** § 101(14), 42 U.S.C. § 9601(14).

**h.**   **AMD Released from the Surface Piles of Coal Mining Waste within the Subject Watershed is a Solid Waste and Hazardous Waste for Purposes of RCRA Subtitle G & the West Virginia Hazardous Waste Management Act:**

**189.**   The mining waste that has been **Disposed** of on the **Subject Property** and the **AMD** that has been and is continuing to be **Released** into the **Environment** from the unsealed fissures, unsealed and inadequately sealed mine portals and unlined mining waste piles within the **Subject Watershed**, all of which was caused or contributed to, in whole or in substantial part, by the Defendants' former mining operations of **EGFA** and Nominal **Remedial Defendant EACC**, is a

---

[20]  CERCLA § 113(b), 42 U.S.C. § 9613(b)

**Discarded** solid or liquid, or both, material resulting from mining operations. Consequently, all such mining waste and **AMD** is a **Solid Waste** as defined herein and in **RCRA** § 1004(27), 42 U.S.C. § 6903(27), and as the same term in used in **RCRA** Subtitle G, specifically including **RCRA** § 7002(a)(1)(B), 42 U.S.C. § 6972(a)(1)(B). In addition, all such **AMD** is a "Waste" as that term is defined in the West Virginia Hazardous Waste Management Act, W. Va. Code § 22-18-3(16).[21]

190.    The untreated **AMD** that has been and is continuing to be released into the groundwater from the unlined coal mining waste piles on the **Subject Property** is: **(a)** a discarded liquid material resulting from mining operations; and **(b)** is not "industrial discharges which are point sources subject to permits under section 402 of the Federal Water Pollution Control Act, as amended (86 Stat. 880)," within the meaning of that phrase as set forth in **RCRA** § 1004(27), 42 U.S.C. § 6903(27), a provision of **RCRA** Subtitle A, and in the West Virginia Hazardous Waste Management Act, W. Va. Code § 22-18-3(16). Consequently, all such **AMD** is a **Solid Waste** as defined herein and in **RCRA** 1004(27), 42 U.S.C. § 6903(27), and as the same term in used in **RCRA** Subtitle G, specifically including **RCRA** § 7002(a)(1)(B), 42 U.S.C. § 6972(a)(1)(B). In addition, all such **AMD** is a "Waste" as that term is defined and used in the West Virginia Hazardous Waste Management Act, W. Va. Code, Chapter 22, Article 18.

---

[21]   As applies only to the federal **Hazardous Waste** regulatory program under **RCRA** Subtitle C, pursuant to **RCRA** § 3006(6), 42 U.S.C. § 6926(6), a state may develop its own hazardous waste management program (*i.e.*, by the enactment of appropriate statutes, creation and funding of necessary governmental infrastructure and promulgation of necessary implementing administrative regulations) and, upon U.S. EPA approval of the state hazardous waste management program, may operate that program "in lieu of the federal program within such state," subject to certain federal requirements, the most notable of which is that the state hazardous waste management program must be equivalent to and consistent with the federal **RCRA** Subtitle C **Hazardous Waste** management program. *See* 42 U.S.C. § 6926(b). West Virginia's **Hazardous Waste** management program, set forth in the West Virginia Hazardous Waste Management Act ("WV HWMA"), W. Va. Code, Chapter 22, Article 18, has been formally approved by the USEPA Administrator and, accordingly, operates within West Virginia "in lieu of" the federal **RCRA** program within West Virginia. *See* 51 Fed. Reg. 17739B (May 15, 1986); 65 Fed. Reg. 29973 (May 10, 2000); 78 Fed. Reg. 70225 (Nov. 25, 2013).

191.    Because of its quantity, concentration, physical and chemical characteristics, all of the mining waste that has been **Disposed** of on the surface of the **Subject Property** and all of the **AMD** that has been and is being **Discharged** into the **Environment** from the five (5) coal mining waste disposal **Facilities** on the surface of the **Subject Property** is a **Solid Waste** and a "Waste" (as that term is defined in the WV Hazardous Waste Management Act) that "may pose a substantial present or potential hazard to human health or the environment when improperly treated, stored, transported, or disposed of, or otherwise managed" within the meaning of that phrase as set forth in both **RCRA** § 1004(5), 42 U.S.C. § 6903(5), and in the West Virginia Hazardous Waste Management Act, W. Va. Code § 22-18-3(6).  Consequently, all such **AMD** is a **Hazardous Waste** as defined in **RCRA** § 1004(5), 42 U.S.C. § 6903(5), and as the same term in used in **RCRA** Subtitle G, specifically including **RCRA** § 7002(a)(1)(B), 42 U.S.C. § 6972(a)(1)(B), and in the WV Hazardous Waste Management Act, W. Va. Code § 22-18-3(6).

i.    **The Past, Currently On-Going and Threatened Future Releases of AMD Contamination into the Environment from Each of the Five (5) Surface Piles of Coal Mining Waste on the Subject Property Have Commingled or Will Commingle Within the Environment to Cause and Contribute to a Single, Indivisible Harm to the Public Health, Safety, Welfare and the Environment and an Actual or Potential Endangerment to Health and the Environment at, under and Emanating from the Subject Property, Which Harm Is Not Reasonably Capable of Being Reliably Apportioned to the Acts or Omissions of Any Individual Defendant.**

192.    The **AMD** contaminant generation from the unlined mining waste **Disposal Facilities** within the **Subject Property** (*i.e.,*  the unlined mining waste piles on the surface and within the mine works) has flowed and continues to flow into groundwaters and surface waters within the **Subject Watershed.**  These past and ongoing **Discharges** commingle within the **Environment** with similarly contaminated groundwater from prior **Discharges** of AMD contamination in the aquifer and surface streams, forming a single surface water and groundwater plume of toxic contamination and similar sediment plume.

193.    **AMD** and mining waste **Discharges** that have resulted and are continuing to result from: the surface coal mining waste piles within the **Subject Watershed** have caused or contributed to, and continue to cause and contribute to, impairments to the quality and beneficial uses of the waters of the **Subject Watershed**, and have commingled within the groundwater, surface water system, and sediments of Johnson Fork.  This commingled, single, indivisible plume of toxic contaminants has caused or contributed to, and is causing and contributing to, the existing and imminently threatened future impairments of the quality and beneficial uses of the waters within the **Subject Watershed, a** "navigable waters," and a WV "§ 303d" listed or TMDL impaired stream.

194.    The **Solid Wastes**, **Hazardous Wastes**, **Hazardous Substances**, and **Pollutants and Contaminants** that have been and are continuing to be **Released** into the **Environment** within the **Subject Watershed** as a result of the **AMD** and mine waste **Discharges** from each of the Defendants' mining operations are easily absorbed by fish and other aquatic organisms.  Even small concentrations of these **Solid Wastes**, **Hazardous Wastes** and **Hazardous Substances** can be toxic because some of those toxic contaminants bioconcentrate or bioaccumulate.  Toxicity of those **Solid Wastes**, **Hazardous Wastes** and **Hazardous Substances** also produces adverse biological effects on an organism's survival, activity, growth, metabolism, or reproduction.  These toxic contaminants can be lethal or harm the organism without killing it directly.  Cumulative, adverse effects on an organism's activity, growth, metabolism, and reproduction are examples of these sublethal effects.  Some of the contaminants of concern are also bioaccumulated within the plants and animals that are in direct or indirect contact with the food chain and adversely impact the health of these organisms and organisms that feed upon those organisms.

195.    The cumulative adverse impacts on the **Environment** that have resulted and are continuing to result from the commingled, single plume of toxic contaminants that has and is continuing to be **Discharged** as a result of mining and mining waste disposal operations and

subsequent maintenance of resulting Public Nuisance conditions and illegal uses of the **Subject Property** by the **Remedial Defendants** within the **Subject Watershed** include loss and continued degradations of biodiversity in the receiving stream, and bioaccumulation within the plants and animals within the **Subject Watershed** that are in direct or indirect contact with the food chain and adversely impact the health of the organisms that feed upon those organisms.

196.    Once a receiving water or organism has been harmed or is imminently threatened with harm by this commingled, single, indivisible plume of toxic contaminants that has and is continuing to be **Discharged** as a result of mining or **Solid Waste** management operations of **EGFA and** the **Remedial Defendants** within the **Subject Watershed,** there exists no reasonable or reliable basis in fact or science for apportioning that harm or threatened harm to health and the **Environment** to any of the Defendants.

197.    As a consequence of the foregoing, **EGFA,** Nominal **Remedial Defendant EACC**, and **Remedial Defendants** Pardee and Curtin Realty, LLC and Quercus West Virginia, LLC have, by each of their acts and omission with respect to maintaining and failing and refusing to abate or cause the abatement of one or more of the piles of coal mining waste on the surface of the **Subject Property** within the **Subject Watershed**, caused and contributed to a single, indivisible harm to health and the **Environment** at and emanating from the **Subject Property** and within the **Subject Watershed**, which harm is not reasonably capable of being reliably apportioned to the acts or omissions of any individual source or Defendant or subset of sources or Defendants.

**j.    Response Activities by the Governmental Plaintiff Addressing Known and Reasonably Suspected Conditions of *Public Nuisance* in the Subject Watershed**:

198.    Pursuant to the **FCoWV Public Nuisance Ordinance**, the FCoWV Code Enforcement

Agency may take "*Abatement Actions*"[22] in response to known or reasonably suspected conditions of *Public Nuisance* within Fayette County.[23]  Such *Abatement* or **Response** actions by the **FCoWV CEA** may include:  **(i)** investigation and "information gathering"[24]; **(ii)** performing or requiring the performance by liable parties of "interim *Abatement Actions*" or "*Removal*" actions, including site investigations, studies to plan and direct cleanup efforts, and various activities to prevent, minimize, or mitigate unacceptable endangerments to Public Health, Safety. Welfare, or the **Environment** prior to the selection and implementation of any final Remedial Action Plan applicable to the site[25]; and **(iii)** performing or requiring the performance by liable parties of longer term "*Remedial*" actions consistent with permanent remedies that prevent or minimize conditions that present or may present unacceptable endangerments to present and future Public Health, Safety, Welfare, and the **Environment**.[26]

    **199.**    In approximately 2011, the Page-Kincaid Public Service District ("P-K PSD"), a public provider of public drinking water to many of the residents within the **Subject Watershed**, relocated it groundwater supply well to a new location within the Subject Watershed.  For several years after that relocation, the P-K PSD groundwater supply well produced nearly pristine water.

    **200.**    Beginning in approximately 2018, the P-K PSD began reporting to the West Virginia

---

[22]  The term "*Abatement Action*" is broadly defined in Section **III(a)** of the **FCoWV Public Nuisance Ordinance** to include all actions, including administrative and judicial enforcement actions, that are necessary and proper in the judgment of the **FCoWV CEA** to respond appropriately to known or reasonably suspected *Public Nuisance* conditions within Fayette Co. and to secure adequate protection of the Public Health, Safety, Welfare or the Environment.

[23]  In compliance with the statutory mandate set forth in W. Va. Code § 7-3-3ff(c), Section **VII** of the **FCoWV Public Nuisance Ordinance** establishes the FCoWV Code Enforcement Agency and authorizes it to investigate and respond appropriately to known or reasonably suspected conditions of *Public Nuisance* within Fayette County.

[24]  Section **VIII(a)** of the **FCoWV Public Nuisance Ordinance**.

[25]  Sections **VIII(b)**, **IX.V** and **XII** of the **FCoWV Public Nuisance Ordinance**.

[26]  Sections **IX.V**, **XII** and **XXII** of the **FCoWV Public Nuisance Ordinance**.

Public Service Commission and the Fayette Co. Commission that it was encountering at its relocated groundwater supply well significantly high level of toxic contaminants traditionally associated with Acid Mine Drainage ("**AMD**"). The costs of treating this contaminated water to required public drinking water standards threatened the continued financial viability of the P-K PSD.

**201.** Responding to these reports of toxic contamination within the Johnson Fork-Loop Creek Watershed within Fayette County, the **FCoWV CEA** and the Environmental and Public Health Protection Unit of the Office of the Fayette Co. Prosecuting Attorney commenced an investigation into the causes, nature and extent of the condition of *Public Nuisance* within Fayette Co.

**202.** In the course of the ensuing **FCoWV** Code Enforcement Agency investigation, D. Scott Simonton, Ph.D., P.E., a prominent and accomplished environmental engineer and full Professor of Environmental Sciences at Marshall University, who is an appointed Special Investigator for the **FCoWV** Code Enforcement Agency, conducted a field investigation within the **Subject Watershed**, took samples of environmental media from within the **Subject Watershed**, and completed a thorough review of public documents produced by the WV Department of Environmental Protection regarding current and historic coal mining and coal mining waste disposal operations and practices within the **Subject Watershed**.

**203.** As a result of his investigation of environmental conditions within the **Subject Watershed** and his review of **WVDEP** documents produced in response to a Freedom of Information Act request, Dr. Simonton reported to the **FCoWV** Code Enforcement Agency:

    **a.** There exists on the **Subject Property** two (2) known areas containing within them five (5) separate, known **Open Dumps** of coal mining waste, all of which were constructed and operated, and continue to exist within the **Subject Watershed** without, any associated **Liner** or **Leachate** collection, control or detection systems;

    **b.** the **Open Dumps** of coal mining waste within the **Subject Watershed** were created

during or before the 1950's within the **Subject Watershed** where **EGFA** was then conducting the only known coal mining and processing activities in that area;

c.    laboratory analysis of samples of environmental media taken by Dr. Simonton within the **Subject Watershed** indicates the presence of contaminants associated with mine-waste in the waters influenced by these mine-waste dumps;

d.    groundwater beneath **Open Dumps** of coal mining waste within the **Subject Watershed** is certainly contaminated and is directly hydraulically connected to surface waters and to the valley alluvial aquifer from which the P-K PSD draws its public drinking water supply.

e.    Mining activities in the **Subject Watershed** were conducted above drainage (*i.e.* upgradient) mostly in the Powellton coal seam, mining of which is notorious for contaminating ground and surface waters with toxic pollutants if appropriate controls are not utilized, and this mining activity included **Disposal** of coal mining wastes above drainage in open coal-waste dumps;

f.    **EGFA** mining activity within the **Subject Watershed** created toxic mine and mine waste drainage which continues to this day, increasing the concentrations of toxic substances in groundwater and subsequently to the surface waters to which they are connected or in which such contaminates continue to migrate within the **Environment**; and

g.    generation of **AMD** toxic contaminants occurs in both the improperly sealed mined seams and in the mining waste material disposed of within or adjacent to these mining operations.    Seepage of toxic **AMD** contaminates and contaminated groundwater continue to flow into surface waters within the **Subject Watershed** in areas in which mines operated, and these discharges commingle with similarly contaminated groundwater from other mining operations and mining waste disposal areas in the adjacent valley aquifer and surface streams, forming a single surface water and groundwater plume and sediment plume.

204.    In exercise of its Investigation and Information Gathering authority under Section **VIII(a)** of the **FCoWV Public Nuisance Ordinance**, the **FCoWV** Code Enforcement

Agency formally issued and served comprehensive Information Demands to each of the **Remedial Defendants** seeking information regarding each of their relevant corporate histories, their acquisition of any interest in the real property within the **Subject Watershed**, relevant activities conducted within the **Subject Watershed**, and their relevant liability insurance information.

205.    Further, in response to information provided by **Remedial Defendant** National Grid NE Holdings 2 LLC regarding historic liability insurance providing coverage to **EGFA** and **EACC**, the Fayette Co. Prosecuting Attorney, in exercise of his authority under the FCoWV Public Nuisance Civil Investigation Ordinance, FCoWV Ordinance No. 2017-002, issued comprehensive Civil Investigation Demands to each of the **Insurer Respondents** seeking relevant information regarding any current or historic liability insurance coverage provided to **EGFA** or **EACC** and all relevant information they may have regarding current or historic mining and mine waste management activities within the **Subject Watershed**.

206.    Following its reviews of the results of its investigation into the known condition of *Public Nuisance* within the **Subject Watershed** and the documents produced in response to formal information demands, on May 4, 2021 at its duly notice public meeting, the **FCoWV CEA**, in exercise of its authority under Section **IX.V** of the **FCoWV Public Nuisance Ordinance**, unanimously voted formally to issue and serve **FCoWV CEA "FINDINGS OF FACT, CONCLUSIONS OF LAW AND FINAL & BINDING TIME-SENSITIVE ABATEMENT ACTION ORDER NO. 2021-002-9.5(b)-001** (hereinafter: "**JF-LC TSAAO # 1**") to each of the **Remedial Defendants** (referred to within that administrative order as the "Remedial Respondents")[27].

---

[27] **JF-LC TSAAO # 1** also included an Information Demand issued to over thirty (30) of the historic liability insurers of **EGFA** and **EACC** by the **FCoWV CEA** pursuant to its authority under Section **VIII** of the **FCoWV Public Nuisance Ordinance**.  Those **FCoWV CEA** Information Demands are not at issue in this federal civil action.

Case 2:21-cv-00307   Document 499   Filed 06/15/22   Page 102 of 196 PageID #: 9641

207.  By its issuance and service of **JF-LC TSAAO # 1**, the **FCoWV CEA** formally made the following findings of liability against the **Remedial Defendants** for abatement of the known condition of *Public Nuisance* within the **Subject Watershed** under the **FCoWV Public Nuisance Ordinance**:

    **a.**  By creating and maintaining throughout its period of ownership of the **EGFA/EACC Subject Property,** non-exclusively including each of the five (5) coal mining waste piles within that watershed, without appropriate protection of the Public Health and *Environment* and, thereby, causing and contributing to an imminent and substantial endangerment to the Public Health, Safety, Welfare and the *Environment* within Fayette County, **EGFA** created and contributed to a *Public Nuisance* within the meaning of the common law of West Virginia within Fayette County, and, therefore, created and contributed to a *Public Nuisance* as declared by Section **V(b)** of **FCoWV Ordinance 2018-001**;

    **b.**  By contributing to and maintaining throughout its period of ownership of the **EGFA/EACC Subject Property**, non-exclusively including each of the four (4) southern-most of the five (5) known, coal mining waste piles within that watershed, without providing appropriate protection of the Public Health and *Environment* within Fayette County and thereby causing and contributing to an imminent and substantial endangerment to the Public Health, Safety, Welfare and the *Environment* within Fayette County, Nominal **Remedial Respondents EACC** contributed to and maintained a condition of *Public Nuisance* within the meaning of the common law of West Virginia, and, therefore, contributed to and maintained a *Public Nuisance* as declared by Sections **V(a)(17)** and **V(b)** of the **FCoWV Public Nuisance Ordinance**;

    **c.**  By contributing to and maintaining throughout its period of ownership of the Surface Estate appertaining to the real property comprising the **EGFA/EACC Subject Property**, non-exclusively including each of the four (4) southern-most of the five (5) known, surface piles of coal mining waste within that **Subject Watershed**, without providing appropriate protection of the Public Health and *Environment* within Fayette County and thereby causing and contributing to an imminent and substantial endangerment to the Public Health, Safety, Welfare and the *Environment* within Fayette County, **Remedial Respondents** Pardee and Curtin Realty LLC contributed to

and maintained a condition of ***Public Nuisance*** within the meaning of the common law of West Virginia, and, therefore, contributed to and maintained a ***Public Nuisance*** as declared by Sections **V(a)(17)** and **V(b)** of the **FCoWV Public Nuisance Ordinance**;

**d.** By contributing to and maintaining throughout each of its period of ownership of the Surface Estate appertaining to the real property comprising the **EACC/EGFA Subject Property** upon which exists the Powellton No. 6 coal mining ***Facilities*** within the **Subject Watershed,** non-exclusively including each of the four (4) southern-most of the five (5) known, coal mining waste piles within that watershed, without providing appropriate protection of the Public Health and ***Environment*** within Fayette County and thereby causing and contributing to an imminent and substantial endangerment to the Public Health, Safety, Welfare and the ***Environment*** within Fayette County, **Respondents** and Quercus West Virginia, LLC each contributed to and maintained a condition of ***Public Nuisance*** within the meaning of the common law of West Virginia, and, therefore, contributed to and maintained a ***Public Nuisance*** as declared by Sections **V(a)(17)** and **V(b)** of the **FCoWV Public Nuisance Ordinance**;

**c.** By "***knowingly***," within the meaning of that term as defined by Section **III(x)** of the **FCoWV Public Nuisance Ordinance**, allowing one or more coal mining waste piles within the **Subject Watershed,** each an **Open Dump,** to exist on their land within Fayette County during each of their periods of ownership of that land (or of the Surface Rights appertaining to that land) on or after March 31, 1993, **Respondents EACC**, Pardee and Curtin Realty LLC each knowingly allowed the use of their land within the **Subject Watershed** during their respective periods of ownership of that land, and **Respondent** Quercus West Virginia, LLC has allowed and is continuing to allow the use of the surface of the real property within the **Subject Watershed** to which its surface rights appertain, for a purpose declared illegal and expressly prohibited by W. Va. Code § 22-15-l0(a); an act and condition declared to be a ***Public Nuisance*** by Section **V(a)(l7)** of the **FCoWV Public Nuisance Ordinance**;

**d.** **EGFA** and Respondents **EACC**, Pardee and Curtin Realty LLC and Quercus West Virginia, LLC are each a *Person* that "knowingly," within the meaning of Section **III(x)** of the **FCoWV Public Nuisance Ordinance**, maintains or maintained a ***Public Nuisance*** within Fayette Co. and, therefore, each is a ***Person*** Liable for the abatement of the ***Public Nuisance*** required by this Order pursuant to Section **VI(a)(3)** of the **FCoWV Public Nuisance Ordinance**;

e.   **EGFA** and **Respondents EACC,** Pardee and Curtin Realty LLC and Quercus West Virginia, LLC are each a ***Person*** that, during the creation or existence of a ***Public Nuisance*** within Fayette Co., owned or had control over the land at, on, in, from, or within which a ***Public Nuisance*** was created, maintained, or is being maintained, and each of whom, regardless of actual knowledge of the existence or nature of the nuisance condition, failed or refused appropriately to abate the ***Public Nuisance,*** and, therefore, each of them is, pursuant to Section **VI(a)(4)** of the **FCoWV Public Nuisance Ordinance**, liable for the abatement of the ***Public Nuisance*** within Fayette Co. set forth in this **Order**;

f.   **EGFA** and **Respondent EACC,** as sequential **Owners** and **Operators** of the Powellton No. 6 coal mining ***Facilities*** within Fayette Co., West Virginia, each have, during their respective periods of ownership and operation, of the coal mining ***Facilities*** within the **Subject Watershed,** non-exclusively including the five (5) coal mining waste piles on the surface of the land within that watershed, caused and contributed to a condition that unreasonably interferes with the reasonable and comfortable use and enjoyments within Fayette Co. of ***Waters of the State***, as that term is defined in Section **III(vv)** of the **FCoWV Public Nuisance Ordinance**; namely the groundwaters and surface waters of the Johnson Fork and Loop Creek Watersheds;

g.   **Respondent Pardee and Curtin Realty LLC,** as a former **Owner** of, and **Respondent Quercus West Virginia, LLC,** as current **Owners** of, the Surface Estate appertaining to the land upon which the surface **Facilities** of the Powellton No. 6 coal mine within Fayette County, West Virginia, non-exclusively including the four (4) southern-most of the five (5) known, coal mining waste piles on the surface of the land within the **Subject Watershed,** are located has, by failing and refusing to abate or cause the abatement of the past and on-going ***Releases*** and ***Discharges*** of ***Hazardous Substances***, ***Hazardous Wastes***, **Solid Wastes**, ***Pollutants and Contaminants***, and Leachate from any of those ***Facilities*** and coal mining waste piles during their period of ownership, each caused or contributed to, a condition that unreasonably interferes with the reasonable and comfortable use and enjoyments within Fayette Co. of *Waters of the State,* namely the groundwaters and surface waters of the **Subject Watershed**;

h.   Nominal **Remedial Defendant EACC**, and **Remedial Defendants** Pardee and Curtin Realty LLC, as sequential former owners of the land (or the Surface Rights appertaining

to the land) upon which the Powellton No. 6 mining *Facilities,* non-exclusively including the four (4) southern-most of the five (5) known, coal mining waste piles located on the surface of the **EGFA/EACC Subject Property**, by each of their failures or refusals during each of their respective periods of ownership to abate or control *Releases* of *Hazardous Substances, Hazardous Wastes,* **Solid Waste,** and *Pollutants and Contaminants* from those *Facilities* and coal mining waste piles, have each caused or contributed to the *Release,* into the *Environment* within Fayette Co. during each of their respective periods of ownership of *Pollutants and Contaminants* that have caused the presence within groundwaters within Fayette Co. of more than 50 μg/L of total manganese; a condition declared to be a *Public Nuisance* in Fayette Co. by Section **V(a)(10)(6)(iii)** of the **FCoWV Public Nuisance Ordinance**;

i.  **Respondent Quercus West Virginia, LLC,** as the Current owner of the Surface Estate appertaining to the land upon which the surface *Facilities* of the Powellton No. 6 coal mining operations within the **Subject Watershed** exist, non-exclusively including the Surface Estate of the land upon which each of the four (4) southern-most of the five (5) known, coal mining waste piles located on the surface of the **EGFA/EACC Subject Property** within the **Subject Watershed** exist, has, by its failure or refusal to abate or control *Releases* of *Hazardous Substances*, *Hazardous Wastes*, **Solid Waste**, *Pollutants and Contaminants*, and **Leachate** from those *Facilities* and coal mining waste piles, caused or contributed to the *Release,* and is continuing to cause or contribute to the *Release,* into the *Environment* within Fayette Co. of *Pollutants and Contaminants* that have caused the presence within groundwaters within Fayette Co. of more than 300 μg/L of total iron; a condition declared to be a *Public Nuisance* in Fayette County by Section **V(a)(10)(6)(vi)** of the **FCoWV Public Nuisance Ordinance**;

j.  **EGFA** is a former owner of *Waste Disposal Facilities,* to wit, the four (4) coal mining waste piles located on the **EGFA/EACC Subject Property**, that has contributed to the past handling, or *Disposal* of a **Waste** or **Hazardous Waste,** to wit, the coal mining *Wastes* within those coal mining waste piles, which:

    **(i)** may present an *Imminent* and *Substantial Endangerment* to the Public Health, Safety, Welfare or the *Environment* within Fayette County; or

    **(ii)** is detrimental to or impairs any beneficial uses within Fayette County of *Waters of the State* or *Natural Resources* owned by the State of West Virginia or Fayette County, or held in trust by either of them for the benefit of present and future

generations of the public, to wit, the surface waters and groundwaters within the **Subject Watershed;**

an act declared to be a ***Public Nuisance*** in Fayette County by Sections **V(a)(6)** and **(8)** of **FCoWV Ordinance 2018-001,** and, therefore, is a ***Person*** liable for the abatement of such ***Public Nuisance*** conditions within the meaning of Section **VI(a)(S)** of the **FCoWV Public Nuisance Ordinance;**

k.   **EGFA** and **Respondents EACC** and Pardee and Curtin Realty LLC are each a ***Person*** that has, by reason of their past ownership of, maintenance of, and failure to abate the four (4) coal mining waste piles located on the surface of the **EGFA/EACC Subject Property** within the **Subject Watershed,,** created or contributed to within Fayette Co. the ***Public Nuisance*** conditions declared in Sections **V(a)(8)** and **(10)(6)(vi)** of the **FCoWV Public Nuisance Ordinance**, and, therefore, are each a ***Person*** liable for the abatement of such ***Public Nuisance*** conditions within the meaning of Sections **VI(a)(l)** and **(2)** and **VIII(a)(l)** and **(b)**of that Ordinance;

l.   **EGFA**, by its creation and maintenance of a condition on the **Subject Property** that unreasonably interferes with the reasonable use and enjoyment of **Waters of the State** and ***Natural Resource*s** within the **Subject Watershed,** and **Remedial Defendants EACC** and Pardee and Curtin Realty LLC, by their illegal use of the land within the **Subject Property** to maintain that same unreasonable interference with the reasonable use and enjoyment of **Waters of the State** and ***Natural Resources*** within the **Subject Watershed**, are each a ***Person*** liable, within the meaning of Sections **VI** and **VIII** of the **FCoWV Public Nuisance Ordinance,** for the abatement of the ***Public Nuisance*** conditions within Fayette County declared in Sections **V(a)(8)** and **(10)(6)(vi)** of that **Ordinance**, and;

m.   **Respondent** National Grid NE Holdings 2 LLC is the corporate successor to **EGFA,** and, pursuant to Section **VI(i)** of **FCoWV Ordinance 2018-001,** is liable for all of the remedial liabilities imposed upon **EGFA** by the **FCoWV Public Nuisance Ordinance** respecting any of its acts or omissions, or it status as an ***Owner or Operator*** of the mining **Facilities** and mining waste **Disposal Facilities** within the **Subject Watershed,** that existed or occurred before January 1, 1966, non-exclusively including:

(1) **EGFA's** liability arising out of its creation and maintenance of the coal mining **Facilities** comprising the Powellton No. 6 coal mining operations within the

**Subject Watershed**, specifically including the five (5) coal mining waste piles;

**(2) EGFA's** liability arising out of its ownership prior to January 1, 1966 of the four (4) coal mining waste piles located on the **EGFA/EACC Subject Property**, and its maintenance until January 1, 1966 of the five (5) coal mining waste piles within the **Subject Watershed**; and

**(3) EGFA's** liability arising out of the *Disposal*, *Releases* and *Discharges* of *Hazardous Substances*, *Hazardous Wastes*, **Solid Wastes**, and *Pollutants and Contaminants* at and from any of those **Facilities** and coal mining waste piles

**n.**  EGFA is a *Person* that during the creation and existence of a *Public Nuisance* declared in Section **V(a)(9)** of the **FCoWV Public Nuisance Ordinance** owned or had control over real property in Fayette County at and on which a *Public Nuisance* was being created, contributed to or maintained;

**o.**  **Respondents EACC**, and Pardee and Curtin Realty LLC are each a *Person* that during the existence of a *Public Nuisance* declared in Section **V(a)(9)** of the **FCoWV Public Nuisance Ordinance** owned or had control over real property in Fayette County at and on which a *Public Nuisance* was being maintained;

**p.**  **Respondent** Quercus West Virginia, LLC is a *Person* that during the existence of a *Public Nuisance* declared in Section **V(a)(9)** of the **FCoWV Public Nuisance Ordinance** had and still has control over the surface of real property **in** Fayette County at and on which a *Public Nuisance* was and is being maintained;

**q.**  **Respondents EACC**, and Pardee and Curtin Realty LLC are each a subsequent owner of the real property within Fayette Co. on which each of the four (4) coal mining waste piles located on the **EGFA/EACC Subject Property** are located, and, consequently, are each a subsequent owner of **Facilities** described in Section **VI(a)(4)** of the **FCoWV Public Nuisance Ordinance** on which the *Public Nuisance* continued unabated throughout each of their respective periods of ownership of such *Facility***(ies);** all within the meaning of Section **VI(d)** of the **FCoWV Public Nuisance Ordinance**;

**r.**  Respondent Quercus West Virginia, LLC is a subsequent *Person* controlling the surface of the real property within Fayette County on which each of the four (4) coal mining waste piles located on the **EGFA/EACC Subject Property**, and, consequently, is a subsequent *Person* controlling *Facilities* described in Section **VI(a)( 4)** of the **FCoWV Public Nuisance Ordinance** on which the *Public Nuisance* has continued

and still is continuing unabated throughout its period of ownership of the surface rights to the real property on which such **Facility(ies)** are located; all within the meaning of Section **VI(d)** of the **FCoWV Public Nuisance Ordinance**; and

**s.**    Subject to Section **VI(j)** of the **FCoWV Public Nuisance Ordinance** and Section **IV(a)(S)(E)** of this **Order**, each of the **Remedial Respondents** is a ***Person*** liable, within the meaning of Sections **VI** and **VIII** of the **FCoWV Public Nuisance Ordinance**, for the abatement of the ***Public Nuisance*** conditions within the **Subject Watershed**.

**208.**    As required by Section **IX** of the **FCoWV Public Nuisance Ordinance**, the **FCoWV CEA** made all of it Findings of Fact and Conclusions of Law set forth in the **JF-LC TSAAO # 1**, including all of those set forth above, based entirely upon the results of its investigations and its review of the relevant documents and information produced in response to formal Information Demands and Freedom of Information Act requests, all of which are, pursuant to the requirements of Section **IX(g)** of the **FCoWV Public Nuisance Ordinance**, set forth it the **FCoWV CEA Administrative Record**[28] for its Matter No. 2021-02-9.5(b) ("Johnson Fork-Loop Creek Abatement Matter") created and maintained by the **FCoWV CEA** and publicly available under the "Johnson Fork-Loop Creek Watershed Pollution Abatement Project" heading at the following website address:  https://fayettecounty.wv.gov/cea/Documents/active.aspx

**209.    JF-LC TSAAO # 1** allowed Respondents to the Order to request informal conferences[29]

---

[28]  Consistent with the federal Administrative Record requirements under **CERCLA** and the **NCP**, Section **IX** of the **FCoWV Public Nuisance Ordinance** specifies what types of documents and information are required and which types are permitted to be in a formal Administrative Record, requires that the Administrative Record be made available for public comment at specified points in the Site Investigation and Response process, and requires that all **FCoWV CEA** decisions be based upon information set forth in the Administrative Record.

[29]  Section **IX** of the **JF-LC TSAAO # 1**.  Closely paralleling the federal provisions for obtaining judicial review of an Administrative Response Order under **CERCLA** § 106, 42 U.S.C. § 9606, Section **IX.V(e)** of the **FCoWV Public Nuisance Ordinance** imposes civil or criminal penalties for the failure or refusal of a Respondent properly served with a Time-Sensitive Abatement Action Order to comply with that Order **only** if a **court** finds that the failure or refusal was willful and without just and sufficient cause.  As is true under **CERCLA** § 113(h), 42 U.S.C. § 9613(h), with respect to a

with the **FCoWV CEA** to discuss the Order, its requirements and the **FCoWV CEA** administrative process.  As a result of comments received in response to the **JF-LC TSAAO # 1** and new information received in response to Civil Information Demands issued to certain Insurer Respondents, at its duly noticed public meeting held on June 22, 2021 the **FCoWV CEA** issued **JF-LC TSAAO # 2**, a copy of which (located at ECF # 3-1 herein) is incorporated herein as **Exhibit 2**, revising and replacing the earlier issued **JF-LC TSAAO # 1**.

210.  Identically to the provisions of **JF-LC TSAAO #1**, **JF-LC TSAAO # 2** requires the **Remedial Respondents**, jointly and severally, competently and timely to undertake at their sole cost and under the oversight and supervision of the **FCoWV CEA** a **Remedial Investigation** and Feasibility Study ("**RI/FS**") of the **Hazardous Substances**, **Hazardous Wastes**, and **Pollutants and Contaminants** that have been and are being **Released** into the **Environment** at and emanating from the five (5) **Open Dumps** of coal mining waste within the **Subject Watershed** and any endangerments to health or the **Environment** that are or may be presented by those **Released** toxic contaminants.

211.  As authorized by Section **IX.V(c)** of the **FCoWV Public Nuisance Ordinance**, Section **XXVI** of the **JF-LC TSAAO # 2** requires the Remedial Respondents, jointly and severally, to periodically reimburse Fayette Co. all **Abatement Action Costs** it has incurred and will continue to incur in responding to the *Public Nuisance* conditions within the S**ubject Watershed**, including the costs of the **FCoWV CEA** in providing oversight and monitoring of the **Response** Actions required of the Remedial Respondents.

212.  As required by Section **IX** of the **FCoWV Public Nuisance Ordinance**, the ninety (90)

---

federal **CERCLA** § 106 Administrative Order, Section **IX.V(g)** of the **FCoWV Public Nuisance Ordinance** authorizes judicial review of a Time-Sensitive Abatement Action Order under the **FCoWV Public Nuisance Ordinance** only in a civil or criminal enforcement action brought by Fayette County with respect to the site or Order at issue.

page **JF-LC TSAAO # 2** spells out in detail the required <u>**NCP-compliant**</u> **RI/FS** process that the Remedial Respondents are required timely to commence.  This NCP-Compliant RI/FS process is designed to provide the data necessary to determine what, if any, Removal or Remedial Action may be required adequately to abate the Public Nuisance condition within the **Subject Watershed** and to provide adequate protection of the Public Health, Safety, Welfare and the **Environment**.

213.   Also at its duly noticed public meeting on June 22, 2021, the **FCoWV CEA** adopted **FCoWV CEA** Resolution # 2021-06 providing for all of the following:  **(i)** formally staying, pending further formal **FCoWV CEA** Order, all further administrative enforcement of **JF-LC TSAAO # 2** against the Remedial Respondents to that Order; and **(ii)** formally requesting that the Fayette Co. Prosecuting Attorney promptly commence judicial enforcement proceeding pursuant to Section **XX** of the **FCoWV Public Nuisance Ordinance** to secure compliance by the Remedial Respondents with the requirements of **JF-LC TSAAO # 2**.


### <u>COUNT ONE</u>:
### RCRA CITIZEN SUIT" RELIEF TO ENJOIN ONGOING VIOLATIONS OF, AND TO ENFORCE THE PROHIBITION OF "OPEN DUMPS" IN, RCRA § 4005(a) AND THE PROVISION OF THE WEST VIRGINIA SOLID WASTE MANAGEMENT ACT AND IMPLEMENTING RULES THAT HAVE BECOME EFFECTIVE PURSUANT TO RCRA

***(Governmental Plaintiff** against **Remedial Defendant** Quercus West Virginia, LLC**)***

214.   The **Governmental Plaintiff** incorporates and realleges in this Count all of allegations asserted in the foregoing paragraphs as if fully set forth herein.

**a. <u>Part One- On-going Violations of RCRA § 4005(a)</u>:**

215.   In enacting **RCRA**, Congress sought to address, in light of the rapidly expanding bodies of knowledge regarding toxicology, public health and environmental sciences, the seemingly myriad array of serious harms, endangerments to health and the **Environment** and uncertainties

attendant to land pollution in the post-Industrial-Revolution United States of America.  **RCRA** encompasses the federal legislative response to such complex issues as **Solid Waste** planning and management, **Hazardous Waste** management, Medical Waste management, use and management of underground storage tanks, and management of munitions wastes.  To begin to address these very complex issues, Congress, in **RCRA**, established both very detailed, prospective, and comprehensive regulatory programs with the most serious and substantial, federal civil and criminal penalties to then ever have been imposed in support of any federal environmental or public health protection legislation.  These requirements and the corresponding civil and criminal penalties attendant to their violation are intended to secure timely and complete compliance with those regulatory requirements in order to afford what Congress determined to be adequate protection of the public health and of the **Environment**.

**216.**   From out of the full array of serious land pollution issues and problems addressed by **RCRA**, Congress singled out the problem of "**Open Dumps**" in this country to be the **sole** issue within all of the Solid Waste management provisions of **RCRA**, the singular province of **RCRA** Subtitle D (*i.e.,* **RCRA** §§ 4001 – 4010, 42 U.S.C. §§ 6941 – 6949a), that Congress elected to address by the nationwide exercise of its powers to regulate interstate commerce.[30]   In fact,

---

[30]   All of the provisions of **RCRA** Subtitle D, with the sole exception of **RCRA** § 4005, 42 U.S.C. § 6945, are clearly valid exercises of the power of Congress under Article I, Section 8 of the U.S. Constitution to spend public funds for public purposes, and to set the conditions attendant to receipt of such federal funding.  As recently highlighted by the United States Supreme Court, Congress' authority under the "Spending Clause" of Article 1, Section 8 of the U.S. Constitution is very broad, albeit not unlimited:

> The Spending Clause grants Congress the power "to pay the Debts and provide for the . . . general Welfare of the United States." U.S. Const., Art. I, § 8, cl. 1.  We have long recognized that Congress may use this power to grant federal funds to the States, and may condition such a grant upon the States' "taking certain actions that Congress could not require them to take." *College Savings Bank*, 527 U.S., at 686, 119 S. Ct. 2219, 144 L. Ed. 2d 605.  Such measures "encourage a State to regulate in a particular way, [and] influenc[e] a State's policy choices." *New York*, supra, at 166, 112 S. Ct. 2408, 120 L. Ed. 2d 120.  The

---

Congress declared its intent to rid our country of "**Open Dumps**" as high among primary purposes of Congress in enacting **RCRA**:

> **(a) Objectives**. The objectives of this Act [*i.e.,* **RCRA**] are to promote the protection of health and the environment and to conserve valuable material and energy resources by—
>
> ***        ***        ***        ***
>
> **(3) prohibiting future open dumping on the land and requiring the conversion of existing open dumps to facilities which do not pose a danger to the environment or to health**;

---

conditions imposed by Congress ensure that the funds are used by the States to "provide for the . . . general Welfare" in the manner Congress intended.

At the same time, our cases have recognized limits on Congress's power under the Spending Clause to secure state compliance with federal objectives. "We have repeatedly characterized . . . Spending Clause legislation as 'much in the nature of a contract.' *Barnes* v. *Gorman*, 536 U.S. 181, 186, 122 S. Ct. 2097, 153 L. Ed. 2d 230 (2002) (quoting *Pennhurst State School and Hospital* v. *Halderman*, 451 U.S. 1, 17, 101 S. Ct. 1531, 67 L. Ed. 2d 694 (1981)). The legitimacy of Congress's exercise of the spending power "thus rests on whether the State voluntarily and knowingly accepts the terms of the 'contract.' Id., at 17, 101 S. Ct. 1531, 67 L. Ed. 2d 694. Respecting this limitation is critical to ensuring that Spending Clause legislation does not undermine the status of the States as independent sovereigns in our federal system. That system "rests on what might at first seem a counterintuitive insight, that 'freedom is enhanced by the creation of two governments, not one.' *Bond*, 564 U.S., at 220-221 , 131 S. Ct. 2355, 180 L. Ed. 2d 269 (quoting *Alden* v. *Maine*, 527 U.S. 706, 758, 119 S. Ct. 2240, 144 L. Ed. 2d 636 (1999)). For this reason, "the Constitution has never been understood to confer upon Congress the ability to require the States to govern according to Congress' instructions." *New York*, supra, at 162, 112 S. Ct. 2408, 120 L. Ed. 120. Otherwise the two-government system established by the Framers would give way to a system that vests power in one central government, and individual liberty would suffer.

*Nat'l Fed'n of Indep. Bus.* v. *Sebelius*, 567 U.S. 519, 576-77, 132 S. Ct. 2566, 183 L. Ed. 2d 450, 2012 U.S. LEXIS 4876 (2012).

Unquestionably, under the standard articulated by the *Nat'l Fed'n of Indep. Bus.* Court, the provisions of **RCRA** §§ **4002(c)(3)**, 42 U.S.C. § 6942(c)(3) [requiring the Solid Waste Management Plans of States that elect to apply for the multiple tens of millions of dollars of federal financial assistance made available to cooperating States by **RCRA** Subtitle D to include provisions for eliminating **Open Dumps**], **4003(a)(2)** and **(3)**, 42 U.S.C. § 6943(a)(2) and (3) [establishing as minimum requirements for federal approval of a state Solid Waste Management Plan submitted to USEPA pursuant to **RCRA** Subtitle D provisions prohibiting the creation and operation of **Open Dumps** and provision requiring the closing or upgrading of existing open dumps] are classic instances of the proper exercise by Congress of its powers under the "Spending Clause" of Article 1, Section 8 of the U.S. Constitution.

RCRA § 1003(a)(3), 42 U.S.C. § 6902(a)(3) [Bolding emphasis added].

217.    To accomplish its above-cited objective, Congress enacted **RCRA § 4005(a)**, 42 U.S.C. § 6945(a) as its <u>only</u> exercise of its power to regulate interstate commerce in all of **RCRA** Subtitle D:

> **(a) <u>Closing or upgrading of existing open dumps</u>.  Upon promulgation of criteria under section 1008(a)(3)[31], any solid waste management practice or disposal of solid waste or hazardous waste which constitutes the open dumping of solid waste or hazardous waste is prohibited, except in the case of any practice or disposal of solid waste under a timetable or schedule for compliance established under this section.  <u>The prohibition contained in the preceding sentence shall be enforceable under section 7002 against persons engaged in the act of open dumping</u>.**  For purposes of complying with section 4003(2) and 4003(3), each State plan shall contain a requirement that all existing disposal facilities or sites for solid waste in such State which are open dumps listed in the inventory under subsection (b) shall comply with such measures as may be promulgated by the Administrator to eliminate health hazards and minimize potential health hazards.  Each such plan shall establish, for any entity which demonstrates that it has considered other public or private alternatives for solid waste management to comply with the prohibition on open dumping and is unable to utilize such alternatives to so comply, a timetable or schedule for compliance for such practice or disposal of solid waste which specifies a schedule of remedial measures, including an enforceable sequence of actions or operations, leading to compliance with the prohibition on open dumping of solid waste within a reasonable time (not to exceed 5 years from the date of publication of criteria under section 1008(a)(3).

RCRA § 4005(a), 42 U.S.C. § 6945(a) [Bolding and underlining emphasis added].

218.    In order to accomplish its purposes in enacting **RCRA § 4005(a)**, Congress in **RCRA § 4004(a)**, 42 U.S.C. § 6944(a), directed USEPA to promulgate federal regulations that clear "bright line" distinguishing between allowable "sanitary landfills" and prohibited "Open Dumps."  Congress, however, set a very high standard of environmental protection as the "<u>minimum</u> criteria" that was to govern USEPA's discretion in promulgating those regulations: "At a minimum, such criteria shall provide that a facility may be classified as a sanitary landfill

---

[31]  In **RCRA § 1008(a)(3)**, 42 U.S.C. § 6907(a)(3), Congress directed that there be included in the "Suggested Guidelines" on Solid Waste management that USEPA was directed to disseminate to state and local government **"minimum criteria"** to be used to implement the congressional prohibition of open dumping and requirement for upgrading of all open dumps in this country.

and not an open dump **only if there is no reasonable probability of adverse effects on health or the environment from disposal of solid waste at such facility**." **Id.** [Bolding and underlining emphasis added].

219. The federal regulations USEPA promulgated to fulfill its duties under the congressional mandate in **RCRA** § 4004(a) are codified at 40 C.F.R., Part 257.  The initial section of those regulations provides, in relevant part:

> **(a)**Unless otherwise provided, the criteria in §§ 257.1 through 257.4 are adopted for determining which solid waste disposal facilities and practices pose a reasonable probability of adverse effects on health or the environment under sections 1008(a)(3) and 4004(a) of the Resource Conservation and Recovery Act (The Act). . . . .
>
> **(1) <u>Facilities</u> failing to satisfy <u>any</u> of the criteria in §§ 257.1 through 257.4 . . . are considered open dumps, which are prohibited under section 4005 of the Act.**
> **(2) <u>Practices</u> failing to satisfy <u>any</u> of the criteria in §§ 257.1 through 257.4 or §§ 257.5 through 257.30 or §§ 257.50 through 257.107 constitute open dumping, which is prohibited under section 4005 of the Act.**

40 C.F.R. § 257.1(a)(1) [Bolding and underlining emphasis added].  Thus, by duly promulgated regulation USEPA has made clear that any solid waste disposal **Facility** and any solid waste disposal **Practice** that fails to satisfy **any** of the criteria set forth in 40 C.F.R. §§ 257.1 through 257.4 is an **Open Dump** expressly prohibited by **RCRA** § 4005(a), 42 U.S.C. § 6945(a).

220. Since its acquisition on June 27, 2013 of the surface rights appertaining to the real estate within the **Subject Watershed** upon which all four (4) of the coal mining waste piles located on the **EGFA/EACC Subject Property** within the **Subject Watershed** exist, **Remedial Defendant Quercus West Virginia, LLC** has allowed each of those surface piles of coal mining waste to exist, wholly unabated, on the surface of the real estate with respect to which it owns the surface rights.

221. By reason of the following facts alleged in Section **VI(a)** through (e), inclusive, of this Verified Second Amended Complaint, and repeated here for convenience of the Court and other readers, each of the surface piles of coal mining waste on the surface of the real estate within the

**Subject Watershed** with respect to which **Remedial Defendant** Quercus West Virginia, LLC has continuously owned the surface rights since June 27, 2013 has failed, and continues to fail, for each day of that period to satisfy the criteria set forth in 40 C.F.R. § 257-3-4(a)[32]:

**(1)** The aquifer at the **Subject Property** meets the definition of an "underground drinking water supply" set forth in 40 C.F.R § 257.3-4(c)(4)(ii) because it is: "An aquifer in which the ground water contains less than 10,000 mg/l total dissolved solids;" and

**(2)** Each of the unlined surface piles of coal mining waste at the **Subject Property** "contaminate an underground drinking water source beyond the solid waste boundary" within the meaning of 40 C.F.R.§ 257.3-4(a) because each of those surface piles of coal mining waste introduce at least cadmium to groundwater within the solid waste boundary at the **Subject Property** that causes "[a]n increase in the concentration of that substance (*i.e.*, cadmium) in the ground water where the existing concentration of that substance (*i.e.*, cadmium) exceeds the maximum contaminant level specified in appendix I." *See*:  40 C.F.R. § 257.3-4(c)(2)(ii).

---

[32]  40 C.F.R. § 257.3-4 provides, in relevant part:

**(a)** A facility or practice shall not contaminate an underground drinking water source beyond the solid waste boundary or beyond an alternative boundary specified in accordance with paragraph (b) of this section.

* * *        * * *        * * *        * * *        * * *

**(c)** As used in this section:

**(2)** Contaminate means introduce a substance that would cause:
**(i)** The concentration of that substance in the ground water to exceed the maximum contaminant level specified in appendix I, or
**(ii)** An increase in the concentration of that substance in the ground water where the existing concentration of that substance exceeds the maximum contaminant level specified in appendix I.
**(3)** Ground water means water below the land surface in the zone of saturation.
**(4)** Underground drinking water source means:
**(i)** An aquifer supplying drinking water for human consumption, or
**(ii)** An aquifer in which the ground water contains less than 10,000 mg/l total dissolved solids.
**(5)** Solid waste boundary means the outermost perimeter of the solid waste (projected in the horizontal plane) as it would exist at completion of the disposal activity.

Accordingly, pursuant to the above-quoted provisions of 40 C.F.R. § 257.1(a)(1)[33], each of the four (4) unlined surface piles of coal mining waste located on the surface of the **EGFA/EACC Subject Property**, is, and has been throughout the ongoing period during which **Remedial Defendant** Quercus West Virginia, LLC has owned the Surface Estate appertaining to the real property comprising the **EGFA/EACC Subject Property**, an **Open Dump** prohibited by **RCRA** § 4005(a), 42 U.S.C. § 6945(a).

222.    In addition, the surface pile of coal mining waste on the surface of the real estate within the **Subject Watershed** identified as the Spruce Hollow (Fox) Refuse Pile, PAD # WV004926, located on the surface of the real property comprising the **EGFA/EACC Subject Property** with respect to which Defendant Quercus West Virginia, LLC has continuously owned the Surface Eights from June 27, 2013 until the present, has failed, and continues to fail, for each day of that period to satisfy the criteria set forth in 40 C.F.R. § 257.3-1[34] because:

1.    PAD WV004926, the Spruce Hollow (Fox) Refuse Pile within the **Subject Watershed** was evaluated by the U.S. Department of the Interior, Office of Surface Mines ("OSM") in 1995.  At that time, OSM concluded that this refuse pile restricts the flow of the base flood as it encroaches into the stream channel.

2.    Additionally, at the time of its 1995 inspection of the PAD WV004926, OSM determined that, as this waste lies within the stream channel, waste material will be

---

[33]  *See* Paragraph 179, *supra*.

[34]  40 C.F.R. § 257-3.1 provides:

> **(a)** Facilities or practices in floodplains shall not restrict the flow of the base flood, reduce the temporary water storage capacity of the floodplain, or result in washout of solid waste, so as to pose a hazard to human life, wildlife, or land or water resources.
>
> **(b)** As used in this section:
>
> > **(1)** Based [sic] flood means a flood that has a 1 percent or greater chance of recurring in any year or a flood of a magnitude equaled or exceeded once in 100 years on the average over a significantly long period.
> >
> > **(2)** Floodplain means the lowland and relatively flat areas adjoining inland and coastal waters, including flood-prone areas of offshore islands, which are inundated by the base flood.
> >
> > **(3)** Washout means the carrying away of solid waste by waters of the base flood.

washed out into the stream during high-water events.

3. In 1995, OSM stated that slippage of the PAD WV004296 refuse pile into the adjoining stream might create a dam in the stream that could eventually fail, creating a hazard for those downstream. The OSM report stated: "The creek channel at the toe of the refuse piles appears slightly altered, leaving still a large, unblocked drainage channel area. Should frequent heavy rainfalls occur, the refuse pile embankment could slide and block Spruce Hollow Creek causing a damming impoundment to occur. The failure of the impoundment would most likely cause substantial personal property loss and even injury or death to anyone in the flood water path."

4. A recent **FCoWV CEA** site inspection of the PAD WV004926, the Spruce Hollow (Fox) Refuse Pile, by D. Scott Simonton, Ph.D., P.E., Special Investigator for the Fayette Co. Code Enforcement Agency, revealed that the mining waste at that refuse pile still encroaches into the stream channel.

**223.** Pursuant to the express provisions of **RCRA** § 4005(a), 42 U.S.C. § 6945(a), its prohibitions are enforceable pursuant to **RCRA** § 7002(a)(1)(A), 42 U.S.C. § 6972(a)(1)(A). Moreover, the prohibition set forth in **RCRA** § 4005(a) is a "standard," "prohibition," and "requirement" which "has become effective pursuant to **RCRA**" within the meaning of those terms in **RCRA** § 7002(a)(1)(A), 42 U.S.C. § 6972(a)(1)(A).

b. **Part Two - Violations of the Requirements of the WV Solid Waste Management Act, W. Va. Code, Chapter 22, Article 15, that Are Principle Components of the State of West Virginia's Solid Waste Management Plan Submitted to and Approved by U.S. EPA Pursuant to RCRA Subtitle D, and that Were Enacted to Accomplish Compliance with the Minimum Requirements of Federal Law for Approval of Such a State Plan Set Forth in RCRA §§ 4003(a)(2)-(4), Inclusive, and 4004(b):**

**224.** W. Va. Code§ 22-15-l0(a), a provision of the West Virginia Solid Waste Management Act, provides, in relevant part:

> **(a) Open dumps are prohibited and it is unlawful for any person to create, contribute to, or operate an open dump or <u>for any landowner to allow an open dump to exist on the landowner's property</u>** unless that open dump is under a

> compliance schedule approved by the director. **The compliance schedule shall contain an enforceable sequence of actions leading to compliance and shall not exceed two years.** . . .

**Id**. (Bolding and underlining emphasis added).

225.    The WV Solid Waste Management Act, W. Va. Code Chapter 22, Article 15, and its implementing regulations, the West Virginia Solid Waste Management Rule, W. Va. C.S.R., Chapter 33, Series 1, were adopted by the State of West Virginia, at least in part, to accomplish compliance with the minimum requirements of federal law for approval of such a state Solid Waste Management Plan set forth in **RCRA** §§ 4003(a)(2)-(4), inclusive, and 4004(b). In turn, the West Virginia Solid Waste Management plan was submitted to and approved by U.S. EPA.

226.    The West Virginia Solid Waste Management Act, W. Va. Code § 22-15-10(a) and the West Virginia Solid Waste Management Rule, W. Va. C.S.R. § 33-1-1.6 provides, in relevant part:

> [N]o landowner may allow an open dump to exist on his or her property, unless such open dump is under a compliance schedule approved by the Secretary.

227.    Upon information and belief, the **Open Dumps** at the **Subject Property** are not now and never have been under any compliance schedule approved by the Secretary of **WVDEP**.

228.    The West Virginia Solid Waste Management Rule, W. Va. C.S.R. § 33-1-1.6 provides, in relevant part:

> **1.6.  Lawful Disposal of Solid Waste Required**. -- Solid waste must be disposed, processed, stored, transferred, or recycled only at permitted solid waste facilities as described in this rule, and in compliance with W. Va. Code §22C-4-10 [now codified at W. Va. Code § 22-15-10].
>
> **1.6.a.**  The discharge, deposit, injection, dumping, spilling, leaking burning, burying, or otherwise placing of any solid waste or **leachate** into or on any land or water so that such solid waste or any constituent thereof may enter the environment or be emitted into the air, or discharged into any waters, including groundwaters, is prohibited unless specifically authorized by a permit or permits from the Department.
>
> **1.6.b. Solid waste facilities or activities failing to satisfy this subsection are considered open dumps, as defined in section 2, and will be subject to the actions and penalties outlined in W. Va. Code §22-15-15.**

**Id**. [Bolding Emphasis added].

229.    Upon information and belief, continuously since the initial creation of each of the **Open Dumps** of mining waste within the **Subject Watershed** and throughout the entire, continuing period that **Remedial Defendant** Quercus West Virginia, LLC has owned the surface rights appertaining to the real property comprising the **EGFA/EACC Subject Property**, **Solid Wastes** and **Leachate** has leaked and been **Discharged** from each of those four (4) surface piles of coal mining waste located on the **EGFA/EACC Subject Property** into **Waters of the State**, including groundwaters, within the **Subject Watershed**, none of which leaking or **Discharge** is now or ever has been permitted by USEPA or **WVDEP**.

230.    Since at least the effective date of the current version of W. Va. C.S.R. § 33-1-1.6 (*i.e.,* June 1, 2015[35]) the leaking and **Discharge** of **Solid Waste** and **Leachate** from each of the four (4) surface piles of coal mining waste located on **EGFA/EACC Subject Property** has violated, and continues to violate, the prohibition set forth in W. Va. C.S.R. § 33-1 1.6.1.a, and, accordingly, each of those four (4) **Facilities** is a *per se* **Open Dump** under WV law.

231.    In addition, the West Virginia Solid Waste Management Rule, W. Va. C.S.R. § 33-1-7.2 provides, in relevant part:

> **7.2.** Protection of the Environment and the Public.
>> **7.2.a. Any site at which the following protective measures have not been instituted will be classified as an open dump:**
>>> **7.2.a.1. Measures must be taken to prevent the discharge of pollutants from the accumulated waste into the waters of the State (e.g., measures to prevent runoff into surface water bodies or the infiltration of leachates into local aquifers);**

**Id.** [Bolding emphasis added.]

232.    Upon information and belief, there is now and has been continuously since the creation and use of each of the five (5) unlined surface piles of coal mining waste at the **Subject Property: (a)** an on-going **Discharge** of **Solid Wastes**, **Hazardous Wastes**, and **Toxic Wastes** from the

---

[35]    *See* W. Va. C.S.R. § 33-1-1.4

wastes accumulated in those **Facilities** to waters of the State of West Virginia, including groundwater within the **Subject Watershed**; **(b)** the on-going runoff of **AMD** contaminated waters, all a **Solid Waste**, into surface waters within the **Subject Watershed**; and **(c)** the continuing infiltration of **leachate** from mining wastes containing constituents of mining waste into the aquifer within the **Subject Watershed**.

**233.** Upon information and belief, **Remedial Defendant** Quercus West Virginia, LLC has never instituted and is not now instituting any protective measures at any of the four (4) **Open Dumps** of coal mining waste that exist on the surface of the real property comprising the **EGFA/EACC Subject Property** to which its Surface Right appertain to prevent the on-going **Discharge** of **Solid Wastes**, **Hazardous Wastes**, and **Leachate** from the wastes accumulated in those **Facilities** to **Waters of the State**, including groundwater, within the **Subject Watershed**, to prevent the on-going **Runoff** of **AMD** contaminated waters into surface waters within the **Subject Watershed**, or to prevent the continuing infiltration of **Leachate** from mining wastes containing constituents of mining waste into the aquifer within the **Subject Watershed**. Accordingly, pursuant to W. Va. C.S.R.§ 33-1-7.2, the site of each of those **Facilities** on the surface of the real property comprising the **EGFA/EACC Subject Property** is an illegal and prohibited **Open Dump.**

**234.** **Remedial Defendant** Quercus West Virginia, LLC is, and has been continuously since June 27, 2013, the owner of the surface rights appertaining to the real property comprising **EGFA/EACC Subject Property** upon which those four (4) **Open Dumps** of mining waste exist, and, accordingly, has both the legal duty and legal authority to abate or cause to be abated each of those **Open Dumps**. **Remedial Defendant** Quercus West Virginia, LLC is in violation of W. Va. Code § 22-15-l0(a) and W. Va. C.S.R. § 33-1-1.6 by reason of allowing each of the four (4) unlined **Open Dumps** of coal mining waste to exist on the surface of the **EGFA/EACC Subject Property**.

235.    This Court and other Federal Courts have recognized[36] that the provision of a state Solid Waste Management statutes or regulations which are components of a state Solid Waste Management Plan adopted to satisfy minimum requirements of **RCRA** Subtitle D, and which State Plan has been approved by U.S. EPA, are "requirements that have become effective pursuant to **RCRA**" within the meaning of **RCRA** § 7002(A)(1)(a), 42 U.S.C. § 6972(a)(1)(A) and are, therefore, enforceable by a "Citizen Suit" properly brought pursuant to **RCRA** § 7002(a)(1)(A).

236.    The provisions of the West Virginia Solid Waste Management Act, W.Va. Code Chapter 22, Article 15, and the West Virginia Solid Waste Management Rule, W. Va. C.S.R., Chapter 33, Series 1, are principal components of the West Virginia Solid Waste Management Plan adopted by the State of West Virginia to achieve minimum compliance with the requirements of **RCRA** Subtitle D, specifically **RCRA** §§ 4003(a)(2)-(4), inclusive, and 4004(B), and approved by the U.S. EPA.  Accordingly, the requirements of that Act and that Rule are enforceable in a properly commenced federal "Citizen Suit" action brought pursuant to **RCRA** § 7002(a)(1)(A), such as this instant civil action.

## COUNT TWO:

### "CITIZEN SUIT" RELIEF PURSUANT TO RCRA § 7002(a)(1)(B), 42 U.S.C. § 6972(a)(1)(B), TO SECURE JUDICIAL ABATEMENT OF CONTINUING CONDITIONS THAT MAY PRESENT AN IMMINENT AND SUBSTATIAL ENDANGERMENT TO HEALTH OR THE ENVIRONMENT ARISING FROM THE PAST AND ONGOING HANDLING OR DISPOSAL OF A SOLID WASTE OR HAZADOUS WASTE

(*Governmental Plaintiff* against all **Remedial Defendants**)

237.    The **Governmental Plaintiff** incorporates and realleges in this Count the allegations

---

[36]  *Ashoff* v. *City of Ukiah*, 130 F.3d 409, 411 n.3 (9th Cir. CA 1997); *Covington* v. *Jefferson County,* 358 F.3d 626, 642 (9th Cir. ID 2004); *Living Lands, LLC* v. *Cline,* 2022 U.S. Dist. LEXIS 46634, at *26-27, __ F.Supp.3d __ (SD WV 2022) (Chambers, J.); *Brod* v. *Omya, Inc.*, 2006 U.S. Dist. LEXIS 102594 (D. VT 2006).

asserted in the foregoing paragraphs of this Complaint as if fully set forth herein.

238.   RCRA § 7002(a)(1)(B), 42 U.S.C. § 6972(a)(1)(B) under which the **Governmental Plaintiff** bring this count, is part of Subtitle G of **RCRA**, and **RCRA's** citizen enforcement provisions.  Section 7002(a)(1)(B) authorizes "any person" (*i.e.,* a phrase uniformly interpreted by the Federal Courts to be constitutionally restricted to any person with standing under Article III of the U.S. Constitution,[37] expressly including a "political subdivision of a state") to seek redress in federal court in the form of judicial abatement of any potential imminent and substantial endangerments that may be posed to public health or the **Environment** by, *inter alia,* the past or present handling or **Disposal** of **Hazardous Waste**, **Solid Waste**, or both.  The gravamen of a **RCRA** § 7002(a)(1)(B) claim is the current existence of a potential imminent and substantial endangerment to health **or** the environment, not a violation of any statute or regulation.

239.   Any "person"[38] may bring a lawsuit under **RCRA** § 7002(a)(1)(B) when:  **(a)** a "solid or hazardous waste;" **(b)** "may present an imminent and substantial endangerment to health or the environment;" and **(c)** the defendant falls within one of the categories of "persons" that Congress declared liable for taking abatement action or "such other action as [this Court determines] may be necessary."

240.   The persons declared strictly liable by Congress for abatement of the potential endangerments to health or the environment addressed in **RCRA** § 7002(a)(1)(B) are "persons" that " contributed to the past or present handling, storage, treatment, transportation, or disposal"

---

[37]   ***See***:  *Lujan* v. *Defs. of Wildlife*, 504 U.S. 555, 112 S. Ct. 2130 (1992).

[38]   **RCRA** § 1004(15), 42 U.S.C. § 6903(15), provides:

>   The term "person" means an individual, trust, firm, joint stock company, corporation (including a government corporation), partnership, association, State, municipality, **commission, political subdivision of a State**, or any interstate body and shall include each department, agency, and instrumentality of the United States.

**Id.** [Bolding emphasis added].

of the **Hazardous Wastes** or **Solid Wastes** that may present the imminent and substantial endangerment at issue. Pursuant to the express terms of **RCRA** § 7002(a)(1)(B), this category of liable "persons" specifically include: "any past or present generator, past or present transporter, or past or present owner or operator of a treatment, storage, or disposal facility" whose past or present actions have contributed or are contributing to the imminent and substantial endangerment to health **or** the **Environment**.

**241.** The **Governmental Plaintiff** and each of the **Remedial Defendants** is a "person" within the meaning of **RCRA** § 1004(15), 42 U.S.C. § 6903(15).

**242.** **RCRA** § 7002(a)(1)(B), which was first added to **RCRA** by the 1984 Hazardous and Solid Wastes Amendments, Pub. L. 98-616, Title IV, § 401, 98 Stat. 3268, imposes federal, retrospective, **remedial** environmental and public health protection liability on a person by reason congressionally designated acts or omissions that may have occurred prior to the enactment of the statute. Perhaps because the <u>vast majority</u> of **RCRA** consists of prospective, regulatory requirements [as opposed to the retrospective, **solely remedial** purposes and requirements of **RCRA** § 7002(A)(1)(b)], **RCRA** is silent on the question of what effect, if any, private party indemnification or transfer of liability agreements can have on the Congressional imposition of the retroactive, remedial liability imposed by **RCRA** § 7002(a)(1)(B). Nonetheless, it is manifest that to properly give effect to the broad, Congressional remedial purposes embodied in **RCRA** § 7002(a)(1)(B), it is essential that federal common law govern the effect of private party "indemnification, hold harmless, or similar agreement or conveyances" (often made years or decades before the imposition of the retroactive federal remedial liability) on the federal, retroactive, remedial environmental and public health protection liability imposed by **RCRA** § 7002(a)(1)(B). A little more than three (3) years prior to the enactment of **RCRA** § 7002(a)(1)(B) in 1984, Congress articulated in its enactment of the retrospective, solely

remedial liability provision of **CERCLA** § 107(e), 42 U.S.C. § 9607(e), the principals of federal law that govern the effect of private party "indemnification, hold harmless, or similar agreement or conveyances" on the federal, retroactive, remedial environmental and public health protection liability imposed by **CERCLA** § 107(a):

> **(e) Indemnification, hold harmless, etc., agreements or conveyances; subrogation rights.**
>
> **(1) No indemnification, hold harmless, or similar agreement or conveyance shall be effective to transfer from the owner or operator of any vessel or facility or from any person who may be liable for a release or threat of release under this section, to any other person the liability imposed under this section.** Nothing in this subsection shall bar any agreement to insure, hold harmless, or indemnify a party to such agreement for any liability under this section.
>
> **(2)** Nothing in this title, including the provisions of paragraph (1) of this subsection, shall bar a cause of action that an owner or operator or any other person subject to liability under this section, or a guarantor, has or would have, by reason of subrogation or otherwise against any person.

Id. [Bolding emphasis added].

**243.**    Applying the legal principles set forth in **CERCLA** § 107(e) as the federal common law governing the effect of private party agreements to indemnify or convey liability on the retroactive, remedial environmental and public health protection provisions of **RCRA** § 7002(a)(1)(B), **EGFA's** conveyance on or before January 1, 1966 of all of its liabilities relating to or arising out of it coal mining operations and coal mining waste disposal practices, including, *inter alia,* those that occurred within the **Subject Watershed**, to its wholly owned subsidiary, **EACC**, is **ineffective** to relieve **EGFA** of the retroactive, remedial liability imposed upon it by **RCRA** § 7002(a)(1)(B) for its acts and omission with respect to its mining operations and mining waste disposal practices within the **Subject Watershed** and with respect to its status as the ***Owner and Operator*** of the **Subject Property** prior to January 1, 1966.

**244.**    Accordingly, **Remedial Defendant** National Grid NE Holdings 2 LLC, as the legal successor to the rights and liabilities of **EGFA**, is legally responsible for all remedial liability

imposed by **RCRA** § 7002(a)(1)(B)on **EGFA** for its acts and omission with respect to its mining operations and mining waste disposal practices within the **Subject Watershed** prior to January 1, 1966.

245.    Moreover, applying the legal principles set forth in **CERCLA** § 107(e) as the federal common law governing the effect of private party agreements to indemnify or convey liability on the retroactive, remedial environmental and public health protection provisions of **RCRA** § 7002(a)(1)(B), Nominal **Remedial Defendant EACC**, which assumed by contract all of the liabilities of **EGFA** relating to or arising out of it coal mining operations and coal mining waste disposal practices, *inter alia,* those that occurred within the **Subject Watershed** on or before January 1, 1966, is also legally responsible for all remedial liability imposed by **RCRA** § 7002(a)(1)(B), 42 U.S.C. § 6092(a)(1)(B), on **EGFA** for its acts and omission with respect to its mining operations and mining waste disposal practices within the **Subject Watershed** prior to January 1, 1966.

246.    **Remedial Defendant** National Grid NE Holdings 2 LLC (as successor to pre-1966 remedial liabilities of **EGFA**) is a "person" that by its (*i.e.,* **EGFA**'s) past operation of coal mining and coal mining waste disposal **Facilities** at the **Subject Property** has contributed to the past handling and **Disposal** of **Solid Wastes** and **Hazardous Wastes** at the **Subject Property** and within the **Subject Watershed**, which handling and **Disposal** has caused, contributed to, and is continuing to contribute to conditions at and emanating from the **Subject Property** that may present an imminent and substantial endangerment to health or the **Environment**.

247.    **Remedial Defendant** Quercus West Virginia, LLC is a "person" that, as the Owner of the Surface Estate appertaining the real property comprising the **EGFA/EACC Subject Property** upon the surface of which each of the four (4) unlined, surface piles of coal mining waste on that property exist, has, by both its past actions and **its continuing action** to allow the use of the surface

of that real property for the purpose of maintaining an illegal use of that real property[39] that may present an imminent and substantial endangerment to health or the **Environment** without making any effort to abate or require the abatement of that continuing endangerment, contributed to and is contributing to past and present handling of a **Solid Waste** and a **Hazardous Waste**.

248. The Federal Courts, in analyzing and applying the phrase "the past or present handling, storage, treatment, transportation, or disposal of any solid or hazardous waste which may present an imminent and substantial endangerment to health or the environment" within **RCRA** § 7002(a)(1)(B), 42 U.S.C. § 6972(a)(1)(B), have given the language of this remedial statute an expansive interpretation[40]:

(a) ___"may present"[41]___:  First, Federal Courts have consistently noted that the language of **RCRA** § 7002(a)(1)(B) includes the word "may" before the standard of liability.[42]  As held in a seminal decision of a United States District Court for the Eastern District of California:  "[t]his is expansive language, which is intended to confer upon the courts the authority to grant affirmative equitable relief to the extent necessary to eliminate any risk

---

[39]  W. Va. Code § 22-15-10(a), a General Law of West Virginia and a provision of the West Virginia Solid Waste Management Plan approved by the U.S. EPA pursuant to the Solid Waste Management Provisions of **RCRA** Subtitle D, 42 U.S.C. § 6943, prohibits any landowner in West Virginia from "allowing an open dump to exist on the landowner's property," subject only to exceptions not herein applicable.

[40]  *Liebhart* v. *SPX Corp.*, 917 F.3d 952 (7th Cir. WI 2019); *Goldfarb* v. *Mayor & City Council of Balt.*, 791 F.3d 500 (4th Cir. MD 2015); *Me. People's All.* v. *Mallinckrodt, Inc.*, 471 F.3d 277 (1st Cir. ME 2006); *Interfaith Cmty. Org.* v. *Honeywell Int'l, Inc.*, 399 F.3d 248 (3d Cir. NJ 2005); *United States* v. *Waste Indus., Inc.*, 734 F.2d 159, 165 (4th Cir. NC 1984) (rejecting the argument that "[§ 6972] was designed to control pollution only in emergency situations"); *Voggenthaler* v. *Md. Square, LLC*, 2010 U.S. Dist. LEXIS 74217 (D. Nev. 2010); *Lincoln Props. v. Higgins*, 1993 U.S. Dist. LEXIS 1251 (E.D. Cal. 1993) (Levi, J.).

[41]  Notably, Congress amended the original 1976 language of **RCRA** § 7002(a)(1)(B) in 1980 by substituting the phrase "may present" for the original 1976 wording "is presenting."  *Me. People's All., supra* at 287 (citing *Solid Waste Disposal Act of 1980*, *Pub. L. 96-482, § 25, 94 Stat. 2334, 2348*).

[42]  *Lincoln Properties, supra,*1993 WL 217429 * 13.

posed by toxic wastes."[43]  To the same effect, in the first major case interpreting **RCRA** § 7002(a)(1)(B) the Third Circuit emphasized that the statute "enhanced the courts' traditional equitable powers by authorizing the issuance of injunctions when there is but a risk of harm, a more lenient standard than the traditional requirement of threatened irreparable harm."[44]   Accordingly, a **RCRA** § 7002(a)(1)(B) plaintiff, like the **Governmental Plaintiff** herein, "need only demonstrate a potential risk of harm."[45]

(b) *"endangerment"*:  Second, the term "endangerment" has been consistently interpreted by the Federal Courts to mean "a threatened or potential harm and does not require proof of actual harm."[46].

(c) *"imminent"*:  Third, the vast majority of Federal Courts have endorsed the principle that "a finding of 'imminence' does not require a showing that actual harm will occur immediately so long as the risk of threatened harm is present."[47]  To the same effect: "An endangerment is 'imminent' if the factors giving rise to it are present, even though the harm may not be realized for years."[48]

(d) *"substantial"*:  Fourth and notably, the majority of Federal Courts have consistently held that "the word 'substantial' within **RCRA** § 7002(a)(1)(B) does not require quantification of the endangerment (*e.g.*, proof that a certain number of persons will be exposed, that

---

[43]  **Id** (internal quotations and citations omitted).

[44]  *United States v. Price*, 688 F.2d 204, 211 (3d Cir. NJ 1982).

[45]  *Liebhart*, *supra*; *Goldfarb, supra; Fairway Shoppes Joint Venture* v. *Dryclean U.S.A.*, 1996 U.S. Dist. LEXIS 22364, (S.D. Fla. 1996)

[46]  *Lincoln Properties, supra,* 1993 U.S. Dist. LEXIS 1251, 1993 WL 217429 at *12 (a) ("When one is endangered, harm is threatened; no actual injury need ever occur." (quoting *Ethyl Corp.* v. *Envtl. Prot. Agency*, 541 F.2d 1, 13 (D.C. Cir. 1976)).

[47]  **Id**; *see also, Liebhart*, *supra*; *Goldfarb, supra; United States v. Waste Indus., Inc., supra; Voggenthaler*, *supra*.

[48]  *Lincoln Properties, supra.*

'excess deaths' will occur, or that a water supply will be contaminated to a specific degree.")[49].  Instead, the "decisional precedent demonstrates that an endangerment is substantial if there is some reasonable cause for concern that someone or something may be exposed to a risk of harm by release or a threatened release of a hazardous substance if remedial action is not taken."[50]

(e)   ***"health or the environment"***:  Every Federal Court that has addressed the meaning of this phrase in the statute[51] has held to the effect that **RCRA** § 7002(a)(1)(B):

> speaks of endangerment to health or the environment.  The term "environment" appears to include air, soil and water. *See:*  [*Ethyl Corp.* v. *EPA*, 176 U.S. App. D.C. 373, 541 F.2d 1 (1976)]; see also 42 U.S.C. § 9601(8) (**CERCLA** definition of "environment" includes water, land and air).  **Neither the statute nor the caselaw interposes an additional requirement that humans or other life forms be threatened.**

*Lincoln Props.* v. *Higgins*, 1993 U.S. Dist. LEXIS 1251, *47 (E.D. Cal. 1993) (Levi, J.) [Bolding emphasis added].

**249.**   Although the vast majority of Federal Courts have held that in order to give effect to its remedial purposes, **RCRA** § 7002(a)(1)(B) should be given an expansive reading, when determining whether there is a risk of imminent and substantial endangerment in any given case, it is also well recognized by the Federal Courts that "injunctive relief should not be granted 'where

---

[49]  **Id** at p. 13; *See also, Liebhart, supra* ("[T]here is no requirement in *RCRA* for a plaintiff to make "a particular quantitative showing as a *sine qua non* for liability." citing *Interfaith, 399 F.3d at 260* and *Dague, 935 F.2d at 1356)*; *Goldfarb, supra; United States* v. *Waste Indus., Inc.; Voggenthaler*, *supra*.

[50]  *Lincoln Properties, supra; See also*:  *Liebhart*, *supra*; *Goldfarb, supra; United States* v. *Waste Indus., Inc., supra; Voggenthaler*, *supra*.

[51]  *Interfaith Cmty. Org.* v. *Honeywell Int'l, Inc.*, 399 F.3d 248 (3d Cir. NJ 2005), cert. denied, 545 U.S. 1129, (2005)

the risk of harm is remote in time, completely speculative in nature, or *de minimis* in degree."[52]

250.    The harms and the existing and threatened, future endangerments to health and the **Environment** at and emanating from the **EGFA/EACC Subject Property** caused or contributed to by **EGFA's** past handling and **Disposal** of **Solid Waste** and **Hazardous Waste** at and from each of the five (5) coal mining waste piles on the surface of the **Subject Property** alleged herein are **not:  (a)** remote in time, as they have been occurring for decades and are continuing to occur within the **Subject Watershed** to date,  **(b)** speculative, in that they have already contributed to the surface waters within the **Loop Creek Watershed** being classified as "Impaired" for purposes of the federal and State water pollution control acts and are continuing to adversely impact the quality and beneficial uses of those same waters; and **(c)** *de minimis*, in either degree or threatened longevity in the absence of urgently required abatement as evidenced by the pernicious impact of the toxic contaminants at issue over the course of the last three (3) decades on the ***Waters of the State*** within the **Subject Watershed**; a serious adverse impact to the **Environment** that is continuing to this very day.

251.    The harms and the existing and threatened future endangerments to health and the **Environment** at the **Subject Property** and within the **Subject Watershed** caused or contributed to by **Remedial Defendant** Quercus West Virginia's past and continuing **Disposal** of, **Solid Waste** and **Hazardous Waste** at and from each of the four (4) coal mining waste piles on the surface of the **EGFA/EACC Subject Property** alleged herein are **not:  (a)** remote in time, as they have been occurring for decades and are continuing to occur within the **Subject Watershed** to date,  **(b)** speculative, in that they have already contributed to the surface waters within the **Loop Creek Watershed** being classified as "Impaired" for purposes of the federal and State water

---

[52] *Lincoln Properties, supra* (quoting *United States* v. *Reilly Tar & Chem. Corp.*, 546 F. Supp. 1100, 1109 (D. Minn. 1982)).

pollution control acts and are continuing to adversely impact the quality and beneficial uses of those same waters; and **(c)** *de minimis*, in either degree or threatened longevity in the absence of urgently required abatement as evidenced by the pernicious impact of the toxic contaminants at issue over the course of the last three (3) decades on the ***Waters of the State*** within the **Subject Watershed**; a serious adverse impact to the **Environment** that is continuing to this very day.

**252.** **EGFA's** pre-1966 handling and **Disposal** of **Solid Waste** and **Hazardous Waste** at and from each of the five (5) unlined, coal mining waste piles on the surface of the **Subject Property** by illegally creating and allowing each of those **Open Dumps** to exist on the surface of that land have caused or contributed to, and by the ongoing effects of their past and present handling and **Disposal** of both **Solid Wastes** and **Hazardous Wastes** at and emanating from the **Subject Property,** continue to cause and contribute to, a condition within the **Subject Watershed** that: **(a)** has already produced actual harm to the **Environment** in the form of significant impairments to the quality and beneficial uses of surface and groundwaters within the **Subject Watershed**; **(b)** which may, and which the **Governmental Plaintiff** asserts demonstrably does, present a serious, substantial and very imminent, in fact, ongoing, endangerment to health or the **Environment** within the **Subject Watershed**; and **(c)** which may present an imminent and substantial endangerment to health or the **Environment** within the already WV § 303 Listed "Impaired" Watershed of Johnson Fork within this judicial district.

**253.** **Remedial Defendant** Quercus West Virginia's contributed to the past and current handling of **Solid Waste** and **Hazardous Waste** at and from each of the four (4) unlined, coal mining waste piles on the surface of the real property comprising the **EGFA/EACC Subject Property** by illegally allowing each of those **Open Dumps** to exist on the surface of that land during its currently on-going period of ownership of the Surface Rights appertaining to that land alleged herein have caused or contributed to, and by the ongoing effects of their past and

present handling and **Disposal** of both **Solid Wastes** and **Hazardous Wastes** at and emanating from the **Subject Property** continue to cause and contribute to, a condition within the **Subject Watershed** that: **(a)** has already produced actual harm to the **Environment** in the form of significant impairments to the quality and beneficial uses of surface and groundwaters within the **Subject Watershed**; **(b)** which may, and which the **Governmental Plaintiff** asserts demonstrably does, present a serious, substantial and very imminent, in fact, ongoing, endangerment to health or the **Environment** within the **Subject Watershed**; and **(c)** which may present an imminent and substantial endangerment to health or the **Environment** within the already WV § 303 Listed "Impaired" Watershed of Johnson Fork within this judicial district.

**254.**    Pursuant to **RCRA** § 7002(a)(1)(B), 42 U.S.C. § 6972(a)(1)(B), the **Governmental Plaintiff** is entitled to an Order of this Court requiring each of the **Remedial Defendants** National Grid NE Holdings 2, LLC (as the legal successor to the pre-1966 remedial liabilities of **EGFA**), Pardee and Curtin Realty LLC, and Quercus West Virginia, LLC, jointly and severally, and subject to appropriate oversight and monitoring by the Fayette Co. Code Enforcement Agency:

    **(a)**  to undertake at their sole cost a Remedial Investigation and Feasibility Study ("**RI/FS**") of the **Subject Watershed** in full compliance with the applicable requirements of the **NCP**,

    **(b)**  timely and competently to implement at their sole cost such immediate or interim removal or remedial actions as the Court may determine to be necessary and proper to appropriate abatement of any public nuisance condition(s) or imminent and substantial endangerments to health or the **Environment** within the **Subject Watershed**;

    **(c)**  following filing of the required final **RI/FS** report with this Court, and after conduct of such hearings as the Court determines to be appropriate, to timely and competently implement at their sole cost the Remedial Action Plan, if any, for the **Subject Watershed** selected and approved by the Court; and

    **(d)**  pursuant to Federal Rule of Civil Procedure 53 and in furtherance of the goals of timely and effective implementation of the complex and continuing, mandatory injunctive relief required herein in accord with the principles articulated in this Court's holding in *Ohio*

*Valley Envtl. Coal.* v. *Fola Coal Co., LLC*, Case No. 2:15-cv-01371 (S.D. WV) (Chamber, C.J.) (September 27, 2017 Order on Plaintiff's Motion for Appointment of a Special Master), to an Order of Reference to a Special Master appointed by this Court and authorized:

> **(i)**  to see to the timely and effective implementation of this Court's Orders;
>
> **(ii)**  to adjudicate in the first instance disputes between the parties regarding any of this Court's Orders and any requests for contempt sanctions, and
>
> **(iii)** to make a Report to the Court reflecting the Special Master's Findings of Fact, Conclusions of Law and Recommended Order; and

**(e)** to an award of the **Governmental Plaintiff's** costs of this litigation (including reasonable attorney and expert witness fees and expenses).

## COUNT THREE

### "CITIZEN SUIT" RELIEF TO COMPEL COMPLIANCE WITH THE MANDATORY NOTIFICATION PROVISIONS OF CERCLA § 111(g), BROUGHT PURSUANT TO CERCLA § 310(a)(1), 42 U.S.C. § 9659(a)(1)

(***Governmental Plaintiff*** *against* ***Remedial Defendant*** *Quercus West Virginia, LLC*)

**255.**  The **Governmental Plaintiff** incorporates in this Count each of the foregoing paragraphs of this Complaint, set forth above, as if fully set forth herein.

**256.**  CERCLA § 111(g), 42 U.S.C. § 9611(g), provides:

> **(g)  Notice to potential injured parties by owner and operator of vessel or facility causing release of substance; rules and regulations.**  The President shall provide for the promulgation of rules and regulations with respect to the notice to be provided to potential injured parties by an owner and operator of any vessel, or facility from which a hazardous substance has been released.  Such rules and regulations shall consider the scope and form of the notice which would be appropriate to carry out the purposes of this title.  Upon promulgation of such rules and regulations, the owner and operator of any vessel or facility from which a hazardous substance has been released shall provide notice in accordance with such rules and regulations.  With respect to releases from public vessels, the President shall provide such notification as is appropriate to potential injured parties.  **Until the promulgation of such rules and regulations, the owner and operator of any vessel or facility from which a hazardous substance has been released shall provide reasonable notice to potential injured parties by publication in local newspapers serving the affected area.**

**Id.** [Bolding emphasis added].

257.   **Remedial Defendant** Quercus West Virginia, LLC, as the current **Owner** of the Surface Estate appertaining to the **EGFA/EACC Subject Property** upon the surface of which the four southern-most of the five (5) known, coal mining waste piles on the **Subject Property** are located, has the legal authority and obligation[53] to abate or cause the abatement of those unlined surface piles of coal mining waste, each of which is a **Facility** and an **Open Dump**.

258.   **Remedial Defendant** Quercus West Virginia, LLC is the "owner and operator," within the meaning of that term in **CERCLA** § 111(g), of the real property upon the surface of which is located each of the four (4) coal waste disposal **Facilities** located on the **EGFA/EACC Subject Property**.

259.   **Hazardous Substances** have been and continue to be **Released** from each of the four (4) **Open Dumps** of coal mining waste on the **EGFA/EACC Subject Property**.

260.   On January 23, 1987 by Executive Order[54] expressly authorized by **CERLCA**[55], the President of the United States delegated his authority **under CERCLA** to promulgate the regulations required by the above-quoted provisions of **CERCLA** § 111(g) to the Administrator of the U.S. Environmental Protection Agency.  As of the date of this Complaint, the Administrator of U.S. EPA has not promulgated any regulations implementing the provisions of **CERCLA** § 111(g).  Accordingly, the provisions of the last sentence of **CERCLA** § 111(g) sets forth the current requirements of federal law under **CERCLA** § 111(g).

261.   Despite having received the **Governmental Plaintiff's** formal "Notice of Violation" of **CERCLA** § 111(g), a copy of which is attached hereto as **Exhibit 3**, sent on September 22, 2020, as of date of this Complaint, **Remedial Defendant** Quercus West Virginia, LLC has failed or

---

[53]  **RCRA** § 4005(a), 42 U.S.C. § 6945(a), and W. Va. Code § 22-15-10(a).

[54]  Sections 8(a) and (c) of Executive Order 12580, 52 Fed. Reg. 2923 (January 29, 1987)

[55]  **CERCLA** § 115, 42 U.S.C. § 9615

refused, and is continuing to fail or refuse, to publish the newspaper notification required by **CERCLA** § 111(g).

262.    Pursuant to **CERCLA** §§ 111(g) and 310(a)(1) and (c), 42 U.S.C. §§ 9611(g) and 9659(a)(1) and (c), the **Governmental Plaintiff** is entitled to:  **(i)** an Order of this Court requiring **Remedial Defendant** Quercus West Virginia, LLC forthwith to publish the notification required by **CERCLA** § 111(g) in compliance with the requirements of the last sentence of that section; and **(ii)** an award of its costs of litigation (including reasonable attorneys' and expert witness fees) incurred and to be incurred herein pursuant to **CERCLA** § 310(f), 42 U.S.C. § 9659(f).


**COUNT FOUR**:

**"CITIZEN SUIT" RELIEF PURSUANT TO THE FEDERAL CLEAN WATER ACT § 505, 33 U.S.C. § 1365, TO RESTRAIN THE ONGOING, ILLEGAL "DISCHARGES OF A POLLUTANTS" BY DEFENDANT QUERCUS WEST VIRGINIA, LLC WITHOUT THE REQUIRED NPDES PERMIT IN VIOLATION OF CLEAN WATER ACT §§ 311(a) & 402, AND TO IMPOSE A CIVIL PENALTY PAYABLE TO THE UNITED STATES FOR PAST VIOLATIONS**

(***Governmental Plaintiff*** *against* ***Remedial Defendant*** *Quercus West Virginia, LLC*)

263.    The **Governmental Plaintiff** incorporates and realleges the allegations set forth in the foregoing paragraphs as if fully set forth herein.

a.    **Illegal Discharges of Pollutants from a Point Source to Waters of the United States and Waters of the State of West Virginia without the Required National Pollutant Discharge Elimination System ("NPDES") Permit in Violation of CWA §§ 301(a) and 401, 33 U.S.C §§ 1312(a) and 1342:**

264.    Section 301(a) of the federal Clean Water Act ("**CWA**"), 33 U.S.C. § 1311(a), prohibits the **Discharge of a Pollutant**[56] by any **Person** into **Navigable Waters**, except in compliance with

---

[56]  **CWA** § 502(16), 33 U.S.C. § 1362(16) provides:

the terms and conditions of a permit, such as National Pollutant Discharge Elimination System ("NPDES") permit issued by U.S. EPA or an authorized state pursuant to **CWA** § 402, 33 U.S.C. § 1342.

**265.**   **CWA** §402(a), 33 U.S.C. § 1342(a), provides that the permit-issuing authority may issue a NPDES Permit that authorizes the discharge only if that discharge will meet all applicable requirements of the **CWA** and such other conditions as the permitting authority determines necessary to effectuate the provisions of the **CWA**.

**266.**   **CWA** § 303(a), 33 U.S.C. § 1313(a), requires that states adopt ambient water quality standards and establish water quality criteria for particular water bodies that will protect designated uses of the water.

**267.**   Acting pursuant to authority granted under **CWA** § 402(a)(2), 33 U.S.C. § 1342(a)(2), the Administrator of U.S. EPA has authorized WVDEP to issue NPDES permits. 47 Fed. Reg. 22363 (May 10, 1983).   The applicable West Virginia law regarding NPDES permits is the West Virginia Water Pollution Control Act. ("WVWPCA"), W.Va. Code, Chapter 22, Article 11.

**268.**   The Johnson Fork of Loop Creek within Fayette County, WV is **Navigable Water** within the meaning **CWA** §§ 301(a) and 502(7), 33 U.S.C. §§ 1311(a) and 1362(7), respectively, because each of them is a **Waters of the United States**[57].

---

The term **"discharge of a pollutant"** and the term **"discharges of pollutants"** each means **(A)** any addition of any pollutant to navigable waters from any point source, **(B)** any addition of any pollutant to the waters of the contiguous zone or the ocean from any point source other than a vessel or other floating craft.

[57] Consistent with their definition in the federal regulations duly promulgated by USEPA pursuant to its authority under the **CWA** and codified at 40 C.F.R. § 122.2, the terms **"Waters of the United States"** and **"Waters of the U.S."** as used herein each mean:

   **(a)** All waters which are currently used, were used in the past, or may be susceptible to use in interstate or foreign commerce, including all waters which are subject to the ebb and flow

269.    All four (4) of the unlined surface piles of coal mining waste located on the real property comprising the **EGFA/EACC Subject Property** are each a **Facility**, and are, together with the seeps from each of those **Open Dumps**, and the unlined drainage ditches and intermittent water channels leading from each of those surface piles of coal mining waste to the Johnson Fork of Loop Creek, each a **Point Source**[58].

270.    The **AMD** contaminants and **Leachate Discharged** from each of the four (4) unlined surface piles of coal mining waste located on real property comprising the **EGFA/EACC Subject**

---

of the tide;

**(b)** All interstate waters, including interstate "wetlands;"

**(c)** All other waters such as intrastate lakes, rivers, streams (including intermittent streams), mudflats, sandflats, "wetlands," sloughs, prairie potholes, wet meadows, playa lakes, or natural ponds the use, degradation, or destruction of which would affect or could affect interstate or foreign commerce including any such waters:

   **(1)** Which are or could be used by interstate or foreign travelers for recreational or other purposes;

   **(2)** From which fish or shellfish are or could be taken and sold in interstate or foreign commerce; or

   **(3)** Which are used or could be used for industrial purposes by industries in interstate commerce;

**(d)** All impoundments of waters otherwise defined as waters of the United States under this definition;

**(e)** Tributaries of waters identified in paragraphs (a) through (d) of this definition;

**(f)** The territorial sea; and

**(g)** "Wetlands" adjacent to waters (other than waters that are themselves wetlands) identified in paragraphs (a) through (f) of this definition.

Waste treatment systems, including treatment ponds or lagoons designed to meet the requirements of CWA (other than cooling ponds as defined in *40 C.F.R. § 423.11(m)* which also meet the criteria of this definition) are not waters of the United States.  This exclusion applies only to manmade bodies of water which neither were originally created in waters of the United States (such as disposal area in wetlands) nor resulted from the impoundment of waters of the United States.

[58]  **CWA** § 502(14), 33 U.S.C. § 1362(14) provides:

The term "**point source**" means any discernible, confined and discrete conveyance, **including but not limited to <u>any</u>** pipe, **ditch**, **channel**, tunnel, conduit, well, discrete fissure, container, rolling stock, concentrated animal feeding operation, or vessel or other floating craft, from which pollutants are or may be discharged.

**Id.** [Bolding and underlining emphasis added].

**Property** following virtually all precipitation events are **Pollutants**[59] and **Toxic Pollutants**[60] within the meaning of **CWA** §§ 311(a) and 402, 33 U.S.C. §§ 1311(a) and 1342.

271.     Since it first acquired the Surface Estate appertaining to the real property comprising the **EGFA/EACC Subject Property** upon which four (4) unlined, surface piles of coal mining waste are located, **Remedial Defendant** Quercus West Virginia, LLC has been allowing the **Discharge of Pollutants**, and is continuing to allow the **Discharge of Pollutants,** from and through seeps on the bottom and sides of each of those four (4) unlined surface piles of coal mining waste, which, when subjected to precipitation, **Discharge AMD Leachate** directly to ditches and intermittent stream channels that **Discharge** directly into the surface waters of the **Subject Watershed**.

272.     In addition to allowing the direct **Discharges of Pollutants** from each of the four (4) **Open Dumps** of coal mining waste on the surface of the real property comprising the **EGFA/EACC Subject Property** to the surface waters of the **Subject Watershed**, Defendant Quercus West Virginia, LLC has since it acquired the Surface Estate appertaining to the real property comprising the **EGFA/EACC Subject Property** been allowing the **Discharge**, and is currently continuing to allow the **Discharge,** of **Pollutants** from each of the unlined **Open Dumps**

---

[59]  **CWA** § 502(6), 33 U.S.C. § 1362(6), provides, in relevant part:

> The term "**pollutant**" means dredged spoil, **solid waste**, incinerator residue, sewage, garbage, sewage sludge, munitions, chemical wastes, biological materials, radioactive materials, heat, wrecked or discarded equipment, rock, sand, cellar dirt and industrial, municipal, and agricultural waste discharged into water.

[60]  **CWA** § 502(13), 22 U.S.C. § 1362(13), provides:

> The term "**toxic pollutant**" means those pollutants, or combinations of pollutants, including disease-causing agents, which after discharge and upon exposure, ingestion, inhalation or assimilation into any organism, either directly from the environment or indirectly by ingestion through food chains, will, on the basis of information available to the Administrator, cause death, disease, behavioral abnormalities, cancer, genetic mutations, physiological malfunctions (including malfunctions in reproduction) or physical deformations, in such organisms or their offspring.

of coal mining waste on the surface of the **EGFA/EACC Subject Property**, each of which is also a **Point Source** within the meaning of the **CWA**, via groundwater that is very proximate to and hydraulically connected to the surface waters of the **Subject Watershed**.  This past and ongoing discharge of **Pollutants** from each of those four (4) **Open Dumps** via groundwater to **Navigable Waters of the United States** that has been ongoing continuously throughout (and long before) the period of time **Remedial Defendant** Quercus West Virginia, LLC has owned the Surface Estate appertaining to the real property comprising the **EGFA/EACC Subject Property** is in every significant regard, non-exclusively including the unlined nature of each of those **Open Dumps**, all located proximate to the surface waters of the **Subject Watershed**, and the design and operation of those **Open Dumps** and unlined drainage ditches without any **Leachate** control, collection or compliant monitoring systems, the fairly minimal distances the polluted groundwater must travel to reach the surface waters of the **Subject Watershed** (varying from zero feet to a few hundred feet), and the high porosity and permeability of the soils through which the polluted groundwater must travel to reach the surface waters of the **Subject Watershed**, the "functional equivalent" of a direct **Discharge** of those **Pollutants** to those surface waters[61].

273.    **Remedial Defendant** Quercus West Virginia, LLC does not now have and never has had an NPDES permit issued by either U.S. EPA or the WVDEP authorizing the **Discharge of a Pollutant** from any of the unlined **Open Dumps** or unlined channels or drainage ditches at the **Subject Property** to surface waters within the **Subject Watershed**, or from those **Facilities** via groundwater to **Navigable Waters** within the **Subject Watershed**, specifically including the Johnson Fork-Loop Creek.

274.    Pursuant to **CWA** §§ 505(f)(1), (2) and (4), 33 U.S.C.§ 1365(f)(1), (2) and (4), the

---

[61] *See:  Cty. of Maui* v. *Haw. Wildlife Fund*, __ U.S. ___, 140 S. Ct. 1462, 2020 U.S. LEXIS 2410, 2020 WL 1941966 (2020).

prohibition of the unpermitted **Discharge of Pollutants** and **Toxic Pollutants** in **CWA** §§ 301(a) and 307, respectively, 33 U.S.C. §§ 1311 and 1317, are each an "effluent standard or limitation" for purposes of **CWA** § 505, 33 U.S.C. § 1365, and, thus, each of those prohibitions are enforceable pursuant to **CWA** § 505, 33 U.S.C. § 1365.

275.    Pursuant to **CWA** § § 505(a) and (d), the **Governmental Plaintiff** is entitled to: **(i)** an Order of this Court requiring **Remedial Defendant** Quercus West Virginia, LLC forthwith to cease and desist allowing the unpermitted, continuing **Discharge of Pollutants** without the required NPDES permit in violation of **CWA** § 311(a) and 402; and **(ii)** an award of its costs of litigation (including reasonable attorney and expert witness fees) incurred and to be incurred herein.

    **b.  Illegal Discharges of Stormwater Associated with Industrial Activity to Waters of the United States and Waters of the State of West Virginia without the Required Stormwater Discharge Permit in Violation of CWA §§ 301(a) and 402(p):**

276.    The **Governmental Plaintiff** incorporates and realleges the allegations set forth in the foregoing paragraphs as if fully set forth herein.

277.    In **CWA** § 402(p)(4)(A), 33 U.S.C. § 1342(p)(4)(A), Congress authorized and instructed the Administrator of U.S. EPA to "establish regulations setting forth the permit requirements for stormwater discharges [associated with industrial activity]." The U.S. EPA Administrator did so, and the resulting duly promulgated regulations are codified at 40 C.F.R. § 122.26 and became effective in November 1990.

278.    Each of the four (4) unlined, **Open Dumps** of coal mining waste on the surface of the real property comprising the **EGFA/EACC Subject Property** is an **Open Dump** that has received industrial waste from facilities, including active coal mining operations, described in 40 C.F.R. § 122.26(b)(14), all within the meaning of 40 C.F.R.§ 122.26(b)(14)(v).

279.    Stormwater at and flowing from each of the four (4) unlined, **Open Dumps** of coal mining waste on the surface of the real property comprising the **EGFA/EACC Subject Property** is not controlled or treated and infiltrates through the **Solid Wastes** and **Hazardous Wastes** disposed of at each of those four (4) unlined, **Open Dumps** of coal mining waste, and is then collected and **Discharged** via channels and drainage ditches formed by the uncontrolled **Runoff** from, and directly associated with, each of those four (4) unlined, **Open Dumps** of coal mining waste that collect that Stormwater **Runoff** from each of those **Open Dumps** and conveys it directly to the surface waters of the **Subject Watershed**.

280.    The Stormwater **Discharged** from each of the four (4) unlined, **Open Dumps** of coal mining waste on the surface of the real property comprising the **EGFA/EACC Subject Property** via the channels and drainage ditches directly associated with each such **Open Dump** is a Stormwater **Discharge** associated with industrial activity defined in 40 C.F.R. § 122.26(b)(14).

281.    Each Stormwater **Discharge** via the channels and drainage ditches directly associated with each of the four (4) unlined, **Open Dumps** of coal mining waste on the surface of the real property comprising the **EGFA/EACC Subject Property** is a **Discharge** of Stormwater that has been contaminated by contact with, or that has come in contact with, waste products located at each of those **Open Dumps**.

282.    **Runoff** occurrence at each of the four (4) unlined, **Open Dumps** of coal mining waste on the surface of the real property comprising the **EGFA/EACC Subject Property** is highly variable as there are many factors that determine whether precipitation will "soak in" and infiltrate into the subsurface, **Runoff** across the surface, or both.   **Runoff** will cross the surface of each such **Open Dump** into both channels and drainage ditches and infiltrate into the subsurface, some part of such infiltration then **Discharging** from seeps at each such **Open Dump** back to the surface of the site and then **Runoff** as **Leachate** into one of the channels or drainage ditches directly associated with each such **Open Dump**.

283.    Determining factors affecting Stormwater **Discharge** from each of the four (4) unlined, **Open Dumps** of coal mining waste on the surface of the real property comprising the **EGFA/EACC Subject Property** include, but are not limited to, soil types, slopes, vegetative cover, and antecedent soil moisture from preceding precipitation events.  The precise adverse environmental impacts of no two precipitation events will be identical.

284.    Generally and to a reasonable degree of engineering certainty, **Runoff** from each of the four (4) unlined, **Open Dumps** of coal mining waste on the surface of the real property comprising the **EGFA/EACC Subject Property** will occur during precipitation events that have intensities and durations described as 1-year recurrence interval events by the National Oceanic and Atmospheric Administration (NOAA) in their Point Precipitation Frequency Estimates for Oak Hill, WV (https://hdsc.nws.noaa.gov/hdsc/pfds/pfds_map_cont.html?bkmrk=va).    For example, the 1-year recurrence interval, 24-hr precipitation event for the Oak Hill, WV area is 2.15 inches.

285.    **Runoff** from each of the four (4) unlined, **Open Dumps** of coal mining waste on the surface of the real property comprising the **EGFA/EACC Subject Property** will usually occur at precipitation amounts of less than the 1-year recurrence interval, 24-hr precipitation event for the Oak Hill, WV area.

286.    WVDEP requires that stormwater best management practices address 1-inch of precipitation in a 24-hr period events for stormwater runoff control (Stormwater Management and Design Guidance Manual).

287.    To provide dates for some events that, absent extraordinary circumstances (which to the best of the **Governmental Plaintiff's** knowledge and belief were not then present and did not occur), would have resulted in stormwater **Runoff** from each of the four (4) unlined, **Open Dumps** of coal mining waste on the surface of the real property comprising the **EGFA/EACC Subject Property** into the channels and drainage ditches directly associated with each of those **Open Dumps** and from those channels and ditches into surface waters of the **Subject Watershed**, the Fayette Co. Code Enforcement

Agency reviewed NOAA daily data from 1 January, 2021 to 1 January, 2022 for Glen Jean, WV – data

that is in the public domain and equally available to Defendants. Precipitation events of 1.5-inches or

more in a 24 hour period – events that would have resulted in such runoff – are:

| DATE | PRECIP IN 24 HRS. |
|------|-------------------|
| 3/1/21 | 2.35 inches |
| 7/8/21 | 1.5 inches |

**288.** Such **Discharges** of Stormwater associated with industrial activity from each of the four

(4) unlined, **Open Dumps** of coal mining waste on the surface of the real property comprising the

**EGFA/EACC Subject Property** have occurred at least on every day during the past 30 years on

which there has **been** rainfall in Johnson Fork, Fayette County, WV exceeding 1.5 inches during

any 24-hour period.

**289.** Since it first acquired the Surface Estate to the real property comprising the

**EGFA/EACC Subject Property** in 2013, **Remedial Defendant** Quercus West Virginia, LLC has

been required to have a stormwater discharge permit for each of the four (4) unlined, **Open Dumps**

of coal mining waste on the surface of the real property comprising the **EGFA/EACC Subject**

**Property** pursuant to the terms of **CWA** § 402(p), 33 U.S.C. § 1342(p) and its implementing

regulations.

**290.** **Remedial Defendant** Quercus West Virginia, LLC does not now have, never has had,

and has never applied for a stormwater discharge permit from either U.S. EPA or WVDEP

allowing it to **Discharge** collected stormwater from any of the four (4) unlined, **Open Dumps** of

coal mining waste on the surface of the real property comprising the **EGFA/EACC Subject**

**Property** to surface waters of the **Subject Watershed**.

**291.** Notwithstanding the facts alleged herein, **Remedial Defendant** Quercus West Virginia,

LLC has for more than a decade been allowing the illegal **Discharge** of, and continues to allow

the illegal **Discharge** of, "stormwater associated with industrial activity" from each of the four (4)

unlined, **Open Dumps** of coal mining waste on the surface of the real property comprising the **EGFA/EACC Subject Property** to Navigable Waters without the permit and controls required by **CWA** §§ 301(a) and 402(p) and its implementing regulations.

292.    **Remedial Defendant** Quercus West Virginia, LLC's illegal **Discharges** of Storm Water Associated with Industrial Activity have adversely impacted and continue adversely to impact:  **(a)** the Public Health, Safety, Welfare and the **Environment** within and emanating from the **Subject Watershed** and **(b)** the beneficial uses of *Natural Resources* within Fayette Co. held in Public Trust, adding *Toxic* **Pollutants and Contaminants** to the waters of the **Subject Watershed**.

293.    Pursuant to **CWA** § 505(f)(1) and (2), 33 U.S.C.§ 1365(f)(1) and (2), the prohibition of unpermitted **Discharges** of Storm Water Associated with Industrial Activities set forth in **CWA** §§ 301(a) and 402(p), respectively, 33 U.S.C. §§ 1311 and 1342(p), are each an "effluent standard or limitation" for purposes of **CWA** § 505, 33 U.S.C. § 1365, and, thus, enforceable pursuant to **CWA** § 505, 33 U.S.C. § 1365.

294.    By reason of **Remedial Defendant** Quercus West Virginia, LLC's ongoing violations of **CWA** §§ 311(a) and 402(a) and (p), 33 U.S.C. §§ 1311(a) and 1342(p), the **Governmental Plaintiff** is entitled to a permanent injunction under CWA § 505, 33 U.S.C. § 1365, ordering **Remedial Defendant** Quercus West Virginia, LLC to:  **(i)** forthwith cease its unpermitted, illegal **Discharge of Pollutants** and its illegal, unpermitted discharges of Stormwater Associated with Industrial Activity from each of the four (4) unlined, **Open Dumps** of coal mining waste on the surface of the real property comprising the **EGFA/EACC Subject Property** to Navigable Waters without the permits required by the **CWA**; and **(ii)** competently and timely to investigate and abate in compliance with the requirement of the **National Contingency Plan** the ongoing endangerments to Navigable Waters that is continuing to be caused by existing contamination of sediments within surface waterways of and downgradient from the **Subject Watershed** resulting

from **Remedial Defendant** Quercus West Virginia, LLC's illegal **Discharges** of **Pollutants** and

Stormwater Associated with Industrial Activities from those four (4) **Open Dumps** of coal mining

waste; and **(iii)** to pay to the United States Treasury an appropriate civil penalty for its violations

of **CWA** §§ 311(a) and 402(p).

## COUNT FIVE:

### JUDICIAL ABATEMENT OF A CONTINUING *PER SE* PUBLIC NUISANCE DECLARED BY THE WEST VIRGINIA SOLID WASTE MANAGEMENT ACT AND THE WEST VIRGINIA SOLID WASTE MANAGEMENT RULE

(*Governmental Plaintiff against all Remedial Defendants*)

**295.**   The **Governmental Plaintiff** incorporates in this Count each of the foregoing

paragraphs of this Complaint, set forth above, as if fully repeated herein.

### a.   The Public Nuisance Doctrine under West Virginia Law:  *Per Se* Public Nuisances:

**296.**   Article II, Section 2 of the West Virginia Constitution provides that <u>all</u> of the powers of

government are resident in the Citizens of the State of West Virginia "and can be rightfully

exercised only in accordance with their will and appointment."

**297.**   Pursuant to Article III, Section 3 of the Constitution of the State of West Virginia, the

government of the State of West Virginia is instituted by the Citizens of West Virginia and vested

with <u>all</u> of their powers as Sovereigns "for the "common benefit, protection and security of the

people, nation or community:"  Most prominent among those powers inherent in the Sovereignty

of those citizens and vested by them in their State government are the "Police Powers" of the

State, meaning the inherent power of a Sovereign to protect the Public Health, Safety, Welfare

and the **Environment** for the benefit of present and future generations of the Public:

> The police power of the state is the power of government inherent in every
> sovereignty to enact laws, within constitutional limits, to promote the general
> welfare of its citizens. *Farley v. Graney*, 146 W.Va. 22, pt. 5 syl., 119 S.E.2d 833;

> *Nulter v. State Road Commission*, pt. 2 syl., 119 W.Va. 312, 193 S.E. 549 (194 S.E. 270); *City of Huntington v. State Water Commission*, 137 W.Va. 786, pt. 3 syl., 73 S.E.2d 833. The police power is difficult to define because it is so extensive, elastic and constantly evolving to meet the new and increasing demands for its exercise for the benefit of society. It embraces the power of the state to preserve and promote the public welfare and it is concerned with whatever affects the peace, security, morals, health and general welfare of the community. **'The exercise of the police power cannot be circumscribed within narrow limits nor can it be confined to precedents resting on conditions of the past. As civilization becomes more complex and advancements are made the police power of necessity must develop and expand to meet such conditions.'** *Farley v. Graney*, 146 W.Va. 22, 36, 119 S.E.2d 833, 842.

*State ex rel. Appalachian Power Co.* v. *Gainer*, 149 W. Va. 740, (1965), [Bolding emphasis added].

298.    The principles of constitutional and common law that form the **<u>remedial arm</u>** of the Sovereign's "Police Powers," which is to say the set of expansive legal authorities that govern the inherent power of the Sovereign States within our federal Republic to **ABATE** <u>anything</u> that impermissibly and unreasonably endangers the Public Health, Safety, Welfare or the Environment, or impermissibly and unreasonably impairs the beneficial uses of any *Natural Resource* held in Public Trust for the benefit of present and future generations of the Public, is referred to as the "Public Nuisance Doctrine." Those acts or conditions that present or may present such impermissible and unreasonable endangerments or impairments to the Public or any substantial number of persons are referred to by the common law and statutes of West Virginia as each being a "Public Nuisance". *State ex rel. Smith* v. *Kermit Lumber & Pressure Treating Co.*, 200 W. Va. 221, 245, 488 S.E.2d 901, 925 (1997) ("A public nuisance action usually seeks to have some harm which affects the public health and safety abated. Thus, until such harm is abated, the Public Nuisance is continuing, and the statute of limitations does not accrue.").

299.    The West Virginia Supreme Court of Appeals has recognized that inherent in the "police powers" of a sovereign state at common law is the power to declare by legislative action those acts, omissions and conditions that present unacceptable risks to the public health, safety, welfare or the **Environment** to be a Public Nuisance, and to prohibit and require appropriate abatement of

the same. *State ex rel. Dyer* v. *Sims*, 134 W Va. 278 (1950).

300.    The United States Supreme Court has recognized the fundamental and essential nature

of the "police powers" of a state to afford adequate protection of the public health, safety and

welfare:

> **Although the police power of a state cannot be arbitrarily exercised, it is
> to be remembered that it is one of the most essential powers of
> government, <u>one that is the least limitable</u>.** It may, indeed, seem harsh in
> its exercise, and usually is harsh on some individual. **But the imperative
> necessity for its existence precludes any limitation upon it when not
> exerted arbitrarily.**

*Hadacheck* v. *Sebastian,* 239 U.S. 394, Syllabus # 1 (1915) (Emphasis added).

301.    Because of its origin and continuing primacy among the inherent "Police Powers" of the

Sovereign State, it long has been and remains a fundamental principle of the common law of Public

Nuisance in West Virginia that the power to bring and prosecute a Public Nuisance Abatement

action generally lies only with public prosecutors authorized by law to bring the claims of the

Sovereign State, and such other public officials as may be authorized by law. *Id.* at p. 241.

("Ordinarily, a suit to abate a public nuisance cannot be maintained by an individual in his private

capacity, as it is the duty of the proper public officials to vindicate the rights of the public.").

302.    Under West Virginia law, when an act, omission or condition is declared to be a danger

to the public health, safety or welfare (*i.e.,* a Public Nuisance) by a provision of a General Law of

the State or by a provision of local legislation (*i.e.,* a duly adopted county or municipal ordinance)

authorized by a General Law of the State, unless a court determines that such legislation was

enacted arbitrarily or in violation of an express constitutional provision, it is the responsibility of

the court to:  **(a)** determine if the act, omission or condition at issue is, in fact, governed by the

language of the duly enacted legislation before it; and, **(b)** if the act, omission or condition is within

the ambit of what has been declared to be a Public Nuisance by such duly enacted legislation, to

order the appropriate abatement of the Public Nuisance so as fully to effect the remedial purposes

of such "police power" legislation. *Sharron Steel Corp.* v *City of Fairmont*, 175 W. Va. 479 at 488-489 (1985); *State* v. *Wender*, 149 W. Va. 413 (1965), *overruled on other grounds, Hartsock-Flesher Candy Co.* v. *Wheeling Wholesale Grocery Co., 174 W. Va. 538* (1984).

> **b.   The Very Existence of Open Dumps within West Virginia Is Prohibited by the General Law of West Virginia and Expressly Declared to be a "Public Nuisance and a Clear and Present Danger to People":**

303.   W. Va. Code § 22-15-l0(a), a provision of the West Virginia Solid Waste Management Act, provides, in relevant part:

> **(a) Open dumps are prohibited and it is unlawful for any person to create, contribute to, or operate an open dump <u>or for any landowner to allow an open dump to exist on the landowner's property</u>** unless that open dump is under a compliance schedule approved by the director.  The compliance schedule shall contain an enforceable sequence of actions leading to compliance and shall not exceed two years. . . .

**Id**. (Bolding and underlining emphasis added).

304.   By enactment of W. Va. Code § 22-15-1(c)(1), a part of the WV Solid Waste Management Act, the State of West Virginia joined with the United States[62] in emphatically condemning and prohibiting **Open Dumps** and other "improper solid waste disposal:

> **(c)** The Legislature further finds that solid waste disposal has inherent risks and negative impact on local communities and specifically finds the following:  **(1) Uncontrolled, inadequately controlled and improper collection, transportation, processing and disposal of solid waste is a public nuisance and a clear and present danger to people**; . . .

W. Va. Code § 22-15-1(c) [Bolding emphasis added].

305.   Because creating, contributing to, or operating an **Open Dumps** in West Virginia on or after the effective date of W. Va. Code § 22-15-10(a) is expressly prohibited by that prospective, regulatory provisions of the General Law of West Virginia, which also prospectively prohibits

---

[62]   *See:*  **RCRA** §§ 1003(a)(3), 4003(a)(3) and 4005(a), 42 U.S.C. §§ 6902(a)(3), 6943(a)(3) and 6945(a).

every landowner in West Virginia (that is not party to a "compliance schedule with the WVDEP Cabinet Secretary) from allowing an **Open Dump** to exist on its land within West Virginia, any currently existing **Open Dump** (not subject to a "compliance schedule with the WVDEP Cabinet Secretary) within West Virginia on or after the effective date of W. Va. Code § 22-15-10 necessarily constitutes an instance of the "inadequately controlled and improper (*i.e.,* expressly illegal) disposal of solid waste" within the meaning of W. Va. Code § 22-15-1(c)(1). Accordingly, **each and every Open Dump (not subject to a "compliance schedule with the WVDEP Cabinet Secretary) now existing within West Virginia is <u>always and everywhere a Public Nuisance</u> and an instance of a "clear and present danger to people," unless such Open Dump is under a compliance schedule approved pursuant to the WV Solid Waste Management Act, W. Va. Code Chapter 22, Article 15, and its implementing rules, the West Virginia Solid Waste Management Rule, W. Va. C.S.R., Chapter 33, Series 1.**

306.  In order to assure that West Virginia law complies with the "minimum requirements" for a federally-approvable State Solid Waste Plan set forth in **RCRA** § 4003(a)(3)[63], which expressly requires that state law provide for the "upgrading of all existing open dumps [*i.e.,* not just those created or operating on after the effective date of W. Va. Code 22-15-10]," the West Virginia Legislature, exercising its patent authority under the Public Nuisance Doctrine inherent in the sovereignty of the State of West Virginia, declared in W. Va. § 22-15-1(c) that each existing

---

[63]  **RCRA** § 4003(a), 42 U.S.C. § 6943(a), provides, in relevant part:

> **(a) Minimum requirements.** In order to be approved under section 4007, each State plan must comply with the following **minimum requirements**—
>
> * * *        * * *        * * *        * * *        * * *
>
> **(3) The plan shall provide for the closing or upgrading of all existing open dumps within the State pursuant to the requirements of section 4005**.
> **(4)** The plan shall provide for the establishment of such State regulatory powers as may be necessary to implement the plan.

instance in West Virginia of the "**Uncontrolled, inadequately controlled and improper collection, transportation, processing and disposal of solid waste is a public nuisance and a clear and present danger to people.**" By so doing, the W. Va. Legislature expressly invoked the full remedial power of the Public Nuisance Doctrine in W. Va. law to secure the appropriate abatement of "all existing open dumps" within West Virginia from all those **Persons** (*i.e.,* all persons who created, caused, contributed to or maintained the public nuisance condition) who bear the retrospective, purely remedial liability that is and has always been the hallmark of the Public Nuisance Doctrine under Anglo-American law.

307.   Each of the five (5) coal mining waste piles on the surface of the **Subject Property** was initially created by **EGFA's Disposal** of **Solid Waste**, as that term is defined in W. Va. Code § 22-15-2(31)[64] because the contents of each of those waste piles were at the time of **Disposal** and remain now "discarded materials resulting from mining operations" and because the acts of discarding and the materials discarded in each of those waste piles was not at the time of **Disposal** and has never been "in compliance with a permit issued pursuant to W.Va. Code Chapters 22, 22A or 22b. *See:* W. Va. Code § 22-15-2(31).

308.   Each of the five (5) surface piles of coal mining waste of the surface of the **Subject Property** is an instance of **Solid Waste Disposal** "in a manner that does not protect the environment," within the meaning of that phrase as used in W. Va. Code § 22-15-2(23) because each of those surface piles of coal mining waste were designed and constructed, and have been continuously operated without a **Liner** and without any associated **Leachate** collection or monitoring systems  Accordingly, each of the five (5) surface pile of coal mining waste on the surface of the **Subject Property** is an **Open Dump** as defined by W. Va. Code § 22-15-2(23) and a "Public Nuisance and clear and present danger to people" as declared by W. Va.

---

[64] See:  Section **IV(w)** of this Amended Complaint, *supra.*

Code § 22-15-1(c)(1).

**309.** Each of the five (5) surface piles of coal mining waste of the surface of the **Subject Property** are not now, and never have been, a "permitted **Solid Waste Facility** in West Virginia, as that term in used in the West Virginia Solid Waste Management Act, W. Va. Code, Chapter 22, Article 15, and in the WV Solid Waste Management Rule, W. Va. C.S.R., Chapter 33, Series 1.

**310.** The West Virginia Solid Waste Management Act, W. Va. Code § 22-15-5(a), authorizes the Cabinet Secretary of the **WVDEP** to promulgate Legislative Rules to implement the WV Solid Waste Management Act. Those Legislative Rules have been promulgated in compliance with the WV Administrative Procedures Act and are codified as the "West Virginia Solid Waste Management Rule" at W. Va. C.S.R., Chapter 33, Series 1.

**311.** The WV Solid Waste Management Rule, W. Va. C.S.R. § 33-1-1.6 provides, in relevant part:

> **1.6.** **Lawful Disposal of Solid Waste Required**. -- Solid waste must be disposed, processed, stored, transferred, or recycled only at permitted solid waste facilities as described in this rule, and in compliance with W. Va. Code §22C-4-10 [now codified at W. Va. Code § 22-15-10].
>
> **1.6.a.** The discharge, deposit, injection, dumping, **spilling**, **leaking**, burning, burying, or otherwise placing of any solid waste or **leachate** into or on any land or water so that such solid waste or any constituent thereof may enter the environment or be emitted into the air, or discharged into any waters, including groundwaters, is prohibited unless specifically authorized by a permit or permits from the Department.
>
> **1.6.b. Solid waste facilities or activities failing to satisfy this subsection are considered open dumps**, as defined in section 2, and will be subject to the actions and penalties outlined in W. Va. Code §22-15-15.

**Id.** [Bolding Emphasis added]. To the same effect, the West Virginia Solid Waste Management Rule, W. Va. C.S.R. § 33-1-7.2 provides, in relevant part:

> **7.2. Protection of the Environment and the Public**.
>
> **7.2.a. Any site at which the following protective measures have not been instituted will be classified as an open dump:**
>
> **7.2.a.1. Measures must be taken to prevent the discharge of pollutants from the accumulated waste into the waters of the State (*e.g.*, measures to**

>prevent runoff into surface water bodies or the infiltration of leachates into local aquifers);

**Id.** [Bolding emphasis added.]

312.    Each of the five (5) unlined surface pile of coal mining waste on the surface of the **Subject Property** have since each of their creation leaked, and continue to the present to leak, **Solid Waste** and **Leachate** into **and** on land at and adjoining each waste pile **and** into water at and downgradient of each waste pile water so that such **Solid Waste** from each such waste pile **and** the constituents thereof may be, and, in fact, are, discharged into *Waters of the State*, including groundwater.  Accordingly, each of the five (5) unlined surface pile of coal mining waste on the surface of the **Subject Property** is an **Open Dump** pursuant to the WV Solid Waste Management Rule, W. Va. C.S.R. §§ 33-1-1.6(b) and 33-1-7.2 and, therefore, each such waste pile is by express edict of the West Virginia Legislature both an instance of the "improper disposal of solid waste" within the meaning of, and a "public nuisance and clear and present danger to people" pursuant to, W. Va. Code § 22-15-1(c)(1).

313.    The WV Solid Waste Management Act, W. Va. Code § 22-15-10(a) and the WV Solid Waste Management Rule, W. Va. C.S.R. § 33-1-1.6 provides, in relevant part:  "**no landowner may allow an open dump to exist on his or her property, unless such open dump is under a compliance schedule approved by the Secretary.**"  [Bolding emphasis added].

314.    Under the common law of West Virginia, **EGFA**, as the entity that created each of the five (5) **Open Dumps** of coal mining waste within the **Subject Watershed** is strictly liable to the **Governmental Plaintiff**, jointly and severally, for the proper abatement of the *Per Se* Public Nuisances it created within Fayette Co., to wit, each of the five (5) **Open Dumps** of mining waste on the surface of the **Subject Property**.

315.    Because **EGFA** created each of those five (5) **Open Dumps** within the **Subject Watershed** prior to 1963, **Remedial Defendant** National Grid NE Holdings 2 LLC, the corporate

successor to the pre-1966 remedial liabilities of **EGFA** imposed by applicable law, non-exclusively including the West Virginia common law of Public Nuisance **FCoWV Public Nuisance Ordinance**, is strictly liable, jointly and severally, for the proper abatement of each of those five (5) **Open Dumps**.

316.  The Restatement (Second) of Torts repeatedly has been cited by the West Virginia Supreme Court of Appeals as articulative of the common law of West Virginia on Nuisance law matters.[65]  The Restatement (Second) of Torts § 821B defines a public nuisance as "an unreasonable interference with a right common to the general public."

317.  Under the common law of West Virginia, Nominal **Remedial Defendant EACC** is strictly liable to the **Governmental Plaintiff**, jointly and severally, for the proper abatement of the *Per Se* Public Nuisances that it contributed to, maintained, and failed or refused to abate during its period of fee simple ownership of the **Subject Property**, to wit, each of the five (5) **Open Dumps** of mining waste on the surface of the **Subject Property**.

318.  Under the common law of West Virginia, Nominal **Remedial Defendant EACC** and **Remedial Defendant** Pardee and Curtin Realty LLC are each strictly liable to the **Governmental Plaintiff**, jointly and severally, for the proper abatement of the *Per Se* Public Nuisances that it contributed to, maintained, and failed or refused to abate during its respective period of ownership of the Surface Estate appertaining to the **EGFA/EACC Subject Property** upon the surface of which four (4) of the **Open Dumps** of mining waste are located.

319.  Under the common law of West Virginia, **Remedial Defendant** Quercus West Virginia, LLC, as the current owner of the Surface Estate appertaining to the **EGFA/EACC Subject Property** within the **Subject Watershed** upon the surface of which four (4) of the **Open Dumps**

---

[65] *Hedricks* v. *Stalnaker*, 181 W. Va. 31 (1989); *Duff* v. *Morgantown Energy Ass'n.*, 187 W. Va. 712 (1992).

of mining waste are located, is strictly liable to the **Governmental Plaintiff**, jointly and severally, for the proper abatement of the *Per Se **Public Nuisances*** that it contributed to, maintained, and failed or refused, and is continuing to fail or refuse, to abate during its period of such ownership, to wit, each of those four (4) **Open Dumps** on the surface of the **Subject Watershed**.

**COUNT SIX**:

**JUDICIAL ABATEMENT OF A CONTINUING *PER SE* PUBLIC NUISANCES DECLARED BY SECTION V OF FAYETTE CO. ORDINANCE NO. 2018-001, PURSUANT TO SECTION XXII OF THAT ORDINANCE, AND RELATED DECLARATORY RELIEF**

(***Governmental Plaintiff*** *Against the* **Remedial Defendants** *Separately Named in Each Subsection of this Count*)

**320.**    The **Governmental Plaintiff** incorporates in this Count each of the foregoing paragraphs of this Complaint, set forth above, as if fully set forth herein.

**321.**    Pursuant to W. Va. Code § 7-1-3, a General Law of West Virginia, the **Governmental Plaintiff** herein, the County Commission of Fayette County, West Virginia, is vested "under rules prescribed by law" with superintendence of the internal "police" (*i.e.,* public protection) and fiscal affairs of Fayette County, a political subdivision of the State of West Virginia.

**322.**    In exercise of the express authority to enact ordinances conveyed to it by W. Va. Code §§ 7-1-3, 7-1-3ff[66] and 7-1-3kk[67], on August 17, 2018, the **Governmental Plaintiff**, the County Commission of Fayette County, West Virginia, following its conduct of several public meetings regarding the proposed Ordinance, duly enacted Fayette County Ordinance 2018-001 entitled "The Fayette County Comprehensive Public Nuisance Abatement Ordinance", an official, verified copy of which is attached hereto as **Exhibit 1** and incorporated herein. Notably, as it

---

[66]  Quoted in Section **V(b)** of this Complaint, ¶ 22, *supra*.

[67]  Quoted in Section **V(b)** of this Complaint, ¶ 21, *supra*.

pertains to the present, continuing Public Nuisance conditions and endangerments to the **Environment** alleged herein, the **FCoWV Public Nuisance Ordinance**, particularly Section **IX(b)** thereof, seeks to implement investigatory and remedial measures regarding ***Public Nuisances*** within Fayette County involving **Released Toxic Wastes** or **Hazardous Substances** which, to the greatest degree possible, are not inconsistent with the procedures and requirements of the National Oil and Hazardous Substance Pollution Contingency Plan, 40 C.F.R., Part 300, the national "roadmap"[68] for the proper investigation and abatement of harms and risks to human health or the **Environment** arising from such **Released Hazardous Substances** or **Pollutants and Contaminants**.

323.    In Section **V** of the **FCoWV Public Nuisance Ordinance**, the County Commission of Fayette County exercised its authority to declare by Ordinance the acts, omissions and occurrences that are a ***Public Nuisance*** within Fayette County.   In Section **VI** of the Ordinance, the Co. Commission of Fayette County carefully defined the nature and extent of the ***Public Nuisance*** Abatement liability imposed by the **FCoWV Public Nuisance Ordinance**.

324.    ***Standard of Liability under the FCoWV Public Nuisance Ordinance***:  Section **VI(e)** of the **FCoWV Public Nuisance Ordinance** provides:  "Unless otherwise expressly indicated, the standard of civil liability imposed by this Ordinance is strict liability, without regard to any element of *mens rea,* fault, negligence, knowledge, or other wrongdoing."

325.    ***Scope of Liability under the FCoWV Public Nuisance Ordinance:***  Section **VI(f)** of

---

[68]  The Federal Courts have repeatedly described the **NCP** as the "federal roadmap" to be followed in the course of conducting appropriate site **Remedial Investigation** and site clean-up actions with respect to **Released Hazardous Substances** and **Pollutants and Contaminants**.  *See:  New York* v. *Adamowicz*, 16 F. Supp. 3d 123 (2nd Cir. NY 2014); *Raytheon Constructors, Inc.* v. *ASARCO Inc.*, 2000 U.S. Dist. LEXIS 6069, 2000 WL 1635482 (D. CO 2000), reversed in part on other grounds, *Raytheon Constructors* v. *Asarco Inc.*, 368 F.3d 1214 (10th Cir. CO 2003); *Town of Halfmoon* v. *GE*, 105 F. Supp. 3d 202 (N.D. NY 2015);  *MPM Silicones, LLC* v. *Union Carbide Corp.*, 931 F. Supp. 2d 387 (N.D. NY 2013).

the **FCoWV Public Nuisance Ordinance** provides:

> **Scope of civil liability**:  When two or more ***Persons*** liable for a ***Public Nuisance*** declared pursuant to this Ordinance or any other ordinance of Fayette County, which Public Nuisance presents or imminently threatens to present a single, indivisible harm to the Public Health, Safety, Welfare, or the ***Environment***, or to any beneficial use within Fayette County of any ***Natural Resource***, for which there is no reasonable and reliable basis for apportioning among those liable or potentially liable ***Persons*** the harm presented or imminently threatened by the ***Public Nuisance***, each such Person shall be jointly and severally liable for appropriate abatement of the Public Nuisance, reimbursement to the County of all ***Abatement Action Costs*** incurred and to be incurred by Fayette County with respect to such ***Public Nuisance***, and for all nuisance and natural resource damages to which the County may be entitled by law.  Any potentially liable party seeking to apportion such harm must prove by a preponderance of the evidence that:
>> **(1)** the component of the harm which is sought to be apportioned is scientifically and technologically susceptible to reasonable and reliable apportionment;
>> **(2)** that there is a reasonable and practicable basis for apportioning the harm; and
>> **(3)** that the separate abatement activity proposed for that harm or portion of the harm is at least as practicable, safe, efficient, reliable and cost-effective in providing the degree of protection of the Public Health, Safety, Welfare, and the Environment as the abatement activity or activities, if any, proposed by the County.

326.  ***Effect of Indemnification, Hold Harmless, etc. Agreements; Subrogation Rights under the FCoWV Public Nuisance Ordinance***:  Section **VI(i)** of the **FCoWV Public Nuisance Ordinance** provides:

> **(i)**  **Effect of indemnification, hold harmless, etc., agreements; subrogation rights:**
>> **(1)** No indemnification, hold harmless, or similar agreement or conveyance shall be effective to transfer from the ***Owner or Operator*** of any ***Facility*** or from any ***Person*** who may be liable for a **Public Nuisance** under this Ordinance, to any other ***Person*** the liability imposed under this Ordinance.  Nothing in this subsection **(i)** shall bar any agreement to insure, hold harmless, or indemnify a patty to such agreement for any liability under this Ordinance.
>> **(2)** Nothing in this Ordinance, including the provisions of paragraph **(1)** of this subsection **(i)**, shall bar a cause of action that an ***Owner or Operator*** or any other ***Person*** subject to liability under this section, or a guarantor, has or would have, by reason of subrogation or otherwise against any ***Person***.

Accordingly, **Remedial Defendant National Grid** (as the corporate successor to the pre-1966 remedial liabilities of **EGFA**, specifically including those imposed on it by the **FCoWV Public**

**Nuisance Ordinance)** is liable to the **Governmental Plaintiff** with respect to the remedial liability imposed by the **FCoWV Public Nuisance Ordinance** on **EGFA** for its acts, omissions at, and status with respect to, the **Subject Property** that occurred prior to January 1, 1966.

327.    The past and continuing **Releases** of **Hazardous Wastes**, **Hazardous Substances**. **Solid Wastes**, and **Toxic Pollutants and Contaminants** from the five (5) unlined **Open Dumps** of mining waste on the surface of the **Subject Property** into the groundwater and surface waters within the **Subject Watershed** has caused or contributed to, and is continuing to cause and contribute to, a condition in the groundwater and connected surface waters within the **Subject Watershed** that:  **(i)** impairs the quality and beneficial uses of *Natural Resources* held in public trust for the use and benefit of present and future generations of the Public; and **(ii)** has been declared in Sections **V(a)(6)**, **(8)**, **(10)** and **(17)** of the **FCoWV Public Nuisance Ordinance** duly adopted by the Fayette Co. Commission following several public hearings, exercising authority expressly granted to it by W. Va. Code §§ 7-1-3 and 7-1-3kk, declaring by Ordinance each of those conditions resulting from those **Open Dumps** to be a *Public Nuisance* in Fayette County, WV.

328.    Adverse impacts on the quality of the groundwater and surface water resources within the **Subject Watershed** caused or contributed to by the past and on-going **Release(s)** into the groundwater environment of high levels of **Hazardous Substances**, **Hazardous Wastes**, **Solid Wastes**, and **Toxic Pollutants and Contaminants** from the illegal **Open Dumps** on the **Subject Property** continuously since their original creation and maintenance by **EGFA** and Nominal **Remedial Defendant EACC**, have resulted, and are continuing to result, in the loss of beneficial uses of these surface water and groundwater resources, specifically including the ability to use those water resources as a public drinking water supply without incurring excessive treatment costs; a condition constituting a *Public Nuisance* under the common law of West Virginia and declared to be a *Public Nuisance* by Section **V(a)(5)** of the **FCoWV Public Nuisance Ordinance**.

329.    Adverse impacts on the quality of the groundwater and surface water resources within the **Subject Watershed** caused or contributed to by the past and on-going **Release(s)** into the groundwater environment of high levels of **Hazardous Substances**, **Hazardous Wastes**, **Solid Wastes**, and **Toxic Pollutants and Contaminants** from the four (4) illegal **Open Dumps** of mining waste located on the surface of the **EGFA/EACC Subject Property** within the **Subject Watershed** that have been maintained by each of **Remedial Defendants** Pardee and Curtin Realty LLC and Quercus West Virginia, LLC continuously throughout each of their respective periods of ownership of the Surface Rights appertaining to that real property, have resulted, and are continuing to result, in the loss of beneficial uses of these surface water and groundwater resources, specifically including the ability to use those water resources as a public drinking water supply without incurring excessive treatment costs; a condition constituting a *Public Nuisance* under the common law of West Virginia and declared to be a *Public Nuisance* by Section **V(a)(5)** of the **FCoWV Public Nuisance Ordinance**.

330.    These past and ongoing **Releases** of **Hazardous Substances**, **Hazardous Wastes**, **Solid Wastes**, and **Toxic Pollutants and Contaminants** from the illegal **Open Dumps** on the **Subject Property** have contributed and are contributing to an *Imminent* and *Substantial Endangerment* to health and the **Environment** within the **Subject Watershed**. This contamination has comingled within the **Subject Watershed** with like **Hazardous Substances**, **Hazardous Wastes**, **Solid Wastes**, and **Toxic Pollutants and Contaminants** from mining **Facilities** owned or operated by other mining companies or resulting from previous **Release** from those **Open Dumps** during the time of their ownership or control by one the previous **Remedial Defendants**/**Owners** within the **Subject Watershed** to form a single, indivisible imminent and substantial endangerment of and harm to the Public Health, Safety, Welfare and the **Environment** within Fayette County for which there exists no reasonable and reliable basis for apportioning among those contributing *Persons*

the harm presented or imminently threatened by the ***Public Nuisance***, and which contamination has caused and is continuing to cause degradation of groundwater, surface waters, and sediment to the point that they can no longer meet their designated uses under the federal Clean Water Act.

331.   **EGFA**, Nominal **Remedial Defendants EACC**, and **Remedial Defendants** Pardee and Curtin Realty LLC and Quercus West Virginia, LLC have by their act and omissions with respect to, and by their failure or refusal to abate or cause the abatement of, the past and continuing **Release** of **Hazardous Substances** and ***Toxic Pollutants and Contaminants*** from each of the four (4) **Open Dumps** of mining waste on the surface of the **EGFA/EACC Subject Property** within the **Subject Watershed** adversely impacted the healthfulness, chemical and biological integrity and beneficial uses of the ***Natural Resource***s within the **Subject Watershed** in Fayette County and waters within that Watershed appear on the WV § 303(d) list of "impaired waters."   The **Governmental Plaintiff** asserts that these past and on-going **Releases** of **Hazardous Substances** and ***Toxic Pollutants and Contaminants*** into the ***Environment*** from Mining ***Facilities*** and the four (4) **Open Dumps** of mining waste located on the surface of the **EGFA/EACC Subject Property** have caused or contributed to the "impaired waters' status of surface waters within the **Subject Watershed**.

   a.   **Abatement of a *Public Nuisance* Declared in Section V(b) of FCoWV Public Nuisance Ordinance – The Five (5) Open Dumps on the Surface of Land within the Subject Watershed Are a *Per Se* Public Nuisance Pursuant to the West Virginia Solid Waste Management Act, W. Va. Code §§ 22-15-1(c)(1), and Are, Therefore, Each a *Public Nuisance* Pursuant to Section V(b) of the FCoWV Public Nuisance Ordinance:**

   *(Asserted against Remedial Defendant National Grid, Nominal Remedial Defendant EACC, and Remedial Defendants Pardee & Curtin Realty LLC and Quercus West Virginia, LLC)*

332.   Section **V(b)** of the **FCoWV Public Nuisance Ordinance** provides:

   **(b)** The nuisances described and declared in Section **V(a)** of this Ordinance are not intended to be, and shall not be construed as, exclusive, **and any act of commission or omission, and any condition which constitutes a nuisance by statute or**

**common law of the State of West Virginia, when committed, omitted or existing within Fayette County, is declared to constitute a *Public Nuisance*.**

Id. [Bolding emphasis added].

333.    Because each of the five (5) **Open Dumps** of mining waste on the surface of the **Subject Property**, as an existing instance of the "improper disposal of a Solid Waste" is a "Public Nuisance and clear and present danger to people" pursuant to express declaration of the West Virginia Legislature in the West Virginia Solid Waste Management Act, W. Va. Code § 22-15-1(c)(1), each of those **Open Dumps** is also a *Public Nuisance* in Fayette County declared by Section **V(b)** of the **FCoWV Public Nuisance Ordinance**.

334.    Because **EGFA** is a *Person* that created the *Public Nuisances* under Section **V(b)** described in the preceding paragraph of this Complaint by its pre-1966 acts in connection with its mining operations in the **Subject Watershed**, it is jointly and severally liable for the remedial relief imposed by the Ordinance required properly to abate that *Public Nuisance* pursuant to Sections **VI(a)(1)(A) and (B)**[69] of the Ordinance.  Consequently, **Remedial Defendant** National

---

[69]   Sections **VI(a)(1)** through **(9)** of the **FCoWV Public Nuisance Ordinance** define the *Persons* that are liable for the *Public Nuisances* declared in Section **V** of the Ordinance.  Sections **VI(a)(1-9)(A)** through **(F)** define the nature and extent of the remedial liability imposed by the Ordinance. Section **VI(a)(1)(A)** and **(B)** provide:

> **(a) Civil Liability for Abatement of a Public Nuisance; Recovery of Abatement Action Costs:**  Notwithstanding any other provision of county or municipal law within Fayette County, and subject only to the affirmative defenses set forth in subsection **(b)** of this Section **VI**, --
>> **(1)** Any **Person** that creates, has caused or created, or threatens imminently to cause or create a *Public Nuisance* [as defined in Section **V** of the Ordinance] within Fayette County;
>
> ***        ***        ***        ***        ***
>
> is liable for:
>> **(A)** timely and effective performance at their cost of all **Abatement Actions** required by this Ordinance appropriately to address, or respond to, or abate the **Public Nuisance** within Fayette County that is, or may be, presented in whole or in part, directly or indirectly, by their act or omission;

---

Grid NE Holdings 2 LLC (as the corporate successor to the pre-1966 remedial liability imposed on **EGFA** and retained by **EGFA** pursuant to Section **VI(g)** of the **FCoWV Public Nuisance Ordinance**) is jointly and severally liable to the **Governmental Plaintiff** pursuant to Sections **V(b)** and **VI(a)(1)(A), (B)** and **(i)** of the **FCoWV Public Nuisance Ordinance** for: **(i)** all *Abatement Action* required properly to abate that *Public Nuisance* in compliance with that Ordinance; and **(ii)** timely reimbursement of all *Abatement Action Costs* incurred and to be incurred to secure proper abatement of that *Public Nuisance* in compliance with that Ordinance.

335.    **EGFA**, Nominal **Remedial Defendant EACC**, and **Remedial Defendants** Pardee and Curtin Realty LLC and Quercus West Virginia are each a *Person* that, during the existence of four (4) **Open Dumps** of coal mining waste on the surface of the real property comprising the **EGFA/EACC Subject Property,** each owned the **EGFA/EACC Subject Property** (or the Surface Estate appertaining to the real property comprising the **EGFA/EACC Subject Property**) at or on which a **Public Nuisance** was being maintained within Fayette County, and, that, regardless of actual knowledge of the existence or nature of the nuisance condition, failed or refused appropriately to abate the **Public Nuisance**.  Because each of those five (5) *Public Nuisance* conditions continue to exist within Fayette County unabated as of the date of this Complaint, R**emedial Defendant** National Grid (as successor to the pre-1966 remedial liabilities of **EGFA**), Nominal **Remedial Defendant EACC**, and **Remedial Defendants** Pardee and Curtin Realty LLC and Quercus West Virginia, LLC are each jointly and severally liable to the

---

**(B)** timely reimbursement to Fayette County of all **Abatement Action Costs** incurred or to be incurred by the County with respect to such Public Nuisance, non-exclusively including all **Abatement Action Costs** incurred by Fayette County to unde1take, or to cause or compel any **Responsible Party** or **Potentially Responsible Party** to undertake, any **Abatement Action** in compliance with the requirements of this Ordinance, regardless of whether those costs are incurred prior to, during or following enactment of this Ordinance;

**Governmental Plaintiff** pursuant to Sections **V(b)** and **VI(a)(4)(A), (B)** and **(d)**[70] of the **FCoWV Public Nuisance Ordinance** for:  **(i)** all *Abatement Action* required properly to abate that *Public Nuisance* in compliance with that Ordinance; and **(ii)** timely reimbursement of all *Abatement Action Costs* incurred and to be incurred by Fayette County to secure proper abatement of that *Public Nuisance* in compliance with the Ordinance.

> **b.** **Abatement of a *Public Nuisance* Declared in Section V(a)(17) of the FCoWV Public Nuisance Ordinance – Knowingly Permitting the Use of Property within Fayette County for an Illegal Act or Activity:**
>
> *(Asserted against Nominal Remedial Defendant EACC, and Remedial Defendants Pardee & Curtin Realty LLC and Quercus West Virginia, LLC)*

336.    Section **V(a)(17)** of the **FCoWV Public Nuisance Ordinance** provides:

> **(a)** Each of the following are hereby defined and declared to be a **Public Nuisance**, and each day any of the following acts, omissions are committed, or conditions maintained or allowed to exist within Fayette County shall constitute a separate offense:
>
> ***        ***        ***        ***        ***
>
> **(17)** knowingly allowing any illegal activity on, or knowingly permitting the use for any illegal activity, act, or omission of, any property within Fayette County.

337.    During some or all of the time period Nominal **Remedial Defendant EACC** and **Remedial Defendants** Pardee and Curtin Realty LLC and Quercus West Virginia, LLC each owned the **EGFA/EACC Subject Property** (or the Surface Estate appertaining to the real property comprising the **EGFA/EACC Subject Property**) within Fayette County at or on the surface of which four (4) **Open Dumps** of mining waste were and are located, either or both

---

[70] Section **VI(d)** of the **FCoWV Public Nuisance Ordinance** provides:

> **Liability of subsequent owner or operator**:  A subsequent owner of, or *Person* controlling, any real or personal property or *Facility* described in subsection **VI(a)(4)** shall be liable to the same extent as the *Person* who owned or controlled such *Facility* at the time when such *Public Nuisance* was created, contributed to, or maintained, so long as such *Public Nuisance* or any *Endangerment* of the Public Health, Safety, Welfare, or the *Environment* within Fayette County resulting, in whole or in part, from such *Public Nuisance* remains unabated.

**RCRA** § 4005(a), 42 U.S.C. § 6945(a)[71], and applicable West Virginia law[72] prohibited any landowner in West Virginia from allowing an **Open Dump** (not subject to a compliance schedule approved by the Cabinet Secretary of the **WVDEP**) to exist on the landowner's property.

338.   Each of Nominal **Remedial Defendant EACC**, and **Remedial Defendants** Pardee and Curtin Realty LLC and Quercus West Virginia, LLC *Knowingly*, as that term is defined in Section **III(x)**[73] of the **FCoWV Public Nuisance Ordinance,** permitted **Open Dumps** to exist on the **EGFA/EACC Subject Property** during the time each of them owned that real property (or the Surface Estate appertaining to the real property comprising the **EGFA/EACC Subject Property**) in violation of West Virginia law.  Accordingly, Nominal **Remedial Defendant EACC**, and **Remedial Defendants** Pardee and Curtin Realty LLC and Quercus West Virginia, LLC are each jointly and severally liable to the Governmental Plaintiff pursuant to Sections **V(a)(17)** and **VI(a)(4)(A), (B)** and **(d)**[74] of the **FCoWV Public Nuisance Ordinance** for:  **(i)** all *Abatement*

---

[71]   Pursuant to its express terms, **RCRA** § 4005(a) became effective upon the promulgation of the standards now set forth in 40 C.F.R., Part 257.  In turn, pursuant to 40 C.F.R. § 257.4, those standards became effective on October 15, 1979.  Accordingly, **RCRA** § 4005(a) also took effect on October 15, 1979.

[72]   W. Va. Code § 22-15-10(a) and its prior codified versions, the effective dates of which date back to at least to 1986.

[73]   Section **III(x)** of the **FCoWV Public Nuisance Ordinance** defines the term "knowingly" as used in that Ordinance as follows**:**

   **(x)** The term **"Knowingly"** imports only a knowledge that the facts exist which brings the act, omission, or condition within the any applicable provision of this Ordinance.  As used in this Ordinance, the term does not require any knowledge of the unlawfulness of such act or omission, nor does it require any knowledge of any requirement in law that a **Person** affirmatively conduct any inquiry or assessment; however, for purposes of this Ordinance, a **Person** acts knowingly if he proceeds without knowledge of any fact which the law, including this Ordinance, imposes an affirmative obligation to know or ascertain.

[74]   Section **VI(d)** of the **FCoWV Public Nuisance Ordinance** provides:

   **Liability of subsequent owner or operator**: A subsequent owner of, or **Person** controlling, any real or personal property or *Facility* described in subsection **VI(a)(4)** of shall be liable to the same extent as the **Person** who owned or controlled such *Facility* at the time when such **Public Nuisance** was created, contributed to, or maintained, so long as such **Public Nuisance**

---

*Action* required properly to abate that ***Public Nuisance*** in compliance with that Ordinance; and **(ii)** timely reimbursement of all ***Abatement Action Costs*** incurred and to be incurred to secure proper abatement of that ***Public Nuisance*** in compliance with the Ordinance.

    **c.**   **Abatement of a *Public Nuisance* Declared in Section V(a)(5) of the FCoWV Public Nuisance Ordinance – Release of a Hazardous Substance within Fayette County which Impairs within Fayette County the Beneficial Uses of *Natural Resources*, including *Waters of the State*:**

*(Asserted against Remedial Defendant National Grid, Nominal Remedial Defendant EACC, and Remedial Defendants Pardee & Curtin Realty LLC and Quercus West Virginia, LLC)*

**339.**   Section **V(a)(5)** of the **FCoWV Public Nuisance Ordinance** provides:

   **(a)** Each of the following are hereby defined and declared to be a **Public Nuisance,** and each day any of the following acts, omissions are committed, or conditions maintained or allowed to exist within Fayette County shall constitute a separate offense:

            \*\*\*       \*\*\*       \*\*\*       \*\*\*       \*\*\*

   **(5)** the ***Release*** into the ***Environment*** within Fayette County of any ***Hazardous Substance***, which presents, or which may present, an **Imminent** and ***Substantial Endangerment*** to the Public Health, Safety, Welfare, or the ***Environment***, or which is detrimental to or impairs any beneficial uses within Fayette County of any ***Natural Resource.***

**340.**   The existence, since the day of creation of each of the five (5) unlined **Open Dumps** without any **Leachate** control or collection system on the surface of land within the **Subject Watershed** has resulted, and is continuing to result in the **Release** into the **Environment** within Fayette County of **Hazardous Substances** which are detrimental to, or impair, and which, in fact, have impaired continuously since the creation of those **Open Dumps,** the beneficial uses within Fayette County of ***Natural Resource***; to wit, the surface waters and groundwater within the **Subject Watershed**; all within the meaning of Section **V(a)(5)** of the **FCoWV Public Nuisance**

---

or any ***Endangerment*** of the Public Health, Safety, Welfare, or the ***Environment*** within Fayette County resulting, in whole or in part, from such ***Public Nuisance*** remains unabated.

**Ordinance**.  Accordingly each of the five (5) unlined **Open Dumps** on the surface of land within the **Subject Watershed** is a *Public Nuisance* lawfully declared by Section **V(a)(5)** of the **FCoWV Public Nuisance Ordinance** and, therefore, a *Per Se* Public Nuisance under the common law of West Virginia.

341.  Because:  **(a) EGFA** is a *Person* that first created the five (5) Open Dumps of coal mining waste withing the **Subject Watershed**, and, therefore, is the **Person** that first created the *Public Nuisance* under Section **V(a)(5)** described in the preceding paragraph of this Complaint by its pre-1966 acts in connection with its mining operations and mining waste disposal practices in the **Subject Watershed**; and **(b)** the continuing **Releases** of **Hazardous Substances** from each of the five (5) **Open Dumps** on the surface of the **Subject Property** prior to 1966 then contributed to the impairment of the beneficial uses of the *Waters of the State* within the **Subject Watershed** and are contributing the current impairment of the beneficial uses of those same Waters, **EGFA** is jointly and severally liable for the remedial relief imposed by the Ordinance required properly to abate that *Public Nuisance* pursuant to Sections **V(a)(5)** and **VI(a)(1)(A)** and **(B)** of the Ordinance.  Consequently, **Remedial Defendant** National Grid NE Holdings 2 LLC (as the corporate successor to the pre-1966 remedial liability imposed on **EGFA** arising out of its mining and mine waste disposal operations in the **Subject Watershed** and retained by **EGFA** pursuant to applicable law, non-exclusively including Section **VI(i)** of the **FCoWV Public Nuisance Ordinance)** is jointly and severally liable to the **Governmental Plaintiff** pursuant to Sections **V(a)(5)** and **VI(a)(1)(A), (B)** and **(i)** of the **FCoWV Public Nuisance Ordinance** for:  **(i)** all *Abatement Action* required properly to abate that *Public Nuisance* in compliance with that Ordinance; and **(ii)** timely reimbursement of all *Abatement Action Costs* incurred and to be incurred to secure abatement of that *Public Nuisance* in compliance with the Ordinance.

342.  Nominal **Remedial Defendant EACC**, and **Remedial Defendants** Pardee and Curtin

Realty LLC and Quercus West Virginia are each a **Person** that, during the existence of four (4) **Open Dumps** of coal mining waste on the surface of the **EGFA/EACC Subject Property**, owned the **EGFA/EACC Subject Property** (or the Surface Estate appertaining to the real property comprising the **EGFA/EACC Subject Property**) on the surface of which all of those four (4) **Open Dumps** are located at or on which the **Releases** of **Hazardous Substances** was ongoing and the **Public Nuisance** declared in Section **V(a)(5)** was being maintained within Fayette County, and, who, regardless of actual knowledge of the existence or nature of the nuisance condition, failed or refused appropriately to abate the **Public Nuisance**. Because each of those four (4) **Open Dump/*Public Nuisance*** conditions continue to exist within Fayette County unabated as of the date of this Complaint, Nominal **Remedial Defendants EACC**, and **Remedial Defendants** Pardee and Curtin Realty LLC and Quercus West Virginia, LLC are each jointly and severally liable to the **Governmental Plaintiff** pursuant to Sections **V(a)(5)** and **VI(a)(4)(A), (B)** of the **FCoWV Public Nuisance Ordinance** for: **(i)** all ***Abatement Action*** required properly to abate that ***Public Nuisance*** in compliance with that Ordinance; and **(ii)** timely reimbursement of all ***Abatement Action Costs*** incurred and to be incurred to secure proper abatement of that ***Public Nuisance*** in compliance with the Ordinance.

    **d.** **Abatement of a *Public Nuisance* Declared in Section V(a)(10), Subparagraph (6) of the FCoWV Public Nuisance Ordinance – Release or Disposal of any Hazardous Waste, Hazardous Substances, Waste, or Pollutant or Contaminant at or Emanating from Any *Facility* which Causes, or Contributes to the Presence in any *Waters of the State* within Fayette County of any Pollutant or Contaminant at Elevated Levels that May Present a Significant, Adverse Impact to the Chemical, Physical, Hydrologic, or Biological Components of Any Impacted Aquatic Ecosystems:**

*(Asserted against Remedial Defendant National Grid, Nominal Remedial Defendant EACC, and Remedial Defendants Pardee & Curtin Realty LLC and Quercus West Virginia, LLC)*

**343.** Section **V(a)(10)**, **Subparagraph (6)** of the **FCoWV Public Nuisance Ordinance** provides, in relevant part:

**(a)** Each of the following are hereby defined and declared to be a **Public Nuisance,** and each day any of the following acts, omissions are committed, or conditions maintained or allowed to exist within Fayette County shall constitute a separate offense:

***       ***       ***       ***       ***

**(10)** the **Release** or **Disposal** of any **Hazardous Waste, Hazardous Substances, Waste,** or **Pollutant or Contaminant** at, under, or emanating from any ***Facility*** which causes, creates, or contributes to any of the following conditions within Fayette County:

***       ***       ***       ***       ***

**(6)** the presence in any ***Waters of the State*** within Fayette County of any ***Pollutant or Contaminant*** at elevated levels that may present a significant, adverse impact to the chemical, physical, hydrologic, or biological components of any impacted aquatic ecosystems or drinking water source, . . .

**344.** The manganese compounds that have been released, that are being released, and that threaten imminently to be released into the groundwater and connected surface waters within the **Subject Watershed** at least in part from each of the five (5) unlined **Open Dumps/Facilities** on the **Subject Property** are a "**Hazardous Waste**" as that term is defined in Section **III(u)(1)(2)** of the **FCoWV Public Nuisance Ordinance**.

**345.** The total iron and total manganese that have been released, that are being released, and that threaten imminently to be released into the groundwater and connected surface waters within the **Subject Watershed** at least in part from each of the five (5) unlined **Open Dumps/Facilities** on the **Subject Property** are each a "**Waste**" as that term is defined in Section **III(ww)** of the **FCoWV Public Nuisance Ordinance**.

**346.** The presence of levels of iron in the groundwater at and downgradient of the five (5) **Open Dumps/Facilities** on the **Subject Property** at levels in excess of 300 μg/L of total iron in groundwater is a continuing ***Public Nuisance*** in Fayette County declared by the County Commission of Fayette County in Section **V(a)(10), subparagraph (6)(vi)** of the **FCoWV Public Nuisance Ordinance** because that condition was caused or contributed to by the "**Release**" or "**Disposal**" of a "**Waste**" or **Leachate** at, under or emanating from each of the five (5) **Open**

**Dumps/Facilities** on the **Subject Property** in Fayette County.

347.    The presence of levels of manganese in the groundwater within the **Subject Watershed** at and downgradient of the five (5) **Open Dumps/Facilities** on the **Subject Property** at levels in excess of 50 μg/L of total manganese in groundwater is a ***Public Nuisance*** in Fayette County declared by the Co. Commission of Fayette County in Section **V(a)(10)**, **subparagraph (6)(iii)** of the **FCoWV Public Nuisance Ordinance** because that condition was caused or contributed to by the **Release** or **Disposal** of either or both a "**Hazardous Waste**" and a "**Solid Waste**" at, under or emanating from each of the five (5) **Open Dumps/Facilities** on the **Subject Property** in Fayette County.

348.    Continuously since the date of the original creation of each of the five (5) **Open Dumps** of coal mining waste within the **Subject Watershed** each such **Open Dump** has been Releasing, and each is continuing to **Release**, **Hazardous Waste**, **Hazardous Substances**, **Solid Wastes and Pollutants and Contaminants** into the ***Waters of the State***, including the groundwaters, within the **Subject Watershed**, thereby causing and contributing to the presence within ***Waters of the State*** within that Watershed of **Pollutants or Contaminants,** including Iron, Cadmium, Manganese, Arsenic, and Beryllium at elevated levels that may present, and, in fact do present, a significant, adverse impact to the chemical and biological components of the aquatic ecosystem within the **Subject Watershed**.  Accordingly each of the five (5) unlined **Open Dump Facilities** on the surface of land within the **Subject Watershed** is a ***Public Nuisance*** lawfully declared by Section **V(a)(10)**, **Subparagraph (6)** of the **FCoWV Public Nuisance Ordinance** and, therefore, a *Per Se* Public Nuisance under the common law of West Virginia.

349.    Because **EGFA** is the ***Person*** that first created and contributed to the ***Public Nuisance*** under Section **V(a)(10), Subparagraph (6)** described in the preceding paragraph of this Complaint by its pre-1966 acts in connection with its mining operations in the **Subject Watershed**,

it is jointly and severally liable for the remedial relief imposed by the Ordinance required properly to abate that *Public Nuisance* pursuant to Sections **V(a)(10), Subparagraph (6)** and **VI(a)(1)(A) and (B)** of the Ordinance.   Consequently, **Remedial Defendant** National Grid NE Holdings 2 LLC (as the corporate successor to the pre 1966 remedial liability imposed on and retained by **EGFA** pursuant to applicable law, non-exclusively including Section **VI(i)** of the **FCoWV Public Nuisance Ordinance**) is jointly and severally liable to the **Governmental Plaintiff** pursuant to Sections **V(a)(10)**, **Subparagraph (6)** and **VI(a)(1)(A), (B)** and **(i)** of the **FCoWV Public Nuisance Ordinance** for:   **(i)** all *Abatement Action* required properly to abate that *Public Nuisance* in compliance with that Ordinance; and **(ii)** timely reimbursement of all *Abatement Action Costs* incurred and to be incurred to secure proper abatement of that *Public Nuisance* in compliance with the Ordinance.

350.   **Remedial Defendant** National Grid (as successor in interest to **EGFA's** pre-1966 remedial liabilities arising out of or relating to its coal mining activities on the **EGFA/EACC Subject Property**), Nominal **Remedial Defendant EACC**, and **Remedial Defendants** Pardee and Curtin Realty LLC and Quercus West Virginia, LLC are each a ***Person*** that, during the existence of five (5) **Open Dumps** of coal mining waste on the surface of the **Subject Watershed,** owned the **EGFA/EACC Subject Property** (or the Surface Estate appertaining to the real property on the surface of which four (4) of the **Open Dumps** are located) during the time periods that the **Releases** of **Hazardous Waste**, **Hazardous Substances**, **Solid Wastes** and **Pollutants and Contaminants** into the *Waters of the State*, including the groundwaters, within the **Subject Watershed** causing and contributing to the presence within *Waters of the State* within that Watershed of **Pollutants or Contaminants,** including Iron, Cadmium, Manganese, Arsenic, and Beryllium at elevated levels that may present, and, in fact do present, a significant, adverse impact to the chemical and biological components of the aquatic ecosystem within the **Subject**

**Watershed** was ongoing, and the **Public Nuisance** declared in Section **V(a)(10), Subparagraph (6)** was being maintained within Fayette County, and, who, regardless of actual knowledge of the existence or nature of the nuisance condition, failed or refused appropriately to abate the **Public Nuisance**.  Because each of the four (4) **Open Dumps/*Public Nuisance*** conditions continue to exist on the surface of the real property comprising the **EGFA/EACC Subject Property** within Fayette County unabated as of the date of this Complaint, **Remedial Defendant** National Grid (as successor in interest to **EGFA's** pre-1966 remedial liabilities), Nominal **Remedial Defendant EACC**, and **Remedial Defendants** Pardee and Curtin Realty LLC and Quercus West Virginia, LLC are each jointly and severally liable to the **Governmental Plaintiff** pursuant to Sections **V(a)(10), Subparagraph (6)** and **VI(a)(4)(A), (B)** of the **FCoWV Public Nuisance Ordinance** for:  **(i)** all *Abatement Action* required properly to abate that *Public Nuisance* in compliance with that Ordinance; and **(ii)** timely reimbursement of all *Abatement Action Costs* incurred and to be incurred to secure proper abatement of that *Public Nuisance* in compliance with the Ordinance.

351.   The **Governmental Plaintiff** has incurred and is continuing to incur **Abatement Action Costs**, within the meaning of Section **III(b)** the **FCoWV Public Nuisance Ordinance**, in responding to the *Public Nuisance* conditions in the **Subject Watershed**.

## COUNT SEVEN

**JUDICIAL ORDER COMPELLING THE REMEDIAL DEFENDANTS TO COMPLY WITH FINAL AND BINDING TIME-SENSITIVE ABATEMENT ACTION ORDER NO. 2021-02-9.5(b)-02 ISSUED BY THE FAYETTE CO. CODE ENFORCEMENT AGENCY PURSUANT TO ITS AUTHORITY UNDER SECTION IX.V OF FCoWV PUBLIC NUISANCE ORDINANCE REQUIRING PERFORMANCE BY THE REMEDIAL DEFENDANTS OF AN NCP-COMPLIANT REMEDIAL INVESTIGATION AND FEASIBILITY STUDY ADDRESSING ENDANGERMENTS TO HEALTH OR THE ENVIRONMENT THAT ARE OR MAY BE PRESENTED BY PUBLIC NUISANCE CONDITIONS WITHIN THE SUBJECT WATERSHED**

(***Governmental Plaintiff*** *against all* ***Remedial Defendants***)

**352.** The **Governmental Plaintiff** incorporates and reallege in this Count all of the allegations asserted in the foregoing paragraphs of this Complaint as if fully set forth herein.

**353.** As alleged in Section **VI(j)** of this Complaint and as clearly set forth in the **JF-LC TSAAO # 2** attached hereto as Exhibit 2, the FCoWV Code Enforcement Agency has, in exercise of its authority under Section **IX.V** of the **FCoWV Public Nuisance Ordinance**, and based upon the documents and information in the Administrative Record for **FCoWV CEA** Matter # 2021-02-9.5(b) ("Johnson Fork-Loop Creek Watershed Pollution Abatement"): **(i)** found the **Remedial Defendants** liable for the proper abatement of the *Per Se* ***Public Nuisance*** conditions declared by that Ordinance within the **Subject Watershed**; **(ii)** ordered the **Remedial Defendants**, jointly and severally, timely and competently to commence implementation of the **Remedial Investigation** and **Feasibility Study** set forth in detail therein; and **(iii)** ordered the **Remedial Defendants**, jointly and severally, periodically to reimburse Fayette Co. the ***Abatement Action Costs*** it has incurred and will continue to incur responding to the ***Public Nuisance*** condition within the **Subject Watershed**, non-exclusively including the costs to be incurred by the **FCoWV CEA** in providing oversight and monitoring of the required **Response** Actions by the **Remedial Defendants**.

**354.** Pursuant to the request of the **FCoWV CEA** in its Formal Resolution # 2021-06[75] and in exercise of the authority conveyed by Section **XX**[76] of the **FCoWV Public Nuisance Ordinance**, the **Governmental Plaintiff's** Relator, the Fayette Co. Prosecuting Attorney, herein requests this Court, upon presentation of the required proof, to issue appropriate injunctive relief compelling the **Remedial Defendants**, jointly and severally, to comply with the requirements of

---

[75] *See:* Section VI(j), *supra*.

[76] *See:* Introductory Paragraph of this Complaint and Footnote # 2, *supra*.

**FCoWV CEA** Time-Sensitive Abatement Action Order # 2021-02-9.5(b)-002, a verified copy of which is attached hereto as Exhibit 2, as required by that same Section **XX** of the Ordinance.

355.    Section **IX(d)** of the **FCoWV Public Nuisance Ordinance** provides:

> **(d) Enforcement of Final and Binding Time-Sensitive Abatement Action Order:** The Fayette County Commission may require, or the Code Enforcement Agency may request, the Fayette County Prosecuting Attorney to commence a civil action in the name of the Fayette County Commission in a court of competent jurisdiction to compel compliance with any Final and Binding Time-Sensitive Abatement Action Order properly issued and served pursuant to Section IX.V.  When, in course of any such civil action, Fayette County has established to the court by a preponderance of the evidence that:    **(1)** the Final and Binding Time-Sensitive Abatement was authorized by and issued and served in compliance with the requirements of Section **IX.V(b)**; **(2)** that the respondent named in the Order is a **Person** described in Section **VI(a)** of this Ordinance with liability for the **Public Nuisance** or **Imminent** and **Substantial Endangerment** at issue; and **(3)** that the Final and Binding Time-Sensitive Abatement Action Order authorized by Section **IX(b)** is not arbitrary and capricious and is otherwise in accordance with law, the court shall enter appropriate injunctive relief compelling timely and competent compliance by the respondent with all terms and conditions of the Final and Binding Time-Sensitive Abatement Action Order.  **In any such civil action, it shall not be necessary for the Code Enforcement Agency to allege or prove at any stage of the proceeding that irreparable damage will occur should the requested injunctive relief not be issued; or that any remedy at law is inadequate, and any temporary restraining order, preliminary injunction, or permanent injunction shall issue as otherwise provided by this Ordinance without any requirement for such allegations and without such proof.**

**Id.** [Bolding emphasis added].

356.    Section **XVIII** of the **FCoWV Public Nuisance Ordinance** establishes the obligation of any Person properly issued and served with a Time-Sensitive Abatement Action Order to comply with the requirements of that Order:

> No **Person** who has been properly served as required by this Ordinance or who has otherwise been properly made a party respondent to: . . . .**(c)** any Final and Binding Time-Sensitive Abatement Action Order issued and served in compliance with Section **IX.V** of this Ordinance shall disobey or fail timely to comply with the any requirement, term, or condition of any such order.

357.    Very similar to the procedural requirements governing federal judicial review of any Site Clean-up or **Response** Action ordered pursuant to a USEPA Administrative Order issued

under **CERCLA** § 106, 42 U.S.C. § 9606, Section **XIX.V** of the **FCoWV Public Nuisance Ordinance** establishes the "Review on the Administrative Record" standards and procedures governing judicial review of a Final and Binding Time-Sensitive Abatement Action Order properly issued and served pursuant to Section **IX.V** of that Ordinance, such as the **JF-LC TSAAO # 2** at issue herein:

> Section XIX.V - Review of Response action taken or ordered pursuant to this Ordinance.
>
> **(a) Limitation:**  In any action before the Fayette County Commission or in any judicial action under this Ordinance regarding any **Public Nuisance** to which the provisions of Sections **IX(b)** of this Ordinance would apply, **review of any issues concerning the adequacy or appropriateness of any Response action taken or ordered pursuant to this Ordinance shall be limited to the Administrative Record required by Section IX(f) of this Ordinance.**  Otherwise applicable principles of administrative law shall govern whether any supplemental materials may be considered by the court.  **Except as may otherwise be required by the Constitution of either the United States or of the State of West Virginia, or by any applicable general law of West Virginia, judicial review of any such action taken or ordered shall be limited to the issues set forth in subsection (b) of this Section XIX.V.**
>
> **(b) Standard:** In considering objections concerning the adequacy or appropriateness of any **Response** action taken or ordered pursuant to this Ordinance raised in any action before the Fayette County Commission or before a court of competent jurisdiction regarding any **Public Nuisance** to which the provisions of Sections IX(b) of this Ordinance would apply, . . . **the court shall uphold the Response action selected by the Code Enforcement Agency . . . unless the objecting party can demonstrate that the decision was arbitrary and capricious or otherwise not in substantial accordance with law.**
>
> **(c) Remedy:**  If . . . the court finds that the selection of the **Response** action was arbitrary and capricious or otherwise not in substantial accordance with law, . . .  the court shall award:
>
>> **(1)** only the **Response** costs, **Abatement Action** Costs, or damages that are not inconsistent with Section IX of this Ordinance liberally construed to effect the remedial purposes of this Ordinance; and
>>
>> **(2)** such other relief as is consistent with the **NCP** and the applicable provisions of this Ordinance construed to accomplish the remedial purposes of this Ordinance.
>
> **(d) Procedural errors:**  In reviewing alleged procedural errors, . . . **the court may disallow costs or damages only if the errors were so serious and related to matters of such central relevance to the action that the action would have been significantly changed had such errors not been made.**

**Id.** [Bolding emphasis added].

358.   In accord with above-quoted provisions of Section **IX.V(d)** of the **FCoWV Public Nuisance Ordinance**, Section **XX(e)** of that same Ordinance provides:

> **(c) Equitable criteria for injunctive relief authorized by this Section XX:**  The Fayette County Prosecuting Attorney may commence a civil action in any court of competent jurisdiction in the name of the Fayette County Commission to secure any of the relief authorized by this Section XX.  I**n any such civil action in which a temporary restraining order, preliminary injunction, or partial or complete mandatory or prohibitory permanent injunction is sought, it shall not be necessary for the County Commission to allege or prove at any stage of the proceeding that irreparable damage will occur should the temporary restraining order, preliminary injunction, or permanent injunction (including any judicial public nuisance abatement order) not be issued; or that any remedy at law is inadequate, and the temporary restraining order, preliminary injunction, or permanent injunction (including any judicial public nuisance abatement order) shall issue without such allegations and without such proof.**

**Id.** [Bolding emphasis added].

359.   Pursuant to the express authority provided in Section **XX(b)** of the **FCoWV Public Nuisance Ordinance**, the **Governmental Plaintiff** also requests this Court enter:   **(i)** a Declaratory Judgment herein establishing the liability of the **Remedial Defendants**, jointly and severally, for timely reimbursing Fayette County for all future **Abatement Action Costs** to be incurred by the County with respect to the *Public Nuisance* conditions within the **Subject Watershed** for which the **Remedial Defendants** are liable; and **(ii)** enter an Order against the **Remedial Defendants**, jointly and severally, awarding to Fayette County "its litigation costs and expenses, including attorneys' fees and expenses, expert witness fees and expenses, and the fees and expenses of not more than one (1) non-testifying technical or scientific expert to assist the Fayette Co. Prosecuting Attorney in the preparation and prosecution of this action.

### COUNT EIGHT:

**"DIRECT ACTION" PURSUANT TO SECTION VI(j) OF THE FCoWV PUBLIC NUISANCE ORDINANCE TO ESTABLISH THE LIABILITY OF EACH OF THE INSURER DEFENDANTS TO PAY FOR OR PERFORM**

**THE REMEDIAL LIABILITIES IMPOSED UPON NOMINAL REMEDIAL DEFENDANT EACC BY THAT ORDINANCE SUBJECT ONLY TO THE REMAINING LIMITS OF LIABILITY UNDER, AND THE TERMS AND CONDITIONS OF, THE LIABILITY INSURANCE POLICY(IES) EACH INSURER RESPONDENT ISSUED TO NOMINAL REMEDIAL DEFENDANT EACC.**

(*Governmental Plaintiff against each Insurer Defendant*)

360. Under very specific terms and conditions, Section **VI(j)** of the **FCoWV Public Nuisance Ordinance** authorizes the **Governmental Plaintiff** <u>only</u> to prosecute a "Direct Action" against the liability insurer of any liable **Person** under that Ordinance that is, *inter alia*, a dissolved or defunct business entity:

> **(i) Direct action against Indemnitor or Insurer of a Liable or Potentially Liable Person:**
>
> > **(1)** *Allowed in certain cases***: In any case or circumstance identified in Paragraph ( 4) of this Subsection VI(j) any liability of such Person arising under this Ordinance may be asserted directly against the Indemnitor or Insurer of any such Person;** provided, however:
> >
> > > **(A)** in the case of any claim or action pursuant to this section **VI(j)** of this Ordinance, such **Indemnitor or Insurer** is entitled to invoke or assert all rights, claims, and defenses: **(i)** which would have been available to such liable or potentially liable **Person** if such action had been brought directly against the liable or potentially liable **Person** by Fayette County; and *(ii)* which would have been available to the **Indemnitor or Insurer** if an action had been brought against the **Indemnitor or Insurer** by such liable **Person** or potentially liable **Person** as a putative indemnitee or insured; and
> > >
> > > **(B)** the total liability of any **indemnitor or Insurer** of any such liable or potentially liable **Person** under this Ordinance is limited to the aggregate amount provided to, or on behalf of, the indemnitee or insured pursuant to the indemnification contract or decree, or the insurance contract or policy, specifically including any amount of coverage for any Remedial Investigation/Feasibility study obligation that is or may be available pursuant to the duty to defend afforded to the insured by any such indemnification agreement or policy of insurance. Nothing in this subparagraph (B) limits any statutory, contractual or common law liability under any other state or federal law of a guarantor or insurer to its guarantee or insured, including, but not limited to, the liability of such guarantor for bad faith either in negotiating or in failing to negotiate the settlement of any claim.

    **(2)** ***Judgment enforceable only against available proceeds or limits of coverage; exception:*** Unless properly joined with a claim authorized by Paragraph (3) of this Section **VI(j),** a judgment in the favor of Fayette County Commission in any action brought directly against the **Indemnitor or Insurer** of any deceased individual or the estate of any decedent pursuant to this subsection **Vl(j)** is enforceable only from the indemnification proceeds or available insurance coverage, and not against other property of such **Person.**

    **(3) Joinder with other specified claims authorized:** Any claim asserting any liability arising under this Ordinance directly against the **Indemnitor or Insurer** of any deceased individual or the estate of any decedent pursuant to this Section **VI(j)** may be joined with a claim under applicable state law seeking recove1y of any undistributed assets, other than insurance assets or third-party indemnification proceeds, of the estate of the decedent.

    **(4) Cases in which a Direct Action is authorized:** A Direct Action authorized by this Subsection **VI(j)** may be brought by the Fayette County Prosecuting Attorney, or by the Code Enforcement Agency, with the advice and consent of the Fayette County Prosecuting Attorney, and shall be brought in the name of the Fayette County Commission by the Fayette County Prosecuting Attorney when directed by the Fayette County Commission, only in any case or circumstance where a **Person** liable or potentially liable under this Ordinance is:

      **(i)** in bankruptcy reorganization, or arrangement pursuant to the federal bankruptcy code;

      **(ii) is a dissolved or defunct business organization of any kind;**

          \*\*\*      \*\*\*      \*\*\*      \*\*\*      \*\*\*

    **(5)** Nothing in this subsection **VI(j)** diminishes the liability of any **Person** under other applicable law.

**Id.** [Bolding emphasis added].

    **361.** Nominal **Remedial Defendant EACC** is a dissolved and defunct business entity within the meaning of **Section VI(j)(4)(ii)** of the **FCoWV Public Nuisance Ordinance**.

    **362.** Each of the **Insurer Defendants** issued liability insurance policies that provide liability insurance coverage to Nominal **Remedial Defendant EACC** for the "property damage" liability imposed upon **EACC** with respect to the conditions of Public Nuisance within the **Subject Watershed** by applicable federal and West Virginia law, specifically including the **FCoWV Public Nuisance Ordinance**.

    **363.** Pursuant to Section **VI(j)** of the **FCoWV Public Nuisance Ordinance**, each **Insurer**

**Defendant** may, at its option, herein:

> **(i)** defend Nominal **Remedial Defendant EACC** against some or all of the liability asserted against it herein;

> **(ii)** assert against the Governmental Plaintiff herein any contractual coverage defenses available to it pursuant to the valid terms and conditions of the liability insurance policy(ies) it issued to Nominal **Remedial Defendant EACC**; or

> **(iii)** both defend Nominal **Remedial Defendant EACC** against some or all of the liability asserted against it herein, and assert any contractual coverage defenses available to it pursuant to the valid terms and conditions of the liability insurance policy(ies) it issued to Nominal **Remedial Defendant EACC.**

364.   Subject only to the remaining limits of liability under each of the liability insurance policies each **Insurer Defendant** issued to Nominal **Remedial Defendant EACC** and to the valid terms and condition of those liability insurance policies, the **Governmental Plaintiff** asserts that it is herein entitled to:  **(1)** a Declaratory Judgment establishing the liability and obligation of each **Insurer Defendant**, jointly and severally, to pay to Fayette County the costs of, or to itself perform, the remedial liabilities properly imposed upon Nominal **Remedial Defendant EACC** herein; and **(2)** corresponding, appropriate injunctive relief compelling each **Insurer Defendant** timely to pay to Fayette Co. the costs of, or to itself perform, the remedial liabilities properly imposed upon Nominal **Remedial Defendant EACC** herein.


## COUNT NINE:

### JUDICIAL ABATEMENT OF A CONTINUING PUBLIC NUISANCE PURSUANT TO THE COMMON LAW OF WEST VIRGINIA

(*Governmental Plaintiff against all Remedial Defendants*)

365.   Pursuant to W.Va. Code § 7-1-3kk, the General Law of West Virginia has vested in the **Governmental Plaintiff** the authority "to abate or cause to be abated anything which the commission determines to be a public nuisance."  As such, the **Governmental Plaintiff** has the

authority to itself abate or to prosecute a judicial action for abatement of a Public Nuisance under duly promulgated statutes[77], ordinances, and regulations and common law of West Virginia to secure timely and adequate abatement of unacceptable harms and hazards to the Public Health, Safety, Welfare or the **Environment** presented by the conditions of Public Nuisance alleged herein.

366.    Under the common law of West Virginia law, a Public Nuisance is "an act or condition that unlawfully operates to hurt or inconvenience an indefinite number of persons." *Hark v. Mountain Fork Lumber Co.,* 127 W.Va. 586, 595-96 (1945).

367.    The Restatement (Second) of Torts § 82lB, which has on multiple occasions been cited by the West Virginia Supreme Court of Appeals as articulative of the common law of West Virginia[78], defines a Public Nuisance as "an unreasonable interference with a right common to the general public."

368.    Where a condition "is shown by facts and circumstances to constitute a nuisance affecting public health **'no measure of necessity, usefulness or public benefit will protect it from the unflinching condemnation of the law.'"** *Board of Com'rs of Ohio County v. Elm Grove Mining Co.*, 122 W.Va. 442, 9 S.E.2d 813, 817 (W.Va. 1940) (quoting 1 Wood on Nuisances, 3d

---

[77]  In addition to its authority under W. Va. Code §§ 7-1-3, 7-1-3ff, and 7-1-3kk, the County Commission of Fayette County also has authority conveyed to it by the General Law of the State of West Virginia to seek judicial abatement of Public Nuisance condition "affecting the public health" within the County pursuant to W. Va. Code § 16-3-6, which provides:

> The state director of health or any county or municipal health officer shall inquire into and investigate all nuisances affecting the public health within his jurisdiction; and the said director or any such officer **or the county commission of any county** or any municipality **is authorized and empowered to apply to the circuit court of the county in which any such nuisance exists, or to the judge thereof in vacation, for an injunction forthwith to restrain, prevent or abate such nuisance**.

**Id.** [Bolding emphasis added].

[78]  *Hedricks* v. *Stalnaker*, 181 W. Va. 31 (1989) and *Duff* v. *Morgantown Energy Ass'n.*, 187 W. Va. 712 (1992)

Ed., §19); *Republica v. Caldwell*, 1 U.S. 150 (1785).

369.    The West Virginia Supreme Court of Appeals has described a Public Nuisance generally under the common law of West Virginia as "the doing of or the failure to do something that injuriously affects the safety, health, or morals of the public, or works some substantial annoyance, inconvenience, or injury to the public[.] (footnotes omitted)".    *State, ex rel. Smith* v. *Kermit Lumber & Pressure Treating Co.*, 200 W. Va. 221, 245 (1997) at fn. 28.

370.    The West Virginia Supreme Court of Appeals in *State, ex rel. Smith* v. *Kermit Lumber & Pressure Treating Co.*, 200 W. Va. 221, 245 (1997) explicitly recognized that a Public Nuisance arising from environmental contamination can take the form of both an "endangerment to the public health [and] safety" and physical harm to environmental media ("in the soil and . . . the waters of this State"). 200 W.Va. at 245, 488 S.E.2d at 925.

371.    The seriousness of the harm and of the unacceptable endangerments to the Public Health, Safety, Welfare and the **Environment** caused by the noxious and offensive Public Nuisance conditions within the **Subject Watershed** alleged herein cannot be justified under West Virginia law, and substantially outweigh, any claimed social utility of the past coal mining conduct of Defendants.

372.    The conduct of the **Remedial Defendant EGFA** and Nominal **Remedial Defendant EACC** in the operation and maintenance of each of their mining activities and mining waste disposal **Facilities** on the **Subject Property** alleged herein is a substantial factor in causing and contributing to the condition of a continuing Public Nuisance in the **Subject Watershed** alleged herein.

373.    The aforementioned acts and omissions of **EGFA,** Nominal **Remedial Defendant EACC**, and **Remedial Defendants** Pardee and Curtin Realty LLC and Quercus West Virginia, LLC caused or contributed to the continuing common law Public Nuisance conditions within the

**Subject Watershed** by their failure and refusal to abate or cause the abatement of any of the illegal, unlined **Open Dumps** of mining waste consisting of **Hazardous Wastes**, **Hazardous Substances**, **Solid Wastes** and **Toxic Pollutants and Contaminants** on the **Subject Property**. These quintessential, hazardous Public Nuisance conditions within the **Subject Watershed** alleged herein are: **(a)** seriously injurious to *Waters of the State*, all of which are a publicly-owned *Natural Resource* held in trust by the State of West Virginia for the use and benefit of present and future generations of the Public; **(b)** constitutes an unreasonable interference with the free use and enjoyment of such *Waters of the State* within the **Subject Watershed**; and **(c)** is injurious to the proper and healthful functioning of the **Environment** within the **Subject Watershed** and offensive to the senses, such that an ordinary person would reasonably be annoyed or disturbed by such condition.

374.    **Remedial Defendant** National Grid NE Holdings 2, LLC is strictly liable, jointly and severally, for the timely and appropriate abatement of the Public Nuisance condition in the **Subject Watershed** because it is: **(a)** the corporate successor to pre-1966 remedial liabilities of **EGFA**, a **Person** that, by its acts and omissions as a former **Owner** and **Operator** of the coal mining's **Facilities** in the **Subject Watershed** created, contributed to, or maintained each of the five (5) unlined **Open Dumps** of mining waste within the **Subject Watershed** resulting in a single, indivisible harm in the nature of the continuing condition of Public Nuisance alleged herein; and **(b)** a "***Person***" that, regardless of actual knowledge of the existence or nature of the nuisance condition, failed or refused to abate the Public Nuisance.

375.    **Remedial Defendants National Grid** (as successor to the pre-1966 remedial liabilities of **EGFA**), Nominal **Remedial Defendant EACC**, and **Remedial Defendants** Pardee and Curtin Realty LLC and Quercus West Virginia are each strictly liable, jointly and severally, for the timely and appropriate abatement of the Public Nuisance condition in the **Subject Watershed** because

each of them is **Person** that, regardless of its actual knowledge of the existence or nature of the nuisance condition, failed or refused to abate the hazardous Public Nuisance condition on the surface of the **EGFA/EACC Subject Property** during its time of ownership of the **EGFA/EACC Subject Property** (or the Surface Estate appertaining to the real property comprising the **EGFA/EACC Subject Property**) on the surface of which four (4) **Open Dumps** of coal mining waste are located thereby contributing to the resulting single, indivisible harm to and imminent and substantial endangerment of the Public Health, Safety, Welfare and the **Environment** within the **Subject Watershed** by maintaining each of those four (4) unlined **Open Dumps/*Public Nuisance*** conditions within the **Subject Watershed**.

376.    Because the Public Nuisance conditions at and emanating from the **Subject Property** and within the **Subject Watershed** arise out of and result from the **Release** of **Hazardous Substances** into the **Environment**, the abatement of that Public Nuisance should be undertaken by the **Remedial Defendants**, jointly and severally, and at their sole cost in full compliance with the Orders of this Court, under the oversight and supervision of the **FCoWV CEA**, and in a manner consistent with Section **IX** of the **FCoWV Public Nuisance Ordinance** and the National Oil and Hazardous Substances Pollution Contingency Plan, 40 C.F.R., Part 300.

## COUNT TEN:

**DECLARATORY AND CORRESPONDING INJUNCTIVE RELIEF AFFORDING SITE ACCESS FOR COUNTY AGENTS AND RECOVERY OF: (i) COUNTY COSTS INCURRED WITH RESPECT TO THE SUBJECT PROPERTY; AND (ii) RECOVERY OF COUNTY'S REASONABLE ATTORNEYS' FEES AND COURT COSTS INCURRED HEREIN PURSUANT TO W. Va. CODE § 7-1-3ff(h)(3) & (4)**

(*Governmental Plaintiff against all **Remedial Defendants***)

377.    As quoted and discussed in Section V, ¶ 22 of this Verified Second Amended Complaint, W. Va Code § 7-1-33ff(b) provided to West Virginia County Commissions "plenary authority to

adopt ordinances regulating the removal and clean-up of any accumulation of refuse or debris, overgrown vegetation or toxic spillage or toxic seepage located on private lands which is determined to be unsafe, unsanitary, dangerous, or detrimental to the public safety or welfare, whether the result of natural or manmade force or effect."

378.   Subsection (h) of that same statute, W. Va. Code § 7-1-3ff(h), provides in relevant part:

> **(h)** A civil proceeding may be brought in circuit court by the county commission against the owner or owners of the private land **or other responsible party** that the subject matter of the order of the county commission to subject the private land in question:
>
>    ***          ***          ***          ***          ***
>
> **(3)** to order and decree that the contractor may enter upon the private land in question at any and all times necessary to make ordered repairs, alterations, or improvements, or ordered demolition, removal, or clean up; and **(4)** to order the payment of all costs incurred by the county with respect to the property and for reasonable attorney fees and court costs incurred in the prosecution of the action.

**Id.** [Bolding emphasis added.]

379.   In contrast with the previous subsections of W. Va. Code § 7-1-3ff, all of which address requirements applicable to administrative proceedings before the County Commission and all of which apply only to the "owner or owners" of the land affected, Subsection **(h)** authorizes County Commissions to commence civil actions against either the "owner or owners of the private land or other responsible party" to secure the equitable relief authorized by that subsection of the statute.

380.   W. Va. Code § 7-1-3ff(h) does not define the term "other responsible party."  However, the terms "responsible party" or "responsible person," when used within the context of federal or state remedial environmental and public health protection law and litigation matters, have, in the more than forty (40) years since the enactment of the Comprehensive Environmental Response, Compensation and Liability Act of 1980, as amended, 42 U.S.C.§§ 9601-9675 (commonly referred to as "CERCLA" or the "federal Superfund Act") and its related State "Superfund" or Hazardous

Substance Cleanup Acts[79], come to have a widely and commonly accepted meaning within both the Environmental Bar and the Environmental Engineering communities; namely, those four (4) classes of Persons described as liable pursuant to CERCLA § 107(a), 42 U.S.C. § 9607(a).

**381.** CERCLA § 107(a), 42 U.S.C. 9607(a)[80], imposes liability for recovery of necessary "Response Costs" (*i.e.,* costs incurred in investigating and responding to hazardous substances that have been released into the environment) upon the following four (4) classes of persons:

> **(1)** the current owner and operator of a vessel or a facility;
>
> **(2)** any person who at the time of disposal (*i.e.,* the "discharge, deposit, dumping, spilling, leaking," *etc.* into the environment) of any hazardous substance owned or

---

[79]  As evidence of this commonly accepted meaning, two (2) distinct provisions of the West Virginia Hazardous Waste Emergency Response Act, W. Va. Code, Chapter 22, Article 19 (commonly known as the "WV Superfund Act"), namely W. Va. Code §§ 22-19-5(c) and (e), employ the term "responsible person" notwithstanding the fact that term is nowhere defined in that Act.

[80]  CERCLA § 107(a) provides, in relevant part:

> **(a) Covered persons; scope; recoverable costs and damages; interest rate; "comparable maturity" date.**

> Notwithstanding any other provision or rule of law, and subject only to the defenses set forth in subsection (b) of this section—
> **(1)**the owner and operator of a vessel or a facility,
> **(2)**any person who at the time of disposal of any hazardous substance owned or operated any facility at which such hazardous substances were disposed of,
> **(3)**any person who by contract, agreement, or otherwise arranged for disposal or treatment, or arranged with a transporter for transport for disposal or treatment, of hazardous substances owned or possessed by such person, by any other party or entity, at any facility or incineration vessel owned or operated by another party or entity and containing such hazardous substances, and
> **(4)**any person who accepts or accepted any hazardous substances for transport to disposal or treatment facilities, incineration vessels or sites selected by such person, from which there is a release, or a threatened release which causes the incurrence of response costs, of a hazardous substance, shall be liable for—
> **(A)**all costs of removal or remedial action incurred by the United States Government or a State or an Indian tribe not inconsistent with the national contingency plan;
> **(B)**any other necessary costs of response incurred by any other person consistent with the national contingency plan;
> **(C)**damages for injury to, destruction of, or loss of natural resources, including the reasonable costs of assessing such injury, destruction, or loss resulting from such a release; and
> **(D)**the costs of any health assessment or health effects study carried out under section 104(i) [*42 USCS § 9604(i)*].

> 42 U.S.C.§ 9607(a).

operated any facility at which such hazardous substances were disposed of;

**(3)** any person who by contract, agreement, or otherwise arranged for disposal or treatment, or arranged with a transporter for transport for disposal or treatment, of hazardous substances owned or possessed by such person, by any other party or entity, at any facility or incineration vessel owned or operated by another party or entity and containing such hazardous substances, and

**(4)** any person who accepts or accepted any hazardous substances for transport to disposal or treatment facilities, incineration vessels or sites selected by such person, from which there is a release, or a threatened release which causes the incurrence of response costs, of a hazardous substance.

382.    With respect to each of the five (5) Open Dumps of coal mining waste with the **Subject Watershed** herein at issue and the past and on-going **Releases** of **Solid Waste**, **Hazardous Waste**, **Hazardous Substances**, and **Leachate** into the **Environment** from each of those Open Dumps, each of the **Remedial Defendants** is a "responsible person" within the meaning of W. Va. Code § 7-1-3ff(h).

383.    Pursuant to W. Va. Code § 7-1-3ff(h)(3), the **Governmental Plaintiff** is entitled to Order and Decree of this Court against **Remedial Defendant** Quercus West Virginia, LLC that designated agents of the Governmental Plaintiff, specifically including authorized representatives and contractors of the Fayette Co. Code Enforcement Agency and authorized representatives of the Fayette Co. Prosecuting Attorneys Office, Fayette Co. Solid Waste Authority and Fayette Co. Board of Health, may enter upon the private land in question within the Surface Estate owned by **Remedial Defendant** Quercus West Virginia, LLC at any and all times necessary to make ordered investigations, repairs, alterations, or improvements, or ordered demolition, removal, or clean up, or to monitor and oversee any such actions by or on behalf of any **Remedial Defendant**.

384.    Pursuant to W. Va. Code § 7-1-3ff(h)(4), the **Governmental Plaintiff** is entitled to appropriate Declaratory and corresponding Injunctive Relief requiring the Remedial Defendants, jointly and severally, timely to reimburse the **Governmental Plaintiff** for: **(1)** all costs incurred by Fayette County with respect to its Response to conditions at and emanating from the real

property within the Subject Watershed at issue herein; and **(2)** all reasonable attorneys' fees and court costs incurred in connection with the prosecution of this civil action.

## COUNT ELEVEN
### UNJUST ENRICHMENT
(*The **Governmental Plaintiff** against all **Remedial Defendants***)

**385.** The **Governmental Plaintiff** incorporates and realleges in this Count all of the allegations asserted in the foregoing paragraphs as if fully set forth herein.

**386. EGFA**, Nominal **Remedial Defendant EACC**, and **Remedial Defendants** Pardee and Curtin Realty LLC, and Quercus West Virginia, LLC have each failed or refused to perform or fund the necessary and proper abatement and remedial actions with respect to the five (5) **Open Dumps** of mining waste on the surface of the **Subject Property** in the **Subject Watershed** necessary and proper to **Respond** to the Public Nuisance conditions alleged herein.

**387.** The **Governmental Plaintiff** has the legal authority and responsibility under applicable law to provide adequate protection of the Public Health, Safety, Welfare and the **Environment** within Fayette County, WV**,** and to abate and cause to be abated, *inter alia*, the five (5) **Open Dumps**/*Per Se* Public Nuisance conditions existing on the surface of the **Subject Property**.

**388.** By undertaking necessary **Responses** to, including necessary investigations into the nature and extent of, the *Per Se* **Public Nuisance** conditions at and emanating from the **Subject Property** and within the **Subject Watershed** alleged herein, the **Governmental Plaintiff** has incurred necessary expense to respond to the *Per Se* **Public Nuisance** conditions existing on the **Subject Property**, and in so doing has conferred and is conferring an economic benefit on each of the **Remedial Defendant**s in consequence of the interest of each **Remedial Defendant** in that same property, which interest arises from each **Remedial Defendant's** liability, jointly and severally, for the timely and competent investigation and abatement of the **Public Nuisance**

conditions that they each created, contributed to, or maintained.

**389.** The commitment or expenditure by the **Governmental Plaintiff** of public funds to investigate and **Respond** to the Public Nuisance conditions in the **Subject Watershed** alleged herein, which would otherwise be **Remedial Defendants'** obligation to fully fund or perform, has unjustly enriched the **Remedial Defendants**.

## VI. *PRAYER FOR RELIEF*:

WHEREFORE, the **Governmental Plaintiff**, in discharge of its statutory authority and responsibility to provide adequate protection of the Public Health, Safety, Welfare and the **Environment** within Fayette County, and to abate or secure the abatement of conditions of Public Nuisance within Fayette County, respectfully requests that this Court award the following relief to the **Governmental Plaintiff** with respect to the causes of action asserted herein:

**A.** Pursuant to **RCRA** § 7002(a)(1)(A), 42 U.S.C. § 6972(a)(1)(A), an Order of this Court enforcing the requirements and prohibitions of **RCRA** § 4005(a), 42 U.S.C. § 6945(a), and of the West Virginia Solid Waste Management Act, W. Va. Code §§ 22-15-1(c)(1) and 22-15-10(a), and requiring the **Remedial Defendant** Quercus West Virginia, LLC timely and competently to take such actions as the Court determines necessary and proper to: **(1)** bring each of the **Open Dumps** of coal mining waste within the **Subject Watershed** into compliance with the requirements and standard of each of those statutes and their implementing regulations; and **(2)** properly abate the existing adverse impacts on health or the **Environment** that are or may be presented by the **Releases** of **Solid Waste** and **Leachate** that resulted from its past violations of the requirements and prohibitions of each of those statutes and their implementing regulations;

**B.** Pursuant to **RCRA** § 7002(a)(1)(B), 42 U.S.C. § 6972(a)(1)(B), the West Virginia common law of Public Nuisance Abatement, and Section **XXII** of the **FCoWV Public Nuisance**

**Ordinance**, an Order of this Court requiring each of the **Remedial Defendants**, jointly and severally, and subject to appropriate oversight and monitoring by the Fayette Co. Code Enforcement Agency: **(a)** to undertake at their sole cost a Remedial Investigation and Feasibility Study ("**RI/FS**") of the **Subject Property** and the **Subject Watershed** in full compliance with the applicable requirements of the **NCP**, **(b)** timely and competently to implement at their sole cost such immediate or interim removal or remedial actions as the Court may determine to be necessary and proper to appropriate abatement of any *Public Nuisance* condition(s) or imminent and substantial endangerments to health or the **Environment** within the **Subject Watershed**; **(c)** following filing of the required final **RI/FS** report with this Court, and after conduct of such hearings as the Court determines to be appropriate, to timely and competently implement at their sole cost the *Remedial Action* Plan, if any, for the **Subject Watershed** selected and approved by the Court; and **(d)** periodically and timely to reimburse the **Governmental Plaintiff** for the **Abatement Action Costs** it has incurred in overseeing and monitoring the Defendants' performance of the **Abatement Action** ordered by this Court;

C.    Pursuant to **CERCLA** §§ 111(g) and 310(a)(1) and (c), 42 U.S.C. §§ 9611(g) and 9659(a)(1) and (c), an Order of this Court compelling **Remedial Defendant** Quercus West Virginia, LLC forthwith to publish the newspaper notification to potential injured parties required by **CERCLA** § 311(g), 42 U.S.C. § 9611(g);

D.    Pursuant to **CWA** § 505(a), 33 U.S.C. § 1365(a), an Order of this Court enforcing the effluent standards and prohibitions set forth pursuant to **CWA** §§ 301(a) and 402(a), 33 U.S.C. §§ 1311(a) and 1342(a), and requiring **Remedial Defendant** Quercus West Virginia, LLC properly to abate the existing adverse impacts on health or the environment that are or may be presented by the past violations of those effluent standards and prohibitions;

E.    Pursuant to the West Virginia common law providing for the Judicial Abatement of

*Per Se* Conditions of Public Nuisance existing within the State of West Virginia, an Order of this Court requiring each of the **Remedial Defendants**, jointly and severally, and subject to appropriate oversight and monitoring by the Fayette Co. Code Enforcement Agency:  **(a)** to undertake at their sole cost a **Remedial Investigation** and **Feasibility Study** ("RI/FS") of the **Subject Property** and the **Subject Watershed** in full compliance with the applicable requirements of the **NCP**, **(b)** timely and competently to implement at their sole cost such immediate or interim removal or remedial actions as the Court may determine to be necessary and proper to appropriate abatement of any *Public Nuisance* condition(s) or imminent and substantial endangerments to health or the **Environment** within the **Subject Watershed**; **(c)** following filing of the required final **RI/FS** report with this Court, and after conduct of such hearings as the Court determines to be appropriate, to timely and competently implement at their sole cost the *Remedial Action* Plan, if any, for the **Subject Watershed** selected and approved by the Court; and **(d)** periodically and timely to reimburse the **Governmental Plaintiff** for the **Abatement Action Costs** it has incurred in overseeing and monitoring the Defendants' performance of the **Abatement Action** Ordered by this Court;

      **F.**   Pursuant to Sections **VI(i)** and **XXII(b)(5)** of the **FCoWV Public Nuisance Ordinance**, a Declaratory Judgment on Remedial Defendants' liability, jointly and severally, for Response Costs, Abatement Action Costs, or damages that will be binding on any subsequent action or actions by the **Governmental Plaintiff** to recover further **Response Costs**, *Abatement Action Costs*, or damages to be incurred by the **Governmental Plaintiff** in compliance with the Orders of this Court and the requirements of the **FCoWV Public Nuisance Ordinance** with respect to the conditions of Public Nuisance within the **Subject Watershed** herein at issue;

      **G.**   Pursuant to Federal Rule of Civil Procedure 53 and in furtherance of the goals of timely and effective implementation of the complex and continuing mandatory injunctive relief

required herein pursuant to the principles articulated in this Court's holding in *Ohio Valley Envtl.*

*Coal.* v. *Fola Coal Co., LLC*, Case No. 2:15-cv-01371 (S.D. WV) (Chamber, C.J.) (September 27,

2017 Order on Plaintiff's Motion for Appointment of a Special Master), entry of an Order of

Reference to a Special Master appointed by this Court and authorized: **(i)** to see to the timely and

effective implementation of this Court's Orders herein; **(ii)** to adjudicate in the first instance any

disputes between the parties regarding implementation of this Court's Orders and any requests for

contempt sanctions, and to make a Report to the Court reflecting the Special Master's Findings of

Fact, Conclusions of Law and Recommended Order respecting each such matters, which Order

will be binding upon all parties to such adjudications as an Order of this Court unless application

to this Court for review of such Order is timely filed or such Order is modified or vacated by this

Court;

      **H.**   Pursuant to **CWA** §§ 309(d) & 505(a), 33 U.S.C. §§ 1319(d) & 1365(a), an award of civil

penalties against **Remedial Defendant** Quercus West Virginia, LLC to be paid to the United States

Treasury pursuant to 33 U.S.C. §§ 1319(d) & 1365(a) in the amount to be determined by the Court

upon relevant proof not to exceed the statutory maximum civil penalty per day of violation for each

violation committed relative to **Remedial Defendant** Quercus West Virginia's violations of the

standard, regulation, condition, requirement, prohibition, or order which has become effective pursuant

to the **CWA**, including (without limitation) those violations specifically identified in Court Four

herein;

      **I.**   Pursuant to **RCRA** § 7002(e), 42 U.S.C. § 6972(e), **CWA** § 505(d),

33 U.S.C. § 1365(d), W. Va. Code § 7-1-3ff(h)(4) and Sections **XX(f)** and **XXII(c)** of the **Fayette**

**Co. Public Nuisance Ordinance**, an award to the **Governmental Plaintiff** and against each of

the **Remedial Defendants**, jointly and severally, of the **Governmental Plaintiff's**

non-duplicative[81] costs of this litigation, including attorneys' and expert witness fees and cost exclusively related to prosecution of this action before this Court;

      **J.**    Pursuant to **CERCLA** § 310(f), 42 U.S.C. § 9659(f), an award to the **Governmental Plaintiff** and against **Defendant** Quercus West Virginia, LLC of the **Governmental Plaintiff's** costs of this litigation concerning Count Three herein (including reasonable attorneys' and expert witness fees and expenses);

      **K.**    Pursuant to Section **VI(j)** of the **FCoWV Public Nuisance Ordinance**, a Declaratory Judgment and corresponding Injunctive Relief establishing the liability and obligation of each **Insurer Defendant**, jointly and severally, to pay to Fayette Co. the costs of, or themselves to perform under the oversight and supervision of the Fayette Co. Code Enforcement Agency, the remedial liabilities properly imposed upon Nominal **Remedial Defendant EACC** herein, together with all sums for Litigation Costs properly awarded against Nominal **Remedial Defendant EACC** herein.

      **L.**    Pursuant to the West Virginia common law of Unjust Enrichment, an award to the **Governmental Plaintiff** and against each **Remedial Defendant**, jointly and severally, of an equitable Order for Restitution for all reasonable sums, specifically including all technical, legal and other consulting costs, the **Governmental Plaintiff** has incurred and will incur to **Respond** to the *Public Nuisance* conditions at and emanating from the **Subject Property** and within the **Subject Watershed** alleged herein, which would otherwise be the **Remedial Defendants'** obligation to fund or perform;

---

[81] With respect to its claims for an award of its litigation costs, including its attorneys' fees and expert witness fees and costs incurred, pursuant to **RCRA** § 7002(e), 42 U.S.C. § 6972(e), **CWA** § 505(d), 33 U.S.C. § 1365(d), and Sections **XX(f)** and **XXII(c)** of the **Fayette Co. Public Nuisance Ordinance**, the **Governmental Plaintiff** seeks only an award of those litigation costs, including attorneys' and expert witness fees and costs, authorized by those laws that have not also been awarded to it as a recoverable "*Abatement Action Cost*" pursuant to applicable provisions of the of the **Fayette Co. Public Nuisance Ordinance**.

**M.** As to all **Remedial Defendants**, jointly and severally, a non-duplicative award to the **Governmental Plaintiff** of prejudgment interest, pursuant to West Virginia and Fayette County law;

**N.** Such other and further relief as this Court deems proper and warranted.

**The Governmental Plaintiff** respectfully requests that this Court retain continuing jurisdiction over this action to the extent necessary and for as long as necessary to interpret and enforce, and to secure and review the **Defendants'** compliance with, such Orders that this Court may enter herein.

## VERIFICATION:

**State of West Virginia,**
**Kanawha County,**

to-wit: Michael O. Callaghan, Esq. (WV Bar No. 5509), Chief Assistant Fayette Co. Prosecuting Attorney, Environmental and Public Health Protection Unit, being duly sworn, says that he has read the foregoing Verified Second Amended Complaint and that he knows the contents thereof; that the facts and allegations therein contained are true, except such as are therein stated upon information and belief, and that as to such allegations he believes them to be true.

Michael O. Callaghan, Esq.
Chief Assistant Fayette Co. Prosecuting Attorney
Environmental and Public Health Protection Unit

Taken, sworn to and subscribed before me this 15th day of June 2022



Respectfully submitted:

**ANTHONY CILIBERTI, ESQ.**

**FAYETTE COUNTY PROSECUTING ATTORNEY**

By: /s/ *Michael O. Callaghan*

      Michael O. Callaghan, Esq. (WV Bar No. 5509)
      Chief Assistant Fayette Co. Prosecuting Attorney
      Environmental & Public Health Protection Unit
      c/o NEELY & CALLAGHAN
      159 Summers Street
      Charleston, WV  25301
      Telephone:  (304) 343-6500
      Facsimile:  (304) 343-6528
      mcallaghan@neelycallaghan.com

# UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
## CHARLESTON DIVISION

| | |
|---|---|
| **The County Commission of Fayette County, West Virginia**, a political subdivision of the State of West Virginia,<br><br>       **- Plaintiff;**<br><br>**Ex Rel. Anthony Ciliberti, Esq, Fayette County Prosecuting Attorney,**<br><br>       **- Relator;**<br><br>     **v.**<br><br>**National Grid NE Holdings 2 LLC,** a Massachusetts Limited Liability Company, [successor in interest to the remedial liabilities of: **Eastern Gas and Fuel Associates (l.k.a. Eastern Associates),** a Massachusetts Business Trust, **incurred as a result of its status, acts or omissions prior to January 1, 1966**, arising out of its mining operations and mining waste disposal practices conducted within Fayette County, WV];<br><br>      **- Defendant;**<br><br>**Eastern Associated Coal, LLC**, a defunct West Virginia Limited Liability Company (**f.k.a. Eastern Associated Coal Corporation**), solely to the extent of its undistributed assets, non-exclusively including the available coverage and proceeds from its liability insurance policies, named herein as a Nominal Defendant Only, and not as a Real Party in Interest;<br><br>     **- Nominal Defendant;**<br><br>**Pardee and Curtin Realty LLC**, a Delaware Limited Liability Company qualified to do business in West Virginia;<br><br>      **- Defendant;**<br><br>**Quercus West Virginia, LLC,** a Delaware Limited Liability Company authorized to do | **CASE NO. 2:21-cv-00307**<br><br>**Hon. Thomas E. Johnston, Chief Judge, Presiding**<br><br><br>**<u>VERIFIED SECOND AMENDED COMPLAINT</u>** |

business in West Virginia,

- **Defendant;**

**Associated Electric & Gas Insurance Services Limited ("AEGIS")**, a Bermuda corporation and an eligible Surplus Lines Insurer in West Virginia, solely to the extent of the remaining proceeds available pursuant to AEGIS insurance policy numbers 010A, 010NJ and 010CNJ providing liability insurance coverage to **Eastern Consolidated Coal Corporation** for its liability to the **Governmental Plaintiff** for all property damages alleged herein arising out of occurrences during the policy period of those policies;

- **Defendant;**

**Century Indemnity Company**, a Pennsylvania corporation and a member company of the Chubb Ltd. Group [as successor to **CCI Insurance Company, as successor to Insurance Company of North America**, as successor to **CIGNA Specialty Insurance Company (**formerly known as **California Union Insurance Company**), **Insurance Company of North America**, and **Pacific Employers Insurance Company (solely as successor to Illinois Union Insurance Company**)] solely to the extent of the remaining proceeds available pursuant to Insurance Company of North America policy numbers ISL 1176, ISL 1330, ISL GO 002701-7, ISL 209166 and XCP 3856, California Union Insurance Company policy number ZCX 00 66 06, and Illinois Union Insurance Company policy number CX020268 providing liability insurance coverage to **Eastern Consolidated Coal Corporation** for its liability to the **Governmental Plaintiff** for all property damages alleged herein arising out of occurrences during the policy period of those policies;

- **Defendant;**

**Columbia Casualty Company**, a Illinois corporation and member company of CNA Financial Corporation, a Delaware corporation,

solely to the extent of the remaining proceeds available pursuant to Continental Casualty Company Policy Numbers RD 9972829 and RDU 9433461 providing liability insurance coverage to **Eastern Consolidated Coal Corporation** for its liability to the **Governmental Plaintiff** for all property damages alleged herein arising out of occurrences during the policy period of those policies;

                                        **- Defendant;**

**First State Insurance Company,** a Delaware corporation and a member company of the Hartford Financial Services Group, Inc., a Connecticut corporation, solely to the extent of remaining proceeds available pursuant to First State Insurance Company policy numbers 928241, 934489, 980061, 980081, and 980591, **and** (as successor in interest to **Royal Indemnity Company**) solely to the extent of remaining proceeds available pursuant to Royal Indemnity Company policy numbers EC 102071, EC 102072, and EC 102073, providing coverage to **Eastern Consolidated Coal Corporation** for its liability to the **Governmental Plaintiff** for all property damages alleged herein arising out of occurrences during the policy period;

                                        **- Defendant;**

**Hartford Accident and Indemnity Company,** a Connecticut corporation and a member company of The Hartford Financial Services Group, Inc., a Connecticut corporation, solely to the extent of remaining proceeds available pursuant to Hartford insurance policy numbers 08 C J31005, 08 C J31014, 08 C J31024, and 08 C J31028 providing coverage to **Eastern Consolidated Coal Corporation** for its liability to the **Governmental Plaintiff** for all property damages alleged herein arising out of occurrences during the policy periods of those policies;

                                        **- Defendant;**

**Hartford Casualty Insurance Company,** an Indiana corporation and a member company of The Hartford Financial Services Group, Inc., a Connecticut corporation, solely to the extent of remaining proceeds available pursuant to Hartford insurance policy number 08 XS 102705 providing coverage to **Eastern Consolidated Coal Corporation** for its liability to the **Governmental Plaintiff** for all property damages alleged herein arising out of occurrences during the policy period of that policy;

- Defendant;

**The Travelers Casualty and Surety Company,** a Connecticut corporation (successor in interest to **Aetna Casualty and Surety Co.**) and a member company of The Travelers Companies, Inc., a Minnesota corporation, solely to the extent of remaining proceeds available pursuant to Aetna Casualty and Surety liability insurance policy numbers 06AL013817SC, 06AL122094SCY 06AL1220SCY, 06AL125194SCY, 06AL127247SRAY, 06AL128702SRAY, 06AL131419SRAY, 06AL133503SRAY, 06AL133534SRA(Y), 06AL133562SRA(Y), 06AL133588SRA, 06AL230021SRA, and 06AL230063SCA providing coverage to **Eastern Consolidated Coal Corporation** for its liability to the **Governmental Plaintiff** for all property damages alleged herein arising out of occurrences during the policy periods of each of those policies;

- Defendant;

**Navigators Management Corporation,** a New York corporation and a member company of The Hartford Financial Services Group, Inc., a Connecticut corporation, solely to the extent of remaining proceeds available pursuant to Navigator Management Corporation liability insurance policy number 85L1159/01 providing liability insurance coverage to **Eastern Consolidated Coal Corporation** for its liability to the **Governmental Plaintiff** for all property damages alleged herein arising out of occurrences during the policy periods;

- **Defendant;**

**Zurich American Insurance Company**, a New York corporation, solely to the extent of remaining proceeds available pursuant to Zurich Insurance Company policy numbers 82-60-827 and 85-49-352 providing coverage to **Eastern Consolidated Coal Corporation** for its liability to the **Governmental Plaintiff** for all property damages alleged herein arising out of occurrences during the policy periods of those policies;

- **Defendant;**

## CERTIFICATE OF SERVICE

I, Michael O. Callaghan, counsel for The County Commission of Fayette County hereby certify that on this 15th day of June, 2022**,** I served a true and accurate copy of **VEREIFIED SECOND SUPPLEMENTAL AND AMENDED COMPLAINT** to all counsel by electronically filing the same with the Clerk of this Court using the CM/ECF system which will send notification of such filing to counsel of record.

*/s/ Michael O. Callaghan*

Michael O. Callaghan, Esq. (WV Bar No. 5509)
Chief Assistant Fayette County Prosecuting Attorney
Environmental & Public Health Protection Unit
c/o NEELY & CALLAGHAN
1337 Virginia Street East
Charleston, WV  25301
Telephone:  (304) 343-6500
Facsimile:  (304) 343-6528
mcallaghan@neelycallaghan.com