**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA**

**CHARLESTON DIVISION**

THE COUNTY COMMISSION OF
FAYETTE COUNTY, WEST VIRGINIA, et al.,

                 Plaintiffs,

v.                                   CIVIL ACTION NO.  2:21-cv-00307

NATIONAL GRID NE HOLDINGS 2 LLC, et al.,

                 Defendants.

**MEMORANDUM OPINION AND ORDER**

Pending before the Court is National Grid NE Holdings 2 LLC's ("National Grid") Motion to Substitute as Defendant in Lieu of Defendants Hanover Insurance Company and Travelers Casualty and Surety Company.  (ECF No. 18.)  For the reasons discussed herein, National Grid's motion is **DENIED**.

*I.      BACKGROUND*

The County Commission of Fayette County, West Virginia (the "County") initiated this action On May 18, 2021.  (ECF No. 1.)  The County then properly filed an Amended Complaint on July 16, 2021.  (ECF No. 31.)  The Amended Complaint alleges violations of the Resource Conservation and Recovery Act, West Virginia common law, and a county-level nuisance ordinance.  (*See id.*)  The County seeks to compel current and former landowners—including National Grid, Eastern Associated Coal LLC ("EAC"), Pardee and Curtain Realty, and Quercus

1

West Virginia—to fund a remediation study and abatement costs related to allegedly contaminated land in the Johnson Fork-Loop Creek Watershed.  (*See id.*)

The Amended Complaint also asserts "direct action" claims against three insurance companies, including Hanover Insurance Company ("Hanover") and Travelers Casualty and Surety Company ("Travelers") (collectively, the "Insurers").[1]  (*Id.* at 149-51).  These direct action claims are based on alleged insurance policies issued to Eastern Associated Coal Corporation ("EACC"), a predecessor of EAC, which is now a defunct subsidiary of Eastern Gas.[2]  (*Id.*) Although the Amended Complaint asserts that all defendants are jointly and severally liable, (*see, e.g.*, *id.* at 10, ¶ 6), it also explicitly states that the Insurers are being sued "solely to the extent of remaining proceeds available" pursuant to certain insurance policies "providing coverage to [EACC] for its liability . . . for all property damages alleged herein[.]"  (*Id.* at 2-3.)

National Grid filed the pending motion to substitute on June 25, 2021.  (ECF No. 18.)  The County filed a Memorandum in Opposition, (ECF No. 34), National Grid filed a Reply, (ECF No. 36), and the County filed a Surreply, (ECF No. 261).  As such, this motion is fully briefed and ripe for adjudication.

## II.     ANALYSIS

### A.  National Grid's Motion

The pending motion to substitute is based on National Grid's alleged obligation to defend and indemnify the Insurers against the direct action claims alleged in this case.  (ECF No. 19 at 15.)  According to National Grid, the Insurers each executed a separate "Confidential Settlement

---

[1] The third insurer, which is not the subject of the pending motion, is Continental Casualty Company ("Continental").
[2] Eastern Enterprises, previously known as Eastern Gas, was the predecessor of KeySpan NE, which was the predecessor of National Grid.  (*See* ECF No. 19 at 5.)  For clarity, the Court will refer to all as "National Grid" in resolving the pending motion.

2

Agreement and Release" in February 2008 (the "2008 Agreements") with National Grid.  (*Id.* at 13.)  The 2008 Agreements purportedly "resolved a 15-year old insurance coverage action in which [National Grid] had sought a defense and indemnification from the Insurers against underlying environmental claims resulting from [its] operation of a former coal tar processing facility in Everett, Massachusetts."  (*Id.* at 5-6.)  National Grid states as follows:

> Pursuant to the two settlement agreements, the Insurers made substantial payments to [National Grid], and obtained a release from [National Grid] from any past, present and future claims and obligations arising out of or relating to the Hanover and Travelers policies issued to [National Grid] (the "Policies"). [National Grid] also agreed to defend, indemnify and hold the Insurers harmless against any and all claims asserted by third parties under or relating to the released Policies, and to request to substitute itself for the Insurers as the proper defendant in the event an indemnifiable claim was asserted against them.

(*Id.* at 6.)

National Grid reports that it has acknowledged that the County's claims against them are "Indemnifiable Claims" under the 2008 Agreements and agreed to defend the Insurers in this action.  (*Id.* at 15.)  Thus, allowing National Grid to substitute for the Insurers is necessary to properly discharge National Grid's obligations under the 2008 Agreements.  (*Id.* at 18.)

Additionally, National Grid urges that it, as the party bearing financial responsibility for the County's claims against the Insurers, should be permitted to control their defense.  (*Id.* at 16.)  According to National Grid, the proposed substitution is "the sensible and efficient course of action, as it will align the defense of the County's claims against those Insurers with the party that bears sole responsibility for any financial obligations that may be imposed on them under whatever

coverage (if any) remains available under the Policies." (*Id.* at 18.)  Further, National Grid avers

that "there is no conceivable prejudice" to the County in allowing substitution.[3]  (*Id.* at 19.)

### B.  *The County's Memorandum in Opposition*

The County offers three arguments on why National Grid's motion should be denied.  (ECF

No. 34 at 3.)  First, the County asserts that the Insurers are properly named defendants pursuant to

a County Ordinance.[4]  (*Id.*)  Thus, the County argues that any contractual indemnity between

National Grid and the Insurers is a private agreement between those parties having no impact on

the County's claims against the Insurers in this litigation.  (*Id.*)  Second, the County claims that

the 2008 Agreements are void pursuant to West Virginia Code § 33-6-21.[5]  (*See id.* at 8.)  Third,

the County alleges that it will be prejudiced by the requested substitution.  (*Id.* at 9.)  The County's

latter two arguments are discussed below.

### C.  *West Virginia Code § 33-6-21*

Section 33-6-21 provides the following:

> No insurance policy insuring against loss or damage through legal liability for the
> bodily injury or death by accident of any individual, or for damage to the property
> of any person, shall be retroactively annulled by any agreement between the insurer
> and the insured after the occurrence of any such injury, death, or damage for which
> the insured may be liable, and any such attempted annulment shall be void.

---

[3] National Grid also argues that "substitution also will promote efficient dispute resolution, by eliminating unnecessary parties with no financial interest at stake."  (ECF No. 19 at 14.)
[4] The Court notes that the propriety of naming Hanover and Traveler as defendants is irrelevant in relation to the requested substitution of parties.  The County apparently recognizes this by acknowledging that this issue "has no bearing on the motion now before the Court" and "may be ripe for a decision herein at some future date."  (ECF No. 34 at 3.)  National Grid agrees that this issue is irrelevant to the pending motion.  (ECF No. 36 at 10.)  As such, the Court will not consider this argument in resolving the pending motion.  The Court also notes that Continental has a pending Motion to Leave to File a Reply Brief, (ECF No. 37), on this issue.  In this motion, Continental also acknowledges that the propriety of the County's direct action need not be decided in order for the Court to rule on National Grid's motion to substitute, but "makes the instant Motion out of the abundance of caution to ensure that it has an opportunity to be heard" on this issue.  (*Id.* at 2.)  Because the Court is not addressing this issue to resolve National Grid's motion to substitute, Continental's Motion to Leave to File a Reply Brief, (ECF No. 37), is **DENIED**.
[5] Both parties cite to West Virginia Code § 36-6-21, which does not exist.

W. Va. Code § 33-6-21.

The Northern District of West Virginia has explained the term "annul" in relation to § 33-6-21:

> Chapter 33 does not define the term "annul." Black's Law Dictionary defines "annul" as "to reduce to nothing." Webster's Third New International Dictionary agrees: to annul is "to reduce to nothing." According to Webster's, to reduce is "to diminish in size, amount, extent, or number." Thus, while "annul" and "reduce" represent related concepts, they are not synonymous.

*W. Virginia Mut. Ins. Co. v. Vargas*, 933 F. Supp. 2d 847, 856 (N.D. W. Va. 2013) (internal citations omitted); *see also* § 19.10 Richard A. Rosen et al., *Settlement of Insurance Coverage Disputes*, Settlement Agreements in Commercial Disputes: Negotiating, Drafting and Enforcement (2d ed. 2021) (explaining that policy buy-back is the broadest release whereby an "insurer's defense and indemnity obligations for any and all past, present, and future claims of any type under the released policies are released," making the policy "void *ab initio*").

Here, the County recounts that "[t]he commercial general liability insurance policies at issue in this case were issued in the 1960's and 1970s," and the alleged injury in the Complaint occurred during that policy period. (ECF No. 34 at 8.) The County then contends that the 2008 Agreements attempt to "retroactively annul the coverage for property damage . . . provided by those liability insurance policies." (*Id.* at 8-9.) As such, the County claims that the 2008 Agreements are void pursuant to West Virginia Code § 33-6-21. (*Id.* at 8.)

Indeed, it appears that the 2008 Agreements did "annul" the Policies. As National Grid acknowledges, the 2008 Agreements released the Insurers from "any past, present and future claims and obligations arising out of or relating to" the Policies. (ECF No. 19 at 6.) Additionally, certain language in the 2008 Agreements, which were filed under seal, make it clear that the

Policies were "reduce[d] to nothing." (*See* ECF Nos. 20-2 and 20-3 at 4 (discussing purpose of release); ECF Nos. 20-2 and 20-3 at 5-6 (defining "claim"); ECF Nos. 20-2 and 20-3 at 6 (defining "Policies").)

In reply, National Grid asserts three arguments as to why § 33-6-21 does not void the 2008 Agreements. These arguments, all of which are unpersuasive, are discussed below.

### 1. Inapplicability

Notably, National Grid argues that § 33-6-21 is inapplicable in the present case. (*See* ECF No. 36 at 12.) Specifically, National Grid points to the plain language of the statute that provides that no insurance policy "shall be retroactively annulled by an agreement between the insurer and ***the insured*** after the occurrence of any such injury . . . for which the ***insured*** may be liable[.]" (*Id.* (emphasis in original).) National Grid contends that "[t]he Hanover and Travelers Policies insured both Eastern Gas and numerous divisions and subsidiaries, including but not limited to EAC's predecessor, [EACC]," and "in the context of policies that insured so many specific entities, the statutory reference to 'the insured' cannot be rewritten to mean 'all insureds' or 'any insured.'" (*Id.*) Instead, National Grid contends that this statutory language "must be construed to refer to the specific insured entity whose liability for a known occurrence has been extinguished by a settlement agreement with its insurer to the detriment of an underlying injured plaintiff." (*Id.* at 13.) Thus, because the County has sued the Insurers to satisfy the alleged liability of EAC, which was not a party to the 2008 Agreements, National Grid asserts that § 33-6-21 does not apply. (*Id.* at 14.)

This argument is flawed for a few reasons. To start, while "insured" is not defined under § 33-6-21, it is generally defined as "[s]omeone who is covered or protected by an insurance

policy." *Insured*, Black's Law Dictionary (11th ed. 2019); *see also* W. Va. Code § 114-14-2 (defining "insured" as "an individual, corporation, association, partnership or other legal entity asserting a right to payment under an insurance policy or insurance contract arising out of the occurrence of the contingency or loss covered by such policy or contract"). This is a broader definition than "named insured" or "primary insured." *See Insured*, Black's Law Dictionary (11th ed. 2019). Thus, "insured" would cover "any insured."

Nevertheless, it seems as if National Grid's argument is that the word "the" means that "the insured" who was a party to the agreement must also be "the insured" who may be liable for the injury. Put another way, National Grid appears to argue that § 33-6-21 is inapplicable because the Insurers are not being sued to satisfy National Grid's liabilities, (ECF No. 36 at 13), and National Grid was "the insured" in terms of the 2008 Agreements. Whereas "neither EACC nor its successor EAC ever entered into any settlement or communication agreement with Hanover or Travelers." (*Id.* at 13-14.)

Yet, while the Supreme Court of Appeals of West Virginia ("WVSCA") has recognized that "a common maxim of statutory construction is that statutes are to be construed so as to give meaning to every word in them," *Hartwell v. Marquez*, 498 S.E.2d 1, 6 (1997) (internal quotations and citations omitted), "another commonly applied rule of statutory construction is that in the construction of a legislative enactment, the intention of the legislature is to be determined, not from any single part, provision, section, sentence, phrase or word, but rather from a general consideration of the act or statute in its entirety," *id.* (internal quotations and citations omitted). The WVSCA has also noted that "it is well-established that in expounding a statute, [the Court] must not be guided by a single sentence or member of a sentence, but look to the provisions of the

7

whole law, and to its object and policy." *Id.* (internal quotations and citations omitted). Thus, focusing solely on the article "the" would be imprudent.

Instead, the Court will look at the entire statute, as well as legislative intent. Unfortunately, this legislative intent must be determined without the benefit of controlling state court precedent or any type of published legislative history. Luckily, at least six other states have almost identical statutes.[6] The highest courts of a few of these states have held that the purpose of such an anti-annulment statute is to protect injured third parties. *See, e.g., Am. Cont'l Ins. Co. v. Steen*, 91 P.3d 864, 871 (Wash. 2004) (explaining that the statute is "to protect the injured and damaged by preventing insureds and insurers from coming together and canceling or rescinding insurance contracts after a potentially covered injury, death, or damage has occurred"); *Chandler v. Valentine*, 330 P.3d 1209, 1213 (Ok. 2014) (stating that the statute's "primary focus is the protection of injured third parties" by "limit[ing] the ability of the parties to an insurance contract to manipulate the term of policy coverage in a way that deprives an injured third party from asserting a claim").

To that extent, National Grid's interpretation would fail to protect an injured third party, at least in the present case. As discussed above, the County has asserted direct action claims against the Insurers based on alleged insurance policies issued to EACC, a predecessor of EAC, "to the extent of remaining proceeds available" pursuant to certain insurance policies "providing coverage to [EACC] for its liability . . . for all property damages alleged herein[.]" (ECF No. 31 at 2-3.) Importantly, some of the insurance policies issued to EACC, which were specifically identified in the Complaint, (*see id.* at 2-3), were annulled under the 2008 Agreements, (*see* ECF Nos. 20-2 at

---

[6] Ariz. Rev. Stat. § 20-1123; Haw. Rev. Stat. § 431:10-227; Ky. Rev. Stat. § 304.20-030; La. Rev. Stat. § 22: 1262; Okla. Stat. tit. 36, § 3625; Wash. Rev. Code § 48.18.320.

6; 20-3 at 6).  That means that, even though EACC was not a party to the 2008 Agreements, multiple insurance policies issued to it, which are subject to this lawsuit, were purportedly annulled by the 2008 Agreements.  Consequently, if § 33-6-21 does not apply simply because EACC was not a party to the 2008 Agreements, the statute would fail to protect injured third parties in this case.

Thus, the Court is unpersuaded by that § 33-6-21 does not apply to the present case.

2.   Knowledge Requirement

National Grid also argues that § 33-6-21 "prohibits retroactive and often collusive annulments of insurance policies, ***after*** an insured defendant and its liability insurer are aware of a claimant's injury, that deprive the injured tort victim of any recovery."  (ECF No. 36 at 11 (emphasis in original).)  From there, National Grid asserts that, at the time of the 2008 Agreements, "none of the parties was aware of the historic property damage occurrences in Fayette County that are the subject of the County's action," and "in fact, the County did not notify National Grid 2 of the legacy environmental damage it alleges in its Amended Complaint until 2019, more than eleven years after the Agreements were executed."  (*Id.*)

While a West Virginia Circuit Court did reason that § 33-6-21 "implies . . . that *public policy* dictates against retroactive policy revision *after notice* of an 'Incident' giving rise to a claim," *In re Pettry v. Mountain State University, Inc.*, No. 11-C-1746 KAN, 2013 WL 8119160, at *9 (W. Va. Cir. Ct. Dec. 17, 2013) (internal citation omitted) (emphasis added), no controlling case law supports National Grid's interpretation, *see Hartwell v. Marquez*, 498 S.E.2d 1, 6 (W. Va. 1997) (stating that W. Va. Code § 33-6-21 proscribes "retroactive annulment of insurance policy after the occurrence of an incident for which the insured may incur liability, impliedly

9

binding insurer as of the date of the accident"); *Farmers Mut. Ins. Co. v. Tucker*, 576 S.E.2d 261, 264 n. 4 (W. Va. 2002) (calling into question "the propriety of the agreement" under § 33-6-21 that waived all coverage under an insurance policy after a potentially covered event occurred); *see also* § 31:49. Steven Plitt et al, *Effect of mutual cancellation and rescission—On vested rights*, Couch on Insurance (June 2022 Update 3d ed.) ("Where the contract of insurance provides for liability to third persons, the insurer and the insured cannot terminate such a contract by their voluntary action to the prejudice of a claimant's rights which have already vested.").

Further, the plain language of the statute does not support National Grid's interpretation. *Lee v. Norfolk S. Ry. Co.*, 802 F.3d 626, 631 (4th Cir.2015) (citation omitted) ("If the plain language is unambiguous, [a court] need look no further.").   The statute simply proscribes retroactively annulling an insurance policy "*after the occurrence* of any such injury, death, or damage for which the insured may be liable."  W. Va. Code § 33-6-21 (emphasis added); *see also Steen*, 91 P.3d at 869 (explaining that "[t]he term 'occurrence' has a general meaning in the context of insurance law well known to legislators," which generally means "an event that gives rise to the legal liability of the insured for which the insurance contract provides coverage").   It does not proscribe retroactively annulling an insurance policy only after the insurer and/or insured know(s) of the occurrence of such event for which the insured may be liable.  Thus, this argument fails.

3.  Policy Considerations

Lastly, National Grid argues that the 2008 Agreements "resolved protracted and expensive coverage litigation that had dragged on for fifteen years."  (ECF No. 36 at 10.)  National Grid also notes that the 2008 Agreements "were negotiated at arms-length and the releases . . . were supported by substantial consideration."  (*Id.* at 10-11.)  Additionally, National Grid contends that

10

unwinding the 2008 Agreements "would be frontally inconsistent with the strong public policy favoring settlement of litigated disputes." (*Id.*)

However, as one court explained, "the public policy favoring settlement does not outweigh the strong public policy of [the anti-annulment statute] to preclude adversely impacting those injured or damaged by environmental occurrences before the settlement agreements were entered into." *Pope Res., LP v. Certain Underwriters at Lloyd's of London*, 494 P.3d 1076, 1098 (Wash. App. 2021). Further, while anti-annulment statutes may "adversely impact the practicality of long tail environmental claim settlements," public policy does not warrant "stranding insured third parties with vested rights solely because they have long tail environmental claims." *Id.* Ultimately, National Grid's policy arguments are not strong enough to overcome the plain language or purpose of § 33-6-21, which has been enacted since 1957. *See Steen*, 91 P3d. at 868 (noting that "[w]hile it is unlikely that the legislature had the particularities" of policies in mind when the statute was enacted, "it has had several decades" to amend the statute and has declined to do so).

At bottom, the validity of the 2008 Agreements is questionable, if nothing else, under West Virginia Code § 33–6–21. *See Tucker*, 576 S.E.2d at 264 n.4. As such, the Court declines to enforce the 2008 Agreements. *Cf. Rollyson v. Jordan*, 518 S.E.2d 372, 380 (W. Va. 1999) ("[A]s a general rule, [courts] enforce[] private agreements between parties, to the extent that such agreements do not conflict with the applicable law."); *see also Griffith v. State of Conn.*, 218 U.S. 572 (1910) (forbidding enforcement of contracts made in violation of statute held valid). Thus, without a proper basis for substitution, National Grid's Motion to Substitute, (ECF No. 18), is **DENIED**.[7]

---

[7] Because the Court declines to enforce the 2008 Agreements under § 33-6-21, it will not address the County's policy arguments in opposition to National Grid's motion.

11

### III.    CONCLUSION

For these reasons, National Grid's Motion to Substitute as Defendant in Lieu of Defendants Hanover Insurance Company and Travelers Casualty and Surety Company is **DENIED**.  (ECF No. 18.)  Further, Continental Insurance Company's Motion to Leave to File a Reply Brief is **DENIED**. (ECF No. 37.)

**IT IS SO ORDERED.**

The Court **DIRECTS** the Clerk to send a copy of this Order to counsel of record and any unrepresented party.

ENTER:        August 1, 2022

THOMAS E. JOHNSTON, CHIEF JUDGE

12