**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA**

**CHARLESTON DIVISION**

THE COUNTY COMMISSION OF
FAYETTE COUNTY, WEST VIRGINIA, et al.,

               Plaintiffs,

v.                               CIVIL ACTION NO.   2:21-cv-00307

NATIONAL GRID NE HOLDINGS 2 LLC, et al.,

               Defendants.

**MEMORANDUM OPINION AND ORDER**

Pending before the Court is National Grid NE Holdings 2 LLC's ("National Grid") Partial Motion to Dismiss.   (ECF No. 43.)   For the reasons discussed below, the motion is **GRANTED IN PART** and **DENIED IN PART**.

*I.      BACKGROUND*

The County Commission of Fayette County, West Virginia (the "County") initiated this action On May 18, 2021.   (ECF No. 1.)   The County properly filed an Amended Complaint on July 16, 2021, (ECF No. 31), and a Second Amended Complaint on June 15, 2022, (ECF No. 499).

This matter arises out of the alleged contamination of the Johnson Fork of Loop Creek Watershed ("Subject Watershed"), which is located entirely within Fayette County, West Virginia. (*See* ECF No. 499 at 33, ¶ 18.)   According to the Second Amended Complaint, from "no later than the late 1920s . . . until at least the mid-1950s," Eastern Gas and Fuel Associates ("EGFA")[1]

---

[1] The Second Amended Complaint details how EGFA eventually became Defendant National Grid Holdings 2 LL.

conducted "extensive coal mining operations throughout the Subject Watershed." (*Id.* at 36-37, ¶ 30.) During these operations, EGFA allegedly created, operated, and maintained "at least five (5) separate, associated piles of coal mining waste," ("CMW"). (*Id.* at 37, ¶ 30.) The County claims that these five piles of CMW were "constructed and maintained without a Liner[2] and without any associated Leachate[3] collection, control or monitoring system[.]" (*Id.* (emphasis omitted).)

Then, from the 1960s until 2003, EGFA's subsidiary, Eastern Associated Coal Corporation ("EACC"),[4] owned and operated the same mining operations. (*See id.* at 41, ¶ 54; 44, ¶¶ 66-69.) Then, from 2003 until 2013, Pardee and Curtain Realty LLC ("Pardee") owned and managed the surface estate within the Subject Watershed, upon which four of the five piles of CMW are located, and "failed or refused to take any action to abate" the five piles of CMW. (*See id.* at 45-46, ¶¶ 70-74.) In 2013, Pardee conveyed its interest in the surface estate to Quercus West Virginia, LLC ("Quercus"), (*id.* at 45-46, ¶ 71), which also "failed or refused to take any action to abate" the five piles of CMW, (*id.* at 47, ¶ 75-77.)

---

EGFA formally changed its name to Eastern Enterprises on April 28, 1989, (ECF No. 499 at 40, ¶ 45.) In 2000, KeySpan Corporation ("KeySpan") "acquired Eastern Enterprises by way of a stock purchase agreement." (*Id.* at ¶ 48.) In 2002, KeySpan merged Eastern Enterprises "into a wholly owned subsidiary of one of its subsidiaries, KeySpan New England, LLC[.]" (*Id.* at ¶ 49.) Then, in 2007, "KeySpan, including KeySpan New England, LLC, merged with, and into, National Grid 8 Inc., a wholly owned subsidiary of National Grid plc." (*Id.* at ¶ 50.) Finally, on April 14, 2008, KeySpan New England, LLC formally changed its name to National Grid NE Holdings 2 LLC," ("National Grid"). (*Id.* at ¶ 51.)

[2] "Consistent with its definition in the West Virginia Solid Waste Management Rule, W. Va. C.S.R. § 33-1-2.68, the term 'Liner' means a continuous layer of natural or manmade materials beneath or on the sides of a surface impoundment, landfill or landfill cell, which restricts the downward or lateral escape of solid waste, any constituents of such waste or leachate and which complies with the W. Va. Solid Waste Management Rule." (ECF No. 499 at 28, ¶ 17(p).)

[3] "Consistent with its definition in federal RCRA Subtitle D regulations, 40 C.F.R. § 257.2, and in the West Virginia Solid Waste Management Rule, W. Va. C.S.R. § 33-1-2.66, the term 'Leachate' means any liquid that has come into contact with, passed through or emerged from Solid Waste and contains soluble, suspended, or miscible materials removed from such waste[.]" (ECF No. 499 at 28, ¶ 17(o).)

[4] Eastern Associated Coal, LLC, a now-dissolved West Virginia Limited Liability Company (formally known as EACC), was a wholly owned subsidiary of EGFA. (ECF No. 499 at 13-14, ¶ 1.)

According to the County, "[c]ontinuously since their original creation," each of the five piles of CMW have discharged[5] and released[6] hazardous substances, hazardous wastes, solid waste, pollutants and contaminants, and leachate into the environment.  (*Id.* at 39, ¶ 43.)  The County alleges that this has caused and continues to cause endangerments to health and the environment.  (*Id.* at 85-86, ¶ 176.)  The County seeks to hold past and present landowners responsible, including National Grid as a successor to EGFA.  (*See generally id.*)  The Second Amended Complaint asserts claims under the Resource Conservation and Recovery Act ("RCRA"); West Virginia Solid Waste Management Act ("WVSWMA"); the Comprehensive Environmental Response, Compensation, and Liability Act ("CERCLA"); Fayette County Comprehensive Public Nuisance Abatement Ordinance ("2018 Ordinance"); and West Virginia common law.  (*See id.* at 3–4.)

National Grid filed the pending Partial Motion to Dismiss on August 6, 2021.  (ECF No. 43.)  The County filed a response, (ECF No. 76), and then a corrected response on September 3, 2021, (ECF No. 77-1).  National Grid filed a reply on September 24, 2021.  (ECF No. 110.)  As such, this motion is fully briefed and ripe for adjudication.[7]

## II.    LEGAL STANDARD

A motion to dismiss for failure to state a claim upon which relief may be granted tests the

---

[5] "The term 'Discharge' means the accidental or intentional spilling, leaking, pumping, pouring, emitting, emptying, or dumping of a Hazardous Waste, Solid Waste, Hazardous Substance, or Leachate into or on any land or water[.]" (ECF No. 499 at 23, ¶ 17(b).)

[6] As used in the Second Amended Complaint, "release[s]" and "disposal[s]" are included in "discharge[s]."  (ECF No. 499 at 23, 30, ¶¶17(c)(w).

[7] The Second Amended Complaint, (ECF No. 499), was filed after the pending partial motion to dismiss, (ECF No. 43), and corresponding briefs were filed.  However, the allegations in the Second Amended Complaint do not materially change the claims which are the subject of the pending partial motion to dismiss, except that Count Ten in the prior complaint, (*see* ECF No. 31), is numbered as Count Eleven in the Second Amended Complaint, (*see* ECF No. 499).  Thus, the parties have stipulated that the Court can rule on National Grid's pending partial motion to dismiss based on the existing motion and memoranda filed by the parties.  (ECF No. 514.)

legal sufficiency of a civil complaint.   Fed. R. Civ. P. 12(b)(6).   A plaintiff must allege sufficient facts, which, if proven, would entitle him to relief under a cognizable legal claim.   *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 554–55 (2007).   A case should be dismissed if, viewing the well-pleaded factual allegations in the complaint as true and in the light most favorable to the plaintiff, the complaint does not contain "enough facts to state a claim to relief that is plausible on its face."   *Id.* at 570.   In applying this standard, a court must utilize a two-pronged approach.   First, it must separate the legal conclusions in the complaint from the factual allegations.   *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).   Second, assuming the truth of only the factual allegations, the court must determine whether the plaintiff's complaint permits a reasonable inference that "the defendant is liable for the misconduct alleged."   *Id.*   Well-pleaded factual allegations are required; labels, conclusions, and a "formulaic recitation of the elements of a cause of action will not do."   *Twombly*, 550 U.S. at 555; *see also King v. Rubenstein*, 825 F.3d 206, 214 (4th Cir. 2016) ("Bare legal conclusions 'are not entitled to the assumption of truth' and are insufficient to state a claim." (quoting *Iqbal*, 556 U.S. at 679)).   A plaintiff's "[f]actual allegations must be enough to raise a right to relief above the speculative level," thereby "nudg[ing] [the] claims across the line from conceivable to plausible."   *Twombly*, 550 U.S. at 555, 570.

### III.   DISCUSSION

The County asserts six claims against National Grid: Count Two (RCRA imminent harm citizens suit); Count Five (nuisance *per se* under the WVSWMA); Count Six (nuisance *per se* under the 2018 Ordinance); Count Seven (enforcement of an order issued pursuant to 2018 Ordinance); Count Nine (abatement of common law nuisance); and Count Eleven (unjust

enrichment).   In the pending partial motion to dismiss, National Grid moves to dismiss Counts Five, Six, Seven, and Eleven.   (ECF No. 44 at 10.)   Each is discussed in turn below.

A.  *Count Five—Nuisance* Per Se *under the WVSWMA*

In West Virginia, "nuisance is a flexible area of the law that is adaptable to a wide variety of factual situations."   *Sharon Steel Corp. v. City of Fairmont*, 334 S.E.2d 616, 621 (W. Va. 1985). "Nuisances may be characterized as either a nuisance *per se* or a nuisance *per accidens*." *Courtland Co., Inc. v. Union Carbide Corp.*, No. 2:19-CV-00894, 2020 WL 5047131, at *11 (S.D. W. Va. Aug. 26, 2020).   A nuisance *per se*, or a nuisance at law, has been generally defined as "an act, occupation, or structure which is a nuisance at all times and under any circumstances, regardless of location or surroundings."   *Duff v. Morgantown Energy Assocs.*, 421 S.E.2d 253, 257 n.8 (W. Va. 1992); *Harless v. Workman*, 114 S.E.2d 548, 548 (W. Va. 1960).   There are varying degrees of strictness with which the term "nuisance *per se*" may be used.   *See Frye v. McCrory Stores Corp.*, 107 S.E.2d 378, 382 (W. Va. 1959) (quoting 66 C.J.S. Nuisances § 9 as follows: "The lawful and proper use of property or conduct of business does not ordinarily create an actionable nuisance, and is never a 'nuisance per se' in the strict sense of that term.").   Still, "a lawful business or a business authorized to be conducted by the government cannot constitute a nuisance *per se*."   *Burch v. Nedpower Mount Storm, LLC*, 647 S.E.2d 879, 892 (W. Va. 2007).

In this case, the County asserts its claim for nuisance *per se* based on alleged violations of the WVSWMA.   (ECF No. 499 at 144–53.)   The WVSWMA was enacted in 1983.[8]   In enacting

---

[8] The WVSWMA was originally codified under West Virginia Code § 20–5F–1, *et seq.   See* Regular Session 1983, Acts of the Legislature of West Virginia, at 932–33, available at https://www.wvlegislature.gov/legisdocs/publications/acts/Acts_1983.pdf (last accessed September 19, 2022) (hereinafter "Regular Session 1983, Acts of the Legislature of West Virginia").   During the 1994 legislative session, the Legislature enacted Chapter 22 in the West Virginia Code, which consolidated, revoked, and renumbered most environmental articles including the WVSWMA.   *Wetzel Cnty. Solid Waste Auth. v. W. Virginia Div. of Nat. Res.*, 62 S.E.2d 349, 351 n.1 (W. Va. 1995).

the WVSWMA, the West Virginia Legislature found that "[u]ncontrolled, inadequately controlled and improper collection, transportation, processing and disposal of solid waste is a public nuisance and a clear and present danger to people," W. Va. Code § 22-15-1(c), and thus established the WVSWMA for the purpose of "establish[ing] a comprehensive program of controlling all phases of solid waste management," *id.* § 22-15-1(a).   To further that purpose, the WVSWMA generally prohibits the establishment and operation of "open dumps."   *See id.* § 22-15-10(a).   An "open dump" is defined as "any solid waste disposal which does not have a permit under this article, or is in violation of state law, or where solid waste is disposed in a manner that does not protect the environment."   W. Va. Code § 22-15-2; *see also* W. Va. Code R. 33-1-2.84 ("'Open Dump' means any solid waste disposal that does not have a permit under W. Va. Code § 22-15-1 et seq., and is not otherwise authorized by an order of the Secretary; or is in violation of state law; or where solid waste is disposed in a manner that does not protect the environment.").   "Solid waste disposal" is defined as "the practice of disposing of solid waste including placing, depositing, dumping, throwing, or causing any solid waste to be placed, deposited, dumped, or thrown."   W. Va. Code § 22-15-2.   In turn, the definition of "solid waste" includes "other discarded materials, including offensive or unsightly matter, solid, liquid, semisolid, or contained liquid or gaseous material resulting from industrial, commercial, mining, or community activities."   *Id.*

Here, the County alleges that the five piles of CMW constitute "open dumps."   (ECF No. 499 at 149.)   The County appears to claim that the contents of the five piles of CMW constitute "solid waste" because they are "discarded materials resulting from mining operations."   (*See id.* at 149, ¶ 307.)   Similarly, the County seems to allege that EGFA engaged in "solid waste disposal" by claiming that EGFA "designed," "constructed," and "created" the piles of CMW by

"discarding" said solid waste on the subject property.   (*See id.* at ¶¶ 307–08.)   Thus, the County asserts that the five piles of CMW constitute "open dumps" because they were created by EGFA's disposal of solid waste, which has never been in compliance with a permit issued pursuant to the WVSWMA, and was done "in a manner that does not protect the environment," as the piles lack liners and leak solid waste and leachate into the land and water.   (*See id.* at 149–51, ¶¶ 307–08, 312.)

Yet, the County does not bring its nuisance *per se* claim based on a violation of § 22-15-10(a)'s prohibition on open dumps.   (*See id.* at 147–53; *see also* ECF No. 77-1 at 17 (stating that the County "is **not** herein asserting against any Defendant, except Defendant Quercus, . . . any direct liability imposed by any provisions of W. Va. Code § 22-15-10").)   Instead, the Second Amended Complaint seeks to hold the Remedial Defendants liable under the preamble of the WVSWMA, W. Va. Code § 22-15-1(c).   (*See* ECF No. 499 at 147–53; *see also* ECF No. 77-1 at 17 (stating that the County "is asserting that once the 'Open Dumps' . . . were declared . . . in W. Va. § 22-15-1(c) to be a Per Se Public Nuisance" National Grid became liable for abatement under "traditional principles" of West Virginia law regarding public nuisances).)   The Second Amended Complaint recalls that, in the preamble to the WVSWMA, the Legislature found that the "*improper . . . disposal of solid waste* is a public nuisance."   W. Va. Code § 22-15-1(c) (emphasis added). Thus, because § 22-15-10(a) prohibits "open dumps," which are defined as "*any solid waste disposal* which does not have a permit under this article, or is in violation of state law, or where solid waste is disposed in a manner that does not protect the environment," *id.* at § 22-15-10(a) (emphasis added), the County asserts that any open dump "constitutes an instance of the

'inadequately controlled and improper (*i.e.*, expressly illegal) disposal of solid waste' within the meaning of W. Va. Code § 22-15(c)(1)," (ECF No. 499 at 147–48, ¶ 305).

Then, the County asserts that the common law doctrine of nuisance dictates liability. (*See id.* at 152, ¶ 316.) According to the County, EGFA is strictly liable for creating the five piles of CMW under the common law of West Virginia. (*Id.* at 151, ¶ 314.) Further, "[b]ecause EGFA created [those piles] prior to 1963," National Grid, "the corporate successor to the pre-1966 remedial liabilities of EGFA . . . is strictly liable[.]" (*Id.* at 151–52, ¶ 315.)

In the pending Partial Motion to Dismiss, National Grid argues that the County cannot bring a claim under the preamble of the WVSWMA.[9] (ECF No. 110 at 7–9.) Conversely, the County insists it can. (ECF No. 77-1 at 14–18.) As discussed more fully below, the preamble of the WVSWMA is not a law that can serve as the foundation of the County's nuisance *per se* claim.

1. National Grid's Partial Motion to Dismiss

The Supreme Court of Appeals of West Virginia ("WVSCA") has held that "[s]tatutory preambles are not part of the enacted law and 'cannot control the enacting part of the statute which is expressed in clear and unambiguous terms.'" *State ex rel. Lorenzetti v. Sanders*, 774 S.E.2d 19, 26 (W. Va. 2015) (quoting *Slack v. Jacob*, 8 W.Va. 612, 628 (1875); *see also White v. Invs.*

---

[9] National Grid originally argued that the County failed to allege a plausible violation of the WVSWMA's prohibition of "open dumps" because the WVSWMA, which was enacted in 1983 and amended in 1988, cannot be retroactively applied to the five piles of CMW which were allegedly created prior to 1966. (ECF No. 44 at 10-15.) In response, the County seemingly agrees that § 22-15-10(a)'s prohibition of open dumps cannot be retroactively applied. (*See* ECF No. 77-1 at 9–10 (stating that, in enacting the WVSWMA, the Legislature created a "comprehensive set of regulatory and permitting requirements, specifically including . . . W. Va. Code § 22-15-10 . . . all of which are . . . prospective only in effect, having legal consequences only with respect to acts, events or conditions occurring on or after the effective date" of the WVSWMA).) However, the County makes it clear that it is not asserting a violation of the WVSWMA's prohibition of open dumps under § 22-15-10(a) of the WVSWMA. (*Id.* at 17.) Instead, the County insists it is asserting a violation of § 22-15-1(c), in which the Legislature found that "[u]ncontrolled, inadequately controlled and improper collection, transportation, processing and disposal of solid waste is a public nuisance." (*Id.*)

*Mgmt. Corp.*, 888 F.2d 1036, 1042 (4th Cir. 1989) (explaining that "[i]t is hornbook law . . . that recitals or preambles in statutes, ordinances, or corporate resolutions are to be looked at . . . only when the language of the enacting language is unclear or ambiguous").   "A preamble may be consulted in some cases to ascertain the intentions of the Legislature. But it is chiefly from the main body the purview of the act, that the will of the Legislature is to be learned; when this is clear and express, the preamble will not avail to contradict it."   Syl. pt. 7, *Slack*, 8 W. Va. at 628.   The Supreme Court of the United States ("Supreme Court") has directed that "the preamble is no part of the act, and *cannot enlarge or confer powers*, nor control the words of the act, unless they are doubtful or ambiguous . . . ."   *Yazoo & M V R Co. v. Thomas*, 132 U.S. 174, 188 (1889); *see also Coosaw Mining Co. v. South Carolina*, 144 U.S. 550, 563 (1892) ("While express provisions in the body of an act cannot be controlled or restrained by the . . . preamble, [it] may be referred to when ascertaining the meaning of a [provision] which is susceptible of different constructions.")

In this case, the language in the WVSWMA's prohibition on open dumps is unambiguous insofar as it only imposes prospective liability:

> Open dumps are prohibited and it is unlawful for any person to create, contribute to, or operate an open dump or for any landowner to allow an open dump to exist on the landowner's property unless that open dump is under a compliance schedule approved by the [Secretary of the West Virginia Department of Environmental Protection] . . . . Open dumps operated prior to April 1, 1988, by a landowner or tenant for the disposal of solid waste generated by the landowner or tenant at his or her residence or farm, are not a violation of this section, if the open dump was not a violation of law on January 1, 1988, and unauthorized dumps which were created by unknown persons are not a violation of this section: Provided, That a person may not contribute additional solid waste to any such dump after April 1, 1988, except that the landowners on which unauthorized dumps have been or are being made are not liable for the unauthorized dumping unless the landowners refuse to cooperate with the division in stopping the unauthorized dumping.

W. Va. Code § 22-15-10(a)

9

In the pending partial motion to dismiss, National Grid argues that this plain language "only prohibits the prospective creation or operation of open dumps," and does "not impose liability on any person who had in the past created, contributed to or operated an open dump." (ECF No. 44 at 13.) The County agrees that § 22-15-10(a) is only prospective in nature. (*See* ECF No. 77-1 at 9–10.) Therefore, because the WVSWMA was not enacted until 1983, the County cannot assert a claim against National Grid under § 22-15-10(a) for the EGFA's alleged dumping that allegedly occurred before 1966.

As such, the Legislative findings in the Preamble cannot be used to "enlarge" § 22-15-10(a)'s prohibition on open dumps by imposing retroactive liability or "confer" a power—*i.e.*, a cause of action—not otherwise included in the WVSWMA itself. *Thomas*, 132 U.S. at 188. Thus, because no violation of the WVSWMA's prohibition of open dumps could have occurred, the Legislature's findings regarding public nuisances, which are not enacted law and thus unenforceable, cannot form the basis of the County's nuisance *per se* claim.[10]

2. The County's Response in Opposition

Still, the County contends that the WVSWMA declares all open dumps wherever and however located to be nuisances *per se*.[11] (*See* ECF No. 77-1 at 6.) In support, the County claims that this Court has previously held that "the mere existence of an 'Open Dump' as defined by the

---

[10] The County also argues that the § 22-15-1(c) is a "remedial" law, which can be applied retroactively, and specifically argues that the rule requiring statutes to be applied prospectively does not apply. (ECF No. 77-1 at 14–18.) However, because the Legislature's findings regarding public nuisances found in the preamble to the WVSWMA are not enacted law and are not enforceable, these arguments are irrelevant.

[11] The County also argues that, because the RCRA prohibits "open dumps," EGFA's alleged disposal of waste was unlawful under federal law. (*See* ECF No. 77-1 at 14.) However, the Second Amended Complaint does not assert a claim against EGFA or National Grid for violating the RCRA's prohibition of "open dumps." (*See* ECF No. 499 at 110–16.) Instead, Count One asserts a claim only against Defendant Quercus West Virginia LLC for "on-going violations of the Open Dumping prohibition" under § 6972(a)(1)(A) of the RCRA, and an analogous provision of the WVSWMA, W. Va. Code § 22-15-10(a). (*Id.*)

WVSWMA is a public nuisance under the WVSWMA 'regardless of when the alleged past dumping occurred' and regardless of the defendant's actual conduct."[12]   (ECF No. 77-1 at 14 (quoting *Courtland Co*, 2020 WL 5047131 at \*12).   The County's reading of *Courtland* is flawed.

In *Courtland*, the plaintiff alleged that the defendant "ha[d] [] stored onsite hazardous toxic chemicals beginning 'no later than 1971'" and "accepted solid waste, hazardous wastes, and other hazardous substances for disposal . . . from the 1950's through the 1980's."[13]   *Id.* at \*1.   Because this allegedly resulted in the "release of toxic, noxious, harmful and hazardous contaminants into the environment," the plaintiff filed a lawsuit, asserting ten causes of action.   *Id.* at \*2.   Of relevance, Count Four sought "judicial abatement of [an] ongoing public nuisance," under common law, and Count Five sought "judicial abatement of [an] ongoing public nuisance *per se*," based on a violation of the WVSWMA.   *Id.*   The defendant moved to dismiss both of these claims, among others.   *Id.*

As to Count Four, the WVSCA first laid out the rules for common law public nuisance. *Id.* at \*9.   Then, the court recalled that the plaintiff alleged that the defendant caused or contributed to the presence of various chemicals in the soil, groundwater, and surface waters.   *Id.*

---

[12] The County also analogizes the WVSWMA to the RCRA and claims that, like Congress, the West Virginia Legislature "clearly and expressly invoked its inherent authority" to "declare" that improper disposal of solid waste is a public nuisance in the preamble to the WVSWMA, located at West Virginia Code § 22-15-1(c).   (*See* ECF No. 77-1 at 10.)   However, the WVSWMA differs from the RCRA in that it does not expressly enumerate a remedy for remediating the effects of past activities.   *Compare* 42 U.S.C. § 6945(b) *with* W. Va. Code § 22-15-1, *et seq*. Additionally, the preamble states the Legislature's clear intent to establish a regulatory scheme.   *See* W. Va. Code § 22-15-1(b).   In fact, this legislative intent was added when the WVSWMA was amended in 1994, whereas the State has declined to amend the WVSWMA to include a remedial scheme for past generators, even though it has had decades to do so.   *See* Regular Session 1983, Acts of the Legislature of West Virginia, at 932–33, available at https://www.wvlegislature.gov/legisdocs/publications/acts/Acts_1983.pdf   (last accessed September 19, 2022). Moreover, the parties in this case agree that the WVSWMA has no retroactive applicability.

[13] The Court also noted that "the waste appears to remain on the property and it is unclear whether [the defendant] has in fact closed its property as a disposal facility[.]"   *Courtland*, 2020 WL 5047131 at \*8 (denying the defendant's argument that plaintiff failed to state a claim under the RCRA for a "current or ongoing" violation because the plaintiff failed to allege any "new" disposal occurred "on or after . . . May 1986").

at *10.   Based on these allegations, the Court found that the plaintiff plausibly alleged a common

law public nuisance because "[t]he alleged contamination of this groundwater, soil, and surface

waters poses a threat to human health and the environment."   *Id.*

In support of Count Five for judicial abatement for a nuisance *per se*, the plaintiff alleged

that the defendant had operated "open dumps," in violation of § 22-15-10(a) of the WVSWMA,

by "collecting, processing, and disposing of both solid waste and hazardous waste without the

required permit and without complying with applicable waste disposal standards[.]"   *Id.* at *12.

The defendant moved to dismiss this claim by arguing that the plaintiffs failed to allege that "open

dumping occurred . . . on or after April 1, 1988," and "that the West Virginia open dumping

provisions do not retroactively apply."   *Id.*   This Court explained that the defendant's argument

that the plaintiffs failed to allege dumping "on or after April 1, 1988 is inapposite" because "[t]hat

time period only applies to waste 'generated by the landowner or tenant at his or her residence or

farm' as an exception to prohibition against open dumps."   *Id.*   Instead, this Court found that the

plaintiff had stated a plausible claim that the defendant violated the WVSWMA's prohibition

against open dumps "[r]egardless of when alleged past dumping occurred," because the plaintiffs

alleged that the defendant "allow[ed] an open dump to exist on its property," that the defendant

"lack[ed] a permit for such an open dump," and that the defendant "ha[d] not complied with state

standards, including a schedule approved by the Secretary of the [WVDEP]."   *Id.*

Contrary to the County's reading, though, this Court did not hold that "the mere existence

of an 'Open Dump' as defined by the WVSWMA is a public nuisance under the WVSWMA."

(ECF No. 77-1 at 14.)   In fact, the plaintiff in *Courtland* did not assert a *per se* public nuisance

claim under the preamble to the WVSWMA.   Instead, the plaintiff asserted a *common law* public

nuisance claim,[14] and a *per se* nuisance claim based on a violation of the WVSWMA's prohibition on open dumps, which allegedly occurred after the WVSWMA was enacted. Further, the Court stated that a nuisance *per se* existed "[r]egardless of when the alleged past dumping occurred," because the April 1, 1988, exception in § 22-15-10(a) was inapplicable to the facts of the case—not because the WVSWMA could be applied retroactively. *Id.*

In this case, there is no question that EGFA's alleged dumping occurred prior to the enactment of the WVSWMA. Unlike the defendant in *Courtland*, which accepted solid and hazardous wastes "though the 1980's," the Second Amended Complaint specifically alleges that EGFA created the five piles of CMW prior to 1966. (ECF No. 499 at 151–52, ¶ 315.) Also, in contrast to the question of whether the defendant in *Courtland* had closed its property as a disposal facility, the Second Amended Complaint explicitly alleges that EGFA ceased mining operations and divested itself of all property by 1966. (*Id.* at 41, ¶ 54.) Therefore, unlike the timeline in *Courtland*, it cannot be said that a nuisance *per se* existed regardless of when the alleged past dumping occurred because the WVSWMA cannot be applied retroactively. Thus, the County's argument based on *Courtland* fails.

Because the preamble to the WVSWMA cannot form the basis of the County's nuisance *per se* claim and the County has failed to allege any other violation of the WVSWMA, the County has failed to state a claim for a nuisance *per se*. Accordingly, Count Five is **DISMISSED** as it relates to National Grid.

*B. Severability Clause*

---

[14] The Court notes that, like the plaintiff in *Courtland*, the County can and, in fact, did assert a common law claim for public nuisance based on the same factual allegations. (*See* ECF No. 499 at 176–80.) However, the County cannot assert a nuisance *per se* claim based on the Legislative findings in the preamble to the WVSWMA.

National Grid moves to dismiss Counts Six, which asserts a claim for nuisance *per se* under the 2018 Ordinance, and Count Seven, which seeks judicial enforcement of an order issued pursuant to the 2018 Ordinance. National Grid argues that Counts Six and Seven should be dismissed by pointing to various provisions in the 2018 Ordinance and arguing that they (1) are *ultra vires*, (2) are preempted, and/or (3) violate due process.

However, it is important to note that Section XXVIII of the 2018 Ordinance states that "[t]he several sections and subsections of this Ordinance are severable, and if any section or subsection hereof shall be held unconstitutional or otherwise invalid, all the remaining sections and subsections of the Ordinance shall nevertheless remain valid." (2018 Ordinance at 85, § XXIII.) "Severability of a local ordinance is a question of state law[.]" *City of Lakewood v. Plain Dealer Publ'g Co.*, 486 U.S. 750, 772 (1988) (citing *Mayflower Farms, Inc. v. Ten Eyck*, 297 U.S. 266, 274 (1936)). To that extent, the WVSCA has indicated that a severability clause in a local ordinance should be given great weight:

> While [a severability clause] is not conclusive, it should be given great, if not controlling, weight in application of the general rule that where part of an act is invalid, that fact does not authorize the courts to declare the other provisions of the Act to be void, unless they are so connected in subject matter, dependent on each other, or otherwise so connected in meaning, that it cannot be presumed that the legislative body would have enacted the one without the other.

*Chesapeake & Potomac Tel. Co. v. City of Morgantown*, 105 S.E.2d 260, 275 (W. Va. 1958) (citing *State v. Edwards*, 122 S.E. 272 (W. Va. 1924)) (discussing a city ordinance).

National Grid does not address this clause in the pending Partial Motion to Dismiss. As such, if some of the sections of the 2018 Ordinance are found to be invalid, they will be severed. However, the severance of some provisions does not necessarily mean that Counts Six and Seven will be dismissed.

C. *Count Six* – Per Se *Public Nuisance under the 2018 Ordinance*

Count Six of the Second Amended Complaint asserts a claim for a *per se* public nuisance, as defined by Section V of the 2018 Ordinance.   (ECF No. 499 at 153–69.)   The County claims that the 2018 Ordinance was enacted pursuant to West Virginia Code §§ 7-1-3ff and 7-1-3kk. (*See* ECF No. 499 at 153–54, ¶ 322.)   In the pending Partial Motion to Dismiss, National Grid moves to dismiss Count Six because the 2018 Ordinance is *ultra vires*[15] and preempted.   (ECF No. 44 at 15–20.)   Each is discussed below.

1.   Preemption

To start, National Grid argues that the West Virginia Groundwater Protection Act ("WVGPA") preempts Sections V(a)(10)(6)(iii) and V(a)(10)(6)(vi) of the 2018 Ordinance, which provide that the release of wastes, contaminants, or pollutants that result in certain levels of iron and manganese in groundwater constitute a public nuisance.   (ECF No. 44 at 19.)   The County does not respond to this argument, (*see generally* ECF No. 77-1), and, as such, has conceded this issue, *see Fields v. King*, 576 F. Supp. 3d 392, 408 (S.D. W. Va. 2021) (collecting cases).   Thus, Sections V(a)(10)(6)(iii) and V(a)(10)(6)(vi) of the 2018 Ordinance are severed.

2.   *Ultra Vires*

County commissions are artificial entities created by state statute, *Butler v. Tucker*, 416 S.E.2d 262 (W. Va. 1992), and "deriv[e] not only some, but all, of their powers from the Legislature," *Booten v. Pinson*, 89 S.E. 985, 989 (W. Va. 1915).   As such, they possess only the powers expressly granted to them by the state constitution or legislature, or necessarily implied

---

[15] "The term 'ultra vires' means beyond the power. It, generally, refers to an act that is beyond the scope of power allowed or granted by a corporate charter, articles of incorporation, bylaw, or law."   *John A. Sheppard Mem'l Ecological Rsrv., Inc. v. Fanning*, 836 S.E.2d 426, 429 (W. Va. 2019) (internal citation omitted).

from those expressly given.  *Tucker*, 416 S.E.2 at 262.   Thus, it is clear that "county commissions 'can only do such things as are authorized by law,' and then only 'in the mode prescribed.'"  *EQT Prod. Co. v. Wender*, 191 F. Supp. 3d 583, 595 (S.D. W. Va. 2016), *aff'd*, 870 F.3d 322 (4th Cir. 2017) (quoting *T. Weston, Inc. v. Mineral Cty.*, 638 S.E.2d 167, 172 (W. Va. 2006)).

Article IX, section 11, of the West Virginia constitution provides, in relevant part, as follows:

> The county commissions . . . shall also, under such regulations as may be prescribed by law, have the superintendence and administration of the internal police and fiscal affairs of their counties . . . . Such commissions may exercise such other powers, and perform such other duties, not of a judicial nature, as may be prescribed by law. . . .

W. Va. Const., Art. IX, § 11.

The final sentence of section 11 has long been held to vest in the state legislature alone the authority to expand the powers of county commissions beyond those laid out in the constitution. *See, e.g.*, *State ex rel. Cty. Ct. of Cabell Cty. v. Arthur*, 145 S.E.2d 34 (W. Va. 1965) ("[I]n determining the powers of the count[ies] . . . we must look to the constitution, which created th[ose] bod[ies], and to the laws which were enacted by the legislature pursuant to the constitutional provisions."); *Barbor v. Cty. Ct. of Mercer Cty.*, 101 S.E. 721 (W. Va. 1920) (same).   As this Court has noted, "[t]he legislature has not been miserly in doing so."  *Wender*, 191 F. Supp. 3d at 595.

Chapter 7 of the state code sets forth powers delegated to county commissions.  *Id.* Specifically, West Virginia Code § 7-1-3kk empowers county commissions with the following authority:

> In addition to all other powers and duties now conferred by law upon county commissions, commissions are hereby authorized to enact ordinances, issue orders

16

and take other appropriate and necessary actions for the elimination of hazards to public health and safety and to abate or cause to be abated anything which the commission determines to be a public nuisance.

W. Va. Code § 7-1-3kk (2002).   In turn, Section 7-1-3ff grants to county commissions the plenary legal authority to enact ordinances regulating the removal and cleanup of any accumulation of refuse or debris, or toxic spillage or toxic seepage located on private lands which is determined by the county commission to be unsafe, unsanitary, dangerous, or detrimental to the public safety or welfare, whether the result of natural or manmade force or effect.   W. Va. Code § 7-1-3ff.

In this case, National Grid argues that Count Six should be dismissed because the County exceeded its statutory authority under §§ 7-1-3kk and 7-1-3ff[16] by declaring certain conditions as nuisances in the 2018 Ordinance that are not otherwise nuisances under established law.   (*See* ECF No. 44 at 15–19.)   National Grid also claims that the 2018 Ordinance does not codify the common law.   (*Id.* at 15.)   Each is discussed below.

i.      Authority to declare a nuisance

The parties first dispute the grant of authority delegated in West Virginia Code § 7-1-3kk. Both parties seem to agree that the County has the authority to enact an ordinance declaring certain conditions nuisances.   (*See* ECF Nos. 44 at 16–17 (recognizing that "a municipality has the power to enact an ordinance declaring some activity or thing to be a nuisance"); 77-1 at 20.)   However, the County insists that § 7-1-3kk permits it to "determine[] [what conditions it deems] to be a public nuisance"—*i.e.*, declare anything a nuisance regardless of whether such a condition would

---

[16] National Grid also asserts that West Virginia Code § 7-1-3ff has no applicability to National Grid because it grants the County the authority to order the removal and cleanup of "refuse . . . or toxic spillage or seepage" only to "the *owner or owners* thereof," and "upon the failure of the *owner or owners* of the private land to perform the ordered duties" to hire a contractor to conduct the work, and National Grid does not own the property at issue.   (ECF No. 44 at 16 n. 12 (citing W. Va. Code § 7-1-3ff(f)(7), (g)) (emphasis in original).)

be a nuisance under any other law.   (*See* ECF No. 77-1 at 20 (citing W. Va. Code § 7-1-3kk) (alterations in original).)   Whereas National Grid contends that this language simply authorizes the County to abate what would be considered a nuisance under common law or statute.   (*See* ECF No. 44 at 16.)   National Grid cites to the WVSCA's decisions in *Parker v. City of Fairmont*, 79 S.E. 660 (W. Va. 1913) and *Sharon Steel*, 334 S.E.2d 616, for support, (*see id.* at 17), which are worth discussing.[17]

In *Parker*, a provision of the charter of the City of Fairmont authorized it "to prevent injury or annoyance to the public or individuals from anything dangerous, offensive or unwholesome; [and] to abate or cause to be abated anything which, in the opinion of a majority of the whole council, shall be a nuisance."   79 S.E. at 661.   Further, a city ordinance provided that, upon a majority vote, the city council could order the abatement of "any out–house, privy, hog–pen, stable or other building."   *Id.*   If the owner did not comply with the abatement order, the mayor could "direct the proper officer of the city" to abate the nuisance by force.   *See id.*

Under these grants of authority, the City of Fairmont declared the plaintiff's dye works business to be a nuisance and ordered that it be torn down because it produced and emitted smoke and soot.   *Id.*   Notably, the city did not involve the courts before seeking to tear down this private property.   *Id.*   The plaintiff filed suit seeking an injunction and argued that the City of Fairmont did not have the authority to interfere with his business.   *Id.*

The WVSCA agreed.   The WVSCA first noted that the plaintiff's business was "not per

---

[17] National Grid also cites to a West Virginia Mass Litigation Panel decision that discusses *Parker and Sharon Steel*. (*See* ECF No. 44 at 17; *see also County Commission of Lincoln County v. West Virginia-American Water Works*, Inc., no. 17C41 LCN, 12 (Kan. Cty. Cir. Ct. Dec. 12, 2018), available at http://www.courtswv.gov/lower-courts/mlp/mlp-orders/water-contamination/OrderGrantingDefendantsMotionstoDismiss17-C-41LCN-12122018.pdf.)   National Grid also cites to 6A McQuillin Mun. Corp. § 24:70 (Third Ed.) for a similar proposition to these cases.   (*See* ECF No. 44 at 17.)

se a nuisance" because neither the charter nor the ordinance "forbid smoke and soot from being produced and emitted." *Id.* at 661. The WVSCA noted "[i]t would seem that under the charter power 'to prevent injury or annoyance to the public or individuals from anything dangerous, offensive or unwholesome,'" the City of Fairmont "could [have] ma[d]e a just and reasonable regulation as to the production and emission of smoke and soot," and "applicable to all alike of the same class and not merely directed toward the property and business of one person," *Id.* However, the city "could not strike directly at plaintiff alone." *Id.*

The WVSCA also clarified that the charter's authorization "to abate or cause to be abated anything which, in the opinion of a majority of the whole council shall be a nuisance," did not authorize the city "to single out and condemn as to any sole individual that which is ordinarily lawful" or "determine that to be a nuisance which is not such by the common law, by statute, or by ordinance." *Id.* Although the charter called for "the majority of the whole council . . . that opinion [was] to be applied in discerning that the thing complained of comes within the categories of nuisances pronounced to be such by law." *Id.* And, although the WVSCA listed "an ordinance" as one of the laws that could pronounce a nuisance, the WVSCA was clear that the "power to abate" did not grant the city the power "to determine what shall be considered a nuisance . . . ." *Id.* Plainly, "[i]t is not reasonable to presume that the Legislature meant to grant such arbitrary power." *Id.* Instead, because the charter granted "a police power of abatement," the city had the power "to abate what the law holds to be a nuisance, not to enact that any particular thing is a nuisance." *Id.* at 661– 62.

Therefore, the WVSCA rejected the City of Fairmont's contention that it can essentially "make the law and enforce it at the same time in individual cases." *Id.* at 662. The WVSCA

recognized that "[i]t may be that smoke and soot from plaintiff's dye shop should be abated," and that the City of Fairmont "had the power to enact laws regulating the production and emission of smoke and soot."   However, "neither the city charter nor any ordinance passed in pursuance thereof warranted the order to abate that business as a nuisance."   *Id.*   Thus, the City of Fairmont could not merely say that a particular "use is in fact a nuisance."   Instead, "[i]t must first say that by general and uniform ordinance."   *Id.*

In this case, the County claims that *Parker* did not, "in any way," determine that the City of Fairmont was without the power to declare things a nuisance and, instead, only instructed that "such declaration" must be by ordinance and not "an arbitrary council decree untethered from any such duly promulgated law[.]"   (ECF No. 77-1 at 20.)   The Court does not necessarily agree. Certainly, the WVSCA was concerned about rogue municipalities, "without any general laws of either the city or of the State," declaring things nuisances on a case-by-case basis, instead of "proceed[ing] uniformly" as to all citizens.   Yet, to hold that a municipality must have an enacted law declaring something a nuisance instead of proceeding on a case-by-case basis is not the same as holding that a municipality can simply enact an ordinance declaring anything it wants a nuisance untethered from any established theory of law.   Further, while it was not an issue in *Parker* because there was no ordinance at all, the WVSCA still seemed concerned about municipalities arbitrarily determining that something is a nuisance that would not be considered such under any other law.   After all, the WVSCA held that the power "to abate and cause to be abated" permits a municipality "to abate what the law holds to be a nuisance, not to *enact* that any particular thing is a nuisance."   *Id.* at 661–62 (emphasis added).   This was made even clearer in *Sharon Steel*.

In *Sharon Steel*, the City of Fairmont enacted an ordinance pursuant to West Virginia Code

20

§ 8-12-5(23), which granted municipalities the power "[t]o provide for the elimination of hazards to public health and safety and to abate or cause to be abated anything which in the opinion of a majority of the governing body is a public nuisance."   334 S.E.2d at 625; W. Va. Code § 8-12-5(23).   The city's ordinance prohibited the permanent disposal of hazardous wastes in the city "as a public nuisance."   *Sharon Steel,* 334 S.E.2d at 618.   The plaintiff, which sought to construct a permanent hazardous waste facility, brought a declaratory action to challenge the ordinance, in part, on the grounds that the City of Fairmont lacked the authority to pass such an ordinance.   *Id.* at 618–19.

The WVSCA disagreed.   Like in *Parker,* the statutory power to "provide for the elimination of hazards to public health and safety" granted the city the power to enact ordinances. *See id.* at 625.   However, the WVSCA "stress[ed]" that the ordinance was "designed to codify the common law of nuisance," because it defined "hazardous wastes," in part, as material which poses a substantial present or potential hazard to human health or the environment.   *Id.* at 625.   As such, the WVSCA "affirm[ed] the power of the City to enact such an ordinance" because "by its terms, under the definition of 'hazardous waste,' a common law nuisance is defined."   *Id.* at 626.

The WVSCA's reasoning in *Sharon Steel* is not to be ignored.   The WVSCA held that a duly enacted ordinance declaring a thing a nuisance was valid because it codified the common law doctrine of nuisance.   If, as the County suggests, a local government has the power to declare anything a nuisance so long as it does so in an ordinance, then why would it matter that the ordinance in *Sharon Steel* codified the common law?   Logically, it is because a local government ordinance declaring something a nuisance that would not otherwise be considered such under any other law poses the same risk as a decree untethered from any duly promulgated law: it "would

place every house, every business, and all the property of the city, at the uncontrolled will of the temporary local authorities."  *See Parker*, 79 S.E. 662 (quoting *Yates v. City of Milwaukee*, 77 U.S. 497 (1870)).

Yet, the County contends that the plain language of § 7-1-3kk "express[ly] provide[s]" that a county can do just that.[18]   (ECF No. 77-1 at 20.)   Principles of statutory interpretation dictate otherwise.   Statutory interpretation starts with "the language of the statute itself."  *United States v. Weaver*, 659 F.3d 353, 356 (4th Cir. 2011).   "If the plain language is unambiguous, [a court] need look no further."  *Lee v. Norfolk S. Ry. Co.*, 802 F.3d 626, 631 (4th Cir.2015) (citation omitted).   A court "determine[s] the 'plainness or ambiguity of statutory language . . . by reference to the language itself, . . . the specific context in which that language is used, and the broader context of the statute as a whole.'"  *Id.* (second and third alterations in original) (quoting *Yates v. United States*, 574 U.S. 528, 237 (2015)).   "A statute is ambiguous if it 'lends itself to more than one reasonable interpretation.'"  *Id.* (quoting *Newport News Shipbuilding & Dry Dock Co. v. Brown*, 376 F.3d 245, 248 (4th Cir.2004)).

The plain language of Section 7-1-3kk only[19] provides that county commissions are

---

[18] The County also notes that West Virginia Code § 7-1-3kk was enacted after the WVSCA's decisions in *Parker* and *Sharon Steel*, thereby seemingly to suggest that the West Virginia Legislature intended to grant municipalities the authority to define nuisances that it was previously lacking.   (*See* 77-1 at 19–20 (noting that the Legislature enacted § 7-1-3kk nine decades after *Parker*).)   However, legislatures tend to be transparent when enacting a statute in response to a court case.   For example, the West Virginia Open and Obvious statute states that "[i]t is the intent and policy of the Legislature that this section reinstates and codifies the open and obvious hazard doctrine in actions seeking to assert liability against an owner, lessee or other lawful occupant of real property to its status prior to the decision of the West Virginia Supreme Court of Appeals in the matter of *Hersh v. E-T Enterprises, Limited Partnership*, 232 W. Va. 305 (2013)."  W. Va. Code § 55-7-8(c).   The absence of such references here undermines any inference that the Legislature enacted § 7-1-3kk with *Parker* and *Sharon Steel* in mind, to the extent the County makes such an argument.

[19] "[I]f the text of the statute evinces "a plain, nonabsurd meaning," then the court should not "read an absent word into the statute."  *Lamie v. United States Trustee*, 540 U.S. 526, 538 (2004); *see also Bates v. United States*, 522 U.S. 23, 29 (1997) (holding that courts should "resist reading words or elements into a statute that do not appear on its face"); *Phillips v. Larry's Drive–In Pharmacy, Inc.*, 647 S.E.2d 920, 927 (W. Va. 2007) ("'[I]t is not for this Court arbitrarily to read into [a statute] that which it does not say."); *State ex rel. Frazier v. Meadows*, 454 S.E.2d 65, 69

22

"authorized to enact ordinances, issue orders and take other appropriate and necessary actions for the elimination of hazards to public health and safety and to abate or cause to be *abated anything which the commission determines to be a public nuisance*."  W. Va. Code § 7-1-3kk (emphasis added).  From this language, it cannot be said that the Legislature "expressly" provided that a county can determine what conditions constitute a nuisance without regard to established law. The legislature could have expressly stated that the purpose of § 7-1-3kk was to grant county commissions the power to determine, in their sole and absolute discretion, whether a condition constitutes a public nuisance. Such a grant of authority would have unambiguously established precisely the boundless authority the County now claims.  However, the absence of such an express grant of authority undermines the County's argument.

Additionally, neither § 7-1-3kk nor Chapter 7 define the term "determine."  Black Law's Dictionary is also unhelpful, as it simply provides that a "determination," (the noun form of "determine") is "[t]he act of deciding something officially."  *Determination, Black's Law Dictionary* (11th ed. 2019).  Thus, the parties' different interpretations are both fairly reasonable, and § 7-1-3kk is ambiguous at best.

To that extent, if a state statute is ambiguous, a federal court "will look to the interpretation by the Supreme Court of Appeals of this State."  *Meeks v. Appalachian Power Co.*, 180 F. Supp. 469, 470–71 (S.D. W. Va. 1960).  In the absence of such judicial construction, the Court must predict how the WVSCA would construe the provision.  *See Liberty Mut. Ins. Co. v. Triangle Indus.*, 957 F.2d 1153, 1156 (4th Cir.1992) (holding that if state law is unclear federal courts must predict the decision of the state's highest court); *see also Wells v. Liddy*, 186 F.3d 505, 527–28

---

(W. Va. 1994) ("Courts are not free to read into the language what is not there, but rather should apply the statute as written.").

(4th Cir.1999); *Brendle v. General Tire & Rubber Co.*, 505 F.2d 243, 245 (4th Cir.1974).   In conducting this analysis, a court may consider "all of the authority that the state high courts would[.]"  *Food Lion, Inc. v. Cap. Cities/ABC, Inc.*, 194 F.3d 505, 512 (4th Cir. 1999) (citing *Commissioner v. Estate of Bosch*, 387 U.S. 456, 465 (1967) (noting that when there is no decision by a state's highest court, federal court must apply what it "find[s] to be the state law after giving 'proper regard' to relevant rulings of other courts of the State")).   Specifically, a court can "consider, among other things, canons of construction, restatements of the law and treatises . . ., recent pronouncements of general rules or policies by the state's highest court . . . or even that court's well considered dicta."  *Liberty Mut. Ins. Co.*, 957 F.2d at 1156.[20]

In this case, neither the WVSCA nor any circuit court have spoken on the meaning of "determine" in § 7-1-3kk.   Nevertheless, section 7-1-3kk's grant of authority is analogous to that granted in *Parker* and *Sharon Steel*.   Like the charter in *Parker*, section 7-1-3kk grants "a police power of abatement" to county commissions.   However, like in *Parker* and *Sharon Steel*, section 7-1-3kk does not grant the County the power "to enact that any particular thing is a nuisance" that would not be considered a nuisance under any other law.  *See Parker*, 79 S.E. at 661–62; *Sharon Steel,* 334 S.E.2d at 626.

Therefore, section § 7-1-3kk does not authorize the County to declare certain conditions a nuisance that would not otherwise be considered such under common law or statute.

ii.   Codification of common law

Next, National Grid argues that the 2018 Ordinance redefines what the common law would

---

[20] At least one reliable treatise does not support the County's interpretation.  *See* 6A McQuillin Mun. Corp. § 24:70 (3d ed.) ("[T]he fact that a particular thing or use is declared a nuisance by an ordinance does not make that thing or use a nuisance, where in fact it is not a nuisance, hence, authority conferred by ordinance is no protection against liability for abating it.").

consider a "nuisance." (ECF No. 44 at 15.) Conversely, the County contends that the 2018 Ordinance codifies a common law nuisance. (*See* ECF No. 77-1 at 22 (arguing that the 2018 Ordinance's "codification" is "entirely consistent with well recognized principles of both state and federal law").) As outlined below, it is plausible that the County attempted to codify a common law nuisance in enacting certain portions of the 2018 Ordinance.

According to the WVSCA, a public nuisance "operates to hurt or inconvenience an indefinite number of persons." *Hark v. Mountain Fork Lumber Co.*, 34 S.E.2d 348, 354 (W. Va. 1945); *see also Sharon Steel*, 334 S.E.2d at 620 (quoting *Hark*, 34 S.E.2d at 354). In other words, a public nuisance is an interference with land use and enjoyment that "affects the general public." *Hark*, 34 S.E.2d at 354. The WVSCA has explained that this definition of a public nuisance is "consistent with the Restatement (Second) of Torts § 821B(1), which defines a public nuisance as 'an unreasonable interference with a right common to the general public.'" *Duff*, 421 S.E.2d at 257 n.6.

Rights common to the general public include the rights of public health, public safety, public peace, public comfort, and public convenience. Restatement (Second) of Torts § 821B(2)(a) (1979). Further, circumstances that may sustain a finding of a public nuisance include, but are not limited to, the following:

> (a) Whether the conduct involves a significant interference with the public health, the public safety, the public peace, the public comfort or the public convenience, or
> (b) whether the conduct is proscribed by a statute, ordinance or administrative regulation, or
> (c) whether the conduct is of a continuing nature or has produced a permanent or long-lasting effect, and, as the actor knows or has reason to know, has a significant effect upon the public right.

*Id.*

In this case, Count Six alleges nuisances under Sections V(a)(5), V(a)(10), V(a)(17), and

V(b) of the 2018 Ordinance.   (ECF No. 499 at 151–64.)   Starting backward, Section V(b) states that "any condition which constitutes a nuisance by statute or common law . . . is declared to constitute a Public Nuisance."   (2018 Ordinance at 24–25, § V(b).)   Section V(a)(17) declares it a nuisance to "knowingly allow[] any illegal activity on, or knowingly permit[] the use for any illegal activity, act, or omission of, any property within Fayette County."   (*Id.* at 24, § V(a)(17).) These provisions seemingly codify the common law doctrine of public nuisance, which includes conduct that is "proscribed by a statute, ordinance or administrative regulation" as a circumstance that may sustain a holding that a public nuisance exists.   Restatement (Second) of Torts § 821B(2)(b).

Next, Section V(a)(10) declares it a nuisance to release or dispose of "any Hazardous Waste, Hazardous Substances, Waste, or Pollutant or Contaminant . . . which causes, creates, or contributes to" various conditions in Fayette County.   (*Id.* at 22 – 23, § V(a)(10) (emphasis omitted).)   Of the listed conditions, Count Six alleges that the Remedial Defendants caused, created, or contributed to elevated levels of iron, manganese,[21] cadmium, arsenic, and beryllium that "may present a significant, adverse impact to the chemical and biological components of the aquatic ecosystem."[22]   (ECF No. 499 at 167, ¶ 348; *see also* 2018 Ordinance at 23, § V(a)(10)(6) (providing maximum levels for iron and manganese which "may present a significant, adverse impact to the chemical, physical, hydrologic, or biological components of any impacted aquatic ecosystems or drinking water source").)   Similarly, Section V(a)(5) declares it a nuisance to

---

[21]  As discussed above, Sections V(a)(10)(6)(iii) and (vi) of the 2018 Ordinance, which list the maximum threshold of iron and manganese in groundwater, are severed.

[22]  Although the common law does not list conditions with such specificity that involve "a significant interference with the public health, the public safety, the public peace, the public comfort," *see* Restatement (Second) of Torts § 821B(2)(a), it also did not specifically identify "hazardous waste," *cf. Sharon Steel*, 334 S.E.2d at 625.   Instead, the important language is the description of the harm any particular act, condition, or use causes.

release "any Hazardous Waste, Hazardous Substance, or Pollutant or Contaminant, or any substance consisting of or containing any Hazardous Waste, Hazardous Substance, or Pollutant or Contaminant, that presents or may present an Imminent and Substantial Endangerment to the Public Health, Safety, Welfare or the Environment," into "any conveyance of a public water supply within Fayette County[.]"   (2018 Ordinance at 22, § V(a)(5) (emphasis omitted).)

Like the ordinance in *Sharon Steel*, these provisions in the 2018 Ordinance identify the public right it is seeking to protect: drinking water sources and public health, safety, welfare, and the environment, respectively.   Also like the ordinance in *Sharon Steel*, the 2018 Ordinance defines hazardous waste as waste that "may cause, or significantly contribute to, an increase in mortality or an increase in serious irreversible, or incapacitating reversible, illness; or (2) pose a substantial present or potential hazard to human health or the Environment when improperly treated, stored, transported, disposed of or otherwise managed[.]"[23]   (*Id.* at 12, § III(u)). Consequently, like the ordinance in *Sharon Steel*, it is plausible that the 2018 Ordinance, by "its terms, under the definition of 'hazardous waste,'" attempted to define a common law nuisance. *Sharon Steel*, 334 S.E.2d at 626.

Thus, because the provisions of the 2018 Ordinance at issue in this case seem to codify the common law doctrine of public nuisance, the County did not exceed its statutory authority in declaring certain acts and conditions nuisances in the 2018 Ordinance.

D.  *Count Seven – Judicial Enforcement of an order issued pursuant to the 2018 Ordinance*

---

[23] National Grid takes great issue with the the word "may" and other qualifying language in the 2018 Ordinance because this language permits the County to "establish liability based upon a mere showing that a condition could potentially have adverse impacts . . . ."   (ECF No. 44 at 17, n.13.)   However, this is analogous to the language that the WVSCA found permissible in *Sharon Steel*.   Further, as discussed below, the County's procedure for establishing liability is generally severed.   As such, this is an issue of little importance for the purposes of whether the 2018 Ordinance codified the common law doctrine of public nuisance.

The 2018 Ordinance authorizes the Fayette County Code Enforcement Agency ("FCCEA") to issue a "Final and Binding Time-Sensitive Abatement Action Order" ("Abatement Order") to any person liable for a public nuisance, as defined by Section V of the 2018 Ordinance, "requiring the timely and competent performance of such Abatement Actions as it deems necessary and proper[.]"  (2018 Ordinance at 54–55, § IX.V(b) (emphasis added).)   The term "Abatement Action" is defined in the 2018 Ordinance as "any Response action, non-exclusively including any Removal Action or Remedial Action, or other activities undertaken to the extent practicable in compliance with the requirements of this Ordinance construed liberally to accomplish its remedial purposes that are or may be necessary or appropriate" in the judgment of the County.   (*See id.* at 2, § III(a).)   Count Seven of the Second Amended Complaint seeks a "judicial order compelling the Remedial Defendants to comply" with the Abatement Order issued pursuant to the 2018 Ordinance, which was purportedly enacted pursuant to West Virginia Code §§ 7-1-3kk and 7-1-3ff.   (ECF No. 499 at 169.)

National Grid moves to dismiss Count Seven because it claims that the 2018 Ordinance dictates the Court's scope of review and alters the standards of issuing injunctive relief, which the County lacks authority to do.   (ECF No. 44 at 20.)   National Grid also argues that the 2018 Ordinance fundamentally alters the rules and procedures that govern nuisance litigation.   (*Id.*) Specifically, National Grid complains that it was not provided the opportunity to present evidence or test the Abatement Order's conclusions at a hearing, and that the 2018 Ordinance "seeks to establish liability based on the possibility of harm and then to shift the burden to the defendant to investigate that possibility."   (*Id.* at 19–20.)   Although National Grid frames these issues as whether the County has the authority to alter "the rules and procedures that govern nuisance

litigation," the real question is whether the County has the statutory authority to take abatement actions before proving that a nuisance exists, *cf. Sharon Steel*, 334 S.E.2d at 625, and whether the County has the statutory authority to seek judicial enforcement of the Abatement Order.[24]

First, the County does not have such authority under § 7-1-3kk.   This section does not lay out any procedures for county commissions to enforce an order issued pursuant to that section. Certainly, the West Virginia legislature explicitly provides such enforcement procedures and/or the power to create "rules of procedure" when it intends to grant such an authority to county commissions.   *See, e.g.*, W. Va. Code § 7-1-3ff.   Further, such authority is not necessarily implied.   Section 7-1-3kk empowers county commissions to "issue orders and take other appropriate and necessary actions for the elimination of hazards to public health and safety and to abate or cause to be abated anything which the commission determines to be a public nuisance." W. Va. Code § 7-1-3kk.   However, in *Sharon Steel*, the WVSCA explained that an analogous

---

[24] The County acknowledges that the 2018 Ordinance "establishes liability for a Release of one or more Hazardous Substances into the environment," and imposes responsibilities on "the liable defendant" to abate the alleged nuisance. (*See* ECF No. 77-1 at 22–23.)   Yet, the County accuses National Grid of mischaracterizing the "remedial provisions" of the 2018 Ordinance.   (*Id.* at 22.)   According to the County, "many other environmental and public health protection laws" establish liability and impose a responsibility on the liable defendant to assess the alleged harm. (*See id.* at 22–23.)   In support, the County cites to two cases analyzing the RCRA.   (*Id.* at 23–24 (discussing *Bayless Inv. & Trading Co. v. Chevron USA, Inc.*, No. 93C704, 1994 WL 1841850, at *3 (D. Ariz. May 25, 1994) and *Lincoln Properties, LTD v. Higgins*, 1993 WL 217429, *16 (E.D.Cal.1993).)   These cases fail to support the County's position, though, because they discuss *the Court's authority* to grant equitable relief.   *See Bayless*, 1994 WL 1841850, at *3 (recognizing the court's authority under § 6972 of the RCRA to "grant affirmative equitable relief to the extent necessary to eliminate any risks posed by toxic wastes," and ordering the defendant "to participate in monitoring, investigating, reporting, and restoring a contaminated parcel of land"); *Lincoln Properties*, 1993 WL 217429, *16 (same).   The County also argues that the Ordinance adheres to the principles set forth in the National Contingency Plan, 40 C.F.R. § 300.430(d), promulgated by the Environmental Protection Agency ("EPA") pursuant to CERCLA. (ECF No. 77-1 at 23.)   Similarly, the County argues that the 2018 Ordinance is modeled upon the process outlined in both CERCLA and the RCRA.   (Id. at 26.)   However, under CERLCA, the EPA has the authority to order a private party to conduct a remedial investigation and feasibility study.   *See* 42 U.S.C. § 9606; 40 C.F.R. § 300.430 (2019). Similarly, the RCRA authorizes the EPA to issue an order requiring a private party to conduct monitoring, testing, analysis, and reporting to determine the nature and extent of hazardous waste at a facility or site.   *See* 42 U.S.C. § 6934.   However, the County does not have such a statutory power under W. Va. Code § 7-1-3kk or 7-1-3ff, as discussed below.

grant of authority—the power "to provide for the elimination of hazards to public health and safety and to abate or cause to be abated anything which in the opinion of a majority of the governing body is a public nuisance," did not "give the municipality the authority to abate the nuisance without first prosecuting the matter in a court."   334 S.E.2d at 625.

Second, the County does not have such authority under § 7-1-3ff.   To start, section 7-1-3ff provides, in pertinent part, that county commissions have the plenary power "to adopt ordinances regulating the removal and clean up of any accumulation of . . . toxic spillage or toxic seepage located on private lands which is determined to be unsafe, unsanitary, dangerous, or detrimental to the public safety or welfare, whether the result of natural or manmade force or effect."   W. Va. Code § 7-1-3ff(b).   In adopting such ordinances, the county commissions must "designate an enforcement agency . . . charged with enforcing the orders of the county commission under this section."   *Id.* § 7-1-3ff(c).   Section 7-1-3ff also states that "[a]ny ordinance adopted pursuant to the provisions of this section shall provide fair and equitable rules of procedure" (1) "to guide the enforcement agency, or its agents," in such investigations, and (2) "for instituting and conducting hearings in the matters before the county commission."   *Id.* § 7-1-3ff(e).

The enforcement agency can issue citations after it has "investigated and determined that any . . . toxic spillage or toxic seepage is unsafe, unsanitary, dangerous, or detrimental to the public safety or welfare and should be repaired, altered, improved, vacated, removed, closed, cleaned, or demolished," which initiates the complaint process.   *See id.* § 7-1-3ff(f)(1).   Once a citation is issued, the county commission must serve "the owner or owners of the private land in question" with a copy of the complaint.   *Id.* § 7-1-3ff(f)(2).   The complaint must include "the findings and recommendations of the enforcement agency," and, if "the owner or owners of the property" do

not file "a written request for a hearing within 10 days . . . an order will be issued by the county commission implementing the recommendations of the enforcement agency."   *Id.* § 7-1-3ff(f)(3).

However, "[i]f the owner or owners of the property" do request a hearing, the county commission must "issue an order" scheduling a hearing within 20 days, whereby "each party has the right to present evidence and examine and cross-examine all witnesses."   *Id.* § 7-1-3ff(f)(4). At this hearing, "[t]he enforcement agency has the burden of proving its allegation by a preponderance of the evidence . . . ."   *Id.* § 7-1-3ff(f)(5).   At the conclusion of the hearing, the county commission must "make findings of fact, determinations, and conclusions of law as to . . . whether there is an accumulation of . . . toxic spillage or toxic seepage on private lands which is determined to be unsafe, unsanitary, dangerous, or detrimental to the public safety or welfare . . . ."   *Id.* §7-1-3ff(f)(6).   Then, "[t]he county commission has authority to order the owner or owners thereof . . . to remove or clean up any accumulation of . . . toxic spillage or toxic seepage within a reasonable time and to impose daily civil monetary penalties on the owner or owners who fail to obey an order."   *Id.* § 7-1-3ff(f)(7).

A party found liable can file an appeal in the circuit court," which must be reviewed "in accordance with the provisions of [West Virginia Code] § 58-3-1 *et seq.*"   *Id.* § 7-1-3ff(f)(8).   On the other hand, if a party found liable does not file an appeal to and simply refuses to comply with the county commission's order, the county commission may hire a contractor to accomplish the ordered repairs, alterations, or improvements or the ordered demolition, removal, or clean up and then file a civil action seeking reimbursement.   *Id.* § 7-1-3ff(g)-(h).

Here, the 2018 Ordinance creates the FCCEA, for the purpose of protecting the public health, safety, welfare and the environment.   (2018 Ordinance at 35, § VII(a).)   The FCCEA can

31

inspect and investigate "such places, conditions, locations, structures, objects or activities" to determine whether any conditions or activities constitute "a Public Nuisance as defined and declared in Section V of this Ordinance or as the same may be defined under state law or other county ordinance." (*Id.* at 36, § VII(c)-(e).) However, that is where the 2018 Ordinance ceases to follow the procedures set forth in § 7-1-3ff.

Once there are "reasonable grounds to believe that a Public Nuisance exists," the 2018 Ordinance authorizes the FCCEA "issue an Order . . . against any Person described in section VI(a) of this Ordinance that is liable with respect to such Public Nuisance, requiring such Person to conduct such monitoring, testing, analysis, and reporting regarding any aspect of such Public Nuisance as the [FCCEA] deems necessary and proper." (*Id.* at 41, § VIII(b).) Persons liable under section VI(a) includes, in part, "[a]ny Person (including any past or present generator, past or present transporter or past or present Owner or Operator of a Facility) that has contributed or is contributing to the past or present" disposal of hazardous waste. (*Id.* at 26, § VI(a)(8).)

Once this order is served, "any Person to whom the Order is issued" has "thirty (30) days" or less "if exigent circumstances" exist, to submit a "detailed proposal for carrying out the required monitoring, testing, analysis, and reporting." (*Id.* at 41, § VIII(b)(1)(B).) After providing an "informal opportunity to confer," the FCCEA can "require such Person to carry out such monitoring, testing, analysis, and reporting in accordance with such proposal," but can also "impose such modifications to the proposal as the [FCCEA] deems necessary and proper . . . ." (*Id.*) If a party does not comply with the FCCEA order, the County can request the Fayette County Prosecuting Attorney to commence a civil action to compel compliance. (*Id.* at 42, § VIII(b)(2)(A).) However, a party deemed liable is not provided an opportunity to challenge the

order through an adjudicatory hearing.  (*Id.* at 45, § VIII(f).)  Instead, if a party "seeks any legal or equitable relief that would as a practical matter have the effect of invalidating, dismissing, staying, quashing (in whole or in part), or modifying all or any part of any [] demand, request, or order," they can only refuse to comply and make any arguments in the civil action brought by the Fayette County Prosecuting Attorney brought against that party.  (*Id.*)

Thus, the 2018 Ordinance diverts from the procedures set forth in § 7-1-3ff in several, substantial ways.  First, section 7-1-3ff grants the county commission—not the enforcement agency—the authority to issue orders.  Second, section 7-1-3ff authorizes county commissions to issue orders against current landowners—not past owners.  Third, section 7-1-3ff authorizes county commissions to issue orders requiring the owners of property to clean up toxic spillage— not orders requiring a party (1) "to submit a 'detailed proposal for carrying out the required monitoring, testing, analysis, and reporting," (2) to engage in any "monitoring, testing, analysis, and reporting," or (3) reimburse the FCCEA for any monitoring, testing, analysis, and reporting.

Further, in contradiction of § 7-1-3ff, the 2018 Ordinance does not provide landowners the opportunity to request a hearing before the county commission during which they could present evidence or cross examine witnesses.  Similarly, the 2018 Ordinance does not permit a party found liable to appeal the decision in circuit court.  Moreover, the 2018 Ordinance purports to allow the County to commence a civil action to enforce an order, whereas section 7-1-3ff only authorizes counties to complete the work necessary and commence a civil action seeking reimbursement for such work.

Consequently, subsections § VIII(b), VIII(b)(1)(B), VIII(b)(2)(A), VIII(f) are severed. Importantly, because the County was without authority to authorize the FCCEA to issue the

Abatement Order, and the County is without authority to file a civil action seeking enforcement of the Abatement Order, Count Seven is **DISMISSED**.[25]

### E.  Count Eleven – Unjust Enrichment

Unjust enrichment is "a species of quasi contract relief." *Gulfport Energy Corp. v. Harbert Priv. Equity Partners, LP*, 851 S.E.2d 817, 823 (W. Va. 2020).  "Unjust enrichment of a person occurs when he has and retains money or benefits which in justice and equity belong to another." *Bright v. QSP, Inc.*, 20 F.3d 1300, 1306 (4th Cir. 1994) (quoting *Dunlap v. Hinkle*, 317 S.E.2d 508, 512 n.2 (W. Va. 1984)). The WVSCA has generally "indicated that if benefits have been received and retained under such circumstance that it would be inequitable and unconscionable to permit the party receiving them to avoid payment therefor, the law requires the party receiving the benefits to pay their reasonable value."[26] *Realmark Devs., Inc. v. Ranson*, 542 S.E.2d 880, 884-85 (W. Va. 2000) (citing *Copley v. Mingo County Board of Education*, 466 S.E.2d 139 (W. Va. 1995).

In the pending partial motion to dismiss, National Grid argues that the County has failed to allege that it conferred any benefit.  (ECF No. 44 at 24.)  In response, the County simply quotes its allegations from the complaint.  (*See* ECF No. 77-1 at 29.)

---

[25] National Grid also argued that the 2018 Ordinance violated due process.  (ECF No. 44 at 22.)  However, because Count Seven is dismissed based on National Grid's *ultra vires* argument, the Court declines to consider this alternative argument.

[26] This Court has previously acknowledged that the WVSCA has arguably provided two formulations of unjust enrichment under West Virginia law.  *See Veolia Es Special Servs., Inc. v. Techsol Chem. Co.*, No. CIV. A. 3:07-0153, 2007 WL 4255280, at *9–10 (S.D. W. Va. Nov. 30, 2007) (calling the *Copley* formulation a "second test" for unjust enrichment).  In the pending partial motion to dismiss, National Grid originally relied on a different formulation, (*see* ECF No. 44 at 24), and in its reply, questions the validity and integrity of the *Copley* formulation, (*see* ECF No. 110 at 22).  Nevertheless, National Grid insists that the County has failed to state a claim under either formulation.  (*Id.*)

The Second Amended Complaint asserts a claim for unjust enrichment against all Remedial Defendants, including National Grid, for alleged costs incurred in connection with the County's investigation and response to the alleged nuisances.   (ECF No. 499 at 184–85.)   Specifically, the Second Amended Complaint alleges that the EFGA "failed or refused to perform or fund the necessary and proper abatement and remedial actions" with respect to the alleged public nuisances, as defined by the 2018 Ordinance.   (*See id.* at 184, ¶ 386.)   Because of these alleged failures or refusals, the County asserts that it had to investigate the nature and extent of those alleged nuisances.   (*See id.* at ¶¶ 387–88.)   And, pursuant to the 2018 Ordinance, the Remedial Defendants have an "obligation to fully fund or perform" these actions based on the Abatement Order.[27]   (*See id.* at 185, ¶ 389.)

However, as National Grid points out, the County failed to plead that it has undertaken any clean-up activities.   (ECF No. 44 at 24; *see generally* ECF No. 499.)   Instead, the only expenditure noted in the Complaint were inspections conducted by Dr. D. Scott Simonton.   (*See id.* at 75–76, ¶¶ 149–50.)   It also appears, from the Second Amended Complaint and terms of the 2018 Ordinance, that the County considers any "technical, legal and other consulting costs" undertaken to compel the Remedial Defendants to abate the alleged nuisance to be an abatement cost for which the Remedial Defendants are liable.   (*See id.* at 188, ¶ H; 2018 Ordinance at 26, § VI, (a)(B).)   Yet, Dr. Simonton's investigation and any legal consulting costs were incurred in

---

[27] The Second Amended Complaint asserts that, pursuant to the 2018 Ordinance, the County served the Remedial Defendants with an Abatement Action Order, which stated, *inter alia*, that each of the Remedial Defendants were liable for the abatement of the alleged nuisance, according to Sections VI and VIII of the 2018 Ordinance.   (ECF No. 499 at 102–08, ¶ 207.)   Section VI declares that any person who contributes to a public nuisance, as defined by Section V, is liable for "timely reimbursement to Fayette County of all Abatement Action Costs incurred or to be incurred by the County with respect to such Public Nuisance[.]"   (*See* 2018 Ordinance at 26, § VI(a)(B).)   Similarly, Section VIII provides that the party responsible for a public nuisance, as defined by Section V, must "timely reimburse Fayette County for Abatement Action Costs incurred and to be incurred[.]"   (*See id.* at 42, § VIII(b)(1)(D).)

order to bring an enforcement action against the Remedial Defendants.   Thus, as National Grid reasons, the County's efforts conferred no benefit on the Remedial Defendants.   (ECF No. 44 at 24.)

Further, the Remedial Defendants' alleged "obligation" to "perform or fund the necessary and proper abatement and remedial actions" arose from the Abatement Order.   However, as discussed above, the issuance of that Abatement Order was *ultra vires*.   Thus, the Remedial Defendants did not have an obligation under the 2018 Ordinance to perform or fund any abatement and remedial actions.

Accordingly, because the County failed to allege a plausible benefit conferred upon the Remedial Defendants, Count Eleven is **DISMISSED**.[28]

### IV.     CONCLUSION

For these reasons, National Grid's Partial Motion to Dismiss is **GRANTED IN PART** and **DENIED IN PART**.   The Court **GRANTS** the motion and **DISMISSES** Counts Five, Seven, and Eleven, but **DENIES** the motion as it relates to Count Six.

**IT IS SO ORDERED.**

The Court **DIRECTS** the Clerk to send a copy of this Order to counsel of record and any unrepresented party.

ENTER:          September 21, 2022

---

[28] National Grid also argued that Count Eleven should be dismissed because it is duplicative, as it is dependent on other claims that provide an adequate remedy.   (ECF No. 44 at 25.)   Because the County's unjust enrichment claim is dismissed for failure to state a claim, the Court declines to consider this alternative argument.

THOMAS E. JOHNSTON, CHIEF JUDGE