**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA**

**CHARLESTON DIVISION**

THE COUNTY COMMISSION OF
FAYETTE COUNTY, WEST VIRGINIA, et al.,

        Plaintiffs,

v.                         CIVIL ACTION NO.   2:21-cv-00307

NATIONAL GRID NE HOLDINGS 2 LLC, et al.,

        Defendants.

**MEMORANDUM OPINION AND ORDER**

Pending before the Court are the parties' cross-motions for summary judgment and partial summary judgment.   (ECF Nos. 984, 986.)   For the reasons explained more fully below, Plaintiff's motion for partial summary judgment is **DENIED**, (ECF No. 986), and Defendant National Grid's motion for summary judgment is **GRANTED**, (ECF No. 984).

### I.   BACKGROUND

The County Commission of Fayette County, West Virginia (the "County") initiated this action on May 18, 2021.   (ECF No. 1.)   The County then properly filed an Amended Complaint on July 16, 2021, (ECF No. 31), and a verified Second Amended Complaint ("SAC") on June 15, 2022, (ECF No. 499).

This matter arises out of the alleged contamination of the Johnson Fork of Loop Creek Watershed ("Subject Watershed"), which is located entirely within Fayette County, West Virginia. (*See* ECF No. 499 at 33, ¶ 18.)   According to the SAC, from "no later than the late 1920s . . . until

1

at least the mid-1950s," Eastern Gas and Fuel Associates ("EGFA")[1] conducted "extensive coal mining operations throughout the Subject Watershed." (*Id.* at 36-37, ¶ 30.) During these operations, EGFA allegedly created, operated, and maintained "at least five (5) separate, associated piles of coal mining waste," ("CMW") (collectively, "gob piles"[2])[3], within the Subject Watershed. (*Id.* at 37, ¶ 30.) The County claims that these gob piles were "constructed and maintained without a Liner[4] and without any associated Leachate[5] collection, control or monitoring system[.]" (*Id.* (emphasis omitted).)

Then, from the 1960s until 2003, EGFA's subsidiary, Eastern Associated Coal Corporation ("EACC"),[6] owned and operated the same mining operations. (*See id.* at 41, ¶ 54; 44, ¶¶ 66-69.) Following that period, from 2003 until 2013, Pardee and Curtain Realty LLC ("Pardee") owned and managed the surface estate within the Subject Watershed, upon which four of the five gob piles are located, and "failed or refused to take any action to abate" the gob piles. (*See id.* at 45-

---

[1] The Second Amended Complaint details how EGFA eventually became Defendant National Grid Holdings 2 LLC. EGFA formally changed its name to Eastern Enterprises on April 28, 1989, (ECF No. 499 at 40, ¶ 45.) In 2000, KeySpan Corporation ("KeySpan") "acquired Eastern Enterprises by way of a stock purchase agreement." (*Id.* at ¶ 48.) In 2002, KeySpan merged Eastern Enterprises "into a wholly owned subsidiary of one of its subsidiaries, KeySpan New England, LLC[.]" (*Id.* at ¶ 49.) Then, in 2007, "KeySpan, including KeySpan New England, LLC, merged with, and into, National Grid 8 Inc., a wholly owned subsidiary of National Grid plc." (*Id.* at ¶ 50.) Finally, on April 14, 2008, KeySpan New England, LLC formally changed its name to National Grid NE Holdings 2 LLC," ("National Grid"). (*Id.* at ¶ 51.)

[2] According to the County, "gob" is an acronym for "garbage of bituminous." (ECF No. 987 at 6, fn. 4) (citing *Va. Elc. & Power Co. v. Bransen Energy, Inc.*, 850 F.3d 645, 651 (4th Cir. 2017).) "Gob piles are piles of waste comprised of coal mixed with mining byproducts." (*Id.*)

[3] The piles are also referred to at times as Abandoned Mine Land Piles ("AML Piles") by the County and National Grid.

[4] "Consistent with its definition in the West Virginia Solid Waste Management Rule, W. Va. C.S.R. § 33-1-2.68, the term 'Liner' means a continuous layer of natural or manmade materials beneath or on the sides of a surface impoundment, landfill or landfill cell, which restricts the downward or lateral escape of solid waste, any constituents of such waste or leachate and which complies with the W. Va. Solid Waste Management Rule." (ECF No. 499 at 28, ¶ 17(p).)

[5] "Consistent with its definition in federal RCRA Subtitle D regulations, 40 C.F.R. § 257.2, and in the West Virginia Solid Waste Management Rule, W. Va. C.S.R. § 33-1-2.66, the term 'Leachate' means any liquid that has come into contact with, passed through or emerged from Solid Waste and contains soluble, suspended, or miscible materials removed from such waste[.]" (ECF No. 499 at 28, ¶ 17(o).)

[6] Eastern Associated Coal, LLC, a now-dissolved West Virginia Limited Liability Company (formally known as EACC), was a wholly owned subsidiary of EGFA. (ECF No. 499 at 13-14, ¶ 1.)

46, ¶¶ 70-74.)   In 2013, Pardee conveyed its interest in the surface estate to Quercus West Virginia, LLC ("Quercus"), (*id.* at 45-46, ¶ 71), which also "failed or refused to take any action to abate" the gob piles.   (*Id.* at 47, ¶ 75-77.)

According to the County, "[c]ontinuously since their original creation," each of the five gob piles have discharged[7] and released[8] hazardous substances, hazardous wastes, solid waste, pollutants and contaminants, and leachate into the environment.   (*Id.* at 39, ¶ 43.)   On May 31, 2019, the County—through its expert Dr. Simonton—extracted eight samples from near the five gob piles.   (ECF No. 986-1, Ex. 4.)   Dr. Simonton's samples detected concentrations of contaminants, including arsenic, beryllium, cadmium, iron, manganese, and/or sulfate.   (*Id.*)

The County alleges that the gob piles have caused and continue to cause endangerment to health and the environment.   (ECF No. 499 at 85-86, ¶ 176.)   The County seeks to hold past and present landowners responsible, including National Grid as a successor to EGFA.   (*See generally id.*)   As pertains to National Grid, the SAC asserts claims under the Resource Conservation and Recovery Act ("RCRA"); West Virginia Solid Waste Management Act ("WVSWMA"); the Comprehensive Environmental Response, Compensation, and Liability Act ("CERCLA"); Fayette County Comprehensive Public Nuisance Abatement Ordinance ("2018 Ordinance"); and West Virginia common law.[9]   (*See id.*, at 117–128; 140–165; 172–181.)   The only remaining claims

---

[7] "The term 'Discharge' means the accidental or intentional spilling, leaking, pumping, pouring, emitting, emptying, or dumping of a Hazardous Waste, Solid Waste, Hazardous Substance, or Leachate into or on any land or water[.]" (ECF No. 499 at 23, ¶ 17(b).)

[8] As used in the SAC, "release[s]" and "disposal[s]" are included in "discharge[s]."   (ECF No. 499 at 23, 30, ¶¶17(c)(w).

[9] Seven of the eleven counts in the SAC were directed at National Grid: Counts Two (RCRA Imminent and Substantial Endangerment); Five (nuisance *per se* per WVSWMA); Six (nuisance *per se* as outlined by the 2018 Ordinance); Nine (abatement of common law nuisance); Ten (recovery of costs pursuant to 2018 Ordinance); and Eleven (unjust enrichment).   The Court has dismissed Counts Five, Seven, and Eleven.   (ECF No. 575, pp. 13, 29, 33–34, 36.)

against National Grid relate to the RCRA, the 2018 Ordinance, and West Virginia common law. (*See* ECF No. 575, pp. 13, 29, 33–34, 36.)

National Grid filed the pending Motion for Summary Judgment on May 17, 2023.   (ECF No. 984.)   The County filed a response on June 7, 2023.   (ECF No. 989.)   National Grid filed a reply on June 21, 2023.   (ECF No. 991.)   As such, this motion is fully briefed and ripe for adjudication.

The County filed the pending Motion for Partial Summary Judgment on May 17, 2023. (ECF No. 986.)   National Grid filed a response on June 7, 2023.   (ECF No. 988.)   The County filed a reply on June 21, 2023.   (ECF No. 993.)   As such, this motion is fully briefed and ripe for adjudication.

## II.   *LEGAL STANDARD*

Rule 56 of the Federal Rules of Civil Procedure governs motions for summary judgment. In pertinent part, this rule states that a court should grant summary judgment if "there is no genuine issue as to any material fact."   Summary judgment should not be granted, however, if there are factual issues that reasonably may be resolved in favor of either party.   *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986).   "Facts are 'material' when they might affect the outcome of the case, and a 'genuine issue' exists when the evidence would allow a reasonable jury to return a verdict for the nonmoving party."   *News & Observer Publ. Co. v. Raleigh–Durham Airport Auth.*, 597 F.3d 570, 576 (4th Cir. 2010).   When evaluating these factual issues, the Court must view the evidence "in the light most favorable to the opposing party." *Adickes v. S. H. Kress & Co.*, 398 U.S. 144, 157 (1970).

"The burden is on the nonmoving party to show that there is a genuine issue of material fact for trial . . . by offering 'sufficient proof in the form of admissible evidence' . . . ."   *Guessous*

4

*v. Fairview Prop. Invs., LLC*, 828 F.3d 208, 216 (4th Cir. 2016).   "This burden may be met by use of the depositions and other discovery materials."   *Barwick v. Celotex Corp.*, 736 F.2d 946, 958 (4th Cir. 1984).   Once the moving party meets its burden, the burden shifts to the non-moving party to "make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."   *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).   Should a party fail to make a sufficient showing on one element of that party's case, the failure of proof "necessarily renders all other facts immaterial."   *Id.* at 323.

"[A] party opposing a properly supported motion for summary judgment may not rest upon mere allegations or denials of his pleading, but must set forth specific facts showing that there is a genuine issue for trial."   *Liberty Lobby*, 477 U.S. at 256.   "The mere existence of a scintilla of evidence" in support of the nonmoving party is not enough to withstand summary judgment; the judge must ask whether "the jury could reasonably find for the plaintiff."   *Id.* at 252.

## III.   DISCUSSION

National Grid moves for summary judgment on Counts Two, Six, Nine, and Ten.   (ECF No. 985.)   The County moves for summary judgment on Counts Six and Nine.   (ECF No. 987.)   Cross-motions for summary judgment are reviewed separately if material facts are in dispute.   *Rossignol v. Voorhaar*, 316 F.3d 516, 523 (4th Cir. 2023).   Here, the material facts underlying the County's claims as to Counts Nine and Six are undisputed—the parties merely dispute the legal significance of those facts and whether the County has met its burden as it pertains to whether there is a common law nuisance or a nuisance *per se*.

### A.   Count II - RCRA Claim

National Grid moves for summary judgment on Count Two of the SAC.   (ECF No. 985 at 21–29.)   Count Two seeks to hold National Grid, as the legal successor to the remedial liabilities

of EGFA, liable under Section 7002(a)(1)(B) of the Resource Conservation and Recovery Act ("RCRA"), codified at 42 United States Code Section 6972(a)(1)(B).   (ECF No. 499 at 117–128, ¶¶ 237–254.)

### (1) Elements of a RCRA Claim

A citizen may bring suit pursuant to 42 United States Code Section 6972(a)(1)(B) "against any person including . . . any past or present generator, past or present transporter, or past or present owner or operator of a treatment, storage, or disposal facility, who has contributed or who is contributing to the past or present handling, storage, treatment, transportation, or disposal of any solid or hazardous waste which may present an imminent and substantial endangerment  to health or the environment."   To prevail on such a claim, a plaintiff must prove: "'(1) that the defendant is a person, including, but not limited to, one who was or is a generator or transporter of solid or hazardous waste or one who was or is an owner or operator of a solid or hazardous waste treatment, storage, or disposal facility; (2) that the defendant has contributed or is contributing to the handling, storage, treatment, transportation, or disposal of a solid or hazardous waste; and (3) that the solid or hazardous waste may present an imminent and substantial endangerment to health or the environment.'"   *Parker v. Scrap Metal Processors, Inc.*, 386 F.3d 993, 1014 (11th Cir. 2004) (quoting *Cox v. City of Dallas*, 256 F.3d 281, 292 (5th Cir. 2001)).

In this case, the focus of the parties' briefing is centered around the third element.   Thus, to survive National Grid's motion for summary judgment, the County needs to point to evidence demonstrating that the gob piles at Johnson Fork "may present an imminent and substantial endangerment to health or the environment."   42 U.S.C. 6972(a)(1)(B).

"The operative word in the statute is the word 'may.'"   *Parker*, 386 F.3d at 1015.   This is "expansive language that confers upon the courts the authority to grant affirmative equitable relief

to the extent necessary to eliminate any risk posed by toxic wastes." *Parker*, 386 F.3d at 1015 (internal quotations omitted). Although broad, "there is a limit to how far the tentativeness of the word *may* can carry a plaintiff." *Crandall v. City & Cty. of Denver Co.*, 594 F.3d 1231, 1238 (10th Cir. 2010) (emphasis in original).

The "term 'endangerment' means a threatened or potential harm, and does not require proof of actual harm." *Parker*, 386 F.3d at 1051. "By combining 'probabilistic' words like may and endanger, Congress signified 'a reasonable prospect of future harm is adequate to engage the gears of [an endangerment claim] so long as the threat is near-term and involves potentially serious harm.'" *Miller v City of Fort Myers*, 424 F.Supp.3d 1136, 1143–44 (M.D. Fla. 2020) (quoting *Me. People's All. & Nat. Res. Def. Council v. Mallinckrodt, Inc.*, 471 F.3d 277, 296 (1st Cir. 2006)).

"The endangerment must also be imminent." *Cox*, 256 F.3d at 300. To be "imminent," there must be a threat for the endangerment "'to occur immediately.'" *Meghrig v. KFC W., Inc.*, 516 U.S. 479, 485 (quoting Webster's New International Dictionary of English Language 1245 (2d ed. 1934)). "[W]aste which 'may present' imminent harm quite clearly excludes waste that no longer presents such a danger." *Meghrig*, 516 U.S. at 485–86. Such language "implies that there must be a threat which is present *now*, although the impact of the threat may not be felt until later." *Id.* (emphasis in original) (quoting *Price v. United States Navy*, 39 F.3d 1011, 1019 (1994)).

Finally, the endangerment also needs to be substantial. "[A]n endangerment is 'substantial' if it is 'serious.'" *Cox*, 256 F.3d at 300. "Courts seldom quantify the necessary level of harm with any precision." *Miller*, 424 F.Supp.3d at 1144 (citing *Simsbury-Avon Pres. Soc'y, LLC v. Metacon Gun Club, Inc.*, 575 F.3d 199, 211 (2d Cir. 2009)). "Instead, substantiality

looks to formulations like where 'there is a reasonable cause for concern that someone or something may be exposed to risk of harm by release, or threatened release, of hazardous substances in the event remedial action is not taken.'" *Miller*, 424 F.Supp.3d at 1144 (quoting *Burlington N. & Santa Fe Ry. V. Grant*, 505 F.3d 1013, 1021 (10th Cir. 2007)). "This risk of harm cannot be 'remote in time, completely speculative in nature, or de minimis in degree.'" *Miller*, 424 F.Supp.3d at 1144 (quoting *Little Hocking Water Ass'n. v. E.I. Du Pont Nemours & Co.*, 91 F.Supp.3d 940, 967 (S.D. Ohio 2015)). "To hold that any amount of pollution that impairs the purity or natural state of some element of the environment *endangers* the environment would be to render the word 'substantial' superfluous, as practically *any* addition of a pollutant into the environment would give rise to liability." *Tri-Realty Co. v. Ursinus College*, 124 F.Supp.3d 418, 455 (E.D. Pa. 2015) (emphasis in original).

"[A]lthough courts consider the totality of the circumstances when evaluating an [imminent and substantial endangerment] claim, evidence regarding the likelihood and degree of human and/or environmental exposure to contamination, along with the risks associated with such exposure, is most likely to assist courts in making endangerment determinations under RCRA." *Tri-Realty Co.*, 124 F.Supp.3d at 444 (E.D. Pa. 2015).

### (2) *The Alleged Harm*

The County alleges that through the acts and omissions of EGFA, National Grid's predecessor, occurring within the Subject Watershed, there has been the release of "[*t*]*oxic*, noxious, harmful, and hazardous contaminants into the subsurface soils, groundwater and surface waters of the **Subject Watershed**." (ECF No. 499 at 10, ¶ 2 (emphasis in original).) Specifically, the County alleges that EGFA and its subsidiary, EACC, operated underground coal

mining operations on the subject property, and in so doing, failed to properly seal seams and portals resulting from the underground coal mining.  (*Id.*)

Beginning in approximately 2018, the Page-Kincaid Public Service District ("Page-Kincaid PSD"), a provider of public drinking water, began reporting that its groundwater supply well located in the Subject Watershed contained allegedly high levels of "toxic contaminants traditionally associated with Acid Mine Drainage."  (ECF No. 499 at 94–95, ¶¶ 199–201.)  As a result, as mentioned above, on May 31, 2019, the County—through its expert Dr. Simonton—collected eight samples from the Subject Watershed to determine the water quality there.  (ECF No. 984-9.)  During the inspection, Dr. Simonton aimed to find possible sources and causes of contamination in the Page-Kincade PSD Public Water Supply.  (*Id.* at 1.)  To do this, Dr. Simonton investigated whether the gob piles in the Subject Watershed were the source of the water contamination.  (*Id.*)

Of the eight samples Dr. Simonton collected, this Court has previously noted that two of the samples (SP1 & SP2) were not tested for inorganics and, by the County's own admission presented "[n]o regulatory violation."  (ECF No. 968 at 10 (citing ECF No. 362-9 at 7).)  Of the remaining six samples, five were tested for inorganics, including arsenic, beryllium, cadmium, iron, manganese, and/or sulfate.  (ECF No. 984-9 at 7.)

Following are the results of the contamination levels from the samples Dr. Simonton collected.  The Court notes that none of the samples were taken from Johnson Fork itself, but from the surrounding seeps upstream.  (*Id.* at Fig. 2.)  (*See* ECF No. 984 at 24; ECF No. 989 at 1.)  First, the SP4 sample contained arsenic at a level of .51 ug/L[10], beryllium at 2.2 ug/L, cadmium at

---

[10] "ug/L" refers to micrograms per liter.

.78 ug/L, iron at .015 mg/L[11], manganese at 3.2 mg/L, and sulfate at 550 mg/L.   (ECF No. 984-9 at tbl. 1.)   Second, the SP5 sample contained arsenic at a level of 3.8 ug/L, beryllium at .23 ug/L, iron at 37 mg/L, and manganese at 5.7 mg/L.   (*Id.*)   Third, the SP6 sample contained sulfate at a level of 97 mg/L.   (*Id.*)   Fourth, the SP7 sample contained beryllium at a level of 3.2 ug/L, cadmium at .31 ug/L, iron at .33 mg/L, and manganese at .34 mg/L.   (*Id.*)   Lastly, the SP8 sample contained arsenic at a level of .49 ug/L, beryllium at 3.1 ug/L, cadmium at .34 ug/L, iron at 1.5 mg/L, and manganese at .39 mg/L.   (*Id.*)   To put these data points from Dr. Simonton and the County into perspective, the following is an explanation of national and West Virginia water quality standards.

Pursuant to federal Clean Water Act guidelines, states establish their own water quality standards.   33 U.S.C. § 1313; 40 C.F.R. § 131.5(a).   In West Virginia, for human health purposes, arsenic is permitted at a level not to exceed 10 ug/L; beryllium is permitted at a level not to exceed 4.0 ug/L; an "X" is provided for cadmium, rather than a numerical value; iron is permitted at a level not to exceed 1.5 mg/L; manganese is permitted at a level not to exceed 1.0 mg/L; and sulfate is not included in the list.   W. Va. St. R. § 47-2-8, App. E, tbl. 1.   By its own admission, the County has conceded that none of the samples gathered by Dr. Simonton on May 31, 2019, from Johnson Fork, violate West Virginia's water quality standards, as set out in W. Va. St. R. §§ 47-2-1 to-9, which includes West Virginia's water standards outlined above.   (ECF No. 984-10 at RFA No. 1.)   *See* W. Va. St. R. § 47-2-8, App. E, tbl. 1; (ECF No. 984-9 at tbl. 1.)   While SP4 and SP5 contain high levels of iron or manganese that exceed West Virginia's water quality standards, SP4 and SP5 were extracted from seeps, to which West Virginia's water quality

---

[11] "mg/L" refers to milligrams per liter.

standards do not apply.   (ECF No. 984-10 at RFA No. 1;) 33 U.S.C. § 1313; 40 C.F.R. § 131.5(a); W. Va. Code § 22-11-3(23).   In case there was speculation as to the latter point, the County does not disagree with this point that National Grid raises.   *See Blankenship v. Necco, LLC*, No.: 2:16-cv-12082, 2018 WL 3581092, at *9 (S.D. W. Va. July 25, 2018) ("The failure to respond to argument raised in a motion . . . can indicate that the non-moving party concedes the point or abandons the claim.").

In addition to the Clean Water Act, Congress enacted the Safe Drinking Water Act ("SDWA") to ensure that "water supply systems serving the public meet minimum national standards for protection of public health."   *Manufactured Housing Inst. v. United States Env't Prot. Agency*, 467 F.3d 391, 400–01 (4th Cir. 2006).   The SDWA is the "primary drinking water regulation" and it includes "maximum contaminant levels" ("MCL(s)") for contaminants that "may have an adverse effect on the health of persons."   *See* 42 U.S.C. §§ 300(f)(1)(B), 300g, 300g-1(b).

MCL means "the maximum permissible level of a contaminant in water which is delivered to any user of a public water system."   42 U.S.C. § 300(f)(3).   MCLs are provided for a variety of inorganics, including arsenic, beryllium, and cadmium, but not iron, manganese, or sulfate.   40 C.F.R. § 141.62(b).   Under the criteria provided, arsenic is permitted at a level not to exceed .010 mg/L (10 ug/L)[12]; beryllium is permitted at a level not to exceed .004 mg/L (4 ug/L); and cadmium is permitted at a level not to exceed .005 mg/L (5 ug/L).   *Id.*   By comparing the MCLs to the data from the samples gathered by Dr. Simonton, it is clear there is no violation.   *Id.*; (ECF No. 984-9

---

[12]  1 mg/L equals 1000 ug/L.

11

at tbl. 1.)   National Grid's expert, Charles A. Menzie, also declared that arsenic, beryllium, and cadmium do not exceed any water standards.   (ECF No. 984-7 at 2–3, ¶¶ 8–9.)

Additionally, the United States Environmental Protection Agency ("USEPA") has adopted "National Secondary Drinking Water Standards," which includes secondary MCLs for fifteen additional substances not provided for in the SDWA, including iron, manganese, and sulfate.   40 C.F.R. § 143.3.   The secondary MCL for iron is .3 mg/L, for manganese it is .05 mg/L, and for sulfate it is 250 mg/L.   *Id.*   The secondary MCLs are "reasonable goals for drinking water quality," but states "may establish higher or lower levels" depending on a variety of factors.   *Id.* The purpose in regulating the contaminants in the list of secondary MCLs is primarily due to "aesthetic qualities relating to the public acceptance of drinking water."   40 C.F.R. § 143.1. However, if these contaminants are found at "considerably higher concentrations" than the levels provided, health implications may exist as well as aesthetic degradation.   *Id.*   West Virginia has adopted these standards by reference.   W. Va. Code St. R. § § 64-3-1.1, 64-3-10.1.3.

SP4, SP5, SP6, or SP7 collected by Dr. Simonton, exceed the secondary MCLs for iron, manganese, or sulfate.   (*See* ECF No. 984-9 at tbl. 1.)   However, as indicated above, these standards are for aesthetic purposes rather than to protect from harm to human health or aquatic life.   40 C.F.R. § 143.1.

Lastly, USEPA has also established a set of MCLs under the RCRA.   *See* 40 C.F.R. pt. 257, App. I.   There are no RCRA MCLs for beryllium, iron, manganese, or sulfate.   (*Id.*)   The RCRA MCL for arsenic is .05 mg/L (50 ug/L) and the RCRA MCL for cadmium is .01 mg/L (10 ug/L).[13]   (*Id.*)   The MCLs promulgated by the RCRA apply to open dumping violations, of which

---

[13] Under the SDWA, the MCL for arsenic is .01 mg/L and the MCL for cadmium is .005 mg/L; however, under 40 C.F.R. pt. 257, App. I, the MCL for arsenic is .05 mg/L and .01 mg/L for cadmium.

the County does not allege National Grid to be in violation.   *See* 40 C.F.R. § 257.1; *The Courtland Co., Inc. v. Union Carbide Corp.*, Nos. 2:18-cv-01230, 2:19-cv-00894, 2:21-cv-00101, 2023 WL 6331069, at \*46, fn. 62 (S.D. W. Va. Sept. 28, 2023).   Nevertheless, by its own admission, the County has admitted that none of the samples gathered by Dr. Simonton on May 31, 2019, violate a MCL under 40 C.F.R. § 257.   (ECF No. 984-11, RFA No. 1.)

In addition to the samples collected by the County, National Grid—through its expert Jimmy D. Bennett, II—collected its own water samples from ten locations in Johnson Fork and its tributaries, and from two locations in Loop Creek above and below its confluence with Johnson Fork.   (ECF No. 984 at 15 (citing ECF No. 984-8 at 1–2, ¶¶ 2–10; ECF No. 984-3 at 5–6, ¶¶ 22–24; ECF No. 984-7 at 3, ¶ 11).)   Samples from all twelve locations were taken on March 22, 2022, and again on July 1, 2022.   (ECF No. 984-8 at 1, ¶ 4; ECF No. 984-3 at 5, ¶ 23.)   The samples were tested for arsenic, beryllium, cadmium, iron, manganese, and sulfate.   (*Id.*)

Of the samples taken by National Grid, none contained any levels of arsenic, beryllium, or cadmium.   (ECF No. 984-8 at 4, ¶ 12; ECF No. 984-3 at 5, ¶ 24.)   Iron and manganese were detected in low levels.   (*Id.*)   According to one of National Grid's experts, one manganese sample did exceed the secondary MCL for finished drinking water at a level of 94.5 ug/L (.0945 ug/L)[14]; however, another sample taken downstream on the same date showed manganese at a level below the secondary MCL at a level of 38.1 ug/L (.0381 mg/L).   (ECF No. 984-3 at 5–6, ¶ 24.)

National Grid's samples were taken from various locations within the Subject Watershed, including the Johnson Fork stream itself.   (ECF No. 984 at 18.)   Alternatively, National Grid asserts, and the County does not deny, that Dr. Simonton's samples were not collected from the

---

[14]  1 ug/L is the equivalent of 0.001 mg/L.

Johnson Fork stream itself, but rather from seeps issuing from or near the five gob piles.   (ECF No. 984 at 24; ECF No. 989 at 1.)   The County asserts their not sampling the stream itself is irrelevant since Dr. Simonton and National Grid's expert, Mr. McCulloch, agree that "water traveling over, through and under the AML Piles flows into Johnson Fork's tributaries, Johnson Fork and its underlying alluvial and shallow bedrock zones."   (ECF No. 984-3 at 2, ¶ 6.) However, that seems to be where their agreement ends as Mr. McCulloch goes on to assert that "the AML Piles are clearly not causing contamination."   (*Id.*)   Despite Mr. McCulloch's assertion, as Dr. Simonton points out, there is an increase in iron and manganese from one of National Grid's upstream samples (JFT5) to one of the downstream samples (JFT3).   (ECF No. 989-1 at 7, ¶ 26.)

An increase between JFT5 and JFT3 is observed in both the March 2022 and July 2022 samples.   (ECF No. 984 at 18–19.)   Yet, even with these increases, all samples are still in compliance with all aforementioned required standards.[15]   (*Id.*)   The iron is also in compliance with the standards promulgated for aquatic life in West Virginia.[16]   W. Va. Code St. R. § 47-2-8, App. E, tbl. 1.   West Virginia imposes no manganese standard or limit for the protection of aquatic life.   *Id.*   To argue its point that the gob piles are causing harm, all the County states is that the samples "show an increase."   (ECF No. 989 at 16, 21–22.)   The County does not even attempt to speculate how such increase is harmful.   The Court cannot find that the waste in the gob piles

---

[15] In March 2022, the iron detected at JFT5 was 74.8 ug/L (.0748 mg/L) and the manganese was detected at 9 ug/L (.009 mg/L).   (ECF No. 984 at 18.)   In March 2022, the iron detected at JFT3 was 105 ug/L (.105 mg/L) and the manganese was detected at 43.9 ug/L (.0439 mg/L).   (*Id.*)   In July 2022, the iron detected at JFT5 was 45.4 ug/L (.0454 mg/L) and the manganese was detected at 8.5 ug/L (.0085 mg/L).   (*Id.* at 19.)   In July 2022, the iron detected at JFT3 was 133 ug/L (.133 mg/L) and the manganese was detected at 94.5 ug/L (.0945 mg/L).   (*Id.*)   The manganese is above the secondary MCL for manganese under USEPA standards.   40 C.F.R. § 143.3.   However, as mentioned, the secondary MCLs are in effect for aesthetic, not health purposes.   40 C.F.R. § 143.1.

[16] In West Virginia, for purposes of protection of aquatic life, iron should not exceed 1,500 ug/L.   WV Code St. R. § 47-2-8, App. E, tbl. 1.

"may present an imminent and substantial endangerment" where the County does not provide any evidence that could support a finding of such endangerment.   While proof of actual harm is not required, there needs to be some "reasonable prospect of future harm" that is imminent.   *Miller*, 424 F.Supp.3d at 1143–44 (quoting *Me. People's All. & Nat. Red. Def. Council*, 471 F.3d at 296); *Parker*, 386 F.3d at 1051.

West Virginia also has promulgated narrative water quality standards.   W. Va. Code St. R. § 47-2-3.   These standards are violated "if wastes discharged from a surface mining operation 'cause . . . or materially contribute to' (1) '[m]aterials in concentrations which are harmful, hazardous or toxic to man, animal, or aquatic life' or (2) a 'significant adverse impact to the chemical, physical, hydrologic, or biological components of aquatic ecosystems.'"   *Sierra Club v. Patriot Min. Co., Inc.*, No. 13-0256, 2014 WL 2404299, at *4 (W. Va., May 30, 2014).   The County argues that the "**ongoing contamination of surface water and groundwater caused by the gob piles violates narrative Water Quality Standards**." (ECF No. 989 at 22 (citing ECF No. 989-1 at 8–11, ¶¶ 28–40) (emphasis in original).)   Yet, the County never offers evidence showing *how* West Virginia's narrative water quality standards are being violated; rather, they rely on conclusory statements by Dr. Simonton that such is true.   By not providing evidence of how the narrative water quality standards are being violated, but simply stating it to be so, no reasonable juror could find that there is a threat of potential harm that is "'near-term and . . . potentially serious.'"   *Miller*, 424 F.Supp.3d at 1143–44 (quoting *Me. People's All. & Nat. Res Def. Council*, 471 F.3d at 296).

Instead of arguing that the sampling by National Grid shows any violations of West Virginia or USEPA water standards, the County—through Dr. Simonton—attempts to show sulfate concentrations detected in some of National Grid's samples are above "background

15

concentrations." (ECF No. 989 at 15–16.)   The West Virginia Department of Environmental Protection uses reference locations to characterize "background environmental conditions." (ECF No. 984-7 at 5, ¶ 17.)   This blanket statement by Dr. Simonton is of the same kind Judge Copenhaver rejected last year in *The Courtland Company*.   2023 WL 6331069, at *58–63 (finding insufficient support for an RCRA imminent and substantial endangerment claim when Dr. Simonton simply stated the detected levels of lead, arsenic, and manganese were above background levels, but did not provide testimony as to whether the contaminants violated West Virginia or USEPA standards).

In *Living Lands, LLC v. Cline*, the court granted the defendant's motion for summary judgement, and in so doing held that the plaintiffs did not "provide enough information to allow a factfinder to conclude the danger of . . . groundwater contamination is either imminent or substantial."   657 F.Supp.3d 831, 849 (S.D. W. Va. 2023).   The plaintiffs in that case relied on reports generated by Dr. Simonton.   *Id.*   The court held that Dr. Simonton's reports contained "conclusory statements that unverified exceedances of contaminants could endanger the environment."   *Id.*   The report alone, without information as to the degree of potential risk of groundwater contamination, was not sufficient information for the court to find that the subject property in that case "present[ed] an imminent and substantial endangerment to health or the environment."   *Id.*

Like in *Living Lands*, the County in this case relies on conclusory statements by Dr. Simonton.   For instance, "**leachate** is being Released [*sic*] from the gob piles into groundwater, Johnson Fork, and its tributaries . . . . And this **leachate** is increasing the concentration of contaminants in Johnson Fork and its tributaries."   (ECF No. 989 at 16 (citing ECF No. 984-3 at 3, 6, ¶¶ 10, 12, 27; ECF No. 989-1 at 5–7, ¶¶ 20–27) (emphasis in original).)   Yet, the County and

Dr. Simonton fail to establish how the alleged increase in "the concentration of contaminants" is harmful.   Just as the County has failed to show how the increase from JFT5 to JFT3 is harmful to human health or the environment or how narrative water quality standards are being violated, the County has also failed to establish how the increase in "the concentration of contaminants" is harmful.   *See generally* discussion *supra* Part A(2).

Further, even if all the contaminants found by the County did exceed MCLs, that alone would not be enough to find "imminent and substantial endangerment."   This is because the "'mere presence' of contaminants, even at high concentrations, is 'alone not enough to constitute an imminent and substantial endangerment.'"   *Lovejoy v. Amcox Oil and Gas, LLC*, No. 2:20-cv-00537, 2022 WL 17566235, at *12 (S.D. W. Va. Dec. 9, 2022) (quoting *Me. People's All. & NRDC v. Mallinckrodt, Inc.*, 471 F.3d 277, 282 (1st Cir. 2006)) (granting defendant's motion for summary judgment as to the imminent and substantial endangerment claim when the only evidence presented by the plaintiff were Dr. Simonton's assertions that "any detectable concentration of contaminants constitutes an 'imminent and substantial endangerment.'"); *see also Simsbury-Avon Preservation Club, Inc. v. Metacon Gun Club, Inc.*, 575 F.3d 199, 211–12 (2d Cir. 2009) (affirming summary judgment for the defendant because the plaintiff's only evidence of an "imminent and substantial endangerment" was "the mere fact that some samples taken from the [defendant's] site may exceed [state] standards.") ; *Miller*, 424 F.Supp.3d at 1146–47 ( 2020) (explaining that "[t]he mere presence of contamination is alone not enough to constitute an imminent or substantial endangerment. This is true even for groundwater—the simple existence of contaminated groundwater does not automatically impel an endangerment claim.")

In this case, like those cited, even if the contaminants exceeded standards, which they do not, Dr. Simonton has not opined as to any toxicological effects that are associated with any of the

detected contaminants.   The "'mere presence' of contaminants," is insufficient to support an "imminent and substantial endangerment" claim.   *Lovejoy*, 2022 WL 17566235, at *12 (quoting *Me. People's All.*, 471 F.3d at 282).

Finally, courts have "rejected groundwater endangerment claims" when there is "no evidence of anyone potentially drinking contaminated water."   *Miller*, 424 F.Supp.3d at 1147.   In *The Courtland Company, Inc.*, Judge Copenhaver declined to find any endangerment when the record was devoid of any evidence that the contaminated groundwater could have potentially been ingested by someone, as the lack of such evidence "eliminate[d] any potential cause for concern to human health."   Nos. 2:18-cv-01230, 2:19-cv-00894, 2:21-cv-00101, 2023 WL 6331069, at *57 (S.D. W. Va. Sept. 28, 2023).

However, the County cannot rely on the Page-Kincaid PSD well in the Subject Watershed that prompted this investigation to show there is an "imminent and substantial endangerment" because the well is no longer in service.   (ECF No. 984-10 at RFA No. 9.)   In fact, the County has admitted "as of now" that it is "unaware of any person(s) in the Johnson Fork-Loop Creek Watershed who is (are) using groundwater as a potable water source."   (*Id.* at RFA No. 6.)   The County has also admitted "as of now" that it is "unaware of any anticipated use of groundwater in the Johnson Fork-Loop Creek watershed as a potable water source."   (*Id.* at RFA No. 7.)   Since the County has not offered evidence that anyone will be ingesting the groundwater, and has instead proven the opposite, the Court follows the above line of cases and rejects the groundwater endangerment claim here.   *Miller*, 424 F.Supp.3d at 1147; *The Courtland Co., Inc.*, 2023 WL 6331069, at *57.

*(3)* *Conclusion as to the RCRA Claim*

The County's concessions that neither USEPA nor West Virginia water standards have been exceeded, along with Dr. Simonton's conclusory statements that lack substantive support, leads to the conclusion that the County has failed to show that contaminants in the Subject Watershed pose an "imminent and substantial endangerment" to health or the environment.   (ECF Nos. 984-11, RFA No. 1; 984-10 at RFA No. 1.)   To find for the County on this claim "would impermissibly enlarge the scope of RCRA to include any speculative prospect of future harm, thereby effectively eliminating the requirement that an endangerment be 'imminent and substantial.'"   *Lovejoy*, 2022 WL 17566235, at *12.   For these reasons, the Court finds that the County's RCRA claim fails as a matter of law, there is no genuine issue of material fact, and National Grid must be awarded summary judgment on the claim.

B.   *Count Nine – Abatement of Common Law Nuisance*

Both National Grid and the County are moving for summary judgment on Count Nine of the SAC.   (ECF Nos. 985 at 29–32; 987 at 14–22.)   Count Nine requests, pursuant to the common law of West Virginia, judicial abatement of a continuing public nuisance.   (ECF No. 499 at 172–176.)

Under West Virginia common law, a public nuisance is "an act or condition that unlawfully operates to hurt or inconvenience an indefinite number of persons."   *The Courtland Co., Inc. v. Union Carbide Corp.*, No. 2:19-CV-00894, 2020 WL 5047131, at *9 (S.D. W. Va. Aug. 26, 2020) (Copenhaver, S.J.) (quoting *Hark v. Mountain Fork Lumber Co.*, 34 S.E.2d 348, 354 (W. Va. 1945)).   A public nuisance is one that affects the general public, whereas a private nuisance affects one person or a limited number of persons.   *Hark*, 34 S.E.2d at 354.   *See also State ex rel. Smith v. Kermit Lumber & Pressure Treating Co.*, 488 S.E.2d 901, 925 (W. Va. 1997) (stating "[a] public

nuisance action usually seeks to have some harm which affects the public health and safety abated."). The Supreme Court of Appeals of West Virginia has recognized that "[n]uisance law has been particularly effective in addressing environmental problems." *State ex. rel. Smith*, 488 S.E.2d at 921 (quoting *Sharon Steel Corp. v. City of Fairmont*, 334 S.E.2d 616, 621 (W. Va. 1985)).

Typically, the proper public official has the duty of vindicating the rights of the public. *Hark*, 34 S.E.2d at 354. Pursuant to West Virginia Code § 7-1-3kk, West Virginia law has vested in the County, the authority to "abate or cause to be abated anything which the commission determines to be a public nuisance." Still, the injury inflicted upon the general public has to be "serious and permanent" and affect "the substance and value of their property." *Curry v. Boone Timber Co.*, 105 S.E.2d 263, 264 (W. Va. 1920). Notably, neither "[d]e minimis contamination levels" nor "well-founded fears that harmful contamination levels exist" constitute a nuisance. *Lovejoy*, 2022 WL 17566235, at *13 (citing *In re Wildwood Litig. V. Amphenol Corp.*, 52 F.3d 499, 503 (4th Cir. 1995) and *Carter v. Monsanto, Co.*, 575 S.E.2d 342, 347 (W. Va. 2002)).

"'Public nuisances always arise out of unlawful acts, and that which is lawful, or is authorized by a valid statute, or which the public convenience imperatively demands, cannot be a public nuisance.'" *Pope v. Edward M. Rude Carrier Corp.*, 75 S.E.2d 584, 589 (W. Va. 1953) (quoting 39 Am.Jur., Nuisances, Section 8). When determining whether a business, lawful in itself, or a particular use of property, is a public nuisance, the test to be employed is the "'reasonableness or unreasonableness of the use of the property in relation to the particular locality involved, and ordinarily such a test to determine the existence of a nuisance raises a question of fact.'" *Duff*, 421 S.E.2d at 257 (W. Va. 1992) (quoting *Sticklen v. Kittle*, 287 S.E.2d 148, Syllabus

20

Point 3 (W. Va. 1981)).   When a nuisance is a prospective or anticipatory one, plaintiffs carry a "heavy burden of proving that harm is reasonably certain to result."   *Duff*, 421 S.E.2d at 263.

For the same aforementioned reasons that the County's RCRA claim fails, so too does its common law public nuisance claim.   Through Dr. Simonton's conclusory statements and lack of evidence, the County has failed to establish that there is any harm or serious and imminent potential harm that is affecting the public as a result of the contamination stemming from the gob piles in the Subject Watershed.   *See* discussion *supra* Part A(2); *The Courtland Co., Inc.*, 2023 WL 6331069, at *108; *Lovejoy*, 2022 WL 17566235, at *13 (granting defendant's motion for summary judgment for a private nuisance claim when the plaintiffs relied on Dr. Simonton's evidence that failed to show any of the contaminants rose to a level of toxicological concern and no person experienced negative health impacts).

For instance, the County states "[t]his ongoing harm and endangerment of natural resources resulting from the gob piles is a significant interference with the Public Welfare, Safety, Comfort and the adequate protection of the Public Environment."   (ECF No. 987 at 19.)   However, yet again, the County fails to substantiate this claim by showing any harm that has occurred or will imminently occur.

Additionally, to try to support its claim, the County relies on the assertion that "the toe of at least one gob pile [Spruce Hollow (Fox) Refuse Pile] presents a threat of substantial personal property loss, injury, or even death, due to its placement in the floodplain and the potential for structural failure and resulting flood risks."   (ECF No. 987 at 20 (citing ECF No. 986-1 at 14, ¶ 30; 18, ¶ 36; Ex. 3, p. 015).)   Contrary to National Grid's belief, while a floodplain theory under RCRA was not brought against them, the relevant facts here were alleged in the "Factual Allegations Common to All Counts" section of the SAC.   (ECF No. 499 at pp. 71, 74, ¶¶ 147–48,

153.)   To supports its assertion, the County provided documentation from the United States Department of the Interior ("DOI").   (ECF No. 986-1 at Ex. 3.)   The DOI report states that "no evidence of stream blockage" was found.   (*Id.* at p. 015.)   The report further states that "[t]he creek channel at the toe of the refuse pile appears to have been slightly altered, leaving still a large unblocked drainage channel area. Should frequent heavy rainfalls occur the refuse pile embankment could slide and block Spruce Hollow Creek causing damning impoundment to occur. The failure of the impoundment would most likely cause substantial personal property loss and even injury or death."   (*Id.*)

When it comes to prospective nuisances, to order abatement, "'*the danger must be impending and imminent* and *the effect certain, not resting on hypothesis or conjecture, but established by conclusive evidence.*'"   *Duff*, 421 S.E.2d 253, 258 (quoting *Chambers v. Cramer*, 38 S.E.691, 693) (emphasis in original).   *See also The Courtland Co., Inc.*, 2023 WL 6331069, at *54–55 (rejecting the plaintiff's RCRA floodplain open dumping violation claim when the plaintiff and Dr. Simonton presented no evidence that restriction on the flow and reduction of the floodplain's storage capacity has resulted in hazard to the environment or human health.)

Here, the "refuse piles" were established around the 1950s.   (ECF No. 986-1 at Ex. 3, p. 015.)   The County has provided no evidence that the harm it fears will occur has occurred, or come close to occurring, in these last seventy-plus years.   Moreover, the harm the County fears is speculative, not certain.   The County relies on what "could" happen upon the occurrence of another event that "could [be] create[d]."   (ECF No. 993 at 7.)   The County has failed to establish this prospective nuisance by "*conclusive evidence*"; therefore, the County has not met the requisite burden.   *Duff*, 421 S.E.2d 253, 258 (quoting *Chambers v. Cramer*, 38 S.E.691, 693) (emphasis in original).

In an attempt to save its claim, the County once again tries to rely on the West Virginia Solid Waste Management Act ("WVSWMA") to establish a public nuisance.  (ECF No. 987 at 17.)  Specifically, the County urges the Court to find as strong evidence for a public nuisance the Legislative Findings that "solid waste disposal has inherent risks and negative impact on local communities and specifically finds the following: (1) Uncontrolled, inadequately controlled and improper collection, transportation, processing and disposal of solid waste is a public nuisance and a clear and present danger to people."  W. Va. Code § 22-15-1(c).  This Court has previously ruled in this case that "the Legislature's findings regarding public nuisances" are "not enacted law and thus unenforceable."  (ECF No. 575 at 10.)  Therefore, just as the statute could not be relied upon by the County for a nuisance *per se* claim, so too can it not be relied on here.  (*Id.*)

Since the County has not established that there is a common law public nuisance to abate, National Grid cannot be held strictly liable for the acts of its successor, EGFA, to abate such. Therefore, the claim fails as a matter of law, there are no genuine issues of material fact, and National Grid is awarded summary judgment as to Count Nine.

### C.  Count Six - Nuisance Per Se as Declared by the 2018 Ordinance

Both the County and National Grid move for summary judgment on Count Six, which seeks abatement of a continuing nuisance *per se* under the 2018 Ordinance.  (ECF Nos. 499 at 149–165; 985 at 32-33; 987 at 22–30.)

In West Virginia, "nuisance is a flexible area of the law that is adaptable to a wide variety of factual situations."  *Sharon Steel Corp*, 334 S.E.2d at 621 (W. Va. 1985).  Nuisances may be characterized as either a nuisance *per se* or a nuisance *per accidens*.  "A nuisance *per se*, or a nuisance at law, has been generally defined as 'an act, occupation, or structure which is a nuisance at all times and under any circumstances, regardless of location or surroundings.'"  *Cnty.*

23

*Commission of Fayette Cnty. v. Nat'l Grid NE Holdings 2 LLC*, 2:21-cv-00307, 2022 WL 4459475, at *3 (S.D. W. Va. Sept. 21, 2022) (quoting *Duff*, 421 S.E.2d at 257 n.8 (W. Va. 1992); *Harless v. Workman*, 114 S.E.2d 548, 548 (W. Va. 1960)).   "There are varying degrees of strictness with which the term 'nuisance *per se*' may be used."   *Id.* (citing *Frye v. McCrory Stores Corp.*, 107 S.E.2d 378, 382 (W. Va. 1959) (quoting 66 C.J.S. Nuisances § 9)).

Chapter Seven of the West Virginia State Code sets forth powers delegated to county commissions.   *EQT Prod. Co. v. Wender*, 191 F.Supp.3d 583, 595 (S.D. W. Va. 2016).   West Virginia Code § 7-1-3kk empowers county commissions with the following authority:

> In addition to all other powers and duties now conferred by law upon county commissions, commissions are hereby authorized to enact ordinances, issue orders and take other appropriate and necessary actions for the elimination of hazards to public health and safety and to abate or cause to be abated anything which the commission determined to be a public nuisance.

Section 7-1-3ff of the West Virginia Code grants plenary legal authority to county commissions to enact ordinances regulating the removal and cleanup of any accumulation of refuse or debris, or toxic spillage or toxic seepage located on private lands which is determined by the county commission to be unsafe, unsanitary, dangerous, or detrimental to the public safety or welfare, whether the result of natural or manmade force or effect.   This Court has previously found that the County is within the bounds of its statutory authority so long as the 2018 Ordinance codifies the common law doctrine of public nuisance.   (ECF No. 575 at 27.)

While the County possesses the authority to enact the 2018 Ordinance, that does not mean the County is "relieved of its burden to show that the activity or thing is in fact a nuisance when it seeks to enforce its ordinance."   *Sharon Steel*, 334 S.E.2d at 625 (W. Va. 1985) (holding that while a city ordinance declared permanent disposal of hazardous wastes to be a public nuisance, whether a given site was a public nuisance remained a question of fact).   *See Parker v. City of*

*Fairmont*, 79 S.E. 660, 661 (W. Va. 1913) (finding a provision in a city ordinance could not be construed "to mean that council may determine that to be a nuisance which is not such by the common law, by statute, or by ordinance. It gives power to abate nuisance, not to determine what shall be considered nuisances.").

In this case, Count Six alleges National Grid have committed a nuisance *per se* under Sections V(a)(5), V(a)(10), V(a)(17), and V(b) of the 2018 Ordinance.   (ECF No. 499 at 151–64.) Section V(b) states that "any condition which constitutes a nuisance by statute or common law . . . is declared to constitute a Public Nuisance."   (ECF No. 1-1 at 24–25, § V(b).)   Section V(a)(17) declares it a nuisance to "knowingly allow[] any illegal activity on, or knowingly permit[] the use for any illegal activity, act, or omission of, any property within Fayette County."   (*Id.* at 24, § V(a)(17).)   Finally, Section V(a)(10) declares it a nuisance to release or dispose of "any Hazardous Waste, Hazardous Substances, Waste, or Pollutant or Contaminant . . . which causes, creates, or contributes to" various conditions in Fayette County.   (*Id.* at 22–23, § V(a)(10) (emphasis omitted).)

Additionally, the County relies on statutory language declaring that "[o]pen dumps are prohibited and it is unlawful for any person to create, contribute to, or operate an open dump" to support its nuisance *per se* argument.   W. Va. Code § 22-15-10(a).    This Court has already rejected such an argument by finding the WVSWMA does not apply retroactively, and therefore, cannot be asserted against National Grid for EGFA's dumping that occurred before 1966.[17]   (ECF No. 575 at 10, 13.)   *See also The Courtland Co., Inc.*, 2023 WL 6331069, at *108.

---

[17] As stated in the prior order, "because the WVSWMA was not enacted until 1983, the County cannot assert a claim against National Grid under § 22-15-10(a) for the EGFA's alleged dumping that allegedly occurred before 1966." (ECF No. 575 at 10.)

Like dominoes, as one count falls in this case, so do the others.   Since the County failed to prove common law nuisance, which the 2018 Ordinance codifies, and since the County cannot rely on the WVSWMA, it follows that there is no genuine issue of material fact and the nuisance *per se* claim must also fail as a matter of law.

### D.  Count Ten - Recovery of Costs by the County Pursuant to the 2018 Ordinance

Lastly, National Grid is moving for summary judgment on Count Ten of the SAC.   (ECF Nos. 499 at 176–180; 985 at 33–35.)   Count Ten of the SAC seeks reimbursement pursuant to West Virginia Code § 7-1-3-ff(h)(4) for "**(1)** all costs incurred by Fayette County with respect to its Response to conditions at and emanating from the real property within the Subject Watershed at issue herein; and **(2)** all reasonable attorneys' fees and court costs incurred in connection with the prosecution of this civil action."   (ECF No. 499 at 179–180) (emphasis in original.)

West Virginia Code Section 7-1-3ff(h) provides, in pertinent part,

> [a] civil proceeding may be brought in circuit court by the county commission against the owner or owners of the private land or other responsible party that the subject matter of the order of the county commission to subject the private land in question . . . (3) to order and decree that the contractor may enter upon the private land in question at any and all times necessary to . . . removal or clean up; and (4) to order the payment of all costs incurred by the county with respect to the property and for reasonable attorney fees and court costs incurred in the prosecution of the action."

W. Va. Code § 7-1-3ff(h)(3)–(4).   The 2018 Ordinance permits the County to recover "Abatement Action Costs and damages."   (ECF No. 1-1 at 77–79.)   "Abatement Action Costs" include "any fees and costs incurred and to be incurred by Fayette County . . . [that] are necessary or proper in performing or preparing to perform an **Abatement Action**, and . . . include . . . costs for expert assistance in health, law, engineering, geology, and environmental science, expert witness services and legal fees."   (*Id.* at 4 (emphasis in original).)

The County "has the burden of proving its allegation by a preponderance of the evidence and has the duty to go forward with the evidence."   W. Va. Code § 7-1-3ff(f)(5).   Importantly, if a plaintiff is unable to prove the underlying legal claims, then the plaintiff is unable to obtain the relief they are seeking.   *Cnty. Commission of Fayette Cnty. v. Gadsden*, 2:22-cv-00441, 2023 WL 2405367, at *5–6 (S.D. W. Va. Mar. 8, 2023).

Here, the County has failed to establish the underlying claims that would give rise to recovering costs under either the 2018 Ordinance or West Virginia Code.   Therefore, Count Ten fails as a matter of law.   As a result, there is no genuine issue of material fact and summary judgment as to Count Ten is awarded to National Grid.

## IV.   CONCLUSION

The County has failed to produce any evidence substantiating their claims remaining against National Grid.   Therefore, the County's motion for partial summary judgment is **DENIED**, (ECF No. 986), and National Grid's motion for summary judgment is **GRANTED**, (ECF No. 984).[18]   The County's remaining claims (Count Two, Count Six, Count Nine and Count Ten) against National Grid are **DISMISSED WITH PREJUDICE**.

**IT IS SO ORDERED.**

The Court **DIRECTS** the Clerk to send a copy of this Order to counsel of record and any unrepresented party.

---

[18] The County also filed objections to certain evidence submitted in support of National Grid's Memorandum in Support of its Motion for Summary Judgment.   (ECF No. 990 (objecting to evidence cited in ECF No. 985).)   Since none of the evidence the County objected to was relied upon by the Court in forming this analysis, the objections are overruled as moot.   (ECF No. 990.)

ENTER:          March 20, 2024

_____
THOMAS E. JOHNSTON, CHIEF JUDGE